

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

KEVIN SO,                                )
                                         )
          Plaintiff,                     )
                                         )
v.                                       )
                                         )
                                         )   Case No. _____
LAND BASE LLC,                           )
                                         )
UNIVEST FINANCIAL SERVICES, INC.,        )
                                         )
BORIS LOPATIN, individually and          )
d/b/a   BORIS LOPATIN ASSOCIATES,        )
                                         )
and                                      )
                                         )
CHARLES W. WOODHEAD,                     )
                                         )
          Defendants.                    )

## COMPLAINT

Plaintiff, Kevin So ("Kevin So" or "Mr. So"), by its counsel Kalbian Hagerty LLP, states

the following for his claims against Defendants Land Base LLC ("Land Base"), Boris Lopatin,

individually and d/b/a Boris Lopatin Associates (Defendants Land Base and Lopatin shall be

referred to collectively as "Lopatin" or "the Lopatin Defendants"), Charles W. Woodhead, and

Univest Financial Services, Inc. ("Univest") (collectively, "Defendants").

### I. Nature of the Case

1.      This action arises from the fraud perpetrated by Defendants Land Base and

Lopatin, acting in concert with various non-party co-conspirators, through a conspiracy wherein

these Defendants intended to and did steal millions of dollars from unsuspecting investors like

the Plaintiff. Acting in concert, the Lopatin Defendants each played a role in what amounted to a sophisticated Ponzi scheme that left a trail of deceit from California to London to Hong Kong.

## II. Parties

2. Plaintiff Kevin So is a non-resident of the United States, a citizen of the People's Republic of China, and a resident of Hong Kong. Mr. So is a successful businessman and CEO of Guangdong Arche Cosmetics Co. Ltd., which is principally in the business of manufacturing cosmetic products.

3. Defendant Land Base is a Nevada limited liability company, duly registered to do business in the State of California, with its California office at 1431 Ocean Avenue, Suite 1210, Santa Monica, California 90401. Upon information and belief, the principal place of business of Land Base is in California. Upon further information and belief, Land Base is in the business of private placement projects administered by asset exchanges, which are purportedly used to finance infrastructure projects throughout the world.

4. Defendant Univest is a corporation organized under the laws of the State of California, having its principal place of business at 1504 Eureka Road, Suite 390, Roseville, California 95661. Upon information and belief, Univest's primary business objective was to finance Proprietary Media, Inc., which was in the business of providing public relations and marketing advice to aquariums and zoos.

5. Defendant Lopatin is an adult individual over the age of 18 years and a resident of California. He is one of two principals of Land Base. On information and belief, the elaborate scheme described in this Complaint was Lopatin's brainchild.

6. Defendant Woodhead is an adult individual over the age 18 years and a resident of California. He is one of two principals of Land Base.

### III.    Jurisdiction and Venue

7.    Jurisdiction is vested in this Court under 28 U.S.C. §1332(a)(2).  The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the action is between citizens of different states and citizens or subjects of a foreign state in that Plaintiff Kevin So is a citizen of China, and, upon information and belief, Defendant Land Base is a citizen of Nevada, and Defendants Univest and Lopatin are citizens of California.

8.    Venue is proper pursuant to 28 U.S.C. §1391, because Defendants Univest and Land Base are registered to do business in California.  Additionally, Land Base maintains its office in the Central District of California.  Upon information and belief, Defendants Lopatin, and Woodhead are residents of California.  Additionally, Defendants Lopatin and Woodhead are officers and principals of Defendant Land Base.

### IV.    Facts Common to All Counts

#### A.    The Fraudulent Scheme

9.    At issue in this case is a sophisticated cabal, by which the Lopatin Defendants stole millions of dollars from Plaintiff.

10.    In or around December 2004, the Lopatin Defendants developed a scheme whereby they, along with non-party Keith Millar ("Millar"),[1] would entice wealthy investors to deposit money into accounts to be managed by supposed bond-trader and non-party co-conspirator, Michael Brown.  Kevin So was one such investor.

---

[1]    Upon information and belief, Mr. Millar is a Canadian citizen.  As of the filing of this Complaint, Plaintiff is unaware of facts that might give this Court jurisdiction over Mr. Millar.  However, should such facts arise during the pendency of this litigation, Plaintiff intends to seek leave to amend the Complaint to include causes of action against Millar.

11.     Brown utilized various business entities he formed to assist with the perpetration of the scheme, including, *inter alia*, 5th Avenue Partners Limited, Devonshire Capital Limited, Lamberhurst Developments Limited, and 5th Avenue Partners GMBH.   Specifically, Brown utilized bank accounts opened in the names of these various entities to facilitate financial transactions underlying the fraud.   Brown and his various business entities will be referred to collectively hereinafter as "Brown."

12.     Specifically, the Lopatin Defendants and Brown promised investors that the principal they invested would remain safe in bank accounts Brown maintained at HSBC Bank plc in London.   Brown and Lopatin represented that these accounts would be segregated in the investors' favor.   Brown would utilize the investors' funds to obtain significant profits by leveraging the investors' funds through bond purchases and sales.   Brown and Defendant Lopatin promised the investors that they could withdraw their funds at any time.

13.     Lopatin promised the investors that Brown would purchase bonds only after having secured bank-approved institutions to repurchase them.   According to Lopatin and Brown, the bonds Brown purchased would, only seconds later, be repurchased by the bank-approved institutions at great profit to the investors.   Lopatin and Brown convinced the investors that, as these bonds would only be held for a matter of seconds before being re-sold to institutional buyers, these transactions posed very little risk.   This bond purchase and sale scheme shall be referred to hereinafter as the "Private Placement Project."

14.     Defendants' representations regarding the bank accounts into which the investors' funds would be placed were false when made.   Defendants neither segregated nor intended to segregate investors' funds in the manner represented, which would have supposedly protected

- 4 -

the investors' principal investment. Rather, at all times the Lopatin Defendants and Brown were able to and did access and utilize these funds for any purpose, including for their own account.

15.     Brown, a purported international bond trader with a British passport and a permanent resident of the U.S., together with Lopatin, served as the front-men for this endeavor. Millar and Lopatin facilitated the fraudulent scheme by recruiting investors and introducing them to Brown.  Lopatin also assisted Brown by convincing investors that the Private Placement Project was a legitimate opportunity for investors to enjoy remarkable profits on their investments.  These representations directly and proximately caused investors, including Mr. So, to comfortably part with their money.

16.     In preparation for implementing this scheme, the Lopatin Defendants entered into a business relationship with Univest, the purported goal of which was for Land Base to place $10 million belonging to Univest into high-return investments.  In this respect, Land Base acted as an agent for and on behalf of Univest.  Moreover, Univest's involvement permitted the Lopatin Defendants and Brown to test HSBC's institutional controls and assess whether HSBC would prevent Defendants from carrying out the Private Placement Project.

17.     In or about December 2004, Univest transferred $10 million from its bank in California to one of Brown's accounts at HSBC London.  In fact, the Lopatin Defendants' true purpose behind entering into the Land Base-Univest relationship was not to obtain legitimate, high return investments for Univest, but rather was (i) to add an aura of legitimacy to a fraudulent investment scheme, (ii) to assist with efforts to induce other potential investors into entering into such a relationship, and, most importantly, (iii) to allow the Lopatin Defendants and Brown to learn whether HSBC would take the necessary steps to protect unsuspecting investors.

18.     Shortly after Univest invested its $10 million in one of Brown's accounts, and throughout January, February and March 2005, it was apparent that Brown was not executing the number of trades required to generate the profits anticipated by the placement.     Upon information and belief, during this period Univest's principal, Craig Christensen, voiced complaints to Lopatin on this very issue.  Still, the Lopatin Defendants continued to participate in the recruitment of additional investors for Brown, including the recruitment of Kevin So, the details of which will be discussed in more detail below.

19.     In or around early to mid-April 2005, and at least several days prior to Mr. So investing his $30 million, Univest's representatives, including Principal Craig Christensen and its attorney Jeffrey Moritz, demanded that Brown refund Univest's $10 million and remit profits to Univest.  These demands were transmitted to Lopatin.  In the absence of an investment by Mr. So, the Lopatin Defendants and Brown were unable to refund Univest's investment.

20.     In fact, on or about April 20, 2005, Kevin So invested in the Private Placement Project by depositing        $30 million into a Brown HSBC London account on or about April 20, 2005.  See Wire Transfer dated April 20, 2005, attached hereto as **Exhibit A.**  Immediately thereafter, Brown and Lopatin, now able to meet Univest's demands, refunded Univest's $10 million "investment" -- which amount was drawn directly from the $30 million Kevin So invested.  Refunding Univest enabled the Lopatin Defendants and Brown to continue their charade for many months and keep the Ponzi scheme alive.

21.     Throughout the perpetration of the fraud and to further convince the potential investors of the legitimacy of the purported investment opportunity and advance their fraudulent scheme, Defendant Lopatin and Brown arranged meetings in the offices of a prestigious London law firm, Fox Williams, and with representatives of HSBC London.  These meetings served to

assure investors like Mr. So that Messrs Brown and Lopatin were legitimate businessmen who the investors could and should trust to invest their money wisely.

22.     Additionally, the Lopatin Defendants and Brown presented investors, including Univest, with nearly identical letters titled "Irrevocable Bank Instruction," which purport to instruct Defendant Brown's bank (HSBC London) to take various steps to safeguard the investors' funds.  This letter was signed on behalf of and stamped as received by an HSBC representative, which added to Defendants' aura of legitimacy.  A copy of the Irrevocable Bank Instruction governing Mr. So's investment is attached as **Exhibit B.**

23.     According to the Irrevocable Bank Instruction relating to Mr. So's investment, "[u]nder no circumstances shall **Principal amount of funds** deposited in the amount of **Thirty Million United States Dollars** ($30,000,000.00) be permitted to be withdrawn, unless as stated hereto and for the payment of wire charges (if any)."  **Exhibit B** at ¶ 5 (emphasis in original). The Lopatin Defendants and Brown never intended to abide by the terms of this Irrevocable Bank Instruction and, as a result of their knowledge and experience from Univest's earlier-issued HSBC Irrevocable Bank Instruction, were confident that HSBC would fail to abide by the letter's terms.

24.     To participate in the Private Placement Project, the Lopatin Defendants and Brown required investors to execute a document known as the "Land Base Agreement."  The Land Base Agreement was florid, wordy, replete with superfluous clauses, and was intended to give investors the impression that it reflected a sophisticated and complex financial and legal arrangement.  In fact, it was in large part devoid of any commercial meaning and purpose, by which the Lopatin Defendants and Brown intended to reinforce with investors an aura of legitimacy to the Private Placement Project.  See Land Base Agreement, attached as **Exhibit C.**

- 7 -

25.     Given Brown's role in the fraudulent enterprise described herein, the High Court of Justice, Queen's Bench Division, Commercial Court in the United Kingdom entered a judgment against Brown and his companies and in Kevin So and other investors' favor. Additionally, Brown was convicted of perjury relating to false statements he made in efforts to gain access to funds he fraudulently obtained from Kevin So and others, as well as false statements made in connection with his efforts to flee the U.K.

### B.      Defendants Defraud Kevin So

### i.      Preparations for Investing

26.     At all times relevant hereto, Plaintiff Kevin So sought investment opportunities in the financial market for approximately $30 million, which, prior to the investment at issue here, he held in an account at HSBC Hong Kong. Specifically, Mr. So sought to invest in Medium-Term Notes (also known as "MTNs" or "bonds") of governmental, public, and private institutions in various jurisdictions. Kevin So's investment objectives included generating profits by purchasing and subsequently selling bonds issued by financial institutions with a very high credit rating -- A+ or better. Notwithstanding this objective, of primary importance to Mr. So, as was well known to each of the Defendants, was security of the principal he invested.

27.     In or around December of 2004, Mr. So entered into a relationship with non-party Lucy Lu ("Lu"), a family friend and business associate, whereby Lu would serve as Kevin So's agent and fiduciary with respect to his investing $30 million. Mr. So and Lu had discussed the possibility of participating in private placements, and particularly private placements akin to that described in Paragraph 13 of this Complaint, with which Lu professed a general familiarity through her husband.

28.     Particularly, Mr. So and Lu discussed private placements consisting of the purchase and re-sale of highly rated bonds in circumstances where the re-purchaser was already in place before the commitment to purchase the bond was made. Mr. So understood that, with respect to these investment vehicles, the return on each individual bond trade would be conservative, but that a good trader making many trades per week could achieve large overall investment returns. Mr. So also understood that, typically, the principal invested in such a private placement is to be safeguarded by a bank.

29.     Ultimately, Lu was introduced to the Lopatin Defendants and Brown by Millar, who was a friend of Lu's husband. Upon information and belief, Millar learned that Lu controlled significant funds to invest and that these funds belonged to Kevin So. Lu was informed that Millar was someone who could introduce her to banks and bank traders involved in bond trading.

30.     Millar and Lu corresponded from approximately late January 2005 through early April 2005. At all times relevant hereto, Lu regularly informed Kevin So of the substance of her conversations with Millar. The purpose of Millar and Lu's communications was to make arrangements for the investment of Mr. So's $30 million. Specifically, Millar intended to entice Kevin So and Lu to invest in the bond trading scheme developed and spearheaded by the Lopatin Defendants and Brown. On information and belief, at some point during this same time period, Lu made contact with Lopatin. It is unclear at this point as to whether the Lopatin Defendants and/or Brown enticed Lu to join their scheme once they learned that she could access millions of dollars.

31.     During the same period, Millar represented to Lu that, upon investing Mr. So's $30 million, the trader (Brown) would require two to three weeks to partake in any trade.

According to Millar, this delay was due to the large demand for these investment vehicles and because the investment had to be run through some form of a compliance procedure, which required investors to disclose certain personal and financial information.   Millar knew that these representations would reinforce with Mr. So and Lu the legitimacy of the Private Placement Project.

32.    On or about February 16, 2005, Millar informed Lu and Kevin So that to proceed with the investment, Lu and Mr. So must travel to London to meet with the trader (Brown), who would be would handling the investment transactions.  Millar also informed them that Mr. So would need to transfer the $30 million to HSBC London, where these funds would be placed in a non-depletion account.  According to Millar, the HSBC London account that was to house Mr. So's funds was regulated by HSBC such that it would be required to maintain $30 million in cash, A-rated bank securities, and/or a combination thereof.

33.    Millar assured Lu and Kevin So that this form of trading was safe and was highly regulated by the UK's Financial Services Authority, the Bank of England, and the U.S. Securities and Exchange Commission.    Throughout February and March 2005, Millar repeatedly represented to Lu and Mr. So that Mr. So's principal investment would be safe and not subject to any risk.

34.    Due to Mr. So's business commitments and personal health issues, he could not travel from Hong Kong to London.  Therefore, Mr. So sent his agent and fiduciary Lu in his stead -- not suspecting at the time that her allegiance might lie elsewhere.  To ensure that Lu was Mr. So's agent and fiduciary, Millar provided Mr. So with an affidavit, which Mr. So executed. The affidavit confirmed that Lu had Mr. So's the authority to act on his behalf with respect to investing his $30 million. This affidavit was subsequently presented by Millar to Brown and the

Lopatin Defendants. Consequently, at all relevant times, the Defendants understood that Lu was acting as Mr. So's representative and that she would transmit to him any and all representations they made.

35. Millar informed Lu and Mr. So that Brown, who Millar at all relevant times referred to only as the "trader," required evidence that Mr. So had sufficient funds necessary to participate in the private placement he was pitching to them. Therefore, Mr. So provided Lu with a certificate evidencing the balance of funds maintained in his HSBC Hong Kong account. Ms. Lu, in turn, transmitted this certificate to Millar.

36. Millar proposed that the London meetings take place in April 2005. According to Millar, present at the meeting would be the trader (Brown), Brown's lawyer, and someone he referred to as the "Fed representative." Prior to Lu traveling to London, Mr. So had not had contact with anyone at HSBC London, any of the Lopatin Defendants, nor Brown or his companies. In fact, at this stage, Mr. So did not know that the Lopatin Defendants, Brown, or his companies were involved.

### ii. April 2005 London Meetings

37. Lu arrived in London on or about April 10, 2005. She was accompanied to London by her friend and Chinese-English interpreter, Jane Zhou ("Zhou"). Ms. Zhou is not a party to this action.

38. On or about April 11, 2005, Lu and Zhou met Brown. Brown immediately began making representations aimed at convincing Lu (and ultimately Kevin So) of the legitimacy of his business and the Private Placement Project.

39. Specifically, he represented, according to Lu's sworn testimony in London proceedings, that his offices were full of hidden cameras and that every phone call and

correspondence in and out was being monitored by the Financial Services Authority. Brown further represented that, as he was being monitored, he had to make sure his dealings with investors were completely honest and above board. Brown also showed Lu a computer screen in his office, which purportedly depicted a trade he was executing.

40. To further impress Lu regarding his bona fides and character, Brown told her that his grandfather was wealthy, and that he left significant stock shares to Brown's father. Both passed away, and Brown managed a fund in his father's memory where he deposited his investment profits. Brown further explained that he was licensed by the UK government to serve as a trader.

41. After Brown explained his background and credentials, Defendant Lopatin arrived at the meeting. Lopatin explained that he was a principal of Defendant Land Base, which he claimed was in the business of private enterprise assets exchanges. Lopatin explained the nature of what he claimed was Land Base's business. Specifically, Land Base would contract with investors to place money into a private placement where the value of the initial investment would be protected. According to Lopatin, usually Land Base worked with a single investor and started with a fund of at least $100 million. Land Base would then place 75% of its share of participation into mainly infrastructure projects that return long-term profits and benefit society.

42. Lopatin next explained his and Land Base's role in the private placement involving Brown to Lu. Lopatin explained that, at this time, he and Land Base were assisting Brown in securing participants with less than $100 million to invest and locating potential investment projects. Lopatin explained that Brown would buy and sell high rated bonds, and that, once the investment value reached $100 million, Brown would drop out and Lopatin would commence trading. Profits after the goal of $100 million would be split, with half going to Land

- 12 -

Base, and half to Mr. So, but 75% of So's profits should be invested into infrastructure projects. In short, Lopatin promised Mr. So high returns coupled with virtually no risk.

43.   Throughout this meeting and thereafter, Brown and Lopatin repeatedly assured Lu and Kevin So that their investment would be safe, and that HSBC London would ensure that the principal investment sums would not be depleted. Brown and Lopatin both knew that HSBC London would, in fact, not take the steps necessary to protect Mr. So. Brown and Lopatin also assured Lu and Mr. So that the funds they deposited would be maintained in an account segregated in their favor.

44.   Lopatin knew these assurances were false when he gave them to Lu, and he specifically intended that Lu and Mr. So would rely on such statements. Brown already demonstrated by his track record with Univest that he actually executed very few trades – many less than were promised to Mr. So. This fact was known to the Lopatin Defendants.

45.   Lu continued her meetings with Boris Lopatin the next day, April 12, 2005. During her second day of meetings, Lu was presented with a copy of the Letter of Instruction, which was stamped by HSBC's Moorgate Branch and signed by HSBC representative, Jackie Arnull. Lu also requested that the Letter of Instruction be revised. The first letter given to Lu only reflected an account in the name of 5th Avenue Partners, one of Brown's companies. Lu requested that the letter indicate that Mr. So and Lu be co-holders of this account. Confident that HSBC would not honor this letter, Lopatin and Brown made the requested changes. Finally, Lu requested that Lopatin and Brown arrange for her to meet with Jackie Arnull.

46.   It was at meetings on April 12 and 13, 2005 that Lopatin discussed with Lu the "Land Base Agreement," which Lopatin explained to be a perfectly legitimate and commercially viable agreement. Lopatin represented that this agreement's purpose was to set out clearly what

was expected of Land Base and investors, and to confirm the benefit sharing of the parties, and the use to which those benefits would be placed.

47.     In fact, Brown and the Lopatin Defendants intended the Land Base Agreement to give Lu and Mr. So the impression of a sophisticated and complex financial and legal arrangement. In fact, this Agreement was in large part devoid of any commercial meaning and purpose. In sum, the Lopatin Defendants intended the Land Base Agreement to reinforce with Mr. So and Lu that the Private Placement Project was both legitimate and humanitarian in nature. See Land Base Agreement, attached as **Exhibit C.**

48.     In the Land Base Agreement, Land Base specifically warranted that Kevin So's account would at all times be holding either cash or highly rated Fixed Income Instruments. See **Exhibit C** at Article 3.11. Upon information and belief, Lopatin and Land Base never intended that Kevin So's investment be maintained at all times with cash or highly rated Fixed Income Instruments and, in fact, Mr. So's investment was never so maintained.

49.     Ultimately, Lu executed the Land Base Agreement on Mr. So's behalf on or about April 13, 2005. The Agreement Lu signed was a bound document on heavy gold-colored paper, and it was signed and sealed on behalf of Land Base by Lopatin.

50.     During her meetings with Lopatin, Lopatin furnished Lu with a recommendation letter from HSBC in which Ms. Arnull, an employee and agent of HSCB working at HSBC's Moorgate branch in London, described Brown as a good customer. Additionally, Lopatin furnished Lu with an amended Letter of Instruction, which reflected an account not only in the name of 5th Avenue Partners, but also in the name of Kevin So and Lu.

51.     Lu returned to Canada on April 14, 2005.  Although she had requested to meet with Ms. Arnull, no meeting ever occurred.  Lopatin informed Lu that Ms. Arnull would not be available until April 14, 2005 – the day Lu returned to Canada.

52.     Upon returning to Canada, Lu discussed the details of her meetings, including her discussions with Lopatin, Brown and others, with Mr. So.  Lu provided Mr. So with copies of the Land Base Agreement, the Letter of Instruction, and Ms. Arnull's recommendation letter, as well as, Arnull's, Lopatin's and Brown's business cards.

53     Lu also informed Mr. So that Brown invited them to contact Ms. Arnull directly if they had any concerns.  In fact, Kevin So did transmit an e-mail to Ms. Arnull seeking her assurances that Mr. So's funds would be held in a segregated, non-depletion account.  Ms. Arnull referred Mr. So's inquiries to Brown directly.  Brown, fearing that his and Lopatin's scheme would be discovered, reacted angrily.  Lopatin sought to diffuse the situation by giving Lu assurances regarding their pending transaction.  Lopatin also assured Lu that, had there been any problems with the Letter of Instruction, HSBC's fraud department would have contacted them immediately.

54.     Mr. So was concerned that Ms. Arnull never responded to his inquiry directly, and inquired about this fact with Lopatin.  Lopatin again allayed Mr. So's concerns by telling Lu that, because the inquiry did not contain legal verbiage, HSBC might not reply.  Also, if HSBC thought there were any problems, they would have responded vigorously and immediately.  With that, Lopatin successfully diffused the situation, and was assured that Mr. So still intended to invest into the Private Placement Project.

55.     Mr. So transferred $30 million to HSBC London on or about April 20, 2005.  See **Exhibit A.**  The wire from Kevin So's HSBC Hong Kong account identified the account into

which the $30 million should be transferred as a Euro account, with beneficiaries listed as "5th Avenue Partners Ltd So Kevin Lu Yan Lucy." However, such an account did not actually exist. By now, Brown, who had transacted in millions of dollars with HSBC London, was confident in his ability to arrange for HSBC to accept the transfer into an account other than that instructed on the wire. In fact, Brown was able to convince HSBC to divert Mr. So's money to a U.S. dollar account in the name of another of Brown's companies, Devonshire Capital Ltd.

56.     As soon as Kevin So's money posted to the Devonshire Capital Ltd. account at HSBC, Brown arranged to transfer $10 million of Mr. So's $30 million directly to Univest.

57.     On April 22, 2005, HSBC faxed wire details to Brown, who forwarded them to Lopatin. Either Brown or Lopatin removed or covered up the final entry, which would have demonstrated that the beneficiary bank account did not match Kevin So's wire instructions. See HSBC Electronic Payments Details dated April 22, 2005, attached hereto as **Exhibit D.**

58.     Following the transfer of Mr. So's $30 million to the Devonshire account, neither Mr. So nor Lu received any confirmation or communication from HSBC regarding any trades. Lu contacted Lopatin on Mr. So's behalf and inquired about receiving statements from HSBC. Lopatin assured her that Brown was reporting to him and Land Base regarding Brown's trading activities, and that Land Base would provide reports to her and Kevin So. In total, Mr. So and Lu only received a handful of trading confirmations from Land Base.

59.     In or around the end of October 2005, Lopatin contacted Lu and informed her that he no longer wanted Brown to be a trader for Mr. So's funds. He stated that he negotiated a settlement with Brown to return a sum of $62,428,220 to Kevin So, which included the $30 million in principal and a $32,428,220 profit derived from trading. Lopatin failed to disclose that HSBC had already frozen Brown's accounts.

60.     In fact, upon information and belief, as Lopatin had compiled investment statements for Kevin So relating to the $30 million he invested, Lopatin knew that Brown had not achieved any profits on Mr. So's investment.  Moreover, Lopatin knew that Brown had not maintained the $30 million principal that Kevin So invested.  As such, upon information and belief, based upon Lopatin's knowledge of the principal loss by Brown, Lopatin's call to Lu in October 2005 was merely an attempt at damage control.  Knowing the house of cards was collapsing and that Brown faced significant civil and criminal liability, Lopatin sought to mask his true role in the scheme to defraud Mr. So.  He sought to convince Lu and Mr. So that their interests were aligned with Lopatin's (and Land Base's) so as to avoid facing a lawsuit or criminal penalties.

61.     Upon information and belief, Land Base and its two principals, Defendants Lopatin and Woodhead[2], profited by over $4 million for their role in this fraudulent scheme, while Kevin So lost nearly $27 million.

62.     Plaintiff has suffered and continues to suffer monetary damages in excess of $30,000,000 and irreparable harm in the form of, *inter alia*, damage to his reputation.

## IV.     CAUSES OF ACTION

### Count I:  Fraud/Intentional Misrepresentation
### (Against the Lopatin Defendants)

63.     Plaintiff incorporates and re-alleges Paragraphs 1 through 62 as if fully set forth herein.

64.     As alleged above, the Lopatin Defendants made false representations of material fact to Plaintiff and/or his agents, including *inter alia* the following:

---

[2]     The precise nature of Woodhead's involvement is not yet known.  Nevertheless, as a principal of Land Base, he stood to and did profit from the Lopatin Defendants' fraud.

(a) the principal Kevin So invested would remain safe in bank accounts Brown maintained at HSBC Bank plc in London;

(b) Mr. So's investment would be and in fact had been segregated in a bank account held jointly by both Mr. So and Brown;

(c) Mr. So could withdraw his funds at any time;

(d) Brown would execute multiple trades per week, thus generating significant returns for Mr. So;

(e) Mr. So's investment principal would be protected by HSBC consistent with the instructions found in the Letter of Instruction;

(f) Mr. So's principal investment would not be subject to any risk;

(g) Mr. So's principal investment would be maintained in $30 million cash, A-rated bank securities, or a combination of these;

(h) Mr. So's investment would quickly reach $100 million in value; and

(i)Lopatin negotiated a settlement whereby Brown would pay Mr. So $62,428,220, when he knew, but failed to disclose to Mr. So, that HSBC had frozen Brown's accounts.

65.     These Defendants knew their representations to Plaintiff and his agent were false and/or acted with utter disregard and recklessness as to whether they were true or false. Each of these Defendants had unique and superior knowledge and/or specialized expertise with regard to the formation, status, condition, and operations of the Private Placement Project.

66.     Defendants were aware and intended that the false information provided to Lucy Lu would be used by Mr. So, a known party. Thus, Defendants knew, intended, and understood that Mr. So would act in reliance on such representations and/or omissions.

- 18 -

67.     Plaintiff received and relied on the false representations and omissions of material fact.  Plaintiff reposed trust and confidence in each Defendant, their unique and superior knowledge and expertise, and the information that was provided to him, with the knowledge, consent, and authority of each Defendant.

68.     Kevin So's reliance was foreseeable, reasonable and justified.

69.     Kevin So's reliance on the Lopatin Defendants' false representations and omissions directly and proximately caused injury and pecuniary loss to Mr. So, for which he is entitled to an award of actual and consequential damages in an amount to be proven at trial, but believed to be in excess of $30,000,000.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in his favor and against Defendants Lopatin and Land Base on Count I of the Complaint, and:

(a)     Award Plaintiff compensatory damages in the amount of at least $30,000,000 or such other amount as may be proved at trial;

(b)     Award Plaintiff punitive damages in the amount of at least $10,000,000.

(c)     Award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs incurred and such other and further relief as the Court may deem just.

### Count II: Negligent Misrepresentation
### (Against the Lopatin Defendants)

70.     Plaintiff incorporates and re-alleges Paragraphs 1 through 69 as if fully set forth herein.

71.     The Lopatin Defendants owed a duty to Kevin So to exercise reasonable care to ensure, at all times, the complete, accurate, and truthful disclosure of all material facts concerning the Private Placement Project, including *inter alia*:

(a) that the principal Kevin So invested would remain safe in bank accounts Brown maintained at HSBC Bank plc in London;

(b) that Mr. So's investment would be and in fact had been segregated in a bank account held jointly by both Mr. So and Brown;

(c) that Mr. So could withdraw his funds at any time;

(d) that Brown would execute multiple trades per week, thus generating significant returns for Mr. So;

(e) that Mr. So's investment principal would be protected by HSBC consistent with the instructions found in the Letter of Instruction;

(f) that Mr. So's principal investment would not be subject to any risk;

(g) that Mr. So's principal investment would be maintained in $30 million cash, A-rated bank securities, or a combination of these;

(h) that Mr. So's investment would quickly reach $100 million in value; and

(i) that Lopatin negotiated a settlement whereby Brown would pay Mr. So $62,428,220, when he in fact knew, but failed to disclose to Mr. So, that HSBC had frozen Brown's accounts.

72.     Each of these Defendants, acting within the course and scope of his or its agency, employee, partner, and/or joint venture relationship, failed to exercise reasonable care to ensure, at all times, the complete, accurate, and truthful disclosure of these material facts to Mr. So.

73.     Each of these Defendants, acting within the course and scope of his or its agency, employee, partner, and/or joint venture relationships, participated in, approved, sanctioned, cooperated in, assisted in, consented to, acquiesced in, benefited from, or otherwise participated

in and/or failed to prevent the generation and dissemination of materially false, incomplete, and inaccurate information described in Paragraphs 64 and 71, above.

74.     The generation and dissemination of materially false, incomplete, and inaccurate information was caused by these Defendants' failure to exercise reasonable care or competence in obtaining or communicating the information, and/or their failure to exercise reasonable care or competence to prevent the communication of false information. Each of these Defendants had unique and superior knowledge and/or specialized expertise with regard to the formation, status, condition, and operations of the Private Placement Project.

75.     These Defendants knew, intended, and understood that such information would be supplied to Mr. So for his benefit and guidance.

76.     These Defendants knew, intended, and understood that the information would be used to influence Mr. So in his determination as to whether or not to invest in the Private Placement Project.

77.     Mr. So was a known, intended, and foreseeable recipient of the false, incomplete, and inaccurate information supplied. These Defendants knew that the information was desired for a serious purpose, that false or erroneous information would cause significant injury, and that the relationship between the parties was such that Mr. So had the right to rely on the Defendants for accurate information, and Defendants owed a duty to give this information with due care.

78.     Mr. So received and relied upon the false, incomplete, and inaccurate information supplied to him. Mr. So reposed trust and confidence in each of these Defendants, their unique and superior knowledge and expertise, and the information that was provided to him, with the knowledge and consent of each Defendant.

79.     Mr. So's reliance was foreseeable, reasonable, and justified.

80.     Mr. So's reliance directly and proximately caused him to suffer significant injury and pecuniary loss, for which he is entitled to an award of actual and consequential damages in an amount to be proven at trial, but believed to be in excess of $30,000,000.

81.     These Defendants' conduct, as outlined above, was intentional and/or deliberate, and involved circumstances of malice, fraud, bad motive, circumstances of aggravation or outrage, and was reckless, willful, wanton and consciously disregarded or was indifferent to Plaintiff's rights.  As a result, Plaintiff is entitled to an award of punitive damages.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in its favor and against Defendants Lopatin and Land Base on Count II of the Complaint, and:

(a)     Award Plaintiff compensatory damages in the amount of at least $30,000,000 or such other amount as may be proved at trial;

(b)     Award Plaintiff punitive damages in the amount of at least $10,000,000.

(c)     Award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs incurred and such other and further relief as the Court may deem just.

### Count III:  Fraud Based on Concealment of Material Facts
### (Against the Lopatin Defendants)

82.     Plaintiff incorporates and re-alleges Paragraphs 1 through 81 as if fully set forth herein.

83.     The Lopatin Defendants, acting within the course and scope of his or its agency, employee, partner, and/or joint venture relationships, knowingly or recklessly concealed and/or failed to disclose material facts that these Defendants had a duty to disclose, including, *inter alia*: (a) the compensation each stood to receive as a result of and from Mr. So's investment; (b) that Brown failed to execute trades with respect to Univest's investment of the frequency promised;

(c) that Brown failed to execute trades with respect to Mr. So's investment of the frequency promised; (d) that the principal Mr. So invested was not and would not be safeguarded by HSBC; (e) that Mr. So's investment was not deposited into any account to which he was a beneficiary; (f) that $10 million of Mr. So's investment was immediately transferred to Univest; (g) that Mr. So could not withdraw his funds at any time; and (h) that, at the time Lopatin purportedly entered into a settlement on Mr. So's behalf, HSBC had frozen Brown's accounts.

84.     Each of these Defendants had unique and superior knowledge and/or specialized expertise with regard to the formation, status, condition, and operations of the Private Placement Project.  Mr. So reposed trust and confidence in each Defendant, their unique and superior knowledge and expertise, and the information that was provided to him, with the knowledge, consent, and authority of each Defendant, in connection with his decision to invest money in such a venture and such projects.

85.     During the April 2005 meetings with Lopatin and Brown, and continuing thereafter, the Lopatin Defendants, acting within the course and scope of their agency, employee, partner, and/or joint venture relationships, knowingly or recklessly concealed material facts that they had a duty to disclose, including, *inter alia*, those material facts described in Paragraph 83, above.  Defendants had unique and superior knowledge and/or specialized expertise with regard to the formation, status, condition, and operations of the Private Placement Project, and its purported assets and management (or lack thereof).  Mr. So reposed trust and confidence in the Defendants, their unique and superior knowledge and/or expertise, and the information they provided to him in connection with his decision to invest money in the Private Placement Project.

86. Defendants concealed and/or failed to exercise reasonable care to disclose these material facts with the knowledge, intent, and understanding that the concealment and/or nondisclosure would defraud Mr. So by creating a false impression on the part of Mr. So as to such matters.

87. These Defendants knowingly or recklessly concealed these material facts, with the knowledge, intent, and understanding that Mr. So, a known party, would take action he would or might not take if he knew the true facts. In particular, Defendants knew that the information was desired for a serious purpose, that the false or erroneous information would cause injury, and that the relationship between the parties was such that Mr. So had the right to rely on Defendants for such information, and Defendants owed a duty to give such information with due care.

88. Mr. So was unaware of the true state of the facts, and acted in reliance on the assumption that the concealed and/or nondisclosed facts did not exist or were different from the actual truth.

89. Mr. So's reliance was foreseeable, reasonable and justified.

90. Mr. So's reliance directly and proximately caused injury and pecuniary loss to Mr. So, for which he is entitled to an award of actual and consequential damages in an amount to be proven at trial, but believed to be in excess of $30,000,000.

91. Defendants' conduct, as outlined above, was intentional and/or deliberate, and involved circumstances of malice, fraud, bad motive, circumstances of aggravation or outrage, and was reckless, willful, wanton and consciously disregarded or was indifferent to Plaintiff's rights. As a result, Plaintiff is entitled to an award of punitive damages.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in its favor and against Defendants Lopatin and Land Base on Count III of the Complaint, and:

(a)     Award Plaintiff compensatory damages in the amount of at least $30,000,000 or such other amount as may be proved at trial;

(b)     Award Plaintiff punitive damages in the amount of at least $10,000,000.

(c)     Award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs incurred and such other and further relief as the Court may deem just.

## Count IV: Conversion
### (Against the Lopatin Defendants)

92.     Plaintiff incorporates and re-alleges Paragraphs 1 through 91 as if fully set forth herein.

93.     These Defendants fraudulently and otherwise wrongfully and without authority assumed and exercised dominion and control over property belonging to Kevin So – namely, $30 million.

94.     These Defendants fraudulently and otherwise wrongfully disposed of Mr. So's property in a manner contrary to Mr. So's directives and understanding with the Defendants by (a) failing to invest Mr. So's $30 million; (b) failing to return the $30 million to Mr. So; (c) transferring $10 million of Mr. So's funds to Univest; (d) retaining at least $4 million of Mr. So's funds for their own uses; and (e) allowing Mr. So's $30 million to be depleted by Lopatin, Brown and perhaps others.

95.     Defendants' conduct, as outlined above, directly and proximately caused injury and pecuniary loss to Mr. So, for which he is entitled to an award of actual and consequential damages in an amount to be proven at trial, but believed to be in excess of $30,000,000.

96.     Moreover, Defendants' conduct, as outlined above, was intentional and/or deliberate, and involved circumstances of malice, fraud, bad motive, circumstances of aggravation or outrage, and was reckless, willful, wanton and consciously disregarded or was indifferent to Plaintiff's rights.  As a result, Plaintiff is entitled to an award of punitive damages.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in its favor and against Defendants Lopatin and Land Base on Count IV of the Complaint, and:

(a)     Award Plaintiff compensatory damages in the amount of at least $30,000,000 or such other amount as may be proved at trial;

(b)     Award Plaintiff punitive damages in the amount of at least $10,000,000.

(c)     Award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs incurred and such other and further relief as the Court may deem just.

### Count V:  Unjust Enrichment/Quasi Contract
### (Against Univest)

97.     Plaintiff incorporates and re-alleges Paragraphs 1 through 96 as if fully set forth herein.

98.     As set forth above, Plaintiff conferred a benefit on Defendant Univest in the amount of at least $10 million.

99.     These circumstances described in the preceding paragraphs render it inequitable, unfair and unjust to allow Defendant Univest to retain any of the moneys it obtained from Plaintiff.

100.    As a direct and proximate result of the unjust enrichment of Defendants, Mr. So is entitled to an award of damages in an amount to be proven at trial, but believed to be in excess of $10,000,000.00.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in its favor and against Defendant Univest on Count V of the Complaint, and:

(a)     Award Plaintiff compensatory damages in the amount of at least $10,000,000 or such other amount as may be proved at trial; and

(b)     Award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs incurred and such other and further relief as the Court may deem just.

### Count VI: Unjust Enrichment/Quasi Contract
### (Against the Lopatin Defendants)

101.    Plaintiff incorporates and re-alleges Paragraphs 1 through 100 as if fully set forth herein.

102.    As set forth above, Plaintiff conferred a benefit on the Lopatin Defendants in the amount of at least $4,141,078.

103.    These circumstances described in the preceding paragraphs render it inequitable, unfair and unjust to allow the Lopatin Defendants to retain any of the moneys it fraudulently obtained from Plaintiff.

104.    As a direct and proximate result of the unjust enrichment of Defendants, Mr. So is entitled to an award of damages in an amount to be proven at trial, but believed to be in excess of $4,000,000.00.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in its favor and against Defendants Land Base, LLC and Boris Lopatin on Count VI of the Complaint, and:

(a)     Award Plaintiff compensatory damages in the amount of at least $4,148,078 or such other amount as may be proved at trial; and

(b)     Award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs incurred and such other and further relief as the Court may deem just.

### Count VII: Civil Conspiracy
### (Against the Lopatin Defendants)

105.    Plaintiff incorporates and re-alleges Paragraphs 1 through 104 as if fully set forth herein.

106.    Defendants, acting as a malicious concern or combination of two or more persons, agreed upon a common objective to be accomplished involving unlawful and tortious acts and unlawful purposes, as described fully herein.  These unlawful acts and purposes included the perpetration of a fraud upon Mr. So, the intentional concealment of material facts, and breach of fiduciary and trust duties.

107.    Each Defendant committed one or more unlawful overt acts in furtherance of the common objective, including committing the fraudulent acts described in Counts I and III, above.

108.    Each Defendant acted with malice toward Plaintiff and intent to cause him monetary and other injury.

109.    As a proximate result of Defendants' conspiracy and illegal acts carried out in furtherance of the conspiracy, Plaintiff incurred injury and pecuniary loss, for which he is entitled to actual and consequential damages in an amount to be proven at trial, but believed to be in excess of $30,000,000.

110.    Defendants' conduct was intentional and deliberate, and involved circumstances of malice, fraud, bad faith, bad motive, circumstances of aggravation or outrage, and was

reckless, willful, wanton and in conscious disregard or indifference to Plaintiff's rights. As a result, Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in its favor and against Defendants on Count VII of the Complaint, and:

(a)     Award Plaintiff compensatory damages in the amount of at least $30,000,000 or such other amount as may be proved at trial;

(b)     Award Plaintiff punitive damages in the amount of at least $10,000,000; and

(c)     Award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs incurred and such other and further relief as the Court may deem just.

### Count VIII: Respondeat Superior
### (Against the Lopatin Defendants and Woodhead)

111.     Plaintiff incorporates and re-alleges Paragraphs 1 through 110 as if fully set forth herein.

112.     At all relevant time periods stated herein, Lopatin acted as an officer, director, agent, sub-agent, partner, joint venturer, employee, and/or controlling person of Land Base.

113.     At all relevant time periods stated herein, Woodhead acted as an officer, director, agent, sub-agent, partner, joint venturer, employee, and/or controlling person of Land Base.

114.     At all relevant time periods stated herein, Lopatin acted as a partner of and joint venturer with Woodhead.

115.     At all relevant time periods stated herein, Woodhead acted as partner of and joint venturer with Lopatin.

116.     At all relevant time periods stated herein, Land Base held out to the public and to Mr. So that Lopatin and Woodhead were qualified, competent, worthy of trust and confidence, and duly appointed principals of Land Base, and members of Land Base's management team.

117.   Thus, at all relevant time periods stated herein, the knowledge and conduct of Lopatin and Woodhead was directly attributable and imputable to each other and to Land Base.

118.   In addition, at all relevant time periods stated herein, Lopatin and Woodhead acted as agents, partners, and/or joint venturers of each other and Land Base. Thus, at all relevant time periods stated herein, the knowledge and conduct of Lopatin and Woodhead was directly attributable and imputable to each other and Land Base.

119.   At all relevant time periods herein, Defendant Land Base:

(a)   Had actual or imputed knowledge of the acts, conduct, representations, and omissions of their respective agents and representatives;

(b)   Accepted the benefits of the acts, conduct, representations, and omissions of their respective agents and representatives;

(c)   Exercised inadequate supervision over the acts, conduct, representations, and omissions of their respective agents and representatives.

120.   At all relevant time periods herein, Defendants Woodhead and Lopatin:

(a)   Had actual or imputed knowledge of the acts, conduct, representations, and omissions of their respective partners and/or joint venturers;

(b)   Accepted the benefits of the acts, conduct, representations, and omissions of their respective partners and/or joint venturers;

(c)   Exercised inadequate supervision over the acts, conduct, representations, and omissions of their respective partners and/or joint venturers.

121.   Land Base is jointly and severally liable for all actual, consequential, restitutionary, and/or punitive damages assessed against Lopatin and/or Woodhead on the basis

of *respondeat superior* and/or their status as officers, directors, agents, sub-agents, employees, partners, and/or joint venturers of these Defendants.

122.    Lopatin and Woodhead are jointly and severally liable for all actual, consequential, restitutionary, and/or punitive damages assessed against each of them on the basis of *respondeat superior* and/or their status as partners and/or joint venturers.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in its favor and against Defendants Land Base, Lopatin and Woodhead on Count VIII of the Complaint, and:

(a)    Award Plaintiff compensatory damages in the amount of at least $30,000,000 or such other amount as may be proved at trial;

(b)    Award Plaintiff punitive damages in the amount of at least $10,000,000.

(c)    Award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs incurred and such other and further relief as the Court may deem just.

### Count IX:  Lack of Separate Corporate Existence/Alter Ego
### (Against Lopatin and Woodhead)

123.    Plaintiff incorporates and re-alleges Paragraphs 1 through 122 as if fully set forth herein.

124.    At all times relevant hereto, Lopatin and Woodhead owned 100% of Land Base and exercised complete domination and control of Land Base and its purported assets, such that Land Base is or was a mere instrumentality of Lopatin and Woodhead.

125.    Lopatin and Woodhead have used their domination and control of Land Base and its assets to commit and to cause fraud, public wrong, and similar injustice, as described herein.

126. Lopatin and Woodhead have used their domination and control of Land Base to commit and cause violations of legal duties, as described herein.

127. The domination and control of Land Base by Lopatin and Woodhead has directly and proximately caused the injury and unjust loss sustained by Mr. So, as described herein.

128. Under agency, alter ego, and piercing the corporate veil principles, Lopatin and Woodhead are liable for the amounts owed by Land Base, including all actual, consequential, restitutionary and punitive damages sustained by Mr. So as a result of Land Base's breach of contract and tortious conduct.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in its favor and against Defendants on Count IX of the Complaint, and:

(a) Award Plaintiff compensatory damages in the amount of at least $30,000,000 or such other amount as may be proved at trial;

(b) Award Plaintiff punitive damages in the amount of at least $10,000,000.

(c) Award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs incurred and such other and further relief as the Court may deem just.

## Count X: Breach of Contract
## (Lopatin, Woodhead and Land Base)

129. Plaintiff incorporates and re-alleges Paragraphs 1 through 128 as if fully set forth herein.

130. The Land Base Agreement constituted a valid and existing contract between Mr. So and Land Base, Lopatin and Woodhead (although some of its provisions may well be unenforceable).

131. All conditions precedent to the enforcement of the Land Base Agreement and Plaintiff's right to enforce thereunder have been met or otherwise satisfied.

132.    Kevin So at all times complied with the Agreement and fully performed his obligations.

133.    Defendants breached the Agreement, *inter alia*, by: (1) failing to ensure that Mr. So's principal investment was safe; and (2) allowing Mr. So's principal investment to be depleted.

134.    Defendants' actions constitute breach of contract. Mr. So suffered irreparable harm as a direct and proximate result of Defendants' breach. Additionally, Mr. So suffered monetary and other damages to its reputation and good will as a direct and proximate result of Defendants' unlawful actions, omissions and breach of contract.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in its favor and against Defendants Lopatin, Woodhead and Land Base on Count X of the Complaint, and:

(a)    Award Plaintiff compensatory damages in the amount of at least $27,000,000 or such other amount as may be proved at trial; and

(b)    Award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs incurred and such other and further relief as the Court may deem just.

### Count XI: Breach of Fiduciary Duty
### (Against Lopatin, Woodhead and Land Base)

135.    Plaintiff incorporates and re-alleges Paragraphs 1 through 134 as if fully set forth herein.

136.    Defendants, by the Land Base Agreement, agreed to safeguard Mr. So's investment. Therefore, Defendants owed Kevin So a fiduciary duty and were required to exercise the utmost good faith and loyalty toward Kevin So.

137. As fiduciaries, Defendants owed Mr. So, *inter alia*, the duty to ensure that the principal amount of Mr. So's investment was not depleted. Defendants' duty also encompassed the obligation to act in the best interest of Mr. So, to inform Mr. So of every development affecting that interest, and not to profit to the detriment of Mr. So.

138. Defendants breached their fiduciary duty to Mr. So, *inter alia,* by (a) failing to safeguard the principal amount of Mr. So's investment; (b) failing to inform Mr. So about Defendants' own involvement and interest in the Private Placement Project; (c) failing to keep Mr. So informed of Brown's failure to execute trades; (d) acting against Mr. So's interests by profiting more than $4 million from the Private Placement Project; and (e) otherwise concealing, failing to disclose and misrepresenting material facts, as fully described above, regarding the Private Placement Project.

139. As a direct and proximate cause of Defendants' multiple breaches of their fiduciary duty, Mr. So has suffered and continues to suffer significant monetary and other damages.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in its favor and against Defendants Lopatin, Woodhead and Land Base on Count XI of the Complaint, and:

(a) Award Plaintiff compensatory damages in the amount of at least $30,000,000 or such other amount as may be proved at trial;

(b) Award Plaintiff punitive damages in the amount of at least $10,000,000; and

(c) Award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs incurred and such other and further relief as the Court may deem just.

## Count XII: Accounting
### (Against All Defendants)

140. Plaintiff incorporates and re-alleges Paragraphs 1 through 139 as if fully set forth herein.

141. By virtue of the facts and circumstances described in this Complaint, Kevin So is entitled to a full accounting of all sales, transfers, assignments, liens, encumbrances, or other dispositions of any and all of Defendants' funds and/or assets since January 1, 2005 and until the present, and a full accounting of all ownership interests that have been issued to anyone in any entity or entities that currently own or formerly owned such assets or projects.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in its favor and against Defendants on Count XII of the Complaint and Order a full accounting as described herein.

## JURY DEMAND

Plaintiff Kevin So demands a trial by jury on all issues raised in the Complaint for which a jury trial is available.

Dated May 16, 2008

Respectfully submitted,

KALBIAN HAGERTY L.L.P.

D. Michelle Douglas (CA Bar No. 190248)
888 17th Street, N.W., Suite 1000
The Brawner Building
Washington, D.C. 20006
Phone:     (202) 223-5600
Facsimile:  (202) 223-6625

*Counsel for Plaintiff Kevin So*

- 35 -

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Margaret M. Morrow and the assigned discovery Magistrate Judge is Alicia G. Rosenberg.

The case number on all documents filed with the Court should read as follows:

## CV08- 3336 MMM (AGRx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

---

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

---

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

Kevin So,

PLAINTIFF(S)

v.

Land Base LLC, Univest Financial Services, Inc.,
Boris Lopatin, individually and d/b/a Boris Lopatin
Associates and Charles W. Woodhead,

DEFENDANT(S).

CASE NUMBER

CV08 - 03336 MMM (AGRx)

**SUMMONS**

TO:   DEFENDANT(S): _____

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you
must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint
☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer
or motion must be served on the plaintiff's attorney, _D. Michelle Douglas, Esq._____, whose address is
_Kalbian Hagerty LLP, 888 17th Street, N.W., Ste. 1000, Washington, D.C. 20006_____. If you fail to do so,
judgment by default will be entered against you for the relief demanded in the complaint. You also must file
your answer or motion with the court.

SHERRI R. CARTER

Clerk, U.S. District Court

Dated: __MAY 20 2008__

By: _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed*
*60 days by Rule 12(a)(3)].*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

Kevin So,

PLAINTIFF(S)

v.

Land Base LLC, Univest Financial Services, Inc.,
Boris Lopatin, individually and d/b/a Boris Lopatin
Associates and Charles W. Woodhead,

DEFENDANT(S).

CASE NUMBER

CV 08 - 03336 MMM (AGRx)

**SUMMONS**

TO:    DEFENDANT(S): _____

A lawsuit has been filed against you.

Within ___20___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _D. Michelle Douglas, Esq._____, whose address is _Kalbian Hagerty LLP, 888 17th Street, N.W., Ste. 1000, Washington, D.C. 20006_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

SHERRI R. CARTER
Clerk, U.S. District Court

Dated: __MAY 20 2008__

By: _____L. MURRAY_____
Deputy Clerk

(Seal of the Court)

SEAL

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
So Kevin

**DEFENDANTS**
Land Base LLC, Univest Financial Services, Inc., Boris Lopatin, individually and d/b/a Boris Lopatin Associates, and Charles W. Woodhead

**(b)** County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases):
Hong Kong, China

County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only):
Los Angeles County

**(c)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
D. Michelle Douglas, Esq.
Kalbian Hagerty LLP, 888 17th Street, N.W., Suite 1000
Washington, D.C. 20006
Tel: (202) 223-5600

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☑ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☑ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:  JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☑ No     ☑ **MONEY DEMANDED IN COMPLAINT: $** 40,000,000.00

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. Section 1391 - Fraud, Civil Conspiracy and Breach of Contract

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☑ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities /Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☑ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed?  ☑ No  ☐ Yes

If yes, list case number(s).

**FOR OFFICE USE ONLY:** Case Number:   CV  08 - 03336   MMM (AGRx)

MAY 20 2008

CV-71 (07/05)                    CIVIL COVER SHEET                    Page 1 of 2

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

#### AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**VIII(b). RELATED CASES:** Have any cases been previously filed that are related to the present case? ☑ No   ☐ Yes

If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

---

**IX. VENUE:** List the California County, or State if other than California, in which **EACH** named plaintiff resides (Use an additional sheet if necessary)
☐ Check here if the U.S. government, its agencies or employees is a named plaintiff.

Kevin So – China

List the California County, or State if other than California, in which **EACH** named defendant resides. (Use an additional sheet if necessary).
☐ Check here if the U.S. government, its agencies or employees is a named defendant.

Land Base LLC – Los Angeles County
Univest Financial Services, Inc. – Placer County
Boris Lopatin individually and d/b/a Boris Lopatin Associates–
Los Angeles County; Charles W. Woodhead – Los Angeles County

List the California County, or State if other than California, in which **EACH** claim arose. (Use an additional sheet if necessary)
**Note:** In land condemnation cases, use the location of the tract of land involved.

United Kingdom

---

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _(signature)_   Date 05/16/08

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

---

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
| --- | --- | --- |
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended (42 U.S.C. (g)) |