# EXHIBIT E

10th, 11th and 13th Defendants
Kevin So
First
Exhibit "KS1"
11 August 2006

2005 FOLIO NO. 841

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT
BETWEEN:

HSBC BANK PLC

Claimant

- and -

(1) 5th AVENUE PARTNERS LIMITED
(2) MICHAEL ROBERT ALEXANDER BROWN
(3) ADM INVESTOR SERVICES
(4) DEVONSHIRE CAPITAL LIMITED
(5) LAMBERHURST DEVELOPMENTS LIMITED
(6) LAMBERHURST HOTELS LIMITED
(7) PREMIER EQUITY LIMITED
(8) PRITCHARD STOCKBROKERS
(9) 6th AVENUE PARTNERS GMBH
(10) MR KEVIN SO
(11) MS YAN LUCY LU
(12) MR CHARLES MARTIN EDWARDS
(13) MR ROBERT WILLIAM MANN
(14) REFCO SECURITIES LLC
(15) REFCO OVERSEAS LIMITED
(16) REFCO SECURITIES LIMITED

Defendants

AND BETWEEN:

(1) MR KEVIN SO
(2) MS YAN LUCY LU
(3) MR CHARLES MARTIN EDWARDS
(4) MR ROBERT WILLIAM MANN

Part 20 Claimants

- and -

(1) 5th AVENUE PARTNERS LIMITED
(2) MICHAEL ROBERT ALEXANDER BROWN
(3) HSBC BANK PLC
(4) ALTUS INVESTMENT MANAGEMENT LIMITED

Part 20 Defendants

---

**WITNESS STATEMENT OF KEVIN SO**

---

I, KEVIN SO of FT B 21/F Tower 1, Park Towers, 1 King's Road, North Point, Hong Kong SAR and 28F, Guangda Building, Tianhe Road North, Guangzhou, Guangdong, People's Republic of China WILL SAY as follows:

PCL2/1262847/1

SO-0001279

-2-

### Introduction

1. The facts referred to in this statement are true to the best of my knowledge and belief. Annexed hereto and marked "KS1" is a bundle of copy documents to which I refer in this statement.

2. From 1994 I have been a registered Chinese resident of Hong Kong SAR. I am 38 years old.

3. I graduated from Shangtau, Guangdong High School in 1988. I am presently studying part-time for a Masters Degree in Economics.

4. I travel regularly between Hong Kong and Guangzhou for both business and leisure and maintain residences in both locations.

5. My Chinese name, as appears on certain documents, is Chong Wing So.

6. I have a limited knowledge of English. Ms Lucy Lu has helped me to understand the contents of my witness statement and understand that Ms Lu has been helped by Mrs Jane Zhou in doing this.

### Business Career

7. I started my business career in 1989 as the General Manager of Lien Mei Shantou Limited. This was a cosmetics manufacturing company based in Guangdong and the predecessor entity to the Arche Companies (which I discuss in greater detail later in this statement). Lien Mei Shantou Limited was set up by my family and throughout its existence was solely a family owned company.

8. In May 1995 I became the General Manager of Chaoyang Arche Cosmetics Company Limited. Chaoyang Arche Cosmetics Company was set up by my family and Ms Lu's family.

9. In January 2002 Chaoyang Arche Cosmetics Company Limited changed its name to Guangdong Arche Cosmetics Company Limited. I remain the General Manager and CEO of Guangdong Arche Cosmetics Company Limited.

10. Guangdong Arche Cosmetics Company Limited is a very well known skin care and cosmetics manufacturing company operating throughout the Chinese domestic market. It is often simply called Arche by those operating within the industry and I will adopt that name for the purposes of this statement. Arche also has interests in the manufacture of pharmaceuticals, construction projects and financial investments.

11. I should point out the name "Arche" may also appear at times on documents as "Yaqian" as the Chinese characters and phonetics are the same for both words. Both words are registered as official commercial trademarks.

SO-0001280

12. In recent years the annual gross revenue of Arche has been in the region of RMB600 million -- RMB700 million. Other companies within the Arche group include Arche Industry Limited, Beijing branch and Arche Industry Limited, Shanghai branch.

13. The main shareholders in the Arche group of companies comprise my family and Ms Lu's family. There are a number of other minor shareholders.

**Relationship with Lucy Lu**

14. My family and the family of Ms Lu have known each other since the 1980's. I cannot recall the precise circumstances in which our families became associated but since that time we have been very close both socially and in business dealings. As explained above our families co-operated in the founding and development of what would become Arche. It would not be going too far to describe us as one family.

15. Also I do not recall the precise date on which I first became acquainted with Ms Lu but, given the close relationship between our families, it was natural that we would become friends.

16. Given our families' and personal histories I trust Ms Lu absolutely when it comes to business matters. My English is very poor when compared to Ms Lu's and therefore, in respect of this particular investment (which I discuss in more detail below), I entrusted Ms Lu to represent my interests. I also have a medical condition which means I cannot fly long distances (I have a heart condition and eye problem). My business is very busy which means I have a number of other projects to oversee. The investment with 5th Avenue Partners Ltd and Michael Brown was the first time we had worked together on an investment of any kind.

17. As I explain below, while Ms Lu had authority to sign documents and enter into the investment on my behalf I still made sure that I was kept up to date with the whole investment process through regular telephone calls with Ms Lu.

**Source of the Funds**

18. In this section I will address the source of the $30m which Ms Lu and I invested with 5th Avenue Partners Limited. I should record that the $30m was not Ms Lu's and my personal savings. Rather it was made up of money which belonged to our respective families. Of the total amount, 90% belonged to my family collectively and 10% belonged to Ms Lu's family collectively. We had been given permission by our respective families to invest the money.

19. In respect of this investment, Ms Lu and I agreed verbally that any profits generated using the $30m would be distributed 70% to my family and 30% to Ms Lu's.

20. As will be seen from the company tax returns, Arche was and is a very profitable company. Over a period of, I think, ten years payments were made by way of bonus

-4-

awards. The bonus payments were to family members by way of profit distribution. There are no documents showing these payments.

21. When these bonuses were made I deposited them into my accounts at Bank of China and Bank of Communications, both of which were located in Hong Kong.

22. In around November 2001 I became aware (although I cannot recall the precise circumstances) that Salomon Smith Barney (which I knew to be a highly reputable division of Citibank) was offering a higher rate of return on its accounts than I was getting from the Hong Kong banks. I also recall that Salomon Smith Barney had a very good reputation for customer service.

23. Therefore I took the decision to move the money to Salomon Smith Barney. I visited their offices in Hong Kong. I attach at pages 1-15 a copy of the application form I filled in and client agreement I was provided with when I opened the account on 15 November 2001. Chong Wing So is my Chinese name.

24. I recall that as part of the account opening process I had to provide documents to Salomon Smith Barney in order to pass their anti-money laundering procedures. I did not retain copies of any anti-money laundering form. There were no difficulties in the account opening procedure or in Salomon Smith Barney accepting the transfers into the accounts.

25. I attach at pages 16-21 an account statement dated 30 November 2001. These are the first statements generated in respect of the two accounts opened with Salomon Smith Barney. I opened two accounts: 06908-16 which was to be used for trading in listed securities and 06908-17 for trading in money and mutual funds. The statements show that I transferred the total of $22,273,546.70 into the accounts around the time they were opened.

26. At no time did Salomon Smith Barney ever question the source of funds being transferred to the account.

27. Although the accounts were opened in Hong Kong, the Hong Kong office of Salomon Smith Barney was just an administrative rather than a trading office. The actual trading accounts were managed by Salomon Smith Barney in New York.

28. At sometime in 2003 the names on the accounts were changed from Chong Wing So to Kevin So, for the convenience of banking in Hong Kong.

29. The money in the Salomon Smith Barney accounts was used to invest in various securities and funds as can be seen from the statements at pages 22-29. In addition, I think I may have transferred into the accounts various other amounts over the years the accounts were active. I cannot recall the exact details.

-5-

30. The account balance grew over the years until it reached in excess of $29m. As I will explain below, in December 2004 I ordered that the amount of $29,732,978.17 be transferred to my account held with HSBC Hong Kong.

### HSBC Hong Kong

31. I have banked in the Hong Kong branch of HSBC since opening an account (number 180-1-021955) on 4 November 1997. This account was closed on 31 August 2004 and replaced by account number 625 018 437 888 in the name of Kevin So. This account remains active.

32. These accounts were term deposit accounts. I opened another account in December 2004 with account number 625-019930 in the name of Mr So Kevin and Ms Lu Yan. I did this as Ms Lu and I were thinking of the possibility of participating in private placements. I attach a certificate of balance dated 14 December 2004 at page 30 showing the funds deposited.

33. I did not have a dedicated contact employee at the Hong Kong branch of HSBC and had dealings with a number of employees during the time I have maintained accounts.

34. The decision to transfer the money held by Solomon Smith Barney was made by me and Ms Lu in December 2004. At this time Ms Lu and I had been discussing the possibility of participating in private placements of the type being processed by Mr Brown (although at this time we did not have a particular opportunity in mind). I recall that Ms Lu suggested the money be transferred to HSBC as she understood that HSBC participated in these sorts of investments and has a very good reputation. I do not recall whether Ms Lu explained from where she had obtained this information.

35. I recall on ordering the transfer into the HSBC Hong Kong account that HSBC Hong Kong conducted a check on the source of the funds. I believe that I was required to produce bank statements or similar documents from Solomon Smith Barney detailing the accounts and the funds available. I cannot recall the precise details and have not retained copies of any documents HSBC Hong Kong may have sent to me or copies of the documents I sent to them.

36. In any event HSBC Hong Kong did not question the source of the funds and accepted the transfer without any problem.

### Keith Millar and the Investment

37. As I explained above, in around December 2004 Ms Lu and I were discussing the possibility of investing in private placements. I had not heard of these types of investments before but Ms Lu provided me with an explanation. I understood at that time that her husband had been told about these sorts of private placements by a business contact of his.

-6-

38. My understanding of private placements was that they consisted of the purchase and re-sale of highly rated bonds in circumstances where the re-purchaser was already in place before the commitment to purchase the bond was made. The returns on such investments are conservative but a good trader would be able to make a number of trades every week which would allow the investment to grow quickly. At all times the principal amount invested is held safe by a bank.

39. At around the same time Arche had a number of significant planned projects which required considerable amounts of capital to be invested. Given the possible returns which could be expected through participating in a private placement and the safety of the principal, I thought that investing in such an opportunity would generate sufficient profits to finance Arche's projects.

40. These projects were:

   (a) Arche planned to invest approximately RMB1.145bn in several new pharmaceutical products;

   (b) Arche planned to invest in real estate projects in Chengdu and Wuhan. These were projects to develop residential apartment buildings.

   (c) Arche planned to invest in a redevelopment project in Shanghai;

   (d) Arche planned to purchase a popular rival cosmetic brand for $76m (now increased to $110m);

   (e) Arche planned to construct a new manufacturing facility at a cost of $3m; and

   (f) Arche planned on starting three new companies (and associated manufacturing facilities) which would hold government issued direct sales licences. The three planned companies were Wuhu Cosmetics Company Limited (with an investment of RMB45m), Yichang Health and Nutrition Company Limited (with an investment of RMB32m and Chengdu Renkang Pharmaceutical Company Limited (with an investment of RMB60m).

41. I do not recall the exact date Ms Lu contacted me to tell me that she had been contacted by a Mr Keith Millar who, according to Ms Lu, said he was able to put us in contact with a trader who was putting together a private placement. I believe it was sometime in January 2005.

42. I had not heard of Mr Millar before and do not recall if Ms Lu told me the circumstances surrounding him contacting her. I should record now that throughout this process Ms Lu and I corresponded only by telephone and that I did not keep notes of those conversations.

43. I recall that Ms Lu reported to me regularly by telephone throughout February and March 2005 in respect of her discussions with Mr Millar. I was never sent or copied

-7-

into the emails which I understood were passing between her and Mr Millar. I did not keep records of our telephone conversations.

44. At some point early on in correspondence, I believe in February 2005, Ms Lu told me that Mr Millar required some personal and financial information from me as part of what was described by him as the "compliance procedure" which was necessary before we could participate in the private placement.

45. I understood this to refer to some form of background checks to verify my identity. I recall that I forwarded to Ms Lu, to send on to Mr Millar personal information including a copy of my passport, details of my home address, a recent telephone bill and a bank statement.

46. At around this time, I believe I also sent a copy of the details of the projects which Arche was interested in doing. I have not retained a copy of this document but remember it was just a list of the projects set out above.

47. I believe in mid-February 2005, Ms Lu told me that Mr Millar had said that we needed to go to London to meet with the trader and to sign the documents relevant to the private placement. I was not willing to go to London owing to other business commitments and my medical condition. I was however happy for Ms Lu to go on my behalf.

48. Ms Lu then told me that she had worked out a solution with Mr Millar where I would sign a document which authorized Ms Lu to sign the private placement documents and to represent my interests in any meeting. Mr Millar provided a draft, Lucy and I discussed and Lucy finalized the documentation for the authorization.

49. I attach a copy of the signed authorization at page 31. Ms Lu told me soon after I had signed the authorization that it had been approved by Mr Millar. I had no concerns in signing the authorization as I trusted Ms Lu completely to act in my best interests.

50. I recall from my telephone discussions with Ms Lu that she had been told by Mr Millar that our $30m investment would be held in a segregated non-depletion account in HSBC and that we could withdraw our funds at any time. Initially I recall that we wanted our money to stay in the Hong Kong branch of HSBC. This was because I had banked with them for the past nine years and they worked in Chinese which was convenient for me.

51. I do not recall exactly when, but I think it was sometime in February 2005, being told by Ms Lu that it was not possible for the money to stay in HSBC Hong Kong but that, at the trader's request, it would need to be transferred to HSBC London. I do not remember the exact reason why this had to be done but was not worried as I considered the money would be just as safe in HSBC London as it would in HSBC Hong Kong.

PCL2/1262847/1

-8-

52. In advance of the planned meeting in London Ms Lu told me that Mr Millar had told her that the trader in London required evidence that we had the necessary funds. I therefore went to the Hong Kong branch of HSBC and asked for a certificate of balance. I told the employees that I was planning on investing overseas and needed a balance certificate. The employees at the branch provided me with a certificate showing we had US$30,013,139.27 in our account as at 23 March 2005. They also provide me with a letter of recommendation dated 24 March 2005. I forwarded these documents to Ms Lu (copies are attached at pages 32-33).

Meetings in London

53. As I explained above I did not go to London for the meeting on 11 April 2005 because of other business commitments and because of my health. I trusted Ms Lu to act in our best interests.

54. Prior to her departure I recall talking with Ms Lu about my own concerns about the proposed private placement. My primary concern was that Ms Lu should obtain confirmation from HSBC London that our principal invested would be held safe by the bank and could not be removed except on our instruction. I was also concerned that the agreement governing the private placement dealt with the proper distribution of any profit.

55. Ms Lu did not contact me during her time in London. I do recall that her husband had been speaking to her while she was in London and that he called me just to say that everything was okay and Lucy will talk to me when she returned to Canada.

56. Once Ms Lu returned to Canada she contacted me by telephone and told me about the meetings she had had with Mr Lopatin of Land Base and Mr Brown who had been introduced to her as the trader. She told me about the Land Base agreement and that she had reviewed it in detail. I do not recall exactly what she told me about the Land Base agreement.

57. Of greatest importance to me was that she had been provided with a signed and stamped letter from HSBC and that the letter confirmed that our money would be held safe by HSBC in a segregated, non-depletion account and that the money would only be used for the purpose of trading in A+ rated instruments. She also told me that she had received a letter of recommendation from a Ms Jackie Arnull of HSBC confirming that Mr Brown was a client of good standing and that the bank held a copy of the Letter of Instruction.

58. I recall Ms Lu saying that Mr Brown and Mr Lopatin both had told her that if we had any doubts about the investment we could contact Ms Arnull at HSBC directly to make any further enquiries.

59. At some point, although I do not remember exactly when but it was probably very soon after she returned to London, she sent to me by mail copies of the Land Base

PCL2/12026477/1

SO-0001286

agreement, the Letter of Instruction, Ms Arnull's letter of recommendation and the business cards of Ms Arnull, Mr Boris Lopatin and Mr Michael Brown.

60. As regards the Land Base agreement we did not discuss it further in any great detail. We concentrated mainly on the Letter of Instruction. We did discuss what would happen if the trading terminated. Ms Lu told me that Mr Lopatin had said that the funds would be sent back to HSBC Hong Kong original account.

61. I considered that the Letter of Instruction, together with the letter of recommendation, were very important documents. My understanding of the effect of the Letter of Instruction from my discussion with Ms Lu was that HSBC was agreeing to hold our money in segregated, non-depletion accounts in the name of 5th Avenue Partners/Lucy Lu/Kevin So and that the money could only be used for trading. I considered that HSBC had agreed to actively supervise the account. Further, when we eventually decided to leave the private placement the principal money invested would be sent straight back to HSBC Hong Kong.

62. My understanding of the letter of recommendation, again from my discussions with Ms Lu, was that HSBC London considered Mr Brown to be of good standing. Further, it confirmed expressly that HSBC London accepted the terms of the Letter of Instruction.

63. I also understood from my discussions with Ms Lu that Michael Brown was the trader who would be responsible for trading our $30m investment until it reached the target figure of $100m.

64. I understood from my discussions with Ms Lu that Mr Lopatin and Land Base acted to locate and organize different investors and to locate investment projects. I understood that once the figure of $100m had been reached Mr Lopatin would step in as the trader.

65. After my conversation with Ms Lu I believed that we were going to be participating in a very good opportunity which would generate the profits Arche needed for its planned projects.

HSBC Hong Kong

66. Even though the Letter of Instruction and letter of recommendation assured me that the investment would be safe, given what Mr Lopatin and Mr Brown had said about contacting the bank, Ms Lu thought it would be a good idea for me to speak with HSBC Hong Kong before transferring the money. Ms Lu and I wrote a letter to go to HSBC London by email (I attach a copy at page 34).

67. I had dealt with Ms Wong at HSBC Hong Kong before and therefore spoke with her by telephone. I cannot recall exactly the time and date of the call but it would have been very shortly before I sent my email to Ms Arnull (described at 69 below).

-10-

68. I explained to Ms Wong that Ms Lu and I intended to participate in an investment project and needed to transfer our money to HSBC London. I also asked her to contact Ms Arnull at HSBC London and to confirm that the account set up was a segregated, non-depletion account and that HSBC London would act in accordance with the Letter of Instruction. I told her that Ms Lu and I had written a draft letter to this effect to be sent to HSBC London.

69. Ms Wong asked me to email the letter to her so that she could review it. I sent the letter to her. After she had received the draft letter she told me on the telephone that I should send it directly to Ms Arnull. I did this on 18 April 2006 (the email is attached at pages 35-36).

70. I was unaware at the time that Ms Wong also contacted Ms Arnull.

71. I did not receive a response from HSBC London. I was told by Ms Lu that, apparently, HSBC London had passed on our letter to Mr Brown. He was, according to Ms Lu, furious that we had contacted the bank and that any communications should have gone through him. I considered that the bank passing my letter on to Mr Brown showed what a close relationship HSBC London had with Mr Brown. I recall that Mr Brown calmed down after being contacted by Mr Lopatin.

72. After discussing the lack of any response from HSBC London with Ms Lu we decided that the Letter of Instruction and the letter of recommendation were sufficient protection. I ordered HSBC Hong Kong to transfer the $30m. I attach at page 37 a copy of a fax from HSBC Moorgate branch informing us that the $30m fund had been received.

The Investment

73. Throughout the time we participated I never had any contact with either Mr Brown or Mr Lopatin. All the information concerning the private placement was received by me from Ms Lu.

74. I recall that Ms Lu received confirmations in writing from Land Base that Mr Brown had conducted seven trades up to the end of September 2005. I do not recall if Ms Lu forwarded copies of the confirmations to me or told me about them over the telephone. I understood at the time that the results being reported to us were profits on brokers being done by Mr Brown.

75. Ms Lu and I had decided before transferring our principal to leave the profits generated in our account so that the overall fund would grow more quickly.

October 2005

76. Around the end of October 2005 Ms Lu told me, again by telephone, that Land Base had contacted her to say they wanted to end the relationship with Mr Brown. It was

SO-0001288

AUG-11-2006 09:51 AM                                                              P.02

FROM :                           FAX NO. :

-11-

suggested that we agree to a settlement with Mr Brown in which we would receive $30m in total including the return of our principal investment.

77. Ms Lu and I discussed this offer and agreed to proceed with the settlement. I recall there was discussion of a settlement meeting in the United States but I did not participate in anything to do with this meeting. I was happy to leave it all to Ms Lu.

78. At some point following the meeting, Ms Lu told me that it had not been successful but that discussions were continuing. I cannot recall the exact details of anything she may have said as to why the settlement had not happened.

79. I was not concerned with the failure of the meeting as I considered that our money was perfectly safe within HSBC London and that even if a settlement could not be reached on the profits that we would get our $30m back.

80. I was then contacted some time in November 2006 by a Mr Tam of HSBC Hong Kong's Security Department who told me that HSBC London had a problem with Mr Brown and that if I cooperated with the investigation they would ensure that the $30m would be returned.

81. I cannot remember exactly when I was told that part of the principal invested had been moved from the account or who told me. I recall that Ms Lu told me that a lawyer, Mr LaRue, had been retained by us and Land Base (and, I think, other investors) to represent us in any action to recover our money.

82. I had at all times believed that, given the contents of the Letter of Instruction and the letter of recommendation, that HSBC London would protect our investment. I could not believe that HSBC London had allowed Mr Brown to dishonestly take off with our money.

83. I believe that the facts stated in this witness statement are true.

Signed: ........[signature]........
            Kevin So

Dated: ..11-28-2006..

SO-0001289