# EXHIBIT H

```
IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION            2005 Folio No. 841
COMMERCIAL COURT
                                    Court No 65
                                    Royal Courts of Justice
                                    The Strand
                                    London WC2 A2U

                              Before:
                       MR JUSTICE WALKER

BETWEEN:
                          HSBC BANK PLC
                                                     Claimant
                              -and-

              (1) 5TH AVENUE PARTNERS LIMITED AND OTHERS
                                                     Defendant
AND BETWEEN:

                        (1) MR KEVIN SO
                        (2) MS YAN LUCY LU
                     (3) MR CHARLES MARTIN EDWARDS
                      (4) MR ROBERT WILLIAM MANN
                                              Part 20 Claimants
                              -and-

                 (1) 5TH AVENUE PARTNERS LIMITED
                 (2) MICHAEL ROBERT ALEXANDER BROWN
                         (3) HSBC BANK PLC
                 (4) EMULEX CONSULTORES E SERVICOS LDA

                                              Part 20 Defendants

              EMULEX CONSULTORES E SERVICOS LDA
                                              Part 20 Claimant
                              -and-

                 (1) MICHAEL ROBERT ALEXANDER BROWN
                 (2) 5TH AVENUE PARTNERS LIMITED
                        (3) KEVIN SO
                        (4) YAN LUCY LU
                    (5) CHARLES MARTIN EDWARDS
                        (6) HSBC BANK PLC
```

MR E MCQUATER QC and MS HUTTON (instructed by Allen & Overy LLP) appeared on behalf of the Claimant.
MR N VINEALL QC and MR J BOWLING (instructed by Bivonas Solicitors) appeared on behalf of the 10th 11th and 13th Defendants.

1123



MERRILL
LEGAL SOLUTIONS

Day 8                  HSBC                17th October 2007

### Page 9

1   A. Do you mean that I talked to Ms Lu about this, that is
2      the —
3   Q. Yes. Did she talk to you about what Mr Millar was
4      saying about profits that could be made in London?
5   A. She didn't discuss it with me.
6   MR JUSTICE WALKER: Mr So, it would help me to know: in
7      February 2005, did Ms Lu talk to you about the profits,
8      generally, that might be made from the transaction?
9   A. No. (Pause).
10   MR McQUATER: Mr So, in his response to Ms Lu, Mr Millar in
11      this e-mail says this in one sentence, and it is towards
12      the end, on page 281 of the bundle, and it is part of
13      his response to a question put to him. And it is — for
14      the translator's benefit, it is six lines from the end
15      of the e-mail. There is a sentence which starts:
16      "Forget all the broker nonsense."
17      He says to Ms Lu:
18      "Forget all the broker nonsense and non-existent
19      deals. This is the best real deal in the world."
20      Did Ms Lu tell you that Mr Millar had made reference
21      to these things?
22   A. She didn't tell me.
23   Q. If she had told you that Mr Millar had made a reference
24      to non-existent deals, would that have worried you?
25   A. She didn't tell me.

### Page 10

1   Q. Now, I am going to move from that e-mail, thank you, to
2      the next e-mail, which is at 285 of the bundle. This is
3      another e-mail from Ms Lu to Mr Millar on the
4      17th February 2005. And it is headed, "HSBC account in
5      London". And Ms Lu puts a number of further questions
6      here to Mr Millar.
7      If you look on in the bundle, please, to page 290,
8      Mr So, we have an e-mail which includes Mr Millar's
9      answers, given also on the 17th February.
10      Now, in this e-mail, Mr So, Mr Millar makes
11      reference to an account being set up in the name of you
12      and Ms Lu in London, on which Ms Lu could be made the
13      sole signatory.
14      Do you remember her telling you about that?
15   A. She didn't tell me.
16   Q. You don't remember any discussion about Ms Lu being made
17      the sole signatory to an account in your names in
18      London?
19   A. She didn't tell me.
20   Q. In this same e-mail, Mr So, Mr Millar tells Ms Lu that
21      the funds deposited in London could be withdrawn at any
22      time. Do you remember her telling you that?
23   A. She didn't tell me.
24   Q. I see. Sorry, just a moment. I am just trying to find
25      a reference. I apologise, Mr So. (Pause).

### Page 11

1      It is your own statement, Mr So. I have found it.
2      It is your own statement at paragraph 50. You have got
3      the Mandarin there. You can follow in the Mandarin.
4      Paragraph 50 of your statement, Mr So, you say this:
5      "I recall from my telephone discussions with Ms Lu
6      that she had been told by Mr Millar that our $30 million
7      investment would be held in a segregated non-depletion
8      account in HSBC and that we could withdraw the funds at
9      any time."
10      So are you now saying that that is untrue and that
11      she told you no such thing?
12   A. What do you mean, that it is incorrect?
13   Q. Well, in your statement, you are saying that Ms Lu told
14      you that she had been told by Mr Millar that the funds
15      in London could be withdrawn at any time. You just told
16      me in your evidence that she told you no such thing.
17   A. When she discussed with me, she only gave me this
18      information. She didn't tell me the details regarding
19      her conversation or discussion with Mr Millar.
20   Q. Well, tell me this. Is paragraph 50 of your statement
21      true or false?
22   A. It is true. Paragraph 52.
23   THE INTERPRETER: 50, sorry.
24   A. Paragraph 50 is true.
25   MR McQUATER: So you want to change your evidence and you

### Page 12

1      now want to say that she did tell you that Mr Millar had
2      said that you could withdraw the funds at any time from
3      the London account?
4   A. Can you repeat your question?
5   Q. I think you understand very well, Mr So, but I will
6      repeat it one last time for you.
7      Are you now saying that Ms Lu did tell you that
8      Mr Millar said that you could withdraw the funds at any
9      time from the London account?
10   A. Ms Lu did say that the money was deposited in a bank
11      account with HSBC. However, what they said in the
12      e-mails, I have no idea.
13   Q. So is paragraph 50 of your statement true or false?
14   A. It is true.
15   Q. Now, you can put your statement away for a second,
16      Mr So. You will need it again later.
17      Going back to Mr Millar's e-mail of the
18      17th February, which is at page 290 of the bundle.
19      Another thing that Mr Millar tells Ms Lu in this e-mail,
20      is that the account in London could hold cash or bank
21      securities.
22      Now, do you remember Ms Lu telling you about that?
23   A. No.
24   Q. So what is envisaged in Mr Millar's e-mail, Mr So, is
25      quite a sophisticated trading account which can hold

Merrill Legal Solutions
(+44) 207 404 1400
www.merrillcorp.com
190 Fleet Street
London EC4A 2AG

1126

SO-0027082

## Page 65

1  Q. Yes, and you knew that was the first time she had met
2     them?
3  A. I did not go to ask how many times they actually met.
4  Q. No, but you knew she had never met them before she went
5     to London, didn't you?
6  A. I did not know Ms Lu's dealings in this aspect.
7  Q. Well, when was the first time those names were mentioned
8     to you, the names of Michael Brown and Boris Lopatin?
9  A. It was after Ms Lu returned from London.
10 Q. Was it during the telephone call that we have been
11    talking about?
12 A. Correct.
13 Q. And Ms Lu told you that she had met these gentlemen in
14    London?
15 A. Correct.
16 Q. And you had no reason to think she had met them before
17    her trip to London, had you?
18 A. I don't know.
19 Q. Just before we move back to the Land Base agreement,
20    Mr So. We agreed that a profit of $100 million in
21    a short space of time on a -- sorry, I will start that
22    question again. I put it the wrong way.
23    We have agreed that what Ms Lu was reporting to you
24    in terms of profits would be an extraordinarily high
25    return. And you say that you understood this would be

## Page 66

1     gained for no risk to your principal. And you have also
2     now told me that you thought you could get your money
3     back at any time if you wanted it.
4     Now, you are a serious businessman, Mr So. Did that
5     not strike you as entirely incredible?
6  A. A moment ago, you asked me questions individually. You
7     asked me individual questions. Now, you are asking me
8     many questions in one go. Could you just kind of ask me
9     individual questions; one question at a time?
10 Q. Well, let me try to make it simple, Mr So. You are
11    being told you can make fantastic profits in a short
12    time, with no risk to your principal, and you would get
13    your money back at any time.
14    Now, that simply was not credible, was it?
15 A. As I just mentioned, you put all of the things you asked
16    before in just like a sort of conclusion. I do not
17    quite understand.
18 MR JUSTICE WALKER: Mr McQuater, could I have a go?
19 MR McQUATER: Of course, my Lord.
20 MR JUSTICE WALKER: Mr So, to make a profit under which
21    $30 million was turned into $100 million is unusual, is
22    it not?
23 A. Correct.
24 MR JUSTICE WALKER: An opportunity like that does not arise
25    very often; correct?

## Page 67

1  A. Correct.
2  MR JUSTICE WALKER: If you add to that, that your
3     $30 million is completely safe, that makes it highly
4     unusual, does it not?
5  A. I agree. From the 30 million to $100 million, yes, that
6     is unusual and I agree that. However, what I accept was
7     the principal would be safe. And also, if the trading
8     volume increases and then the speed of accumulating the
9     interest -- the profit, would become very quick.
10    However, I wasn't given any exact period, length
11    of time when the principal could increase into the
12    figure we just mentioned. I wasn't given the exact
13    length of time how quick that is.
14    So did I just answer the question you posed, your
15    Lordship?
16 MR JUSTICE WALKER: No, you did not.
17 A. I am sorry.
18 MR JUSTICE WALKER: Go back to getting $30 million turned
19    into $100 million. Is not that difficult to believe?
20    Is it not difficult to believe?
21 A. Yes, it is unusual.
22 MR JUSTICE WALKER: If you are then told: what is more, all
23    the time, your $30 million is safe; is not that even
24    more difficult to believe?
25 A. Yes, correct, yes.

## Page 68

1  MR JUSTICE WALKER: And then you are told: on top of that,
2     you can have the $30 million back at any time; is not
3     that incredible?
4  A. I am sorry. May I just answer a question first --
5     answer one question first?
6  MR JUSTICE WALKER: Yes.
7  A. When the bank's counsel asked me questions, he asked
8     me: under which circumstances, I could get my money
9     back. I wasn't aware this question is actually linked
10    to two other questions. I just thought under normal
11    circumstances, if I want to take my money out, then
12    I can take my money out. This is how I understood --
13    that was my understanding.
14 MR JUSTICE WALKER: My question is: is not this combination
15    of amazingly good terms, completely incredible?
16 A. Yes. If you combine all those factors together, yes, it
17    is.
18 MR JUSTICE WALKER: Thank you.
19 A. I would like to add a point, one point.
20    I would like to add, kind of -- when doing some
21    investment, when the investment process ends, then the
22    money can be taken out. I am not saying taking the
23    money out during the process, the investment process.
24 MR JUSTICE WALKER: Mr McQuater, I don't understand what
25    that means, but if there is anything you want to ask

```
 1   Q.   Now, I am going to move from that e-mail, thank you, to
 2        the next e-mail, which is at 285 of the bundle.  This is
 3        another e-mail from Ms Lu to Mr Millar on the
 4        17th February 2005.  And it is headed, "HSBC account in
 5        London".  And Ms Lu puts a number of further questions
 6        here to Mr Millar.
 7            If you look on in the bundle, please, to page 290,
 8        Mr So, we have an e-mail which includes Mr Millar's
 9        answers, given also on the 17th February.
10            Now, in this e-mail, Mr So, Mr Millar makes
11        reference to an account being set up in the name of you
12        and Ms Lu in London, on which Ms Lu could be made the
13        sole signatory.
14            Do you remember her telling you about that?
15   A.   She didn't tell me.
16   Q.   You don't remember any discussion about Ms Lu being made
17        the sole signatory to an account in your names in
18        London?
19   A.   She didn't tell me.
20   Q.   In this same e-mail, Mr So, Mr Millar tells Ms Lu that
21        the funds deposited in London could be withdrawn at any
22        time.  Do you remember her telling you that?
23   A.   She didn't tell me.
24   Q.   I see.  Sorry, just a moment.  I am just trying to find
25        a reference.  I apologise, Mr So. (Pause).
```

10

```
 1          It is your own statement, Mr So.  I have found it.
 2          It is your own statement at paragraph 50.  You have got
 3          the Mandarin there.  You can follow in the Mandarin.
 4          Paragraph 50 of your statement, Mr So, you say this:
 5              "I recall from my telephone discussions with Ms Lu
 6          that she had been told by Mr Millar that our $30 million
 7          investment would be held in a segregated non-depletion
 8          account in HSBC and that we could withdraw the funds at
 9          any time."
10          So are you now saying that that is untrue and that
11          she told you no such thing?
12  A.      What do you mean, that it is incorrect?
13  Q.      Well, in your statement, you are saying that Ms Lu told
14          you that she had been told by Mr Millar that the funds
15          in London could be withdrawn at any time.  You just told
16          me in your evidence that she told you no such thing.
17  A.      When she discussed with me, she only gave me this
18          information.  She didn't tell me the details regarding
19          her conversation or discussion with Mr Millar.
```

20  Q.      Well, tell me this.  Is paragraph 50 of your statement
21          true or false?
22  A.      It is true.  Paragraph 52.
23  THE INTERPRETER:  50, sorry.
24  A.      Paragraph 50 is true.
25  MR McQUATER:  So you want to change your evidence and you

11

```
 1      gained for no risk to your principal.  And you have also
 2      now told me that you thought you could get your money
 3      back at any time if you wanted it.
 4          Now, you are a serious businessman, Mr So.  Did that
 5      not strike you as entirely incredible?
 6   A. A moment ago, you asked me questions individually.  You
 7      asked me individual questions.  Now, you are asking me
 8      many questions in one go.  Could you just kind of ask me
 9      individual questions; one question at a time?
10   Q. Well, let me try to make it simple, Mr So.  You are
11      being told you can make fantastic profits in a short
12      time, with no risk to your principal, and you would get
13      your money back at any time.
14          Now, that simply was not credible, was it?
15   A. As I just mentioned, you put all of the things you asked
16      before in just like a sort of conclusion.  I do not
17      quite understand.
18   MR JUSTICE WALKER:  Mr McQuater, could I have a go?
19   MR McQUATER:  Of course, my Lord.
20   MR JUSTICE WALKER:  Mr So, to make a profit under which
21      $30 million was turned into $100 million is unusual, is
22      it not?
23   A. Correct.
24   MR JUSTICE WALKER:  An opportunity like that does not arise
25      very often; correct?
```

```
 1  A.  Correct.
 2  MR JUSTICE WALKER:  If you add to that, that your
 3      $30 million is completely safe, that makes it highly
 4      unusual, does it not?
 5  A.  I agree.  From the 30 million to $100 million, yes, that
 6      is unusual and I agree that.  However, what I accept was
 7      the principal would be safe.  And also, if the trading
 8      volume increases and then the speed of accumulating the
 9      interest -- the profit, would become very quick.
10          However, I wasn't given any exact period, length
11      of time when the principal could increase into the
12      figure we just mentioned.  I wasn't given the exact
13      length of time how quick that is.
14          So did I just answer the question you posed, your
15      Lordship?
16  MR JUSTICE WALKER:  No, you did not.
17  A.  I am sorry.
18  MR JUSTICE WALKER:  Go back to getting $30 million turned
19      into $100 million.  Is not that difficult to believe?
20      Is it not difficult to believe?
21  A.  Yes, it is unusual.
22  MR JUSTICE WALKER:  If you are then told: what is more, all
23      the time, your $30 million is safe; is not that even
24      more difficult to believe?
25  A.  Yes, correct, yes.
```

```
 1   MR JUSTICE WALKER:  And then you are told: on top of that,
 2       you can have the $30 million back at any time; is not
 3       that incredible?
 4   A.  I am sorry.  May I just answer a question first --
 5       answer one question first?
 6   MR JUSTICE WALKER:  Yes.
 7   A.  When the bank's counsel asked me questions, he asked
 8       me: under which circumstances, I could get my money
 9       back.  I wasn't aware this question is actually linked
10       to two other questions.  I just thought under normal
11       circumstances, if I want to take my money out, then
12       I can take my money out.  This is how I understood --
13       that was my understanding.
14   MR JUSTICE WALKER:  My question is: is not this combination
15       of amazingly good terms, completely incredible?
16   A.  Yes.  If you combine all those factors together, yes, it
17       is.
18   MR JUSTICE WALKER:  Thank you.
19   A.  I would like to add a point, one point.
20          I would like to add, kind of -- when doing some
21       investment, when the investment process ends, then the
22       money can be taken out.  I am not saying taking the
23       money out during the process, the investment process.
24   MR JUSTICE WALKER:  Mr McQuater, I don't understand what
25       that means, but if there is anything you want to ask
```