# EXHIBIT I

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION          2005 Folio No. 841
COMMERCIAL COURT

                              Court No 65
                              Royal Courts of Justice
                              The Strand
                              London WC2 A2U

                     Before:
                  MR JUSTICE WALKER

BETWEEN:

                  HSBC BANK PLC
                                              Claimant

                     -and-

    (1) 5TH AVENUE PARTNERS LIMITED AND OTHERS
                                              Defendant

AND BETWEEN:

                  (1) MR KEVIN SO
                  (2) MS YAN LUCY LU
              (3) MR CHARLES MARTIN EDWARDS
                (4) MR ROBERT WILLIAM MANN
                                    Part 20 Claimants

                     -and-

            (1) 5TH AVENUE PARTNERS LIMITED
          (2) MICHAEL ROBERT ALEXANDER BROWN
                  (3) HSBC BANK PLC
          (4) EMULEX CONSULTORES E SERVICOS LDA

                              Part 20 Defendants

        EMULEX CONSULTORES E SERVICOS LDA
                              Part 20 Claimant

                     -and-

        (1) MICHAEL ROBERT ALEXANDER BROWN
          (2) 5TH AVENUE PARTNERS LIMITED
                  (3) KEVIN SO
                  (4) YAN LUCY LU
              (5) CHARLES MARTIN EDWARDS
                  (6) HSBC BANK PLC

MR E MCQUATER QC and MS HUTTON (instructed by Allen & Overy
LLP) appeared on behalf of the Claimant.
MR N VINEALL QC and MR J BOWLING (instructed by Bivonas
Solicitors) appeared on behalf of the 10th 11th and 13th
Defendants.

MERRILL
LEGAL SOLUTIONS



1153

SO-0027109

Day 9                          HSBC                    18th October 2007

**Page 13**

1   A. I can't remember what she told me about the content of
2      this letter.
3   Q. You can't remember?
4   A. Correct.
5   Q. You see, Mr So -- I will come to that.
6      Did Ms Lu tell you the circumstances in which she
7      was given this document?
8   A. I cannot remember.
9   Q. Did she tell you that it was given to her in
10     Mr Lopatin's hotel room in London?
11  A. I cannot remember.
12  Q. Did she tell you that it was handed to her by somebody
13     she didn't know and whose role she didn't understand?
14  A. I cannot remember.
15  Q. In your conversation with Ms Lu, did she tell you that
16     she had not visited HSBC?
17  A. I cannot remember.
18  Q. Did she tell you that she had not even spoken to any
19     representative of HSBC?
20  A. I cannot remember.
21  Q. At the time of your discussion with Ms Lu on
22     the telephone, on her return to Canada, how did you know
23     that this letter of instruction was a genuine document
24     at all and not a forgery? (Pause)
25  A. Do you mean that a letter from HSBC can be a forgery?

**Page 14**

1   Q. No, what I mean is: how did you know that this was
2      a genuine letter from HSBC and had not been forged by
3      one of the gentlemen that Ms Lu had met in London?
4   A. I trusted HSBC, I never thought that anyone would forge
5      a letter from HSBC. Can you tell me, were there
6      instances that someone produced a letter of forgery from
7      HSBC?
8   Q. Well, I ask the questions, Mr So.
9      So the possibility that the letter might be
10     a forgery never crossed your mind?
11  A. I said I trusted HSBC completely.
12  Q. You didn't consider it would be sensible to check with
13     HSBC that this was indeed a genuine document?
14  A. I trusted HSBC completely.
15  Q. Yes, but how did you know that this was a genuine HSBC
16     letter, Mr So?
17  A. It never occurred to me that someone will produce
18     a letter of forgery from HSBC.
19  Q. Now, you recall Mr So, that before Ms Lu went to London,
20     you signed certain documents relating to the opening of
21     a non-depletion account. Do you remember that?
22  A. Are you referring to what I am required to do and that
23     is a letter of authorisation regarding signatory, for
24     Ms Lu?
25  Q. Yes. So when Ms Lu went to London, you were expecting

**Page 15**

1      her to open an account at HSBC, weren't you? That is
2      what you were expecting, wasn't it?
3   A. I authorised her to act on my behalf, I trusted her
4      completely.
5   Q. Well, the plan was, Mr So, that she would visit HSBC in
6      London, and open a non-depletion account in both your
7      names there; that was the plan, wasn't it? (Pause)
8   A. I authorised Ms Lu and whatever she does in London is up
9      to her.
10  Q. Well, I suggest that you knew from your conversation
11     with her that she had not visited HSBC, and you, Mr So,
12     were having great difficulty in understanding how she
13     could possibly have opened such an account? (Pause)
14     That is right, isn't it, Mr So? What I am saying,
15     Mr So, is that it would have been apparent from your
16     discussion with Ms Lu, that she had not visited HSBC and
17     you could not therefore understand how she could have
18     opened an account for you and her there?
19  A. I do not understand your question.
20  Q. Well, let me try and make it clearer for you, Mr So. Do
21     you recall we looked at some documents relating to your
22     accounts at Salomon Smith Barney? You remember we
23     looked at an application form and client agreement,
24     Mr So? Which you've signed in nine places? You
25     remember looking at that document, don't you?

**Page 16**

1   A. Yes.
2   Q. And that was a document you signed to open
3      a sophisticated trading account at Salomon Smith Barney,
4      isn't it? (Pause)
5      It is not a hard question, Mr So. Those were
6      documents that you signed to open your trading account
7      at Salomon Smith Barney?
8   A. Yes.
9   Q. But you knew that Ms Lu hadn't signed any of that kind
10     of documentation on her trip to London, had she?
11  A. I do not know. I did not know.
12  Q. She didn't tell you she had, did she?
13  A. What you ask me, I do not know.
14  Q. Well, you signed an authorisation before she went to
15     open a bank account on your behalf. So I assume that
16     when she returned to Canada, you discussed with her
17     whether she had indeed opened such an account? (Pause)
18  MR JUSTICE WALKER: What is your question, Mr McQuater?
19  MR McQUATER: You had such a discussion, didn't you, Mr So?
20     When Ms Lu returned to Canada, you had a discussion with
21     her about whether she had indeed opened a bank account
22     at HSBC on behalf of you and Ms Lu? Do you remember
23     such a discussion, Mr So?
24  A. Can you repeat your question?
25  Q. Do you remember discussing with Ms Lu during your

4 (Pages 13 to 16)

1157

SO-0027113

Day 9                              HSBC                      18th October 2007

| | |
|---|---|
| 1  not — I will start again. | 1  any communications should have gone through him." |
| 2    I am suggesting that you knew that Ms Lu had no | 2    Now, let me try and refresh your memory, Mr So. If |
| 3  contact with HSBC and you realised that it was necessary | 3  we could go together, please, to bundle page 113 — |
| 4  to get these assurances in this letter directly from | 4  sorry, cross-examination bundle 2, page 113; we have in |
| 5  HSBC. That is correct, isn't it? | 5  the top part of this page an email that Mr Brown sent to |
| 6  A. No, it is wrong. | 6  Ms Lu on 19th April. So that is the day after you had |
| 7  Q. Which part of it is wrong? | 7  sent your enquiry to HSBC. And he says this: |
| 8  A. As I said before, I did not know the circumstance with | 8    "Hi Lucy, regrettably your bank's communication to |
| 9  regard Ms Lu's contact with HSBC London. | 9  mine was unacceptable. I therefore have asked HSBC |
| 10  Q. That is not true, is it, Mr So? It was quite apparent | 10  London to cease communication. Best wishes for |
| 11  from your discussion with her that she had neither | 11  the future, Michael Brown." |
| 12  visited nor spoken to anyone at HSBC; that is right, | 12    Now, you had the conversation which is described in |
| 13  isn't it? | 13  your statement, because Ms Lu had received this email |
| 14  A. Which — during which discussion I had mentioned that? | 14  from Mr Brown, didn't you? |
| 15  Q. What I am suggesting is that it would have been obvious | 15  A. I do not know whether she had received any email from |
| 16  to you from your discussions with Ms Lu at this time | 16  Mr Brown. |
| 17  when she returned to Canada from London that she had | 17  Q. Well, she told you Mr Brown was furious. That is in |
| 18  neither visited nor spoken to anyone at HSBC. That is | 18  your statement? |
| 19  correct, isn't it? | 19  A. Correct. |
| 20  A. Could you answer my last question? | 20  Q. And I am quite sure, Mr So, that she told you about this |
| 21  Q. I am afraid I ask the questions, Mr So. | 21  email. That is right, isn't it? |
| 22    I am going to put it to you one more time. | 22  A. Wrong. |
| 23  A. I understand now. | 23  Q. Well, how did she say she knew Mr Brown was furious |
| 24  Q. Well, do you agree that at this time, when this letter | 24  then? |
| 25  was drafted, you knew that Ms Lu had neither visited nor | 25  A. I would not have known how did she know — how she knew. |

Page 29                                                     Page 31

| | |
|---|---|
| 1  spoken to anyone at HSBC during her visit to London? | 1  Q. Was it of no interest to you to discover why a gentleman |
| 2  A. No, totally wrong. | 2  with whom you were about to invest US$30 million might |
| 3  Q. Well, that is a lie, isn't it, Mr So? You knew full | 3  have become furious? |
| 4  well that she hadn't visited or spoken to HSBC and that | 4  A. I had not thought about it. |
| 5  is why you realised that it was important to get | 5  Q. Well, didn't you ask Ms Lu why Mr Brown was furious? |
| 6  assurances directly from HSBC. | 6  A. She said any correspondence should be done through |
| 7  A. Totally wrong. | 7  Mr Brown. |
| 8  Q. You sent this letter off to HSBC on 18th April; we can | 8  Q. Well, I would invite you to be somewhat more frank with |
| 9  see that from bundle — page 98 is your version of this? | 9  the court, Mr So. I suggest that she did tell you about |
| 10  A. Yes, correct. | 10  this email. |
| 11  Q. You sent that off on the 18th. | 11  A. Totally wrong. |
| 12  A. Correct. | 12  Q. And I suggest that you understood a number of things |
| 13  Q. And neither you nor Ms Lu received any reply from HSBC | 13  from your discussion with Ms Lu. First, I suggest that |
| 14  to this letter, did you? | 14  you knew that Mr Brown had said that your letter to HSBC |
| 15  A. What did you refer to? | 15  was unacceptable. You knew that, didn't you? |
| 16  Q. I am saying that neither you nor Ms Lu received any | 16  A. Yes, I knew about this point, yes. |
| 17  reply from HSBC to this letter. | 17  Q. Yes, thank you. |
| 18  A. Correct. | 18    Now, you also knew that Mr Brown had told Ms Lu that |
| 19  Q. Instead, if we can look, please, at paragraph 71 of your | 19  he had asked HSBC London to cease communication? |
| 20  witness statement. I will read in the English, please | 20  A. No, I did not know. |
| 21  follow in the Mandarin, Mr So: | 21  Q. Well, I suggest you knew that from your discussion with |
| 22    "I did not receive a response from HSBC London. | 22  Ms Lu, and you therefore knew that you would not be |
| 23  I was told by Ms Lu that apparently HSBC London had | 23  receiving a response to your letter to HSBC. That is |
| 24  passed on our letter to Mr Brown. He was, according to | 24  right, isn't it, Mr So? You knew that Ms Lu had been |
| 25  Ms Lu, furious that we had contacted the bank and that | 25  told that Mr Brown had told HSBC to cease communication? |

Page 30                                                     Page 32

8 (Pages 29 to 32)

Day 9 — HSBC — 18th October 2007

**Page 33**

1  A. No, I did not know.
2  Q. You knew at that point you weren't going to get
3   a response to your letter, didn't you? That is right,
4   isn't it?
5  A. I don't know.
6  Q. And you knew the reason for that was that Mr Brown had
7   told HSBC not to respond. You knew that, didn't you,
8   Mr So?
9  A. Could you just repeat?
10 Q. Yes, you knew at this stage that Mr Brown had told HSBC
11   not to reply to your letter?
12 A. No, I did not know.
13 Q. And we've seen from this email that we've looked at on
14   page 113, Mr So, that Mr Brown had found the letter so
15   unacceptable that he had called the deal off. Do you
16   remember Lucy telling you that, Ms Lu telling you that?
17 A. No, she did not tell me.
18 Q. Well, I suggest she did tell you that Mr Brown had
19   either called the deal off or was at least threatening
20   to call the deal off.
21 A. No, she did not tell me.
22 Q. Mr Brown's reaction to your letter to HSBC must have
23   been very surprising to you, Mr So, wasn't it? (Pause)
24 THE INTERPRETER: The interpreter would like to clarify with
25   the witness. (Pause)

**Page 34**

1  A. Okay. It didn't come as a surprise, it is more like
2   curious, because our letter was sent to HSBC bank. HSBC
3   bank did not answer my questions; instead they went
4   directly to ask Mr Brown. On top of that, after your
5   explanation to me today, when Mr Brown asked HSBC London
6   not to communicate with me, then HSBC London stopped
7   communicating with me. So you thought on the basis of
8   that I should be surprised? Is that what you meant,
9   Mr Counsel?
10 Q. Let me clarify. By your last answer, did you mean that
11   at the time, that is to say, on or about
12   19th April 2005, you knew that Mr Brown had told HSBC
13   not to respond to your letter?
14 A. Whether they should communicate with me, I didn't know
15   about that. My answers I just given is referring to
16   your question to say whether I was surprised.
17 Q. Okay. One reason why I suggest you would have been
18   surprised by Mr Brown's response -- I am sorry,
19   Mr Brown's reaction, is that it was contrary to
20   something he had previously told Ms Lu. To explain to
21   you what I mean, Mr So -- we've looked at it already but
22   let's look again at paragraph 58 of your statement:
23   "I recall Ms Lu saying that Mr Brown and Mr Lopatin
24   both had told her that if we had any doubts about
25   the investment we could contact Ms Armull at HSBC

**Page 35**

1   directly to make any further enquiries."
2  A. So now what is your question?
3  Q. Well, you told me before that that paragraph is true.
4  A. Yes.
5  Q. So, Mr Brown in reacting the way he did was acting
6   contrary to what he and Mr Lopatin had previously told
7   Ms Lu.
8  A. So what is your question? What would you need me to
9   answer?
10 Q. Let me try to simplify. Mr Lopatin and Mr Brown had
11   previously told Ms Lu that you and she could contact
12   HSBC directly. A few days later, you contact HSBC
13   directly and Mr Brown becomes furious. Didn't that
14   surprise you?
15 A. Before I answer this question, could you explain
16   something to me?
17 Q. What would you like to have explained, Mr So?
18 A. The letter we sent to HSBC, did the bank need to consult
19   with Mr Brown in advance?
20 Q. No, I ask the questions, Mr So.
21   I think you understand perfectly well what I am
22   putting to you.
23 A. I already asked your permission.
24 Q. Mr Brown, as you knew, had told Ms Lu that you and she
25   could contact HSBC directly. That is exactly what you

**Page 36**

1   then did, and he became furious. Did that not worry
2   you?
3  A. On the contrary.
4  THE INTERPRETER: I said the witness should finish his
5   sentence before I interpret back.
6  A. Our understanding was our enquiry letter was sent to
7   the bank. However, before the bank could give us
8   a response, they had to go to consult with Mr Brown.
9   This proved to us Mr Brown must have been a very
10   important figure in the bank.
11 MR McQUATER: And you know that Mr Brown had told the bank
12   not to respond? You know that, didn't you, Mr So?
13 A. No, I did not know.
14 Q. And Mr Brown's reaction did not worry you?
15 A. As I already answered, he was an important figure in
16   HSBC bank because the bank had to consult with him --
17   had to obtain his opinion.
18 Q. What did you understand was the reason why Mr Brown was
19   furious? Please, without your statement, please, Mr So.
20   Please close your statement. What did you understand
21   was the reason why Mr Brown was furious?
22 A. I already answered just now.
23 Q. Well, indulge me. Please answer again.
24 A. He wasn't pleased we contacted HSBC directly. He wasn't
25   pleased that we contacted the bank directly.

9 (Pages 33 to 36)

Merrill Legal Solutions
(+44) 207 404 1400                www.merrillcorp.com

190 Fleet Street
London EC4A 2AG

1162

SO-0027118

Day 9        HSBC        18th October 2007



**Page 41**

1   said he doesn't know about the email. You have his
2   statement which says that he accepts he was told that
3   Mr Brown was furious. If we work from there as
4   the reference point, after that.
5   MR McQUATER: I see, my Lord.
6   MR JUSTICE WALKER: There is something that he accepts.
7   MR McQUATER: I was perhaps presuming too much.
8     Mr So, you remember being told by Ms Lu that
9   Mr Brown had become furious?
10   A. Yes.
11   Q. After that time, did you make any further attempt to
12   contact or get in touch with HSBC directly?
13   MR JUSTICE WALKER: Can I again identify some obvious
14   difficulties with the question. First, "you"; who is
15   you? Is that Mr So personally, or is that Ms Lu?
16   Second, when you refer to getting in touch with HSBC
17   directly, this man has just told you that he -- his
18   evidence was that he believed Mr Brown to have a very
19   high position in HSBC. It seems to me that the starting
20   point is: did you personally contact Mrs Arnull again?
21   MR McQUATER: Mr So, let me try this again. After the time
22   that you learned that Mr Brown had become furious, did
23   you personally make any further attempt to contact
24   Ms Arnull?
25   A. No.

**Page 42**

1   Q. Are you aware of Ms Lu making any further attempt to
2   contact Ms Arnull?
3   A. No, I did not know.
4   Q. After the time you learned of Mr Brown becoming furious,
5   did you make any attempt to contact any other officer or
6   representative of HSBC?
7   A. No.
8   Q. Are you aware of Ms Lu making any attempt to contact any.
9   other officer or representative of HSBC after you
10   learned Mr Brown had become furious?
11   A. No, I did not know.
12   Q. After you had learned Mr Brown had become furious, you
13   didn't at any stage ask Ms Lu to contact Ms Arnull, did
14   you?
15   A. Correct. As I already said, I believe he had a high
16   position, very senior position, within HSBC bank and
17   also, the bank itself had high regard to Mr Brown. So
18   therefore, I had no reason to doubt anything.
19   Q. Mr So, on the chronology we've reached 19th April 2005.
20   I suggest it was at or about that time that you learned
21   that Mr Brown had become furious. Does that sound
22   right? Does that sound as though that was at or about
23   that time that you learned this information?
24   A. Could you repeat your question, please?
25   Q. Perhaps I can help with your statement; give me

**Page 43**

1   a second. In your statement, at paragraph 69 you say
2   that you had sent your letter to HSBC on 18th April and
3   in paragraph 71 you say you did not receive a response:
4   "I was told by Ms Lu that apparently HSBC London had
5   passed our letter to Mr Brown."
6     Now, after you learn that Mr Brown had become
7   furious, who made the decision to proceed with this
8   investment?
9   A. First of all, to whom this question is directed to?
10   I do not understand your question.
11   Q. Let me try to be clear. After you had learned that
12   Mr Brown had become furious about your letter to HSBC,
13   who then took the decision to proceed with
14   the investment? (Pause)
15   A. As I just said, after our analysis, we felt -- we
16   felt -- we trusted HSBC bank very much, and then HSBC
17   bank needed to consult with Mr Brown. Therefore, both
18   Ms Lu and I felt we were confident in this investment.
19   Q. Are you saying that you and Ms Lu made the decision to
20   proceed with the investment?
21   A. I can't remember very much details. What I remember is
22   we all agreed to proceed with the investment.
23   Q. So who are the individuals who took the decision to
24   proceed with the investment?
25   A. So what is your question?

**Page 44**

1   Q. Well, when I asked you about this the other day, Mr So,
2   I asked you who made the decisions in relation to
3   the investment, and you declined to answer and told me
4   there was a process. What I would like to know is which
5   person or persons took the decision to make this
6   investment?
7   A. As I already answered, after our analysis both Ms Lu and
8   I agreed to proceed with the investment.
9   Q. So, you and Ms Lu took the decision?
10   A. We both agreed to proceed with this investment. So what
11   do you think -- do you think how should I define?
12   Q. As I understand it, this was in large part family money
13   that was being invested, wasn't it, Mr So?
14   A. Correct.
15   Q. Were other members of your family involved in making
16   decisions about this investment?
17   A. My family members trust me very much. From my previous
18   answer, you should have known the process.
19   Q. Can you explain the process to me? Who is involved in
20   it?
21   A. What would you like me to explain?
22   Q. Well, I would like you to explain what the process is
23   and who is involved in it.
24   A. This question is just too big. I can't answer you.
25   Q. Well, is your father involved in making -- let me put

11 (Pages 41 to 44)

Merrill Legal Solutions
(+44) 207 404 1400     www.merrillcorp.com

190 Fleet Street
London EC4A 2AG

1164

SO-0027120

Day 9                                           HSBC                              18th October 2007

**Page 45**

1   that more directly. Was your father involved in making
2   decisions about this investment?
3   A. The family had already agreed that I was going to carry
4   out this business.
5   Q. So am I to understand that the individuals who took
6   the decision to invest in 5th Avenue Partners were
7   yourself and Ms Lu?
8   A. Correct.
9   Q. My Lord, that might be a good point to break.
10  MR JUSTICE WALKER: Could I mention something. There is
11  a group of 20 law students from Yale University who wish
12  to come and see something of this trial on Monday.
13  I think that we could squeeze them in if we were to make
14  use of the row of seats over there, and for that
15  purpose, it will be necessary just to move some of
16  the box files. Perhaps they could come -- the top two
17  and a half rows might perhaps come to the front before
18  Monday, if that could be achieved.
19  MR VINEALL: I am sure we could sort something out, my Lord.
20  MR JUSTICE WALKER: Thank you very much. 2 o'clock then.
21  (1.00 pm)
22                      (The short adjournment)
23  (2.00 pm)
24  MR McQUATER: Mr So, good afternoon. We were looking before
25  lunch at an email on page 113 of cross-examination

**Page 46**

1   bundle 2. The email we looked at was dated
2   19th April 2005; you may just keep your finger in that
3   page, please, and turn on if you would, perhaps with
4   some assistance, to a new page that was added which you
5   recently disclosed. It is added after page 124 and it
6   is number X2/124/A1. The page we are now looking at, at
7   X2/124/A1, Mr So, as I understand it, is your
8   instruction to HSBC Hong Kong to transfer
9   the $30 million, is that right?
10  A. Yes. That is right.
11  Q. So, we see that the instruction was actually given on
12  20th April. If you could, please, then look back to
13  where we were on page 113, I want you to look at
14  the bottom email on that page. There are two emails on
15  the page. It is an email from Ms Lu to Michael Brown on
16  18th April, so it is two days before the instruction we
17  just looked at.
18      She says this:
19      "Hi Michael, thank you for your email. Now I have
20  successfully log in your website. It is amazing."
21      Then she says this:
22      "We have finished the documents in HSBC Hong Kong
23  for the fund transfer and paid US$60,000 penalty.
24  I think the fund will be transferred on Thursday."
25      Am I right in thinking, Mr So, that the documents

**Page 47**

1   for the fund transfer were prepared on 18th April?
2   A. I can't remember.
3   Q. Can you remember if you had already by the 18th April
4   incurred a penalty with HSBC Hong Kong for breaking your
5   time deposit?
6   A. I can't remember.
7   Q. Now, we've reached -- if you come on to the document we
8   looked at a moment ago, X2/124/A1, just behind
9   page 124 -- we've reached 20th April, Mr So. Was there
10  any urgent need for you to make this investment on
11  20th April?
12  A. I can't remember.
13  Q. By that, I mean was there any particular deadline or
14  pressure of time that was on you to make the investment?
15  A. I can't remember.
16  Q. Well, as far as I can tell, Mr So, you could have taken
17  as much time as you liked to decide about this
18  investment?
19  A. I don't understand what you are saying.
20  Q. I am suggesting that there is no particular time
21  pressure on you to make this investment, so if you had
22  wished to take time, for example, to get advice, you
23  could have done so. Is that right? (Pause)
24  A. I didn't think of it, I didn't think about it.
25  Q. You weren't aware of any time pressure being placed on

**Page 48**

1   you by anybody to make this investment; is that correct?
2   A. That is right, there was no pressure.
3   Q. So if you had wanted to get --
4   A. You were asking me that there was -- nobody was giving
5   me pressure regarding time?
6   Q. Yes, nobody was putting pressure of time on you to make
7   this investment.
8   A. That is correct.
9   Q. Had you wished to do so, you would have had time to have
10  the letter of instruction, the Land Base agreement, and
11  the letter of reference translated. You could have done
12  that if you had wished to do so; you had the time,
13  Mr So. That is correct, isn't it? You had time to do
14  that, had you chosen to do so?
15  A. I didn't think of it.
16  Q. And you could have taken professional advice if you had
17  wished to do so? You had the time to take professional
18  advice if you had wished to do so, Mr So, didn't you?
19  A. Can you ask the question again?
20  Q. You could have taken professional advice -- let me start
21  again.
22      You had the time to take professional advice if you
23  had wished to do so, didn't you, Mr So?
24  A. That is correct.
25  Q. Now, let me turn to the period of time after

12 (Pages 45 to 48)

Day 9                                         HSBC                                    18th October 2007

**Page 61**

1   anything. I haven't decided but I don't think it will
2   be more than 10 minutes.
3   MR JUSTICE WALKER: In those circumstances, I think the
4   sensible course is that we have our break right now. We
5   will resume at 3.15, and that would be on the basis that
6   you will have from 3.15 to 4 o'clock.
7   MR McQUATER: Understood, my Lord.
8   MR JUSTICE WALKER: I am sure that the break will give you
9   enough time to make any necessary revisions to your
10  planned questions.
11  MR McQUATER: I entirely understand, my Lord, yes.
12  (3.00 pm)
13  (A short break)
14  (3.15 pm)
15  MR McQUATER: Mr So, I hope you still have your statement
16  open in front of you, paragraph 76. Do you have your
17  statement?
18  A. (Nods)
19  Q. As I understand your evidence, Mr So, you are saying
20  that at the time that you agreed to settle on the terms
21  described in that paragraph, you did not ask Lucy Lu
22  what the reason for the settlement was, the reason why
23  there had to be a settlement.
24  THE INTERPRETER: Could the interpreter -- repeat
25  the question again?

**Page 62**

1   MR McQUATER: At the time you agreed to these terms of
2   settlement referred to in paragraph 76, did you know
3   the reason why a settlement was necessary?
4   A. No.
5   Q. And you didn't ask Ms Lu?
6   A. Correct.
7   Q. In her statement, Ms Lu tells us that by the end of
8   October 2005 at least, that Mr Lopatin was telling her
9   that Mr Brown had concealed trades from investors. Do
10  you remember being told that?
11  A. I can't remember.
12  Q. I think you said Ms Lu subsequently instructed a lawyer
13  called Mr Larue; do you remember that, Mr So? Do you
14  remember instructing a lawyer called Mr Larue?
15  THE INTERPRETER: The interpreter would like counsel to
16  spell the name.
17  MR McQUATER: L-A-R-U-E.
18  A. I can't remember.
19  Q. Could you look at the bundle, please, at page --
20  cross-examination bundle 2, page 2/210. This is
21  a document in English with Mr Larue's name at the top.
22  It gives the name of his law firm, and it is dated
23  20th October 2005. If you look over the page to
24  page 211, Mr So, you should find your signature. And
25  two pages on at 213, you will find a copy of your

**Page 63**

1   passport attached. Moving back to page 210,
2   the substance of this document is that Mr Larue is
3   engaged by you and by Ms Lu to act as legal counsel. Do
4   you now remember signing a document to engage Mr Larue
5   as your legal counsel?
6   A. I can't remember.
7   Q. You don't remember signing this document?
8   A. I can't remember this document.
9   Q. That is your signature on page 211, is it, Mr So?
10  A. Yes.
11  Q. Do you remember if you had any conversations with
12  Mr Larue?
13  A. No.
14  Q. Now, we know from other documents in this case, Mr So,
15  that there was a meeting in Monterey in California on
16  31st October 2005 which was attended by Mr Larue and
17  others. The matters I am going to summarise for you --
18  THE INTERPRETER: Sorry, the interpreter forgot the name of
19  the city in California?
20  MR McQUATER: Monterey in California. That meeting was on
21  31st of October 2005. And the meeting was attended by
22  Mr Larue, Boris Lopatin, and a lawyer from Michael Brown
23  called Keith Oliver. Did you know anything about this
24  meeting?
25  A. I know there was a meeting, a meeting had been held.

**Page 64**

1   I am not so sure about the details.
2   Q. Let me try to remind you. We know from other documents,
3   Mr So, that at the meeting Mr Brown's lawyer handed over
4   a box of papers to Mr Larue and Mr Lopatin.
5   A. Who give who a box of documents?
6   Q. Mr Brown's lawyer handed over a box of documents to your
7   lawyer, Mr Larue, and to Mr Lopatin. And that box
8   contained documents from this legal action and details
9   of HSBC's allegations about Michael Brown, including
10  HSBC's allegations that Michael Brown had dishonestly
11  stolen investors' money. Were you aware of that?
12  A. No.
13  Q. Did your lawyer, Mr Larue, not tell you what had
14  happened at that meeting?
15  A. I knew that the meeting wasn't -- was not successful.
16  Q. Well, you have invested 30 million in a transaction in
17  London and your lawyer has by this stage been informed
18  of serious allegations of fraud relating to that
19  transaction. Are you saying that he didn't tell you
20  about that?
21  A. Any external business was handled by Ms Lu on my behalf.
22  Q. Did Ms Lu tell you about these allegations?
23  A. No.
24  Q. She didn't tell you that HSBC was saying that
25  Michael Brown had stolen monies from investors in

16 (Pages 61 to 64)

Day 9                          HSBC                     18th October 2007

**Page 65**

1    the London transaction?
2    A. What she told me was the meeting wasn't successful.
3    Q. Could you turn, please, to cross-examination bundle 2,
4        page 269? At page 269, there is an email dated
5        17th November now, 17th November 2005. It is an email
6        that has been forwarded along the way but the original
7        email at the bottom is from a gentleman called Ivan at
8        HSBC in Hong Kong. And in the text of the email, he
9        says this:
10        "Kevin So called me this afternoon. He said after
11        discussion with his lawyers that he has decided that
12        there will be no lawyer's letter."
13    THE INTERPRETER: The interpreter would like to clarify "no
14        lawyer's letter"; does that just mean lawyer's letter?
15    MR McQUATER: No letter from Mr So's lawyer, I beg your
16        pardon. It then says under number 1 -- I am sorry,
17        I should read the line above that:
18        "He mentioned the following two points as a reply to
19        the queries. (1) that he [that is referring to you,
20        Mr So] that he has nothing to do with all
21        the transactions. When I clarified the statement with
22        him, he said he had no knowledge about all
23        the transactions, eg buying a jet."
24    THE INTERPRETER: The interpreter would like to clarify;
25        buying a jet means literally buying an aeroplane?

**Page 66**

1    MR McQUATER: An aeroplane.
2    THE INTERPRETER: Okay, okay. So it's not some Stock
3        Exchange term --
4    MR McQUATER: No, it is a jet aeroplane:
5        "But he did not answer other questions put to him
6        the other day."
7        Now, do you remember a conversation with Ivan at
8        HSBC Hong Kong?
9    A. There was a gentleman from the Hong Kong branch talked
10        to me. I wasn't so sure whether this person was from
11        the security department or the securities department.
12    Q. Do you remember calling him?
13    A. I remember I had a telephone conversation with him.
14    Q. In this email, he says that you made reference to all
15        the transactions, for example, buying a jet. Does that
16        refresh your memory, Mr So, as to when you found out
17        about the allegations against Michael Brown?
18    A. I can't remember. During my conversation with this
19        gentleman, I was told there was some problem between
20        HSBC bank and Mr Brown.
21        He asked me to co-operate with the investigation in
22        order for me to get my $30 million investment back.
23        (Pause)
24    Q. Sorry, had you finished, Mr So?
25    A. That is as far as I could remember.

**Page 67**

1    Q. Was reference made in this telephone conversation to any
2        allegation that Michael Brown had used investors' money
3        to buy a jet aeroplane?
4    A. I can't remember.
5    Q. Back to the bundle, please, this time page 272; another
6        document in English, Mr So. It is headed "Agreement and
7        undertaking by mutual consent" and the date is
8        22nd November 2005. Mr So, this is another settlement
9        agreement and it is between Michael Brown and
10        a gentleman called Basil Aucott-Young, who is purporting
11        to act for Kevin So, Lucy Lu, Robert Mann and
12        Charles Edwards. Do you remember instructing
13        Basil Aucott-Young in this matter?
14    A. Appointing what?
15    Q. Appointing him to act on your behalf in order to
16        negotiate a settlement with Mr Brown?
17    A. I can't remember.
18    Q. Your solicitors, your English solicitors in this action,
19        Mr So, the first firm you instructed, a firm called
20        Goodman Derrick -- do you remember instructing them?
21    A. I remember this name.
22    Q. Well, they acknowledged service of these legal
23        proceedings on your behalf, on 30th November 2005. So
24        you understand what I am saying, Mr So? That by
25        30th November 2005, your own lawyers in England have

**Page 68**

1        acknowledged service of this legal action. So am
2        I right in thinking that by that stage at least you were
3        aware of HSBC's allegations that Michael Brown had
4        stolen money from investors in the London transaction?
5    A. I can't remember the exact time. I only -- I only knew
6        our principal money had been moved from the account.
7    Q. Well, when you learned that, Mr So, that must have been
8        quite a shock, wasn't it?
9    A. Yes.
10    Q. I am surprised you can't remember when and in what
11        circumstances you learned that news. Is that right?
12        Are you telling the court you simply can't remember when
13        you learned that news?
14    A. Correct.
15    Q. Can you remember if it was before or after you
16        instructed Goodman Derrick in London? (Pause)
17    A. I remember it was in March, year 2006, when I paid
18        the solicitor fees, then I knew -- I learned
19        the capital -- no, the principal money had been moved.
20    Q. So you think you learned that in March 2006, is that
21        right?
22    A. That is my recollection, my current recollection.
23    Q. Were you giving instructions to Goodman Derrick or was
24        somebody else doing that for you? (Pause)
25    A. What kind of instruction?

17 (Pages 65 to 68)

Day 9      HSBC      18th October 2007

**Page 69**

1   Q. Well, English solicitors, Mr So, have obligations when
2     they take on new clients. They have to establish their
3     new client's identity and so forth, matters like that.
4     I am asking whether you were involved in giving
5     instructions to Goodman Derrick when they were
6     instructed back in November 2005.
7   A. I can't remember.
8   Q. Can you remember when you first reported this matter to
9     the police?
10   A. Reported to police where?
11   Q. In England, the police in England.
12   A. I can't remember.
13   Q. Do you still consider that Boris Lopatin acted honestly
14     in this transaction?
15   THE INTERPRETER: "Did you" or "do you"?
16   MR McQUATER: Boris Lopatin.
17   THE INTERPRETER: No, "did you" or "do you"?
18   MR McQUATER: Do you; do you still consider that he acted
19     honestly in this transaction?
20   A. I wasn't so clear on what his activities were during
21     the process.
22   Q. Have you ever at any time, Mr So, done your own research
23     or made enquiries as to the propriety of private
24     placement investments?
25   THE INTERPRETER: The interpreter would like to clarify one

**Page 70**

1     word, "propriety".
2   MR McQUATER: Perhaps if I say the legitimacy of --
3   THE INTERPRETER: Yes, okay, thank you.
4   MR McQUATER: -- of private placement investments.
5   A. Enquiring from who?
6   Q. Well, have you ever asked any -- even to this day, have
7     you ever asked any financial adviser, for example,
8     whether such investments are legitimate or whether
9     the kinds of profits you were told about could be made
10     from them?
11   A. No.
12   Q. Would your Lordship just give me one moment. (Pause)
13     Mr So, you remember we talked a couple of days ago
14     about some notes that you thought may still exist in
15     your office in Guangzhou? You remember us discussing
16     those notes?
17   A. Yes.
18   Q. I now understand, and please correct me if I am wrong,
19     I now understand that you say that if such notes still
20     exist, they will be on your desk in your office in
21     Guangzhou. Is that correct?
22   A. Correct, yes.
23   Q. So if there are such notes they will be lying on your
24     desk or in some papers on your desk; is that correct?
25   A. Correct.

**Page 71**

1   Q. One other unrelated matter, Mr So; you mentioned to me
2     before lunch that you thought that Mr Brown had a senior
3     position in HSBC.
4   A. Yes.
5   Q. Did that affect your decision to make this investment?
6   A. Affect what?
7   Q. Your decision to make this investment.
8   A. I don't understand.
9   Q. Was that something that you took into account when you
10     made this investment? (Pause)
11   A. What kind of effect, or what kind of influence?
12   Q. Was that something that made you feel positive about
13     the investment?
14   THE INTERPRETER: I said to the witness please complete
15     the sentence before I translate. (Pause)
16   A. The position -- Mr Brown's position within HSBC bank
17     gave me confidence for transferring the money from HSBC
18     Hong Kong to London. As I said before lunch,
19   MR McQUATER: I see. Would you have made this investment if
20     you had not believed that Mr Brown had a senior position
21     at HSBC?
22   THE INTERPRETER: The interpreter would like counsel to
23     repeat the question.
24   MR McQUATER: Would you have made this investment if you had
25     not believed that Mr Brown had a senior position at

**Page 72**

1     HSBC?
2   A. Throughout the -- from the very beginning to the end,
3     I had trusted the HSBC bank.
4   MR McQUATER: Yes, thank you, Mr So. I have no further
5     questions.
6   MR JUSTICE WALKER: Mr Vineall.
7   MR VINEALL: I have no re-examination, thank you.
8   MR JUSTICE WALKER: I have no questions.
9     Now, this witness, I hope can be released and can
10     now return to China?
11   MR McQUATER: My Lord, your Lordship knows that we haven't
12     yet received any notes that might be from Mr So's office
13     but I am not in a position to say that that is a reason
14     why he shouldn't be released.
15   MR JUSTICE WALKER: Mr So, thank you for your help. You are
16     released. That means that you are under no obligation
17     to return to this court. You are also now free to talk
18     about the case with others if you wish to do so.
19     However, I would like just to canvass with counsel
20     the extent to which it would be appropriate for you to
21     talk to Ms Lu or Mr Mann. What do counsel have to say
22     about that?
23   MR McQUATER: My Lord, from our point of view, we would
24     consider it very undesirable that Mr So should speak to
25     Ms Lu before her evidence. Her evidence overlaps in

18 (Pages 69 to 72)

1   Q.   No, what I mean is: how did you know that this was

2        a genuine letter from HSBC and had not been forged by

3        one of the gentlemen that Ms Lu had met in London?

4   A.   I trusted HSBC, I never thought that anyone would forge

5        a letter from HSBC.  Can you tell me, were there

6        instances that someone produced a letter of forgery from

7        HSBC?

8   Q.   Well, I ask the questions, Mr So.

9            So the possibility that the letter might be

10       a forgery never crossed your mind?

11  A.   I said I trusted HSBC completely.

12  Q.   You didn't consider it would be sensible to check with

13       HSBC that this was indeed a genuine document?

14  A.   I trusted HSBC completely.

15  Q.   Yes, but how did you know that this was a genuine HSBC

16       letter, Mr So?

17  A.   It never occurred to me that someone will produce

18       a letter of forgery from HSBC.

19  Q.   Now, you recall Mr So, that before Ms Lu went to London,

20       you signed certain documents relating to the opening of

21       a non-depletion account.  Do you remember that?

22  A.   Are you referring to what I am required to do and that

23       is; a letter of authorisation regarding signatory, for

24       Ms Lu?

25  Q.   Yes.  So when Ms Lu went to London, you were expecting

14

1    Q.    Was it of no interest to you to discover why a gentleman

2          with whom you were about to invest US$30 million might

3          have become furious?

4    A.    I had not thought about it.

5    Q.    Well, didn't you ask Ms Lu why Mr Brown was furious?

6    A.    She said any correspondence should be done through

7          Mr Brown.

8    Q.    Well, I would invite you to be somewhat more frank with

9          the court, Mr So.   I suggest that she did tell you about

10         this email.

11   A.    Totally wrong.

12   Q.    And I suggest that you understood a number of things

13         from your discussion with Ms Lu.   First, I suggest that

14         you knew that Mr Brown had said that your letter to HSBC

15         was unacceptable.   You knew that, didn't you?

16   A.    Yes, I knew about this point, yes.

17   Q.    Yes, thank you.

18             Now, you also knew that Mr Brown had told Ms Lu that

19         he had asked HSBC London to cease communication?

20   A.    No, I did not know.

21   Q.    Well, I suggest you knew that from your discussion with

22         Ms Lu, and you therefore knew that you would not be

23         receiving a response to your letter to HSBC.   That is

24         right, isn't it, Mr So?   You knew that Ms Lu had been

25         told that Mr Brown had told HSBC to cease communication?

32

```
 1    A.   Okay.  It didn't come as a surprise, it is more like
 2         curious, because our letter was sent to HSBC bank.  HSBC
 3         bank did not answer my questions; instead they went
 4         directly to ask Mr Brown.  On top of that, after your
 5         explanation to me today, when Mr Brown asked HSBC London
 6         not to communicate with me, then HSBC London stopped
 7         communicating with me.  So you thought on the basis of
 8         that I should be surprised?  Is that what you meant,
 9         Mr Counsel?
10    Q.   Let me clarify.  By your last answer, did you mean that
11         at the time, that is to say, on or about
12         19th April 2005, you knew that Mr Brown had told HSBC
13         not to respond to your letter?
14    A.   Whether they should communicate with me, I didn't know
15         about that.  My answers I just given is referring to
16         your question to say whether I was surprised.
17    Q.   Okay.  One reason why I suggest you would have been
18         surprised by Mr Brown's response -- I am sorry,
19         Mr Brown's reaction, is that it was contrary to
20         something he had previously told Ms Lu.  To explain to
21         you what I mean, Mr So -- we've looked at it already but
22         let's look again at paragraph 58 of your statement:
23              "I recall Ms Lu saying that Mr Brown and Mr Lopatin
24         both had told her that if we had any doubts about
25         the investment we could contact Ms Arnull at HSBC
```

34

1    directly to make any further enquiries."

2    A.  So now what is your question?

3    Q.  Well, you told me before that that paragraph is true.

4    A.  Yes.

5    Q.  So, Mr Brown in reacting the way he did was acting

6        contrary to what he and Mr Lopatin had previously told

7        Ms Lu.

8    A.  So what is your question?  What would you need me to

9        answer?

10   Q.  Let me try to simplify.  Mr Lopatin and Mr Brown had

11       previously told Ms Lu that you and she could contact

12       HSBC directly.  A few days later, you contact HSBC

13       directly and Mr Brown becomes furious.  Didn't that

14       surprise you?

15   A.  Before I answer this question, could you explain

16       something to me?

17   Q.  What would you like to have explained, Mr So?

18   A.  The letter we sent to HSBC, did the bank need to consult

19       with Mr Brown in advance?

20   Q.  No, I ask the questions, Mr So.

21           I think you understand perfectly well what I am

22       putting to you.

23   A.  I already asked your permission.

24   Q.  Mr Brown, as you knew, had told Ms Lu that you and she

25       could contact HSBC directly.  That is exactly what you

35

1  Q.  Are you aware of Ms Lu making any further attempt to

2      contact Ms Arnull?

3  A.  No, I did not know.

4  **Q.  After the time you learned of Mr Brown becoming furious,**

5      **did you make any attempt to contact any other officer or**

6      **representative of HSBC?**

7  **A.  No.**

8  Q.  Are you aware of Ms Lu making any attempt to contact any

9      other officer or representative of HSBC after you

10     learned Mr Brown had become furious?

11  A.  No, I did not know.

12  Q.  After you had learned Mr Brown had become furious, you

13     didn't at any stage ask Ms Lu to contact Ms Arnull, did

14     you?

15  A.  Correct.  As I already said, I believe he had a high

16     position, very senior position, within HSBC bank and

17     also, the bank itself had high regard to Mr Brown.  So

18     therefore, I had no reason to doubt anything.

19  Q.  Mr So, on the chronology we've reached 19th April 2005.

20     I suggest it was at or about that time that you learned

21     that Mr Brown had become furious.  Does that sound

22     right?  Does that sound as though that was at or about

23     that time that you learned this information?

24  A.  Could you repeat your question, please?

25  Q.  Perhaps I can help with your statement; give me

42

1   Q.   Well, when I asked you about this the other day, Mr So,

2        I asked you who made the decisions in relation to

3        the investment, and you declined to answer and told me

4        there was a process.  What I would like to know is which

5        person or persons took the decision to make this

6        investment?

7   A.   As I already answered, after our analysis both Ms Lu and

8        I agreed to proceed with the investment.

9   Q.   So, you and Ms Lu took the decision?

10  A.   We both agreed to proceed with this investment.  So what

11       do you think -- do you think how should I define?

**12  Q.   As I understand it, this was in large part family money**

**13       that was being invested, wasn't it, Mr So?**

**14  A.   Correct.**

15  Q.   Were other members of your family involved in making

16       decisions about this investment?

17  A.   My family members trust me very much.  From my previous

18       answers, you should have known the process.

19  Q.   Can you explain the process to me?  Who is involved in

20       it?

21  A.   What would you like me to explain?

22  Q.   Well, I would like you to explain what the process is

23       and who is involved in it.

24  A.   This question is just too big.  I can't answer you.

25  Q.   Well, is your father involved in making -- let me put

44

```
 1        for the fund transfer were prepared on 18th April?

 2    A.  I can't remember.

 3    Q.  Can you remember if you had already by the 18th April

 4        incurred a penalty with HSBC Hong Kong for breaking your

 5        time deposit?

 6    A.  I can't remember.

 7    Q.  Now, we've reached -- if you come on to the document we

 8        looked at a moment ago, X2/124/A1, just behind

 9        page 124 -- we've reached 20th April, Mr So.  Was there

10        any urgent need for you to make this investment on

11        20th April?

12    A.  I can't remember.

13    Q.  By that, I mean was there any particular deadline or

14        pressure of time that was on you to make the investment?

15    A.  I can't remember.

16    Q.  Well, as far as I can tell, Mr So, you could have taken

17        as much time as you liked to decide about this

18        investment?

19    A.  I don't understand what you are saying.

20    Q.  I am suggesting that there is no particular time

21        pressure on you to make this investment, so if you had

22        wished to take time, for example, to get advice, you

23        could have done so.  Is that right?  (Pause)

24    A.  I didn't think of it, I didn't think about it.

25    Q.  You weren't aware of any time pressure being placed on
```

47

```
 1      you by anybody to make this investment; is that correct?
 2   A. That is right, there was no pressure.
 3   Q. So if you had wanted to get --
 4   A. You were asking me that there was -- nobody was giving
 5      me pressure regarding time?
 6   Q. Yes, nobody was putting pressure of time on you to make
 7      this investment.
 8   A. That is correct.
 9   Q. Had you wished to do so, you would have had time to have
10      the letter of instruction, the Land Base agreement, and
11      the letter of reference translated.  You could have done
12      that if you had wished to do so; you had the time,
13      Mr So.  That is correct, isn't it?  You had time to do
14      that, had you chosen to do so?
15   A. I didn't think of it.
16   Q. And you could have taken professional advice if you had
17      wished to do so?  You had the time to take professional
18      advice if you had wished to do so, Mr So, didn't you?
19   A. Can you ask the question again?
20   Q. You could have taken professional advice -- let me start
21      again.
22          You had the time to take professional advice if you
23      had wished to do so, didn't you, Mr So?
24   A. That is correct.
25   Q. Now, let me turn to the period of time after
```

48

```
 1    MR McQUATER:  At the time you agreed to these terms of

 2         settlement referred to in paragraph 76, did you know

 3         the reason why a settlement was necessary?

 4    A.   No.

 5    Q.   And you didn't ask Ms Lu?

 6    A.   Correct.

 7    Q.   In her statement, Ms Lu tells us that by the end of

 8         October 2005 at least, that Mr Lopatin was telling her

 9         that Mr Brown had concealed trades from investors.  Do

10         you remember being told that?

11    A.   I can't remember.

12    Q.   I think you and Ms Lu subsequently instructed a lawyer

13         called Mr Larue; do you remember that, Mr So?  Do you

14         remember instructing a lawyer called Mr Larue?

15    THE INTERPRETER:  The interpreter would like counsel to

16         spell the name.

17    MR McQUATER:  L-A-R-U-E.

18    A.   I can't remember.

19    Q.   Could you look at the bundle, please, at page --

20         cross-examination bundle 2, page 2/210.  This is

21         a document in English with Mr Larue's name at the top.

22         It gives the name of his law firm, and it is dated

23         20th October 2005.  If you look over the page to

24         page 211, Mr So, you should find your signature.  And

25         two pages on at 213, you will find a copy of your
```

1        passport attached.  Moving back to page 210,

2        the substance of this document is that Mr Larue is

3        engaged by you and by Ms Lu to act as legal counsel.  Do

4        you now remember signing a document to engage Mr Larue

5        as your legal counsel?

6   A.   I can't remember.

7   Q.   You don't remember signing this document?

8   A.   I can't remember this document.

9   Q.   That is your signature on page 211, is it, Mr So?

10  A.   Yes.

11  Q.   Do you remember if you had any conversations with

12       Mr Larue?

13  A.   No.

14  Q.   Now, we know from other documents in this case, Mr So,

15       that there was a meeting in Monterey in California on

16       31st October 2005 which was attended by Mr Larue and

17       others.  The matters I am going to summarise for you --

18  THE INTERPRETER:  Sorry, the interpreter forgot the name of

19       the city in California?

20  MR McQUATER:  Monterey in California.  That meeting was on

21       31st of October 2005.  And the meeting was attended by

22       Mr Larue, Boris Lopatin, and a lawyer from Michael Brown

23       called Keith Oliver.  Did you know anything about this

24       meeting?

25  A.   I know there was a meeting, a meeting had been held.

63

1      the London transaction?

2   A.   What she told me was the meeting wasn't successful.

3   Q.   Could you turn, please, to cross-examination bundle 2,

4        page 269?  At page 269, there is an email dated

5        17th November now, 17th November 2005.  It is an email

6        that has been forwarded along the way but the original

7        email at the bottom is from a gentleman called Ivan at

8        HSBC in Hong Kong.  And in the text of the email, he

9        says this:

10           "Kevin So called me this afternoon.  He said after

11       discussion with his lawyers that he has decided that

12       there will be no lawyer's letter."

13   THE INTERPRETER:  The interpreter would like to clarify "no

14       lawyer's letter"; does that just mean lawyer's letter?

15   MR McQUATER:  No letter from Mr So's lawyer, I beg your

16       pardon.  It then says under number 1 -- I am sorry,

17       I should read the line above that:

18           "He mentioned the following two points as a reply to

19       the queries.  (1) that he [that is referring to you,

20       Mr So] that he has nothing to do with all

21       the transactions.  When I clarified the statement with

22       him, he said he had no knowledge about all

23       the transactions, eg buying a jet."

24   THE INTERPRETER:  The interpreter would like to clarify;

25       buying a jet means literally buying an aeroplane?

65

1    MR McQUATER:  An aeroplane.

2    THE INTERPRETER:  Okay, okay.  So it's not some Stock

3        Exchange term --

4    MR McQUATER:  No, it is a jet aeroplane:

5        "But he did not answer other questions put to him

6        the other day."

7        Now, do you remember a conversation with Ivan at

8        HSBC Hong Kong?

9    A.  There was a gentleman from the Hong Kong branch talked

10       to me.  I wasn't so sure whether this person was from

11       the security department or the securities department.

12   Q.  Do you remember calling him?

13   A.  I remember I had a telephone conversation with him.

14   Q.  In this email, he says that you made reference to all

15       the transactions, for example, buying a jet.  Does that

16       refresh your memory, Mr So, as to when you found out

17       about the allegations against Michael Brown?

18   A.  I can't remember.  During my conversation with this

19       gentleman, I was told there was some problem between

20       HSBC bank and Mr Brown.

21       He asked me to co-operate with the investigation in

22       order for me to get my $30 million investment back.

23       (Pause)

24   Q.  Sorry, had you finished, Mr So?

25   A.  That is as far as I could remember.

66

1   Q.   One other unrelated matter, Mr So: you mentioned to me

2        before lunch that you thought that Mr Brown had a senior

3        position in HSBC.

4   A.   Yes.

5   Q.   Did that affect your decision to make this investment?

6   A.   Affect what?

7   Q.   Your decision to make this investment.

8   A.   I don't understand.

9   Q.   Was that something that you took into account when you

10       made this investment?  (Pause)

11  A.   What kind of effect, or what kind of influence?

12  Q.   Was that something that made you feel positive about

13       the investment?

14  THE INTERPRETER:  I said to the witness please complete

15       the sentence before I translate.  (Pause)

16  A.   The position -- Mr Brown's position within HSBC bank

17       gave me confidence for transferring the money from HSBC

18       Hong Kong to London.  As I said before lunch.

19  MR McQUATER:  I see.  Would you have made this investment if

20       you had not believed that Mr Brown had a senior position

21       at HSBC?

22  THE INTERPRETER:  The interpreter would like counsel to

23       repeat the question.

24  MR McQUATER:  Would you have made this investment if you had

25       not believed that Mr Brown had a senior position at

71