# EXHIBIT J

Under an order dated 8 October 2007 there were restrictions on the reporting of this case, including the present judgment. However on 28 November 2008 those restrictions were removed by a "permission order" made by HHJ Wadsworth QC in the criminal proceedings against Michael Brown at Southwark Crown Court. Accordingly there are no restrictions on reporting other than those restrictions which are applicable to all cases without specific order of the court.

Neutral Citation Number: [2007] EWHC 2819 (Comm)

Case No: 2005 Folio 841

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL
Date: 7 December 2007

Before :

**MR JUSTICE WALKER**

- - - - - - - - - - - - - - - - - - - - -

Between :

| | |
|---|---|
| **HSBC BANK PLC** | Claimant and Second Part 20 Defendant |
| - and - | |
| **5TH AVENUE PARTNERS LIMITED** **MICHAEL ROBERT ALEXANDER BROWN** | 1st and 2nd Defendant and Second Part 20 Defendants |
| - and - | |
| **KEVIN SO** **YAN LUCY LU** **ROBERT WILLIAM MANN** | 10th, 11th and 13th Defendants and Second Part 20 Claimants |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Mr Ewan McQuater QC & Ms Louise Hutton** (instructed by **Allen & Overy**) for the claimant
The 1st and 2nd defendants did not appear and were not represented.
**Mr Nicholas Vineall QC & Mr James Bowling** (instructed by Bivonas Ltd) for the 10th, 11th and 13th
**defendants**
Hearing dates: 4, 8,9,10,11,15,16,17,18,22,23,24,25,29,30,31 October 2007
1,2,5,6,7, 20, 22 November 2007

- - - - - - - - - - - - - - - - - - - - -

Judgment

Mr Justice Walker :

# Introduction and Reporting Restrictions

1.  This judgment sets out my conclusions following the trial of civil claims between
    individuals on the one hand and a leading international bank on the other. The
    individuals say that an alleged fraudster induced them to pay money into an account
    opened by one of his companies with the bank, and that the bank's conduct entitles
    them to claim against it in contract, in equity for dishonest assistance in breach of
    trust, and in tort for negligence. The bank, while accepting that the alleged fraudster
    was indeed a fraudster, denies that the individuals' claims are well established either
    in fact or in law. At the start of the trial a question arose as to the relationship between
    the present civil proceedings and criminal proceedings against the alleged fraudster, in
    which the alleged fraudster denies that he acted fraudulently. At his request, made
    with the support of the prosecution in those proceedings, I made an order on 7
    October 2007 under s 4(2) of the Contempt of Court Act 1981 postponing reporting of
    the present proceedings.[1]

# Overview

2.  The Claimant ("HSBC") is an international bank with its headquarters in London. In
    2004 and 2005 it had dealings with the second defendant, Mr Michael Brown ("Mr
    Brown"), and his companies. One of those companies was the first defendant ("5th
    Avenue"). During the period up to October 2005 Mr Brown arranged for investors to
    transfer funds to accounts held by 5th Avenue with HSBC at its Moorgate branch in
    the City of London. The accounts were in various currencies including United States
    dollars ("$"). From January 2005 onwards in each case at least two documents were
    prepared prior to the transfer. The first was an agreement ("the Land Base
    Agreement" or "LBA") between the investor and Land Base LLC ("Land Base" or
    "LB"), a company registered in Nevada. Land Base was run by Mr Boris Lopatin and
    Mr Charles W Woodhead. The second was a document on 5th Avenue letterhead,
    addressed to Mrs Arnull at HSBC, and entitled "Exhibit HSA1" or "Exhibit HAS."
    Below that title were the words "Irrevocable Bank Instruction", and after giving Mrs
    Arnull's address the text of the document purported to set out instructions from 5th
    Avenue to HSBC, naming the investor, directing that the funds be held in a segregated
    account, and limiting the circumstances in which funds could be paid out of the
    account. The extent to which this document had legal effect is in dispute. Without pre-
    empting the resolution of that dispute I shall refer to it for convenience only as a
    "Letter of Instruction" (or "LOI"). In each case an employee of HSBC applied
    HSBC's stamp to the LOI and signed it. These investors included the 10th Defendant
    ("Mr So") and the 11th Defendant ("Mrs Lu"), who apparently acted jointly. HSBC
    raise an issue in that regard. Without pre-determining that issue I shall, unless
    separate treatment is called for, refer to them together as "Mr So and Mrs Lu." The
    investors also included the 12th Defendant ("Mr Edwards") and the 13th Defendant
    ("Mr Mann"). Mr So and Mrs Lu, Mr Edwards, and Mr Mann were in each case given
    a stamped and signed LOI. Large sums were transferred to accounts of 5th Avenue

---

[1] Note: the restrictions in the order dated 8.10.07 were removed by a "permission order" made on 28.11.08 by
HHJ Wadsworth QC in the criminal proceedings against Michael Brown at Southwark Crown Court.
Accordingly there are no restrictions on reporting other than those restrictions which are applicable to all cases
without specific order of the court.

held with HSBC - $10m by Mr Edwards, $5m by Mr Mann and $30 million by Mr So and Mrs Lu. Mr Brown pretended that these funds enabled him to make substantial profits for the investors, but the trades he reported were fictions. Meanwhile he made transfers out of the accounts into which the funds had been transferred. The extent to which those transfers out were inconsistent with the LOIs is in issue between the parties.

3.      At HSBC there were four individuals who were involved in its handling of the LOIs:

(1)  Mrs Jacqueline Arnull stamped and signed most of the LOIs. She had been employed in branches of HSBC since leaving school. By the time that she came to deal with Mr Brown she was a senior counsellor, a clerical rather than a managerial role, at the Moorgate branch of HSBC. In February 2005 she was promoted to managerial rank, with the title "premier manager". This title reflected the fact that she dealt mostly with "premier" customers, these being customers whose annual income was £75,000 or more. I shall explain later in this judgment the course of events on the first occasion when Mrs Arnull came to be involved with LOIs, and how on subsequent occasions she repeated what she did on the first occasion.

(2)  Ms Joanne Mather was a counsellor at the Moorgate branch of HSBC. When Mr Brown first sought to open accounts for 5th Avenue in the late summer of 2004 it was Ms Mather who, with the help of Mrs Arnull, completed the appropriate procedures. As part of those procedures Mr Ian Leonard was appointed the relationship manager for Mr Brown's accounts. Ms Mather continued to see Mr Brown occasionally when he came to the branch, describing him as someone who was "very smooth and friendly and made a big effort to chat to staff when he came into the branch." She thought he was a bit too full of himself and liked to show off how rich he was. Mr Brown's chauffeur was Mr Sonny Patel, known as "Sonny." Ms Mather saw him on occasions when he came to the branch. She described him as "always quite pushy, demanding instant attention and trying to jump the queue." Early in 2005 Sonny came to the Moorgate branch and asked Ms Mather to give to Mrs Arnull two documents to be stamped and signed. Ms Mather did not read them, and so was unaware what they were. In fact they were on 5th Avenue headed paper and entitled "Exhibit "HSA1" above the words "Irrevocable Bank Instruction", were dated 22 February, and, after stating that they were addressed to Mrs Arnull at HSBC, they said that 5th Avenue "on behalf of our client, Robert William Mann" irrevocably instructed the bank to proceed with 7 numbered tasks – before concluding in the bottom right hand corner with the words "Receipt Acknowledgment (Bank)". Ms Mather took the documents to Mrs Arnull who was busy on something else, glanced at the first page but did not read it, said it was okay and that she had seen these documents before, and instructed Ms Mather to stamp and sign confirming that the document was a copy of the original. Mrs Arnull also told her to take a copy of the stamped and signed document and send it in the internal post to Mr Leonard with a compliments slip saying words to the effect of "for file" or "to Ian for file". Ms Mather duly stamped and signed one, or possibly both, of the documents and gave them, or possibly just one of them, back to Sonny,

sending a photocopy of the stamped and signed LOI with a compliments slip to Mr Leonard.

(3) Ms Emma Walker was also a counsellor at the Moorgate branch. In early 2005 a man whom she described as "very pushy" jumped the queue at reception and came straight into the counselling area. He said he was "Sonny" and asked to see Mrs Arnull, saying that it was urgent. He said he had two documents which he needed Mrs Arnull to stamp or certify and sign. Ms Walker found Mrs Arnull working on another matter. Mrs Arnull looked at the documents, but Ms Walker does not recall if she looked at them in detail. Mrs Arnull said something like, "Oh yeah, that's fine." Ms Walker accordingly took the documents and put on both of them a branch stamp saying, "We certify this to be a true copy of the original". She signed both documents where she had stamped them, but did not read either document or notice what they said. She gave one of the documents back to Sonny, and took the other to Mrs Arnull. It may be, Ms Walker was not sure, that on Mrs Arnull's instruction she then put it in the internal post to Mr Leonard. The document which Ms Walker stamped and signed was, although she was unaware of this, a Letter of Instruction which referred to funds to be transferred by a company called "Fastgain Investment Limited" ("Fastgain").

(4) Mr Leonard had, by the time of relevant events, been employed by HSBC for more than 17 years, and had been a manager for more than 5 years. He had become a commercial relationship manager in 2003, and his focus was entirely on business customers. He was based at the Eastcheap branch of HSBC, where he dealt with business customers at a number of branches, including the Moorgate branch. He had a number of meetings and telephone conversations with Mr Brown and a good deal of email contact with him. Mr Leonard's role in relation to the LOIs is discussed in detail below.

4.   In early October 2005 HSBC became concerned that Mr Brown had acted fraudulently. It commenced these proceedings on 14 October 2005, obtaining a worldwide freezing and tracing order against Mr Brown and his companies together with a search order.  On 18 November 2005, pursuant to an order of Gloster J that day, the claim form was amended to join Mr So, Mrs Lu, Mr Edwards and Mr Mann, and to seek declarations that HSBC had no liability to them.

5.   Mr So, Mrs Lu, Mr Edwards and Mr Mann responded by issuing part 20 proceedings against 5th Avenue, Mr Brown, HSBC and Altus Investment Management Group Limited ("Altus", a company which was thought to have traceable assets). In those proceedings they obtained summary judgment from Cooke J against Mr Brown and 5th Avenue for fraud, and they no longer seek any relief against Altus.

6.   Following the commencement of proceedings some $17m was recovered by HSBC, along with an executive jet. Payments have been made to investors out of these recoveries, but the recoveries fall well short of the amounts invested. In recent months a third party has claimed an interest in the recoveries. Issues in that regard have not been the subject of the present trial.

7.   An agreement has been reached between HSBC and Mr Edwards, and this litigation is no longer live as between them. The present trial has, with one exception, been

confined to issues of liability between HSBC and Mr So, Mrs Lu and Mr Mann. I
shall refer to these three individuals as "the SLM Investors". The exception is that if
HSBC is liable to the SLM Investors, additional issues are to be determined in the
present trial on consequential claims by HSBC against Mr Brown and 5th Avenue.
Counsel for Mr Brown in the criminal proceedings attended at the start of the trial in
order to argue his application for reporting restrictions. Apart from that, neither Mr
Brown nor 5th Avenue has taken part in the trial. His legal team stated that Mr Brown
had insufficient resources to defend the summary judgment proceedings and was
unable to take any further part in the civil proceedings.

8.      The background to the current criminal proceedings against Mr Brown is that HSBC
        contacted the police in early October 2005. On 19 November 2005 the police arrested
        Mr Brown in relation to his dealings with investors' monies. He was given bail.
        However, he obtained a second passport and fled to Spain. From there he was
        extradited under a European Arrest Warrant issued on application by the police at the
        request of HSBC. After being returned to this country he pleaded guilty on 25
        September 2006 to perjury in relation to statements made by him at an early stage in
        the present civil proceedings. He also pleaded guilty to an offence in relation to the
        obtaining of the second passport. The current criminal proceedings against him arise
        in relation to Mr Brown's dealings with Mr Edwards and his money. Further
        information about the current criminal proceedings is set out in Annex A to this
        judgment.

9.      The proceedings between HSBC and the SLM Investors do not involve any
        determination by me of a contested issue as to whether Mr Brown and 5th Avenue
        acted fraudulently. That is because both sides agree that they did, and I must assume
        that they are right when I proceed to determine the legal consequences of what
        happened between HSBC and the SLM Investors. In particular, both HSBC and the
        SLM Investors now agree that Mr Brown was operating a high yield investment fraud.
        A classic type of high yield investment fraud is known as a "Ponzi scheme" (coming
        from a famous fraud of that name), in which "profits" and withdrawals by investors
        are financed from existing or new deposits in the scheme and not from any real
        trading.

## My conclusions

10.     The SLM Investors were foolish and greedy. They – like many others – were taken in
        by Mr Brown's remarkable charm. As I shall explain, I have serious concerns about
        their evidence. They nevertheless have my sympathy, for they have lost large sums of
        money which were important to them. It is understandable that they have aimed to
        recover what they have lost, and that the first target for consideration when seeking to
        do this was HSBC. However consideration of the circumstances in which HSBC
        played a role in what Mr Brown was doing has not been straightforward. It has
        required many days of witness evidence and lengthy submissions. After consideration
        of all this material I have concluded that HSBC's involvement was not such as to give
        rise to legal liability on the part of HSBC to the SLM Investors. These conclusions
        apply only to the SLM Investors, and I express no view as to the position between
        HSBC and any other party.

11.  The remainder of this judgment gives my reasons for these conclusions. I set out first some background information about each of Mr So, Mrs Lu and Mr Mann, followed by general comments about the evidence given by witnesses at the trial. I then give an account of key documents and relevant events, before turning to examine the three heads of claim advanced by the SLM Investors - contract, dishonest assistance in breach of trust, and negligence - along with HSBC's claim against Mr Mann for deceit. I conclude with observations about matters made academic by my findings, including HSBC's claim over against 5th Avenue and Mr Brown.

## Witnesses

### Mr So: backgound

12.  Mr Kevin So is 39 years old. He graduated from High School in Guangdong in 1988. Since then he has worked in the family business, which is now known as Guangdong Arche Cosmetics Company Limited ("Arche"). Mr So has been a registered Chinese resident of Hong Kong since 1994. He became the General Manager and Chief Executive Officer of the business in 1995, and continues to hold that position. Arche is a skin care and cosmetics manufacturing company operating throughout the Chinese domestic market. It also has interests in the manufacture of pharmaceuticals, construction projects and financial investments. The annual gross revenue of Arche is the equivalent of around $80m.

13.  Mr So has limited knowledge of English, and gave his evidence entirely through translators.

### Mrs Lu: backgound

14.  Mrs Lu is 40 years old. She graduated from university in Beijing in 1985. She then moved to Shenzhen and worked from 1986 as a teacher in Shenzhen University. After emigrating to Canada in 1995, she married Henry Yang in 1996 and worked in his family's car rental business until 1999. At that point she stopped working to concentrate on raising their two daughters. She became a Canadian citizen in 2000. Her investment experience was limited to the purchase of some bank shares which became available when the share market in China opened.

15.  Mrs Lu said that her English was fairly good, but unusual or complicated words may be an issue. In that regard during the course of relevant events Mrs Lu was assisted by Jane Zhou, a friend of her parents also resident in Canada. Ms Zhou had previously translated for news and film production companies and Mrs Lu described Ms Zhou's English as perfect.

16.  Mrs Lu recounted how her husband had been introduced to what she described as "private placement investment" in the early 1990s by a Singaporean business man called Jeremy. He was a customer of the car rental business, and had been long retired by the time he and her husband became friends. He had described an investment producing a 100% return in a relatively short term. Her husband thought such a deal would be risky, with a danger that he would lose his money. Jeremy told her husband that it was not high risk and was in effect guaranteed by banking laws as to the principal. The bank would research the background of the investors. After checking

that the money being used was legitimate, the bank's trader would start trading worldwide in bonds. Each and every deal would be under the supervision of the bank. Her husband decided not to invest. In cross-examination Mrs Lu explained that it was in about 1995 that she had first learnt about her husband's discussion with Jeremy, which had taken place three years earlier. She did not know whether after Jeremy's explanation of the bank guarantee her husband had still thought it was too risky.

17.     Mrs Lu explained that her family and that of Mr So had been associated at a business and personal level since the 1980s, when her parents moved to Guangdong. She had known Mr So for all that time.

## Mr Mann: background

18.     Mr Mann is an American citizen. He graduated from Harvard University in 1970, and between then and 1980 gained additional degrees in Business Administration and Law, along with an LLM in Taxation Law. He was admitted to the bar in California and several other states. In 1977-78 he worked with the City Attorney in Los Angeles, after which he worked in Philadelphia for his family's heating oil distribution business. He returned to Los Angeles in the summer of 1980 and opened a law office, acting for clients in respect of general business transactions and tax issues. In around 1982 Mr Mann started to invest his own money in mergers and acquisitions, and also set up the Robert W Mann Retirement Trust. Over time he decided for tax reasons that the Retirement Trust should invest in the business deals he was working on.

19.     By 1985, other than in respect of small projects for friends, Mr Mann was no longer actively practising law but rather was working full time in investment banking type projects. In addition to his mergers business, through the Retirement Trust he invested in other projects. One of these concerned a nursing home health care company, and generated a net profit to the Retirement Trust of around five million dollars.

20.     Mr Mann said that his $5million transfer to HSBC which is the subject of these proceedings represented a very significant proportion of his overall wealth, approximately 50%, and was extremely important to him.

21.     Mr Mann had from 1999 onwards taken an active interest in what he described as "closed end" bond trading. He used "closed end" as a layman's term for the institutional wholesale trading of highly rated bonds where there is already a credible buyer in place at a higher price before the original purchase is made. He said he understood this to be a very conservative business which could generate significant profits if there was a relatively high volume of trading. He claimed to have come across this form of securities trading many times in the course of his investment business, and that it was entirely normal. More detail about Mr Mann's involvement in "closed end" trading is given in Annex B.

## General Comments on the Oral Evidence

22.     I heard oral evidence from 6 witnesses of fact: Mr So, Mrs Lu, Mr Mann, Mrs Arnull, Ms Mather and Mr Leonard. Mrs Arnull and Ms Mather were agreed by both sides to be honest witnesses. I consider that each of them was doing her best to tell me what happened. In the case of Mrs Arnull her ability to give me an accurate account of what happened was hampered by the obvious effects of the terrible stress she had

suffered over the last two years. As to Mr So, Mrs Lu, Mr Mann and Mr Leonard, none of them told me the whole truth, and each lied at stages in their evidence. My reasons for these conclusions are set out in annex B. I approach everything they said with caution.

23.     I had the benefit of written reports of two expert witnesses, each of whom gave oral evidence. At the request of the SLM Investors Mr Stephen Hiscock FCIB assisted me in relation to banking practice and procedures. At the request of HSBC Dr M Desmond Fitzgerald assisted me in relation to practice and procedure as regards the trading of bonds. I have dealt with their evidence to the extent necessary in later sections of this judgment. Both these witnesses fully complied with their duties as experts under the Civil Procedural Rules.

## The Land Base Agreement

24.     Mrs Lu produced the LBA which she signed on behalf of herself and Mr So. It was a bound document on heavy gold-coloured paper. As with the LBA for Mr Mann, it was signed and sealed on behalf of LB by Mr Lopatin.

25.     I set out some of the features of the Land Base Agreements in Annex C, where I also note some minor differences between the LBA signed by Mr Mann and that signed by Mrs Lu on behalf of herself and Mr So. Land Base Agreements were also entered into by other investors or proposed investors in 2005; but I do not need to examine them for the purposes of this judgment.

26.     The SLM Investors rightly observe that the drafting of the Land Base Agreements is florid, some of it is tortuous, and in places it is very wordy. They accept that article 3.3 appears to require profits over $100m to be applied on humanitarian projects, although its terms are vague and uncertain; that it is not clear what article 3.4 is intended to achieve; that the last part of article 3.11 appears to be meaningless; and that the termination provisions are unclear. Nevertheless the SLM Investors contend that the overall intended effect of the Land Base Agreements is at least tolerably plain:

   i)     the investor will place money with Land Base;

   ii)    Land Base is authorised to "purchase or to cause to be purchased" highly rated Fixed Income Instruments (Art. 3.10);

   iii)   Land Base warrants (Art 3.11) that the investor's account must at all times be holding either cash, or highly rated Fixed Income Instruments (although the SLM Investors acknowledged that the last part of this article appeared meaningless);

   iv)    the profits will be shared equally between the investor and Land Base (Art. 6).

27.     HSBC comments that the LBAs bear many of the features commonly found in documentation designed to lend an appearance of legitimacy to arrangements made for an unlawful purpose, which may be investment fraud or money laundering or may have multiple unlawful purposes. They are designed so that, to the casual or naïve reader, they may give the impression that they reflect sophisticated and complex

financial and legal arrangements when in fact they are substantially devoid of any sensible commercial meaning or purpose and are replete with unnecessary or ineffective terms.

## The Letters of Instruction

28.  Those pages of the Letters of Instruction that were stamped and signed by HSBC were in largely common form. As I shall explain later, Mrs Lu was eventually presented with an additional page, but this was neither stamped nor signed by HSBC. Although HSBC was unaware of this, in all cases after 2004 the common form derived from the Land Base Agreements. Clause SCA.3 in Schedule A to the Land Base Agreements provided that:

> 5th Avenue Partners Ltd shall issue an Irrevocable Bank Instruction to govern [the investor's] segregated account that is to be lodged with the Bank as stated hereto. [Reference was then made to Exhibit "HSA1" or Exhibit "HSA"].

29.  I have set out Schedule A to the LBAs at Annex D to this judgment. Each of the Land Base Agreements then contains as an appendix a document headed Exhibit "HSA1" or Exhibit "HSA", followed by the words "Irrevocable Bank Instruction", and the text set out at Annex E to this judgment.

30.  During the period to May 2005 the form of the Letters of Instruction is consistent. The wording adopted in each case is, with two exceptions, exactly that of Exhibits "HSA1" or "HSA" to the LBA. So exactly does each LOI copy that wording that each is in fact entitled Exhibit "HSA1" or Exhibit "HSA". A first exception is that whereas the exhibit does not identify the bank, each LOI is addressed to Mrs Arnull at HSBC. A second exception is that whereas the exhibit is undated, in some cases the LOI bears a date.

## Relevant events

31.  The history of events given in this section is largely drawn from each side's written closing submissions. Issues arose only in relation to a handful of events, and I shall identify these below.

### Up to December 2004

32.  5th Avenue had been incorporated on 15 March 2004 as an off-the-shelf company and changed its name on 11 August 2004. When Mr Brown first attended at HSBC Moorgate on 23 August 2004 he applied for a sterling business current account and also for Swiss Franc, Dollar, and Euro foreign currency accounts ("FCAs").  They were to operate under the sterling Master Account No 81489747. Mr Brown told Mrs Arnull and Ms Mather that he was a bonds and options trader whose clients included RBS, HBOS, Morgan Stanley and others, and that his turnover in the first year would be a minimum of £5m. No thought was given by Mrs Arnull as to whether Mr Brown or 5th Avenue ought to be FSA authorised. Mrs Arnull decided on 23 August 2004 that Mr Brown's accounts required a relationship manager ("RM"), and that this should be Mr Leonard.

33.    Mr Leonard and Mr Brown appear to have met on 30 September 2004 and on 5 November 2004. There are no records of these meetings.

## *Late December 2004 - Univest*

34.    Univest was a Californian corporation. It does not appear to have entered into an agreement with Land Base, but rather to have made an agreement with 5th Avenue directly dated 20 December 2004. $10m was transferred from Univest's account at Union Bank of California into the 5th Avenue dollar account no 1 on or about 21 December 2004. Mr Brown intended the monies to go into a newly opened account. On 21 December 2004 Mr Brown sent an urgent fax to Ms Mather. He said he was writing "Further to my meeting with Jackie on Friday" (which would have been 17 December 2004) and that he had spoken to Jackie "this morning". He complained that the "secondary US$ account" was not yet open, and asks that as a result a transfer out be made from the account into which the $10m was going to be received, instead of from the "new" account.

35.    Although the documentary record is incomplete, the likely sequence of events before and after 21 December is as follows. On Friday 17 December 2004 Mr Brown met with Mrs Arnull. Mrs Arnull signed and stamped the Univest LOI. It is in slightly different form to the later ones.  Mr Brown asked Mrs Arnull to open another "secondary US$ account" account number 59099344 in order to receive a $10m transfer from Union Bank of California. On 20 or 21 December Mr Brown followed up his meeting with a fax to Ms Mather. Because the Dollar 2 account had not yet been opened he asked that the transfer go into the existing Dollar 1 account (58947825), and asked that an outgoing transfer to Bank of Scotland for €2,876,833 be paid out of Dollar 1 in lieu of Dollar 2.

36.    On 21 December someone at Moorgate printed out the electronic payment details ("EPD") for the incoming transfer and faxed it to Mr Brown. On 22 December Mr Leonard did a screen print out of the four 5th Avenue accounts, and gave an instruction to the foreign department to transfer £2000 from the Dollar 1 a/c to the Sterling a/c. By this stage the HSBC system recorded 5th Avenue's activities as "Fund Management Activities". On 23 December Mr Brown emailed Mr Leonard to see if he had "Got the fax?" The fax being referred to has not been identified.

37.    From 22 December into the spring Mr Brown disbursed the Univest $10m by a series of transfers reducing the balance to $3.2m by 17 March 2005;  and he had various email exchanges with Mr Leonard. On 21 January Mr Leonard was asked by Karen Pollen, the foreign payments clerk at Moorgate, to help resolve a query about a transfer out of $300k. On 31 January Mr Leonard dealt with Karen Pollen in connection with a request from Mr Brown for two faxes showing the state of the FCAs. On 2 February Mr Leonard provided Mr Brown with confirmation of two further outgoing transfers, and emailed Mr Lopatin to apologise for the delay in making transfers to Land Base and Univest.

38.    I think it likely that the Univest LOI was the first occasion on which Mrs Arnull was asked to stamp and sign an LOI. Mrs Arnull's evidence, which I accept, was that when she was first asked to sign and stamp a letter of instruction she did so because she was told by Mr Brown that he had a letter he wanted HSBC to keep a copy of on file and to sign it to say that the bank had taken a copy. When she asked him what it

was he responded that it was between him and his client, that he was not asking HSBC to do anything except to keep a copy on the file, and that he just wanted the bank to have a record of his business on the file. When Mrs Arnull queried it with him he was adamant that the bank did not need to do anything. She told him that she would do as he asked but would send the bank copy to Mr Leonard to check that it was OK since he was the relationship manager for 5th Avenue. Mr Brown told her this was fine, and she did indeed send a copy to Mr Leonard.

39.   In the event HSBC has not been able to locate any copy held by Mrs Arnull or Mr Leonard of the Univest LOI. Something has gone wrong in that regard, but I do not know what it is.

### January & February 2005 – Mr Edwards

40.   Mr Edwards is a past Chairman of Manchester United Football Club. He signed an agreement with Land Base on or about 4 or 7 February, and he and his adviser Mr Cormack, a former partner in KPMG, met Mr Lopatin and Mr Brown on 7 February. It is likely that Mr Edwards went into HSBC Moorgate with Mr Brown to meet Ms Mrs Arnull on the afternoon of 7 February.

41.   An undated Letter of Instruction in relation to Mr Edwards bearing Mrs Arnull's signature is likely to have been signed by Mrs Arnull, and sent to Mr Leonard, before the meeting on 7 February. On 8 February Mr Brown's secretary sent Mr Edwards a fax confirming the account details for his transfer. He was to wire his funds to account number 59099344, stating the account reference "Charles Martin Edwards". Mr Edwards transferred $10m from a NatWest account the following day, 9 February. HSBC's standard form Advice of Credit letter of 9 February to 5th Avenue shows, under Bank to Bank Information "For account of: 59099344 CHARLES MARTIN EDWARDS". The electronic payment details produced by HSBC show the "Ordering Customer" as "Mr Charles Martin Edwards" and the "Beneficiary Customer" as "Charles Martin Edwards". The "Beneficiary Bank" is shown as "5th Avenue Partners Limited." On 10 February Mrs Arnull obtained a copy of these electronic payment details and faxed it to Mr Brown in Spain.

42.   Mr Edwards subsequently made further transfers to 5th Avenue. In total he transferred some $12.71m. The $10m which Mr Edwards paid in to the 5th Avenue Dollar no 2 account (59099344) was paid out to Refco Securities on 18 February.

43.   When, prior to the meeting on 7 February, Mrs Arnull forwarded the stamped and signed Edwards LoI to Mr Leonard, she attached a compliments slip with the expectation that Mr Leonard would read the LOI and would tell her if he thought there was any problem. It is common ground that at some point after the Edwards LOI reached the Eastcheap branch Mr Leonard stuck a post-it note on a copy of that document and wrote on it. My conclusions about that are set out in Annex B to this judgment. Here I record what Mr Leonard wrote on the post-it note:

Jackie/Legal

What does this mean?

### January & February 2005 – Mr Ahmed

44.     Little is known of Aftab Ahmed. He signed a Land Base Agreement dated 10
February 2005. On 11 February 2005 Mrs Arnull made arrangements for the opening
of "two new secondary business accounts" for which funds were expected. A Letter of
Instruction referring to Mr Ahmed was stamped on 11 February 2005 and signed by
Mrs Arnull. On the morning of 11 February 2005 Mrs Arnull emailed Mr Leonard
saying that Sonny the chauffeur had asked to change Mr Leonard's meeting with Mr
Brown to 1.30pm, asking Mr Leonard to call Mr Brown, and asking Mr Leonard to
email back to her to let her know "if you have been receiving those papers from 5[th]
Avenue – I have sent two in the internal post in the last week – another one on its way
today." Mrs Arnull had some limited email communication with Mr Ahmed. In the
event, Mr Ahmed made no transfer to 5th Avenue.

### January & February 2005 - Fastgain

45.     Fastgain (mentioned at paragraph 3(3) above) was an off the shelf company purchased
by Mr Simon Paterson, an insolvency practitioner and partner in Moore Stephens. He
has provided a witness statement describing how, through an introduction by a Mr
Denis Byrne, met Mr Brown and Mr Lopatin. Mr Brown explained the proposed
transaction to him. Mr Paterson says that although he believed that the whole thing
was a scam he signed the LBA in order to try to find out more about the investment.
He and Mr Byrne went to the HSBC Moorgate branch with Mr Brown's chauffeur.
While he and Mr Byrne stood chatting in the reception area Mr Brown's driver went
to the counter. After 5 minutes the chauffeur returned with the stamped and signed
LOI for Fastgain, and they left the bank. Having received the stamped and signed LOI
Mr Byrne did not take the proposed transaction any further. The circumstances in
relation to this LOI from HSBC's perspective are explained at paragraph 3(3) above.

### January & February 2005 - Mr Mann

46.     Mr Mann's investment history, and his initial involvement with Mr Sweatman and Mr
Bradshaw, are set out in Annex B. Over two days in early February 2005 Mr Mann
and Mr Bradshaw held meetings in London with Mr Lopatin. Mr Sweatman was there
for part of the time. Mr Bradshaw has given an account of events in this regard that
differs from Mr Mann's evidence. For present purposes, however, I limit my findings
to key features described by Mr Mann. That is not because I find that there was any
impropriety on the part of Mr Bradshaw. It is simply because Mr Bradshaw now has
conflicting interests to those of Mr Mann and I am not persuaded that his account is so
plainly right that I should adopt it where it differs from Mr Mann's account.

47.     The key features of the meetings in early February are that Mr Lopatin gave Mr Mann
a copy of the Land Base agreement, explained the agreement and how he understood
the trading would work, and then said that the purpose of the meeting was to
introduce Mr Mann to the trader and to take him to the bank.  Mr Brown arrived and
explained how he proposed to trade.  It was agreed that they would reconvene the next
day and visit the bank. Mr Mann signed the Land Base agreement.  There was tension
when Mr Brown said that only the client and his lawyer could visit the bank, and Mr
Mann pointed out that Mr Bradshaw was not his lawyer. Mr Bradshaw and Mr Brown
argued over Mr Bradshaw's insistence that Mr Bradshaw accompany Mr Mann to the

bank. Mr Lopatin then told Mr Mann that Mr Brown did not want to deal with Mr Mann. Mr Lopatin asked for all documents to be returned to him, and they were. Mr Mann returned to Los Angeles. He sacked CMFS in what has been described as the "cease and desist" email (see Annex B). On 15 February he sent a fawning email to Mr Brown. As explained in Annex B, on 17 February Mr Bradshaw emailed a letter drawing attention to particular features of the proposed transaction.

48.     On 22 February Mr Mann returned from California to London, having met with Mr Lopatin. The fawning email had served its purpose, and both sides were ready to proceed with the transaction. At lunch at the Caledonian Club on 22 February 2005 he was given a LOI, signed by Ms Mather on Mrs Arnull's instructions as described at paragraph 3(2) above. After lunch he and Mr Brown drove over to Moorgate to see Mrs Arnull. For the reasons given in Annex B I am sure that Mr Mann carefully structured his questions at that meeting so that he could make a plausible claim that he had been given the assurances that he needed, and he then made a note of the meeting designed to back up that claim.

49.     On 23 February Mr Mann went to Zurich. The $5m was transferred on 28 February. On the morning of 1 March  Mr Brown emailed Mrs Arnull asking her to look out for the incoming funds of $5m and Mrs Arnull replied that the funds had been received the previous day into account 59102753 (i.e. 5th Avenue's US Dollar No 3 a/c).

### January & February 2005 - Mrs Lu and Mr So

50.     In mid to late 2004 Mrs Lu told Mr So what she had learnt about private placement investments (see paragraph 16 above). Mr So identified funds held with Saloman Smith Barney ("SSB") as funds which could be invested in this way. These funds had their origin in trading profits of the Arche group. Either on his own authority or with such approval as was necessary from members of Mr So and Mrs Lu's families, he agreed that these funds could be used if Mrs Lu could find a suitable private placement investment. In readiness for this approximately $30m was transferred from SSB to a term deposit with HSBC Hong Kong in the joint names of Mr So and Mrs Lu.

51.     From at least late January 2005 Mrs Lu was in contact with a Mr Keith Millar by email.  In his email of 17 February  Mr Millar told Mrs Lu exactly what to expect when she ultimately visited London:

> I must stress that this is a real "front door" transaction where you will meet a director of the trade group and the bank trader.  The initial meeting is in a prestigious London law firm, and then you will walk across the road with the trader to open the account in the branch of HSBC that is doing the trading, only after you have agreed and signed, the contracts.  If you are not entirely happy with what is offered, you can decline to sign the contract ...

52.     On 16 February  Mr Millar spoke to Mrs Lu on the phone and then emailed her to say:

> The only way we could get you into this program in HSBC London would be for you, or with your partner Kevin So, to come to London for two days to meet the principal and the trader who would explain

everything to you, and open an own name, non-depletion account in HSBC London, for you.   Your funds would then be transferred internally from HSBC HK using the HSBC network. You would need to bring your passport, a current bank statement of your account at HSBC, HK and two utility bills as proof of address in order to open the account. The program will compound your profits week after week in order to get you up to $100m quickly. We would then transfer you into a special program of amounts of $100m, and above, which provides substantial returns. ...

53.   Mrs Lu then replied to Mr Millar thanking him for his efforts to date and setting out a series of questions to which she sought answers "before I speak to Mr So to get his concurrence on the transferring the investment funds from Hong Kong to London".  A series of 10 questions under four heads then followed.

54.   Mr Millar's response to a direct question about the approximate rate of return on the second stage "Special Investment program" (which could supposedly be accessed when funds reached $100m) was ...

Very high. We are not allowed to put a figure in this. All I can tell you is that the parent trust is #1 in the business and that the actual profits they return to a client and his/her project(s) are the highest real returns in this business. Forget all the broker nonsense and non-existent deals – this is the best real deal in the world, which you will realise when you meet the team of people involved.

55.   In the covering text to his replies he said this:

I must stress that this is a real "front door" transaction where you will meet a director of the trade group and the bank trader. The initial meeting is in a prestigious London law firm, and then you will walk across the road with the trader to open the account in the branch of HSBC that is doing the trading, only after you have agreed and signed, the contracts

56.   One of Mr Millar's answers referred to the account being opened as a "sub-account". Mrs Lu emailed him back with three further queries that evening to which Mr Millar responded on 18 February. After these two rounds of queries from Mrs Lu and responses from Mr Millar, Mrs Lu emailed Mr Millar on 18 February to say she would provide the relevant information to Mr So, and that she looked forward to receiving arrangements for a visit to London the next week. Mrs Lu sent Mr Millar an "Authorization of Signatory" document by email on 20 February. She said she was planning to be in London on 23 February and asked to have an advance copy of the "contracts" before she arrived in London. Miller's reply was that that would not be possible "due to the confidential nature of this business".

57.   For reasons which are not clear the visit planned for February 2005 was delayed.

### March & April 2005 - Mrs Lu and Mr So

58.     Mrs Lu chased Mr Millar on 10 March. Mr Millar replied on 17 March to say he
        would be in touch shortly and then replied substantively the next day, again
        describing the process in some detail. Mr Millar suggested Mrs Lu should come to
        London for the morning of 30 March, but that date was then postponed by Mr Millar
        on the grounds that "the trader" was away for Easter. Mrs Lu said she would be
        bringing a friend, Jane Zhou, with her to translate. Various official-sounding requests
        for proof of identity and authority to act on behalf of Mr So, all said to emanate from
        the "compliance officer" were made of Mrs Lu, along with requests for proof of
        identity of Ms Zhou). Mrs Lu and Ms Zhou arrived in London and met with Mr
        Millar and a Mr Minton on the evening of Sunday 10 April. Mr Millar prepared Mrs
        Lu for her meeting the next day with "the trader"; explained the importance of
        secrecy, and described restrictions on what might and might not be asked of the
        trader.

59.     The next morning, 11 April, Mrs Lu and Ms Zhou were taken by Mr Millar and Mr
        Minton to meet Michael Mr Brown. He was in new offices at the top of a town house.
        Mr Brown described what he was trading on screen and said there were secret
        cameras. Mr Lopatin arrived and explained the role of Land Base. Mrs Lu asked
        various questions of both Mr Lopatin and Mr Brown. She was told that the account at
        HSBC would name her and Mr So as beneficiaries in addition to 5th Avenue Partners.

60.     Meanwhile at lunchtime Mr Leonard emailed Mr Brown on another matter altogether
        – the IDB foundation. Mr Leonard signed off his email:

                Hope you and Sharon are well

                See you Wednesday,

                Ian

61.     On the afternoon of 11 April Mrs Lu and Ms Zhou went with Messrs Lopatin, Miller
        and Minton to Mr Lopatin's hotel room and went through the Land Base Agreement
        article by article. Mrs Lu stressed to Mr Lopatin the importance of the Letter of
        Instruction, and Mr Lopatin passed that message to Mr Brown by phone.

62.     There are at least three distinct versions of the So/Lu letter of instruction on which the
        pattern of stamps are different. They all bear a typed date of 11 April. Since the
        established modus operandi was for two separate "originals" to be brought into the
        bank for stamping and signature it is likely that So/Lu LoIs were brought into the
        bank on at least two occasions for signature by Mrs Arnull. It is probable that the first
        occasion was in fact 12 April and another was signed the next day.

63.     Just before lunch on Tuesday 12 April Mr Brown emailed Mrs Arnull:

                Hi Jackie!! Lost your number.. are you there all day today???? I may
                need some documents stamped.. Please call me on 0207 297 6464.

64.    At about the same time Mr Brown called Mrs Arnull. He told her that the new office was up and running, and they discussed Mr Leonard's visit of the following day (to Upper Brook Street). There was this exchange:

> B. Well, actually, I may have some things I need you to get stamped again today.
>
> A. Sure, no problem
>
> ...
>
> B. Just the normal crap – just stamp them and bring them back – send them back
>
> A. Yeah, absolutely fine, no problem.

65.    Mrs Arnull was not alarmed when Mr Brown described the LoI as "the normal crap" and it did not jar with her – it was just the way he spoke. Later in the conversation it emerged that Mrs Arnull would be at Legoland, rather than in the office, on the Thursday. At 14.24 on the afternoon of 12 April Mrs Arnull emailed Mr Brown, referring to what must have been a So/Lu Letter of Instruction:

> Hi
>
> Sonny has been in and docs all stamped

66.    Mrs Lu's meeting reconvened in the afternoon and in the course of the afternoon Denis Byrne arrived. He brought with him a Letter of Instruction.

67.    Mr Leonard met Mr Brown at the Brook Street Offices on 13 April, probably at 11 am. What exactly Mr Leonard and Mr Brown discussed is not known. Mr Leonard disclaims any recollection. Mr Leonard was provided with password access to the 5th Avenue website. Subsequent emails suggest there must have been some discussion of Mr Brown's mortgage.

68.    In the morning of 13 April Mrs Lu met again with Mr Lopatin. Mrs Lu wanted to meet Mrs Arnull; Mr Lopatin told her that Mr Brown had tried to arrange a meeting but Mrs Arnull was not available. Mrs Lu said that she wanted a letter from Mrs Arnull and Mr Lopatin said he would pass the message to Mrs Arnull.

69.    Mr Brown phoned Mrs Arnull, left a message, and then emailed her. There is a short email timed at 1.51pm which suggested Mr Brown called. Then at 1.57pm Mr Brown emailed Ms Mrs Arnull:

> Subject: Help!!
>
> Hi Jackie
>
> Need your help. about the client that signed the agreement yesterday.
>
> Could you please type a letter to me at 5th Avenue Partners 26 Upper Brook Street London W1K 7QE

I need the letter to say

Dear Mr Brown:

This is to confirm that you are a client of HSBC Bank in good standing and we are satisfied with the way your accounts are managed.

We also confirm that we hold in our files a copy of the instructions issued by yourself, on April 11, 2005, pertaining to your clients Kevin So and Lucy Yan Lu.

Should you need any further assistance, please feel free to contact the undersigned.

Sincerely,

Jackie Arnull (mrs.)

(yer title goes here, dear)

Jackie, need this ASAP, can sonny Come around to pick it up.. stick a couple of your cards in the envelope!!)

Thanks

Michael x

70.   Mr Brown and Mrs Arnull finally spoke after lunch, probably at about 2.20pm., and a tape of the conversation has been recovered. It was played at the trial. Mrs Arnull was in fact already typing up the letter. She played along with a joke by Mr Brown about it being to put on the wall. Mrs Arnull knew that the Reference Letter was for Mr So and Mrs Lu – "the clients who signed the agreement yesterday". The SLM Investors rightly say that the tape recording is particularly telling - and chilling. First one hears a charming Michael Brown speaking to a confident, bubbly and eager-to-please Mrs Arnull; then immediately the phone goes down Mr Brown's tone changes: he gloats about misleading Mrs Arnull, and he delivers his instructions to Sonny the chauffeur in a quite different style of delivery.

71.   Mrs Arnull did as Mr Brown had asked.  She emailed him back at 2.19pm to say the letter would be ready by 2.30pm. She corrected the spelling mistake (but omitted Mr So's surname) and duly produced a letter in the terms sought by Mr Brown. I shall refer to this as the "Reference Letter." She signed it showing herself as "Premier Manager". She enclosed some business cards. Mrs Arnull did not send a copy of the Reference Letter to Mr Leonard. Subsequent investigations by HSBC have failed to locate any copy of the Reference Letter.

72.   It is likely that Mrs Arnull signed a further version of the So/Lu LOI on 13 April. On that day Mrs Lu was given not only the reference letter and Mrs Arnull's business cards, but also a 3 page LOI stamped and signed by Mrs Arnull which was accompanied by a fourth page. The fourth page gave instructions for transfer of funds. It was on 5th Avenue headed paper and gave the name of the transferee account as "5th Avenue Partners Ltd/So Kevin/Lu Yan Lucy". This page, however, was neither

stamped nor signed by Mrs Arnull and for that reason I conclude that it was not presented to her.

73.     Also on 13 April Mrs Lu signed the Land Base Agreement on behalf of herself and Mr So.

74.     Mrs Lu and Ms Zhou returned to Canada on 14 April. Mrs Lu spoke to Mr So and they discussed the documentation. It is unclear whether the documents were faxed to Mr So. In any event he did not have them translated and his understanding cannot have been independent of Mrs Lu's. At some time over that weekend Mr So and Mrs Lu drafted a letter in these terms:

> Dear Ms. Arnull,
>
> As per Exhibit "HSA" Irrevocable Bank Instruction by 5th Avenue Partners Ltd., I understand that an account bearing the number of 58947833 in the name of 5th Avenue Partners Ltd./Kevin So/Lucy Yan Lu.
>
> Please verify if such account is a segregated & non-depletion account that the beneficiary is Kevin So/Lucy Yan Lu & that under no circumstances shall the principal amount of Funds deposited in the Thirty Million USD ($30M USD) be permitted to be withdrawn as stated hereto & for payment of wire charges (if any).
>
> Please verify the above & contact myself and my bank officer immediately.
>
> My Email address: sureleader@yahoo.com.cn
>
> My bank officer:    Janet Wong
>
>      Customer Relationship Manager.
>
>      Convention Plaza HSBC Premier Centre
>
> Direct call:    (852) 2824 6102
>
> Email:   janetmwwong@hsbc.com.hk
>
> Sincerely,
>
> Kevin So

75.     I shall refer to this letter as "Mr So's Enquiry Letter". It was dated 15 April but not emailed until Sunday 18 April, when it was sent direct to Mrs Arnull and also to Ms Janet Wong, who was the manager dealing with Mr So at HSBC Hong Kong.

76.     The explanations by Mr So and Mrs Lu as to why the letter was sent are dealt with in Annex B. For the reasons I give in that annex, I am sure that both of them doubted whether the Reference Letter and the LOI, even with the fourth page, gave them the assurances that they wished to have.

77.   On 16 April Mr Brown emailed Mrs Lu to say she could access the website. When this was achieved Mrs Lu responded on 18 April to say that it was "amazing".

78.   Ms Wong at HSBC Hong Kong forwarded the emailed letter to Mrs Arnull in London at 8.22am on 18 April saying "Jackie, Please take a look and call me back straight away". Mrs Arnull's response was to fax a copy of the Letter of Instruction to HSBC Hong Kong. She spoke to Ms Wong, although she cannot remember the conversation. At 9.30 am she emailed Ms Wong saying that although she could "confirm that we have such an instruction which we have been told to hold in our files (copy faxed to you), as I am not the relationship manager for the 5th Avenue account, I have sent a copy of this to the RM Ian Leonard to reply".

79.   Mrs Arnull knew that there was no account 58947833 in the name of 5th Avenue Partners Limited/Kevin So/Lucy Lu, and she would have been able to tell Ms Wong that. She did not do this and instead passed the matter to Mr Leonard. She said that there appeared to be an issue between Mr So and Mr Brown about the nature of the account, and she felt "uncomfortable" with Mr So's Enquiry Letter.

80.   At 9.32 am Mrs Arnull forwarded to Mr Leonard a copy of the incoming email from Hong Kong and her reply to Ms Wong, and asked Mr Leonard to reply to it. Mr Leonard responded at 10.15: "Jackie, Not in until tomorrow, can you send me their original email." Late on 18 April , at 7.49 pm, Mr Brown emailed Mrs Arnull:

> Wasn't in work today as it was the anniversary of my father's passing and tend to curl up in ball on these days!
>
> Apparently HSBC Hong Kong, through the client that you signed the paperwork on last week is trying to send $30m to the account. They said that they tried to contact you (HSBC Hong Kong that is). Did you hear anything. Will be in the office tomorrow (Tuesday)

81.   At 9.01 am on 19 April Mrs Arnull emailed Mr Brown:

> I have had an email and call from hsbc hong kong – i confirmed that we held an instruction in our file and have faxed them a copy. They also asked various other questions which I could not answer – i forwarded to Ian for a response, if yoiu calltoday [sic] or would like me to e mail you a copy of their email i will be happy to
>
> Regards Jackie

82.   Mr Brown responded at 10.03:

> Hi, please do forward me a copy and ask ian not to answer anything until i see the email

83.   Mrs Arnull immediately sent Mr Brown a copy of Mr So's letter of enquiry (at 10.12), and passed on to Mr Leonard Mr Brown's request (at 10.13):

> Hi Ian, Michael Mr Brown asks that you contact him before replying to any letter/email re Kevin/Lucy. Thanks Jackie.

84.  At 10.21 Mr Brown replied to Mrs Arnull, with a copy to Mr Leonard:

> Hi: thanks for this, I will reply to his email myself. They were not
> informed that the account was segregated in their favour, and as such if
> wantedto[sic] naff off to Barbados with the funds; technically I could
> do so!!
>
> ho hum, another bites the dust.
>
> Take care
>
> Michael

85.  Immediately below that text is the text of Mr So's enquiry letter.

86.  I accept Mrs Arnull's evidence that when Mr Brown said he could "naff off to
Barbados with the funds" she simply thought it was "one of his silly little jokes and
didn't think anything of it".

87.  Mr Leonard disclaims any recollection of this email, but for reasons set out in Annex
B I conclude that he was well aware of it.

88.  At or about 9.57 am on April 19 Mr Brown emailed Mrs Lu follows:

> Hi Lucy
>
> Regrettably, your banks communication to mine was unacceptable. I
> therefore have asked HSBC London to cease communication.
>
> Best wishes for the future.
>
> Michael Brown

89.  Mr Lopatin then reassured Mrs Lu in a telephone conversation. He said that Mr
Brown had probably been annoyed at the direct approach and that Mr Brown would
have expected the approach to have been via Mr Lopatin and Mr Brown to HSBC. Mr
Lopatin said that if there had been any problem with the HSBC Letter of Instruction
the HSBC fraud department should have contacted Mr So/Mrs Lu right away. Mr
Brown emailed Mrs Lu to similar effect. Mrs Lu also asked Mr Lopatin about the
lack of response to Mr So's Enquiry Letter emailed directly to Mrs Arnull. Again Mr
Lopatin reassured her: he told her that HSBC legally received the enquiry but because
it was not in legal bank verbiage they might not get a reply.

90.  For reasons given in Annex B I conclude that Mrs Lu told Mr So that Mr Brown had
threatened to block the deal, as well as telling him that Mr Brown had been angry, and
why. Annex B sets out my conclusions as to the inferences drawn by Mr So and Mrs
Lu.

91.  Mr Brown emailed both Mr Leonard and Mrs Arnull at 9.47am on 20 April:

>     After much humming and hawing with the Chinese chappies. I believe
>     that they, now, understand the position. I have been informed that
>     funds are due in in the next 48 – 72 hours. Can you please urgently let
>     me know before crediting them to my accounts ..

>     Important that both of you keep your eyes on this one and as such need
>     you to confirm receipt of this email

92.   Mr Leonard says he cannot remember this either. My reasons for concluding that he
      did remember it are set out in Annex B.

93.   Mrs Arnull responded at 9.58 am to say that they would not see the funds at the
      branch until they actually credit an account, and asked Mr Brown to let her know
      which account no they were being sent to. She promised to call Mr Brown when the
      funds were received.

94.   At 3.54 pm on the afternoon of 20 April (in Hong Kong) HSBC Hong Kong were
      given the So/Lu instruction to transfer funds.  The instructions followed the transfer
      instruction form and were for $30m to go to a/c no 58947833 (the Euro account) at
      sort code 40-05-15 (the HSBC London sort code for the FCAs). The name of the
      account was given as 5th Avenue Partners Ltd/So Kevin/Lu Yan Lucy. The relevant
      SWIFT instruction from HSBC Hong Kong shows that the SWIFT instruction was
      consistent with the So/Lu transfer instruction, giving the Euro account number
      followed by the text 5th Avenue Partners Ltd/So Kevin/Lu Yan Lucy. At 11.15 Mr
      Brown emailed Mrs Arnull to ask her to "give the foreign department a heads up
      $30mm from HSBC Hong Kong ....... Its due into the € account....".

95.   Later on 20 April there was an exchange of emails between Mr Brown and Mr
      Leonard. The likely sequence of events is:

      i)      At 12.15pm the processing department called "RM" – ie Mr Leonard and
              recorded "RM on hol[iday], alt[ernative] nos engaged

      ii)     At 12.45pm Karen (presumably Karen Pollen at Moorgate) called the
              processing department and left a message that she would ring back ("WRB")

      iii)    At 2.21pm Mr Brown emailed Mr Leonard

              Got the release I needed... go ahead and credit, **will send copy of
              email that I sent to them for your records.** I am over next week.
              Enjoy the golf ... remember the sun block mate. [Emphasis added]

      iv)     At 2.28pm Mr Leonard emailed 5th Avenue about new accounts.

      v)      At 3.05pm somebody in HSBC named Karl gave a message to the processing
              department: "Pl[ease] credit USD[ollar] A/C 58947825 A[s] P[er] Karl.

      vi)     At 3.10pm Mr Brown chased:

> Did you get my email allowing you to credit the funds? I sent it about one hour ago? Please confirm

    vii)    At 17.49pm Mr Leonard replied to Mr Brown:

> Michael, Yes thanks

96.    Mr Brown arranged a transfer out of $10m to Univest on 21 April from account no 58947825 (the account into which Mr So and Mrs Lu's monies were received).

97.    On 22 April Mrs Arnull printed off and faxed the electronic payment details to Mr Brown. Mr Brown forwarded it Mr Lopatin who passed it on to Mrs Lu: but one or other of them removed or covered over the final entry showing the beneficiary bank to be Devonshire Capital Ltd, which was one of Mr Brown's companies.

98.    Mrs Arnull didn't look at it. Had she done so she would have seen that it recorded the beneficiary customer as "5th Avenue Partners Ltd So Kevin Lu Yan Lucy" – which she would have known to be false.

### May 2005: Mr Leonard chases Mr Brown

99.    On 25 May Mr Leonard emailed Mr Brown. The email deals with three things: business cards, an offer to Mr Brown from HSBC corporate credit, and then this:

> I also have not yet received a copy or your email to your client in Hong Kong as previously discussed.

100.    I set out in Annex B my reasons for concluding that this referred to the email to Mr So and Mrs Lu which, on 20 April, Mr Brown told Mr Leonard he would forward to him.

### Progress reports in 2005

101.    Land Base notified Mr Mann and Mrs Lu of alleged trades which were profitable but not at the spectacular levels suggested by Mr Millar to Mrs Lu.

### September & October 2005: Emulex

102.    Emulex Consultores e Servicos LDA ("Emulex") is a Portuguese corporation. It has recently claimed an interest in recoveries made by HSBC, and in order to advance that claim has been joined to these proceedings. It has played no part in the present trial.

103.    Mr Brown obtained a stamped and signed Letter of Instruction from Mrs Arnull on 27 September 2005. It differed from previous LOIs. In particular, immediately above the space for signature it stated:

> We, HSBC Bank plc, represented by Jackie Arnull, hereby acknowledge receipt and acceptance of the irrevocable instructions herein and undertake to adhere to these instructions until the Principal Amount is repaid to Emulex Consultores e Servicos LDA

104.    At 5.27 pm on 29 September 2005 a Mr Keating, the Finance Director of Emulex, emailed Mrs Arnull saying that she "will have seen our name recently on the

irrevocable letter of instruction relating to the new account opened by the bank for 5th Avenue a/c 5939256" and enclosing a pro forma instruction (in the form of a board resolution) which Emulex would use when seeking the return of its funds.

105.   At 9.36 am on 30 September Mrs Arnull forwarded the email to Mr Leonard with a covering note that "this related to the form handed in at this branch and forwarded to you about 2 weeks ago"; and emailed Mr Keating to say that that was what she was doing. At 10.26 Mr Leonard emailed Mrs Arnull to say he was referring "this all" to legal and telling her "Do not sign any more unless advised otherwise. I will correspond directly to Michael Brown and Mr Keating." At 10.39am Mr Leonard replied to Mr Keating asking him not to remit funds, and saying that he was getting his legal team to vet the instruction signed by his colleague which was "currently not binding" as she did "not have the power to act for the bank in this manner". Mr Keating acknowledged receipt at 11.07. At 11.45 Mrs Arnull replied to Mr Leonard: "No problem".

106.   At 13.23pm Mr Leonard emailed Mr Brown:

> I have received an email from [Emulex] , asking us to follow his instructions, re the deposit he is about to make, in relation to his instructions signed by Jackie. I have had to advise him that his instruction cannot be actioned and are the actual instructions are not binding.
>
> I will forward his email.
>
> I have referred your instructions to our legal team to see if can be accepted and the consequences o such going forward. Also who has the authority to accept on behalf of the bank.
>
> I hope things are quieting down after the recent publicity and the Foundation golf day went well
>
> Regards, Ian

107.   At 12.46 Mr Brown replied to Mr Leonard

> Hi Ian
>
> All is calm thanks ... I don't get on well with this guy, I am dealing with his boss. He is fully aware that the funds are under my control and that he is not authorised to make or demand anything on the account. The instructions are there for the bank to hold in case I get knocked down by a bus!! Or a times reporter!!
>
> You should email him back and inform him that the funds are in an account under 5[th] Avenue's control. Any instructions on the account need to come from me and that you are holding any instructions as a matter of fact.

> The instructions should not be adhered to unless they come from me as the holder of this account.
>
> Call me in psain when you get a chance.

108.    Mr Brown then emailed Mr Leonard again, at 14.22:

> I have looked at this board resolution again ... it is really sent for your records along with the other document. I really cant see the issue.
>
> The other document is form me to the bank and really does not concern emulex, rather you and I.
>
> The document executed by Jackie is the one that we have used before and Emulex does understand that it is my instructions to you.
>
> I have left numerous voicemails and tried you mobile, give me a call in spain when you can.

109.    Mr Leonard replied at 14.28:

> Michael
>
> Out of office with clients will ring later or Monday if do not get back in time.

110.    Mr Brown responded asking Mr Leonard to "call him for 2 secs anyway" and Mr Leonard tried to call him later in the afternoon. At 6.05pm Mr Leonard emailed Mr Keating again to tell him that he had:

> ...spoken to my client, 5th Avenue, who have advised me not to accept payments from yourself for the time being.

111.    Mr Leonard gave a copy of the Emulex letter to his colleague Ms Claire Dornan-Baker, and asked her to fax the document to HSBC's legal department to advise. Whether that fax was sent, or advice was sought, on 30 September 2005 is not clear. In any event, nothing very much seems to have happened until 6 October 2005. On 6 October 2005 Mr Leonard spoke to the legal department about the Emulex letter, and the legal department also spoke to Mrs Arnull.  Mrs Arnull then emailed Mr Leonard to say that she had been given a bit of a roasting by legal for signing "that form", which she had signed "without even thinking".

112.    I set out in Annex B my conclusions as to what Mr Leonard in fact did at this stage.

## The SLM Investors' claim in contract

### *The SLM Investors' rights as third parties*

113.    The first way in which the SLM Investors put their case in contract assumed that there was no contract between any of the investors and HSBC. Instead it was said that the

investors had statutory rights under the contract between 5th Avenue and HSBC. The
argument involved two stages. The first stage was that the pre-existing banking
contract between HSBC and 5th Avenue was varied by each letter of instruction. The
second stage was that having been so varied, it purported to confer a benefit on the
investor who could therefore sue under the Contracts (Rights of Third Parties) Act
1999.

114.   I do not accept the first stage of the argument. It was common ground that there was a
       pre-existing banking contract between HSBC and 5th Avenue, and that in order for it
       to be altered by the Letters of Instruction the investors must prove that there was a
       contract of variation. I shall refer to such a contract as a "contractual variation". In my
       view there was no contractual variation because neither party intended it. The SLM
       Investors placed reliance on an objective analysis, but there is no need for such an
       analysis, if there were an objective analysis it would include the whole of the dealings
       between the parties, and even if the objective analysis were confined to the stamped
       and signed LOIs such an analysis would not conclude that agreement had been
       reached on a contractual variation.

## Neither party intended a contractual variation

115.   As described earlier I accept Mrs Arnull's evidence that when she was first asked to
       sign and stamp a letter of instruction she did so because she was told by Mr Brown
       that it was between him and his client, that he was not asking HSBC to do anything
       except to keep a copy on the file, and that he just wanted the bank to have a record of
       his business on the file. Mr Vineall suggested in his closing submission that in
       relation to later Letters of Instruction Mrs Arnull did not rely upon what had been said
       by Mr Brown on the first occasion, and instead relied upon Mr Leonard. There is no
       foundation for that suggestion in the evidence. Mrs Arnull believed that Mr Leonard
       had no problem with her stamping and signing the letters of instruction. That does not
       detract from what was absolutely clear from her evidence, that on each occasion she
       was led to believe and did believe that the purpose of asking her to stamp and sign the
       letter was the same as it had been on the first occasion. Nor can there be any doubt
       that Mr Brown was well aware of that belief.

116.   In these circumstances there was no contractual variation, for HSBC in the person of
       Mrs Arnull did not intend that there should be one and 5th Avenue through Mr Brown
       knew this.

## An objective analysis does not arise

117.   The SLM Investors advanced a contention that there was an "objective" contract. It
       was accepted that 5th Avenue could not assert against HSBC that there had been a
       contractual variation. Nevertheless it was said that HSBC could, if it were minded not
       to allow an investor's money to be paid out of the relevant account, assert against 5th
       Avenue that a contractual variation had taken place. It was submitted by Mr Vineall
       that the well known decision in *Smith v Hughes* (1871) LR 6 QB 597 showed the
       usual rule to be that an objective analysis as to creation of a contract trumps a
       subjective analysis. He added that the objective analysis applied where the question
       turned only on the construction of a document. In my view these arguments do not
       assist the SLM Investors. First, the objective analysis operates to ensure that
       unexpressed reservations of one party do not prevent the formation of a contract

where to all outward appearances there is agreement in the same terms on the same subject matter; see *Chitty on Contracts*, 29th edition, paragraph 2.001. The decision in *Smith v Hughes* is cited by the editors in that paragraph, and I can see nothing in it inconsistent with the proposition I have cited. In the present case there is no unexpressed reservation; the absence of any intention to vary the banking contract was the clear basis on which Mrs Arnull signed the first letter of instruction, and it continued to be the basis, known to both parties, on which all subsequent letters of instruction were signed. Accordingly the principles of objective analysis are not engaged. Second, if HSBC became concerned about the terms on which it had received funds from the Investors, it did not need to assert a contractual variation in order to protect itself. Mr Vineall accepted that there were other ways in which HSBC could seek to protect its interests. Third, even if HSBC were entitled to do so, the factual position is that it has never asserted a contractual variation. In the absence of such an assertion, the only contract between HSBC and 5th Avenue for the purposes of Section 1 of the Contracts (Rights of Third Parties) Act was the ordinary banker/customer contractual relationship.

## Objective analysis not confined to the LOI

118.   The SLM Investors' argument assumed that for the purposes of objective analysis the court should look only at the signed and stamped Letter of Instruction. What the Contracts (Rights against Third Parties) Act presupposes, however, is a contract in the sense of a binding agreement between contracting parties. If it were the case that the objective analysis principle came into operation, it would be necessary to analyse objectively the dealings between the alleged contracting parties. Objective analysis of those dealings does not support the SLM Investors' case. Far from there being the outward appearance of agreement on contractual terms, what would be apparent to the reasonable bystander was a course of conduct in which both parties proceeded on the basis that HSBC was doing no more than acknowledge that it held a copy of the document in question.

119.   In their written reply the SLM Investors say that if the contract (or variation) is contained only in a written document, a reservation which is expressed only orally is treated as an unexpressed intention, as explained in *Lewison* at paragraph 2.05 and *R v LCD ex p Nangle* [1992] 1 All ER 897 DC 903j-904a, and as to which they referred to *Chitty* paragraph 2-156. The passages relied on, however, seem to me to reinforce the principle that the objective test merely prevents a party from relying upon an uncommunicated belief as to the binding force of the agreement. I note in this regard that the parol evidence rule does not prevent evidence that the parties' agreement was not contained in the written document: see *Chitty* at paragraphs 12-096 to 12-098.

## Analysis limited to the LOI does not assist

120.   The SLM Investors added that if the contractual variation was contained in the stamped and signed Letter of Instruction, then HSBC could only escape by asserting "non est factum", and it had not done so – doubtless because such a plea can only succeed in the absence of negligence. Even if, however, an objective analysis were to be confined to the stamped and signed Letter of Instruction, the SLM Investors would not in my view succeed on the first stage of their argument. I reach this view for two independent reasons.

121.  My first reason is that an objective observer, on initially reading the stamped and signed LOI with its tortuous drafting and wordy phraseology, would in my view react immediately by saying, "What on earth is this?" On re-reading the document an objective observer would conclude that it was so out of the ordinary that it could not be relied upon without taking legal advice. In reaching these conclusions I have not found it necessary to rely on the evidence of Dr Fitzgerald, for I consider that the court can with reasonable confidence predict the reaction of an independent observer in these circumstances

122.  My second reason derives from a more painstaking analysis propounded by HSBC. HSBC submitted that the wording "receipt acknowledgment: (bank)" amounted to no more than receipt of the letter – explicitly in relation to Mr So and Mrs Lu and implicitly in relation to Mr Mann, where the letter relating to him did not even acknowledge its receipt. HSBC relied on *Chitty on Contracts*, 29th edition at 2-025:

> The mere acknowledgement of an offer, in the sense of a communication stating simply that the offer had been received, would likewise not be an acceptance.

123.  HSBC contrasted this with the wording which had been added to the letter relating to Emulex. That wording was appropriate to confirm the bank's "acceptance of the irrevocable instructions" and its undertaking to adhere to them. HSBC observed that the circumstances surrounding this later letter caused the fraud to be uncovered by HSBC. Mr McQuater added that if a bank was asked to acknowledge receipt of a document it was difficult to see what else it could do. It was unreal to suggest that the bank could refuse to acknowledge receipt, even in a case where the document was headed "irrevocable bank instruction". Junior employees could be asked to acknowledge receipt, and it put them in a terribly invidious position if one was going to start construing that as a contractual acceptance.

124.  Mr Vineall sought to answer this point in his oral closing submissions. First, he pointed out that when the Letters of Instruction were returned to Sonny nothing was said to the effect that the instructions either were or were not accepted. The sums identified in the Letters of Instructions were subsequently transferred to HSBC in the case of the Letters of Instruction that referred to Mr Mann, Mr So and Mrs Lu, Mr Edwards, and Univest – although Mr Vineall acknowledged that this had not happened in the case of Mr Ahmed, nor in that of Fastgain. Looking at the matter objectively, these were instructions about what to do with money which came in from clients of 5th Avenue. HSBC were not bound to comply with the instructions, but a reasonable bystander would say that it had received the instructions, had done nothing to suggest that they were unacceptable, and by stamping, signing and returning the instructions was saying that it accepted them – because if they were not accepted the bank would not stamp, sign or return the letters. Alternatively, submitted Mr Vineall, there was an acceptance of the instructions by continuing in the banker/client relationship and receiving the money identified in the instructions. Normally if a banker had expressly acknowledged an instruction then, by the time that money came in, it would not be open to the banker to ignore that instruction: the banker must either comply with the instruction or at least say that it would not comply. One reason for this was that at the time of giving the instruction the customer may not know whether the bank was bound to comply.

125.   This first suggested answer provides no sound basis for rejecting HSBC's argument. It asks the court to look at events contemporaneous with or subsequent to the stamping and signing of the Letter of Instruction. That immediately goes outside the premise that the objective analysis is to be confined to the stamped and signed Letter of Instruction. If the court is to look at events contemporaneously with or subsequent to the stamping and signing of the Letter of Instruction, I can see no reason why the court should not also look at events prior to the stamping and signing of the Letter of Instructions. Once the court does so, then for the reasons given earlier, it is plain that there was no contractual variation.

126.   A second suggested answer was put in this way by Mr Vineall. He accepted that merely acknowledging receipt of an offer is insufficient for objective agreement. However stamping and signing the Letters of Instructions was very different from merely acknowledging receipt. The Letters of Instructions were expressed clearly as containing instructions to the bank to do something. They did not easily fall into analysis as an offer, partly because there was a pre-existing relationship in which instructions were given from time to time and as a matter of course were complied with, whether or not in strict law the bank was obliged to do so. This suggested answer, however, was met by a powerful response by Mr McQuater. An acceptance by definition had to be a final and unequivocal expression of assent to the terms of the offer, and this was all the more so where one party asked the other to agree sophisticated and complex terms about trading and settlement of fixed income instruments, the dividing of benefits under a complex formula, and the maintaining of a segregated account. It was not a standard form bank mandate, but had been crafted by the customer in strange and unusual terms.

127.   I accept HSBC's submission that the Letters of Instruction cannot possibly fall into a category of instructions which as a matter of course are complied with. The result is that even if the objective analysis principle applies, and the analysis is confined to the signed and stamped Letter of Instruction, the SLM Investors have not made good the first stage of their argument on third party rights.

128.   There was no suggestion by the SLM Investors that HSBC was estopped from denying that the ordinary banker/customer contract had been varied. The conclusions set out above mean that in relation to the claim under the Contracts (Rights of Third Parties) Act I do not need to deal with legal questions arising from other points taken by HSBC in relation to the first stage, nor with those arising on the second stage. I consider that it would be artificial to try to examine those questions on hypothetical assumptions which differ from my conclusions in the present case, and accordingly I do not do so.

## A contract between HSBC and the SLM Investors

129.   The second way in which the SLM Investors put their case in contract was to assert that there were direct contacts between them and HSBC. Initial suggestions of collateral or implied contracts were abandoned in Mr Vineall's oral closing submissions. The remaining formulation of the second case in contract was that the Letters of Instruction constituted an offer which was accepted by the SLM Investors' conduct in depositing monies with HSBC. Mr Vineall submitted orally that HSBC knew that Mr Mann had the Letter of Instruction which he showed to Mrs Arnull at the meeting on 22 February 2005, and knew that Mr So and Mrs Lu had the Letter of

Instruction which gave rise to the questions in Mr So's letter to Mrs Arnull. Mr Vineall submitted that HSBC knew what was in any event an inescapable inference: that the SLM Investors would rely on the Letters of Instruction in transferring their money into accounts of 5th Avenue Partners held with HSBC. HSBC had proffered the letter, which was thus an offer, and which had been accepted when the investor transferred funds to HSBC for the account of 5th Avenue Partners. The analysis was that where a bank knew that an investor had a letter of instruction stamped and signed, plainly setting out what HSBC should do with a specific amount of money coming from the investor, that was an offer capable of acceptance by the investor. The obvious way of communicating acceptance was to do what the Letter of Instruction contemplated, namely transfer funds to HSBC.

130.    In summary the SLM Investors said that they wished their funds to be held and protected on the terms of the Letters of Instruction, and there were good reasons why HSBC should be held to those terms, having signed, stamped, certified and accepted the Letters of Instruction and put them into circulation when it knew or ought to have known that they would be relied upon by the investors named in them.

131.    As to "proffering" and "putting into circulation" the Letters of Instruction, I do not accept that the Letters of Instruction in the form found in exhibit "HSA" to the Land Base Agreements were, merely on the basis that they had been stamped and signed by HSBC, capable of amounting to a contractual offer. For the reasons given on the SLM Investors' first argument as to third party rights, when objectively analysed the stamped and signed Letters of Instruction contain no acceptance of 5th Avenue's instructions. The mere fact that HSBC had acknowledged receipt of those instructions did not give rise to any inference that HSBC was willing to enter into a contract with the investor should the investor choose to transfer funds to 5th Avenue's account. Nor, as I have held earlier did any of Mr Mann, Mr So or Mrs Lu believe that this was the case.

132.    The next question is whether the position is any different as a result of the dealings between the investor and HSBC. For this purpose, in order for the SLM Investors to demonstrate that a contract arose between them and HSBC they must, as a minimum (see *Chitty On Contracts*, 29th edition, paragraphs 2-002 and 2-003), show that, at the time of the alleged acceptance by transferring funds, both:

   i)    HSBC's words or contract were such as to induce a reasonable person to believe that it intended to be bound; and

   ii)   When the SLM Investors transferred funds they did not know that HSBC lacked the intention to be bound.

133.    In Mr Mann's case neither of these prerequisites is satisfied. For the reasons given in Annex B, I am sure that on receiving the Letter of Instruction Mr Mann's initial view was that HSBC had probably not appreciated that the Letter of Instruction sought to place responsibilities on HSBC to monitor and control what 5th Avenue did with the transferred funds. I am equally sure that when meeting Mrs Arnull he was careful to avoid any suggestion that there was even a possibility that the Letter of Instruction sought to place responsibilities on HSBC to monitor and control what 5th Avenue did with his money. The result was that Mrs Arnull was not alerted to that possibility, was not aware of any belief by Mr Mann in that regard, and remained in complete

ignorance of any possibility that the Letter of Instruction sought to place any
responsibilities on HSBC. Mr Mann was well aware of this, and I see no basis for
thinking that there was any contrary representation to him. An objective observer
would not have taken long to realise that Mr Mann's limited questions only made
sense if he was skirting around the issue whether HSBC intended to undertake any
contractual obligation as regards the transferred funds. Such an observer would have
concluded that Mrs Arnull's answers all proceeded on the basis of an assumption by
her that the Letter of Instruction was concerned only with the position between 5th
Avenue and Mr Mann. She was not representing that her knowledge, or that of Mr
Leonard was such as would give rise to any inference that HSBC was willing to be
bound by the terms of the Letter of Instruction.

134.    Further, for the reasons given in Annex B, I am sure that when Mr Mann made the
        transfer his belief as regards HSBC was simply that, on a worst case basis, his notes
        of his meeting with Mrs Arnull would be enough to force it to pay up. He fully
        appreciated that Mrs Arnull had no intention that HSBC should be bound by the terms
        of the Letter of Instruction.

135.    In the case of Mr So and Mrs Lu, neither of them regarded the three pages stamped
        and signed by HSBC as sufficient for their purposes. Nor did they consider that the
        Reference Letter sufficed. In order to allay concerns expressed by Mrs Lu in London
        a fourth page was added to the Letter of Instruction, a crucial element on that page
        being the identification of an account at HSBC in the joint names of themselves and
        5th Avenue. When the fourth page was supplied, however, it was neither stamped nor
        signed by HSBC. It follows that the fourth page does not show that the first
        prerequisite identified above was met.

136.    For the reasons given in Annex B I am sure that even with the fourth page Mr So and
        Mrs Lu doubted whether HSBC had accepted or would accept any responsibility to
        monitor and control what 5th Avenue did with their money. It was for that reason that
        Mr So's letter to Mrs Arnull was emailed both to her and to HSBC Hong Kong.
        HSBC itself did not reply to that letter.

137.    Mr So's letter sought verification that an account in the joint names of 5th Avenue, Mr
        So and Mrs Lu was a "segregated & non-depletion account", that the beneficiary was
        "Kevin So/Lucy Yan Lu" and that "under no circumstances shall the principal amount
        of Funds deposited in the Thirty Million USD ($30M USD) be permitted to be
        withdrawn as stated hereto & for payments of wire charges (if any)." Is it right to
        infer from this that HSBC, by failing to reply to Mr So's letter, would be understood
        by a reasonable person to have represented that it intended to be bound by the terms
        of either the three page Letter of Instruction or the Letter of Instruction with the fourth
        page? Here it seems to me that the reasonable person must be put into the position of
        Mr So and Mrs Lu. They knew that Mr So's letter had come to the attention of Mr
        Brown, and that his response was to email Mrs Lu saying that Mr So's letter to HSBC
        had been unacceptable and that Mr Brown had told HSBC not to respond to it. After
        Mrs Lu's discussions with Mr Lopatin, Mr So and Mrs Lu knew that Mr Lopatin was
        saying that they should not communicate with HSBC in that manner again without
        first contacting him, that there would be no response from HSBC to Mr So's Letter,
        and that if Mr So and Mrs Lu were to go ahead with the transaction, it would be on
        the basis that they would not have a response from HSBC to Mr So's letter. In these
        circumstances a reasonable person would have thought that something was terribly

wrong with the proposed transaction. If HSBC was intending to be bound, what possible reason could there be for the failure by Mrs Arnull to respond to Mr So's letter? The explanations put forward by others were obvious nonsense. At the stage when the $30 million was transferred no reasonable person in the position of Mr So and Mrs Lu would have believed that HSBC intended to be bound by the Letter of Instruction.

138.   Thus Mr So and Mrs Lu cannot satisfy the first prerequisite for there being a direct contract with HSBC. Mr Mann can satisfy neither prerequisite. I hold accordingly that the SLM Investors had no direct contract with HSBC.

139.   This conclusion means that I need not deal with legal questions which would arise if it were necessary to investigate other reasons put forward by HSBC in answer to the direct contract claim. I consider it desirable to comment on one aspect of one of those reasons, a suggestion that HSBC were entitled to rescind any such contract for misrepresentation. The misrepresentation was said to have been made to Mrs Arnull, before she stamped and signed the relevant letter, by Mr Brown as agent for the relevant investor, with the legal consequence that his knowledge was to be treated as knowledge of the relevant investor, and thus on this basis the relevant investor knew that HSBC did not intend to be bound. In such circumstances it seems to me that no direct contact could arise, as the second prerequisite identified above would not be met. There would thus be nothing to rescind. As to other aspects of misrepresentation, and the other reasons put forward by HSBC in answer to the direct contract claim, examining those matters would involve speculating on what the position would be if I were to make different findings of fact, and I do not consider it useful to do so.

## Dishonest Assistance in Breach of Trust

140.   The next head of claim on behalf of the SLM Investors was dishonest assistance in breach of trust. Here three propositions of law were common ground for the purposes of argument before me:

> (1) A person who dishonestly assists a trustee in committing a breach of trust may be liable to the beneficiary. Liability is based on being an accessory to the trustee's wrong and does not depend on having received trust property.

> (2) The accessory must be proved to have been dishonest in giving assistance to the trustee's breach. In applying this standard the accessory is not free to be judged according to the accessory's own standards of honesty. The accessory is to be judged according to the standards of ordinary honest people: *Royal Brunei v Tan* [1995] 2 AC 378.

> (3) It is unnecessary for the accessory to take a view on the propriety of what the accessory is doing. In order to prove dishonesty in this context it suffices that the accessory was conscious of those elements of the transaction which made participation in it transgress ordinary standards of honest behaviour.

141.   The first question arising under this head is whether 5th Avenue or Mr Brown owed to
the SLM Investors the obligations of a trustee. The SLM Investors relied upon the
judgment of Cooke J given on 11 October 2006 in these proceedings. On that
occasion Cooke J was dealing with Part 20 claims between Mr Edwards and the SLM
Investors on the one hand and 5th Avenue and Mr Brown on the other. Cooke J
concluded at paragraphs 13 and 14 that summary judgment should be granted against
5th Avenue and Mr Brown on the basis (among others) that they were liable as
expressed, implied or constructive trustees. He made it clear, however, in paragraph
18 that nothing in his judgment impacted upon the present disputes between HSBC
and the SLM Investors.

142.   HSBC's written closing submissions contended that the material before me revealed
differences from what was in evidence before Cooke J. These differences were
elaborated in supplementary closing submissions, but I have not found it possible to
identify anything in these suggested differences which would lead to a conclusion that
relevant events did not give rise to a trust.

143.   The dishonest assistance claim was refined during the course of the trial. Whereas
previously it was said that both Mrs Arnull and Mr Leonard were dishonest, when the
SLM Investors lodged their written closing submissions they abandoned any assertion
of dishonesty on the part of Mrs Arnull.

144.   Thus the only question now arising on this head of claim is whether Mr Leonard was
dishonest. In Annex B I have set out my reasons for concluding that he was dishonest
in his evidence, and behaved dishonestly in October 2005 after he was sent Emulex's
email of 29 September 2005. In considering whether Mr Leonard was dishonest at
earlier stages, my starting point is the approach advocated by the SLM Investors at
paragraphs 368 to 372 of their written closing in relation to concealment:

> 368. It is often said that concealment is the badge of fraud.
> Concealment is indeed often the badge of fraud, but concealment,
> particularly after the event, can also be the consequence of
> embarrassment, shame or straightforward self-interest in a cover-up to
> conceal incompetence.
>
> 369. It therefore does not necessarily follow from what happened after
> the fraud was discovered that that acts or omissions by Mr Leonard at
> an earlier stage were dishonest acts or omissions. There is clearly a
> possibility that Mr Leonard's dishonest conduct after the fraud was
> discovered was the result of his desire to keep his job, or at least to
> save his career in banking (which is what he in fact achieved).
>
> 370. The right approach it is submitted, is
>
> (1) to decide what in fact happened
>
> (2) to consider any explanation advanced to explain what
> happened, to decide whether it is credible, and if so whether it is
> consistent with honesty

(3) to consider whether there is any other explanation for what happened *which is consistent with the available evidence* (albeit not explicitly advanced by Mr Leonard) which could reasonably account for what happened, and if so whether it is consistent with honesty.

371. However, it is not the task of the Court to speculate upon explanations which might be advanced and might be consistent with honesty, but which are not consistent with the available evidence.

372. There is a difference between not making a finding of dishonesty because the evidence is compatible with an honest explanation of what happened, and making findings unsupported by the evidence as part of finding that there is no dishonesty.

145.  Adopting that starting point, I acknowledge relevant considerations identified by Mr McQuater as follows:

(a) The basis of a bank's dealings with its customer is trust, not distrust, and full weight must be given to this consideration when determining whether a banker knows that the customer is involved in a fraud: Barclays Bank v Quincecare Ltd [1992] 4 All ER 363 at 377e-f per Steyn J.

(b) What matters is what the defendant knew, as distinct from what a reasonable person would have known or appreciated (Royal Brunei Airlines v Tan [1995] 2 AC 378, PC at p.389, 391 per Lord Nicholls). It does not therefore assist to say that a reasonable person would have drawn a particular inference unless the court finds that such inference was in fact drawn by the defendant.

(c) It will be relevant to take into account the personal attributes of the defendant, such as his or her experience and intelligence, the reason for acting as he/she did and the commercial setting in which the relevant events occurred: Royal Brunei v Tan p389 per Lord Nicholls and Twinsectra at 198 per Lord Millett.

(d) Wilful blindness or "blind-eye" knowledge is sufficient but is not established by a mere vague feeling of unease: Manifest Shipping Ltd v Uni-Polaris Co. Ltd [2003] 1 AC 469.

146.  I also accept HSBC's submissions that there are striking examples of Mr Brown's powers to deceive:-

(a) He was able to involve Fox Williams, a reputable firm of City solicitors, in his scheme.

(b) He was able to open accounts with and enter into agreements with the well known prime broker Refco, deceiving Mr Mudie their Head of Fixed Income Prime Brokerage and Mr Hawksworth their

Head of Fixed Income. His deception was such that they were prepared to enter into an agreement with 5th Avenue to act as principals for it in trades and to provide leverage and clearing services, although no real trading actually took place.

(c) Even after Mr Brown's fraud had been discovered, after the police had arrested him and this court had granted worldwide freezing and tracing orders and search orders against him, he persuaded Mr Clifford Knuckey, a former head of Scotland Yard's Anti-Money-Laundering Unit who now manages a private investigatory firm, to produce a due diligence report suggesting that the whole thing was a terrible misunderstanding, that there was in fact no fraud and that it was safe for Altus to do business with Mr Brown.

147.   With these considerations in mind, I examine in turn each of the suggested primary facts which the SLM Investors urge at paragraph 373 of their closing submissions that I should find:

(1) I accept that Mr Leonard knew that 5th Avenue's accounts were ordinary accounts in relation to which HSBC was operating a standard mandate.

(2) I accept that Mr Leonard read a copy of the Letter of Instruction signed and stamped in relation to Mr Edwards. For the reasons in Annex B, I find that he did not do this immediately on receiving the Edwards LOI.

(3) I do not accept that Mr Leonard realised that there was an inconsistency between what the Letters of Instruction described and how the accounts were in fact operated. For the reasons given in annex B, I have concluded that Mr Leonard did not take time to read the provisions in the Letter of Instruction relating to Mr Edwards. He glanced at the document, took sufficient time to see that it appeared incomprehensible, flagged it with a post-it note and put it on one side with the intention of taking it further in due course.

(4) I accept that Mr Leonard realised that he did not fully understand the Letter of Instruction in relation to Mr Edwards. I accept also that he made a note on a post-it which he stuck to his copy of the letter to remind himself that he proposed to seek help from Mrs Arnull or from HSBC's legal department as to what the letter meant. I do not accept that he considered that he was under any obligation in that regard.

(5) I accept that Mr Leonard did not obtain clarification either from Mrs Arnull or from HSBC's legal department. However, for the reasons given in annex B, I conclude that Mr Leonard was aware of Mr Brown's email of 19 April 2005 to Mrs Arnull stating that the investors were not informed that the account was segregated in their favour, and was also aware of the email sent the following day to Mrs Arnull and himself by Mr Brown stating that the Investors "now, understand the position." He was also aware from Mr Brown's later email dated 20 April 2005 that

Mr Brown had said he would send Mr Leonard a copy of an email that Mr Brown had sent to the investors in relation to this transaction. He considered that there was no longer any need to seek clarification from Mrs Arnull or from HSBC's legal department.

(6) Mr Leonard was repeatedly reminded of the existence of the Letters of Instruction to this extent: he received intermittently Letters of Instruction which were stamped and signed in relation to Mr Ahmed, Mr Edwards, Mr Mann, and Mr So and Mrs Lu, along with the Letter of Instruction relating to Emulex and correspondence concerning the Letters of Instruction in relation to Mr So and Mrs Lu and in relation to Emulex.

(7) For the reasons given in annex B it was some time before Mr Leonard read the Letters of Instruction. It was only after doing so that Mr Leonard became aware of the identity of the clients identified in the Letters of Instruction. He was aware of the identity of Mr So and Mrs Lu before the $30 million was transferred by them to 5th Avenue's account with HSBC.

(8) Mr Leonard read the emails which were copied or addressed to him between 18 and 20 April 2005, and realised that there was "an issue" about the recipient account. He knew on 20 April 2005 that Mr Brown said he had sent an email to Mr So and Mrs Lu and he knew that Mr Brown had said that he would forward a copy of this email to Mr Leonard. On 25 May 2005 Mr Leonard sent Mr Brown an email reminding Mr Brown that he had not yet received a copy of the email in question.

148.   Turning to other matters raised by the SLM Investors, I accept that there is no need to show motive for dishonest assistance. Absence of motive might be a counter-indication to dishonesty. In relation to Mr Leonard, however, there was a motive in the sense that he had a personal interest in keeping Mr Brown's business, which accounted for around £10,000 of his £28,000 bonus for 2005.

149.   I also accept that Mr Leonard's role in querying the Emulex Letter of Instruction is not a counter-indication to dishonesty in February and April 2005. If someone closes their eyes to suspicion and does nothing about them, they may still get cold feet when yet further evidence emerges of possible skulduggery. Finally in this regard I accept that the defence that Mr Leonard simply never read the LOIs has collapsed. The SLM Investors say that all that one is left with – presumably in the period after the post-it note and prior to voicing his concerns about the Emulex letter – is inaction. That is not quite right, for Mr Leonard was in email correspondence with Mr Brown and Mrs Arnull about Mr So's enquiry letter, and on 25 May 2005 he chased Mr Brown for the email that Mr Brown had promised to provide. What can be said is that in this period Mr Leonard, having flagged concerns by writing on the post-it note, did not take steps to raise those concerns with anyone inside or outside HSBC. The crucial question is whether he had such knowledge of relevant matters as to make that failure dishonest. The SLM investors submit that he had knowledge of a "mismatch". This submission calls for careful analysis.

150.   I take first the position prior to April 2005. I do not accept that during this period Mr Leonard had actual knowledge of a mismatch between the operation of the 5th Avenue accounts and the arrangements described in the Letters of Instruction. He eventually looked at the Letter of Instruction in relation to Mr Edwards and queried what it meant. It was something that he had in mind to take further. His failure to take it further was not the result of a deliberate decision to shut his eyes to possible fraud. On reading the Letter of Instruction in relation to Mr Edwards, it was a document that was difficult to understand. This was something to take further with Mrs Arnull or with the legal department, but did not call for immediate action. It was for that reason that all he did at the time was to place a post-it sticker on his copy of the Letter of Instruction in relation to Mr Edwards, to remind himself that he intended to do something about it.

151.   The position changed when Mr Leonard learnt of Mr So's letter to Mrs Arnull. Mr Leonard took the steps described in Annex B. I am sure that his reaction was an honest one. He was satisfied by what Mr Brown had told him that the actions of Mr Brown and 5th Avenue were actions which Mr Brown's clients understood and agreed to. He did not deliberately shut his eyes to the possibility that there was a mismatch between the way in which the 5th Avenue accounts were operated and the Letters of Instruction. On the contrary, he positively believed that Mr Brown had resolved any uncertainty in this regard by taking the matter up with his clients and ensuring that they understood how the funds would be dealt with. Had Mr Leonard been aware of fraud on the part of 5th Avenue or Mr Brown, or had he been shutting his eyes to such fraud, he would not have sent the email of 25 May 2005 chasing Mr Brown for the copy of the email sent by Mr Brown to his clients and promised by Mr Brown in his email of 20 April 2005. This conclusion is consistent with later events. What happened in relation to the Emulex letter was that Mr Leonard realised that he had been wrong to believe that Mr Brown ensured that his clients knew how the funds would be dealt with. Mr Leonard's reaction was not to raise the alarm immediately, for he also realised that he had been a fool to accept what Mr Brown had said about this in his emails. Mr Leonard went back to the file, saw the notes and compliments slips which had accompanied the LOIs when they were sent to him, and realised that his failure to read through the LOIs on receiving them had been a gross breach of his duty to HSBC. He concluded that he must raise with HSBC his concerns about the Emulex letter, and decided that when doing so he would do what he could to cover up his own laxity. To this end he decided that he would pretend to his employer that he had come across the LOIs in the file only after reporting his concerns about Emulex, and that in order to support this pretence he would destroy the notes and compliments slips which had accompanied those LOIs. The lies that Mr Leonard has told since then have all been necessitated by this decision.

152.   The SLM Investors relied on oral evidence by Mr Leonard when asked about passages in the cross-examination of Mrs Arnull:

   Q.  And I asked her:

   "Why didn't you, Mrs Arnull, forward that to Janet Wong?"

   And she said:

   "Well, Ian was dealing with it, so why would I?"

She said she passed the query, passed it over to Ian:

"Ian knew his client, Ian knew what was going on, it was down to Ian
to reply."

You accept that, do you? Mrs Arnull, having forwarded to you --

A. I would not accept that if someone has got concerns, it's not down
to -- it's -- they can pass responsibility to someone else. So I do not
accept that is correct, that it was purely down to me, but yes, if I had
concerns, I would have responded to that email as well.

Q. What are you saying Mrs Arnull should have done, other than
forwarding it to you?

A. I'm not sure if it's my place to actually say what I think she should
have done, but I believe that if you have -- **personally, I believe if you
have concerns, then you ensure that those concerns are verified or
sorted out.** [emphasis added]

153.   The reason that the SLM Investors referred to this evidence was to support, if
       necessary, a contention that Mr Leonard knew that he had been acting dishonestly. It
       was, however, common ground that the SLM Investors did not need to advance such a
       contention. I have nevertheless considered whether this passage may support a
       submission that Mr Leonard at least shut his eyes to fraud. My conclusion is that it
       does not support such a submission. His final answer quoted above was an unworthy
       attempt to pass the blame to Mrs Arnull. The motive for that, in my view, was an
       uncomfortable realisation that his own inadequacies had by this stage been
       remorselessly and repeatedly exposed during the course of cross-examination.

## Tort: Claims by the SLM Investors

154.   The claim against HSBC in tort asserted negligent misstatement, conduct and failure
       to act. A separate claim alleging deceit on the part of Mrs Arnull was abandoned at
       the stage of closing submissions.

### Negligence: Duty of Care

155.   The SLM Investors accepted that for a duty of care to arise in relation to misstatement
       it was necessary to show a special relationship between the investor and HSBC. It was
       also accepted that in relation to the wider case in negligence the touchstones for the
       existence of duties of care required an "assumption of responsibility", and that it was
       fair, just and reasonable to impose a duty.

## *The Representations Relied Upon*

156.   For the purposes of the claim in negligent misstatement a first set of alleged representations is set out at paragraph 65 of the SLM Investors re-re-re-re-amended defence and counterclaim. For convenience I shall refer to the relevant part of this statement of case as "the counterclaim". The common factor is that all are said to have been made by stamping and signing the Letters of Instruction. That conduct is of itself said to have given rise to the following 5 representations to each of the SLM Investors:

> (a)     That HSBC (1) was ready, willing and able to adhere to and/or follow the instructions contained in the Letters of Instruction and to hold all funds transferred by the SLM Investors on the terms thereof, and/or (2) had the then present intention of adhering to and/or following such instructions and holding all funds on the terms thereof.

> (b)     That HSBC had accepted the instructions contained in the Letters of Instruction and/or acknowledged that it was bound by their terms or would be so bound in the event that the SLM Investors transferred funds to HSBC.

> (c)     That there was no reason of which HSBC was aware which would prevent the instructions contained in the Letters of Instruction being adhered to and/or followed and/or HSBC holding all funds transferred by the SLM Investors on the terms thereof.

> (d)     That any funds transferred by the SLM Investors to HSBC would be held by HSBC on the terms of the Letters of Instruction.

> (e)     That the SLM Investors could rely upon HSBC to take reasonable care (1) to ensure that the instructions contained in the Letters of Instruction were adhered to and/or followed, and/or (2) to adhere to and/or follow such instructions.

157.   I do not accept that any of these representations in this first set arose merely out of the stamping and signing of the Letters of Instruction. For the reasons given in the section of this judgment dealing with the SLM Investors' contractual claims, an objective observer, on initially reading the stamped and signed LOI with its tortuous drafting and wordy phraseology, would in my view react immediately by saying, "What on earth is this?" On re-reading the document an objective observer would conclude that it was so out of the ordinary that it could not be relied upon without taking legal advice. The signed and stamped Letters of Instruction did not, without more, convey that HSBC had accepted those instructions, nor that HSBC intended or was ready, willing or able to adhere to or follow them. In those circumstances there is simply no foundation for the alleged representations set out in sub-paragraph 65(a). In the absence of the representations set out in sub-paragraph 65(a), the more elaborate representations asserted at sub-paragraphs 65(b) to (e) cannot possibly arise.

158.   A second set of representations is said to have been made by Mrs Arnull to Mr Mann at the meeting on 22 February 2005. These are set out at paragraphs 66 of the counterclaim as being:

(a) that the form of the Letter of Instruction had been approved by HSBC's legal department; and

(b) Mr Mann's funds would be held in a segregated account, further or alternatively that HSBC was ready willing and able to hold his monies in such an account and/or had the then present intention of doing so.

159. For the reasons given in Annex B, however, I am sure that:

(1) No representation was made by Mrs Arnull that there had been approval by the legal department;

(2) Whatever was said about a "segregated" account was, to the knowledge of Mr Mann, not understood by Mrs Arnull to mean a segregated account in the sense relied upon in the counterclaim.

160. A third and final set of representations was said to have been made to Mr So and Mrs Lu. These were described in paragraph 67 of the counter claim as:

(a) A repetition of the representations at paragraphs 65(a) to (e), by signing and stamping the amended Letter of Instruction; and

(b) A repetition of those representations by providing the Reference Letter.

161. However, for the reasons given in Annex B, I am sure that if Mrs Arnull did sign a further Letter of Instruction in relation to Mr So and Mrs Lu, that Letter of Instruction did not include a fourth page, and was identical to the first Letter of Instruction signed in relation to Mr So and Mrs Lu. As to the Reference Letter, it said that HSBC held in its files "a copy of the instructions issued by yourself, on April 11, 2005, pertaining to your clients Kevin So and Lucy Yan Lu." This part of the Reference Letter must be read in conjunction with the Letter of Instruction. For the reasons given earlier the mere stamping and signing of the Letter of Instruction did not convey any of the representations alleged. Did it make a difference that HSBC said in a letter addressed to 5th Avenue that a copy of the Letter of Instruction was held in HSBC's file? This did not in my view constitute any sort of representation made by HSBC that it had accepted and would act upon the relevant instructions. On reading the Reference Letter a reasonable observer would in my view have asked whether the letter remedied the key deficiencies, from the investors' point of view, in the signed and stamped Letter of Instruction. Particular deficiencies that cried out for remedy were that the Letter of Instruction was not addressed to the investors, nowhere said it had been accepted by HSBC, and nowhere contained any undertaking by HSBC. The Reference Letter did not do anything to assuage obvious concerns in this regard. On the contrary, it adopted wording which was inapt for instructions to HSBC – "we hold in our files *a copy of* your instructions [emphasis added]". The failure to say that the instructions were accepted, and the curious wording used in the Reference Letter, would in my view only have increased the alarm that the Letter of Instruction itself would arouse in a reasonable observer.

162.   Thus I conclude that the requisite special relationship between the parties did not
exist, for none of the representations relied upon by the SLM Investors was in fact
made. There was extensive argument as to whether the making of the alleged
representations would have given rise to a duty of care. I consider it artificial to
speculate whether as regards one or more hypothetical representations a duty of care
would arise, and accordingly I do not do so.

### *Duty of Care: HSBC's Actions and Omissions*

163.   The SLM Investors assert at paragraphs 79A to 79I of the counterclaim a succession
of different duties said to arise in relation to HSBC's actions and omissions to act.
The alleged duties at paragraphs 79B to 79E are said to have arisen from what
happened when HSBC was informed of the content of Mr So's letter to Mrs Arnull.
However in that regard the position as between the investors and HSBC was simply
that Mr So emailed a letter to HSBC and HSBC failed to respond. There was nothing
in the circumstances to suggest that a failure to respond indicated an assumption of
responsibility by HSBC. On the contrary, HSBC's failure to respond to a letter asking
for help was the reverse of what could be expected if HSBC were assuming any
responsibility in the matter. As regards the alleged duties at paragraphs 79B to 79E of
the counterclaim I conclude that there was nothing to indicate any assumption of
responsibility by HSBC, and no basis on which any duty of care on the part of HSBC
could arise.

164.   The duties of care alleged at paragraphs 79A and 79I of the counterclaim are said to
arise merely by stamping and signing the Letters of Instruction. The SLM Investors'
case in this regard is simply a reworking of the alleged duties in relation to
misrepresentations, and fails for the same reasons.

165.   The remaining alleged duties of care are at paragraphs 79F to 79H. These assert a
duty to ensure either that Mrs Arnull was capable of exercising reasonable skill and
care in relation to the relevant transactions or that she was properly supervised so as
to ensure that the SLM Investors did not suffer loss. Again, however, nothing passed
between HSBC and Mr So and Mrs Lu which could be regarded as any sort of
assumption of responsibility by HSBC to Mr So and Mrs Lu in this regard. In relation
to Mr Mann, for the reasons given earlier, no reasonable observer could consider that
HSBC was assuming any responsibility towards him of the kind alleged. It follows
that the duties alleged in paragraphs 79F to 79H did not arise.

## HSBC's claim in deceit against Mr Mann

166.   In his oral opening Mr McQuater noted that HSBC's existing pleading was that
because Mr Mann knew Mrs Arnull was too junior he invented the allegation that she
said the LOI had been approved by the legal department and he deliberately did not
question her authority. He knew at the meeting that HSBC was being stitched up and
defrauded, and knew or suspected at the time of the meeting that Mr Brown had only
been able to procure HSBC's stamp and signature on the letter of instruction by
deceiving Mrs Arnull as to the true nature and effect of it. At the meeting Mr Mann
had said nothing to correct the deception, knowing all the time that if things went
wrong he was going to use the document to claim from HSBC as though it were a
genuine document. Mr McQuater made an application for permission to revise this

plea. After steps were taken to explain the nature of the revision in greater detail Mr Vineall did not oppose the application. The revised case for HSBC was that instead of properly drawing the nature and effect of the LOI to the attention of Mrs Arnull, Mr Mann participated in the meeting as if its purpose was simply to introduce him to her and stood by without correcting the impression she had gained from Mr Brown's previous deceit. By subsequently making claims against HSBC on the basis of the letter Mr Mann approved, adopted and assumed responsibility for the continuing misrepresentations made to Mrs Arnull by Mr Brown, and knowingly participated in his deception of her with the purpose and intention of causing her to act to the detriment of HSBC. The continuing misrepresentations were those set out in the reply, with revisions to add Mr Brown saying "it was something between him and his client and he just wanted the bank to have a record of the business on the file".

167.   Mr McQuater submitted that as against Mr Mann, the precise terms of Mr Brown's misrepresentations did not matter. What was clear to him was that Mrs Arnull had been misled about the nature and effect of the letter, this being something that was already pleaded.

168.   For the reasons given in Annex B, however, I am satisfied that he took great care to avoid making any representation to Mrs Arnull as to what might or might not have been said to her by others. He had no view one way or the other as to whether Mr Brown may have made misrepresentations to her. His sole concern was to ensure that she said things to him which he could make a note of and could deploy later should the need arise. He made no positive representations as to the effect of the Letter of Instruction. He did not make any assumption as to how Mrs Arnull had concluded that it was appropriate to sign the LOI, and his conduct did not involve any adoption by him of anything said by Mr Brown.

## Issues which have become academic

169.   My conclusion above means that many issues have become academic. I have identified earlier aspects of the case where I do not think that hypothetical observations by me will serve any useful purpose. Lest this case go further, however, I set out brief observations on certain other aspects.

### *Reliance*

170.   For the reasons set out in Annex B, I do not consider that any of the SLM Investors relied on HSBC at the time that funds were transferred to 5th Avenue's account with HSBC. They were relying on Mr Brown and Land Base. Also for the reasons set out in Annex B, I do not consider that any of the SLM Investors relied, or was reasonably entitled to rely, on HSBC at the time that funds were transferred to 5th Avenue's account with HSBC.

### *Title to Sue*

171.   The evidence of Mr So and Mrs Lu was that the funds transferred to the 5th Avenue account with HSBC were held by them on behalf of others. The evidence of Mr Mann was that the funds he transferred belonged to the Retirement Trust. HSBC's argument is that each of the SLM Investors lacked title to sue, and that if it paid damages in

compliance with a judgment in favour of the SLM Investors it might remain exposed to a further claim from the true owners of the funds in question. In effect, HSBC argued that when suing the SLM Investors for declarations of non-liability it had sued the wrong defendants.

172.   Had this question arisen for determination I would not have resolved it in favour of HSBC. In each case the SLM Investors dealt with HSBC as principals. HSBC was fully entitled to identify them as the defendants against whom it should seek declarations. There have been no attempts by any suggested true owner to become party to these proceedings or to claim against HSBC in any other way. Even if the SLM Investors were in law acting as agents for undisclosed principals, in the event that they failed to account for damages paid by HSBC the undisclosed principals' only remedy would be a claim against the SLM Investors.

## Contributory Negligence

173.   My findings have of fact led me to conclude that HSBC is not liable to SLM Investors. It follows that questions concerning contributory negligence do not arise. I do not consider that it will serve any useful purpose for me to speculate as to how different findings of fact might lead me to apportion blame.

## Settlement

174.   HSBC relied upon two agreements which were said to bar the SLM Investors' claims. The first was an agreement between Land Base (acting on behalf of itself and the SLM Investors and Mr Edwards) and Mr Brown dated 17 October 2005. The second was an agreement dated 22 November 2005 between the SLM Investors, together with Mr Edwards, and Mr Brown and 5th Avenue GmbH (another of Mr Brown's companies). HSBC says that the first agreement was intended to release HSBC from any liability, and that the second waived any right the investors may have had to complain about the way in which the HSBC accounts had been operated. Alternatively, HSBC says that it would be inequitable for the SLM Investors to pursue these claims against HSBC, having reached an alternative arrangement with Mr Brown in satisfaction of their claims. HSBC adds that the SLM Investors cannot now, as against it, pursue claims for coincident damage arising from exactly the same events.

175.   I am not persuaded by HSBC's submissions in this regard. As is demonstrated by the summary judgment granted by Cooke J, these agreements did not relieve Mr Brown of liability to the SLM Investors. HSBC was not a party to the agreements, and they contained no provision releasing HSBC. There is no reason to think that they afford HSBC any ground of defence against claims by the SLM Investors.

## Responsibility of HSBC for its staff

176.   Earlier sections of this judgment have assumed that HSBC is responsible for things done or not done by its staff. Had it been necessary to examine the correctness of that assumption, my starting point would have been that when an employer such as HSBC gives responsibility to employees, it does not follow that the employer will be absolutely liable for everything done or not done by the employees. In order for the

employer to be liable, there has to be a sufficient link between an employee's acts or omissions and the role of the employee.

177.    In the contractual context, where an employer gives to an employee a role which, internally as between the employer and employee, permits the employee to make the employer legally liable, then it can be said that the employee has "actual authority" in that regard. Of course a third party often will not know the internal limits on an employee's role. A measure of protection to third parties is afforded by legal principles concerning "apparent authority", also called "ostensible authority". These principles say that in certain circumstances – generally involving at least a representation by the employer as to the employee's role – activities falling within the employee's apparent role may bind the employer.

178.    The SLM Investors relied on the expert report of Mr Hiscock. Important passages in his report, however, did not help the SLM Investors' case. In particular, at paragraph 3.3.1 Mr Hiscock noted that neither Mrs Arnull nor Mr Leonard was familiar with Fixed Income Instruments and other investment methods referred to in the Letters of Instruction or bank methods of dealing with such transactions. In his opinion therefore, they should each have referred the Letters of Instruction to the appropriate person or department for approval as soon as they received these documents. In the present case, the documents should have been referred either to the bank's legal department or the departments specialising in Fixed Income Instruments. At paragraph 3.3.2 Mr Hiscock concluded that unless those departments approved the Letters of Instruction Mrs Arnull should not have signed or stamped them, and Mr Leonard should not have allowed them to remain on file without taking any action. At paragraph 5.2.3 Mr Hiscock repeated the conclusion he had reached in paragraph 3.2.1. It was plain that in these passages Mr Hiscock was saying that as a matter of banking practice neither Mrs Arnull nor Mr Leonard could b e regarded as having had authority to agree to the Letters of Instruction. The SLM Investors sought to overcome this difficulty in various ways. They can be conveniently examined under four heads.

179.    First, it was submitted that the internal arrangements made between HSBC and Mrs Arnull conferred on her actual authority to commit HSBC to a contract obliging it to comply with provisions with the Letters of Instruction. Mrs Arnull had authority to open accounts, including client accounts. HSBC were unable to point to any document that limited the scope of her authority in relation to account opening. As she had actual authority to open accounts including client accounts it was said to be difficult to see how her authority could be confined to particular types of mandate. It was common ground that as a "premier manager" Mrs Arnull's role was to deal with "premier" customers, that those earning £75,000 per annum or more. Nevertheless, internal documents, when describing limits on authority, simply referred to lending limits – in Mrs Arnull's case there was a limit of £25,000. Mr Vineall suggested that HSBC's focus was on the danger of loans to a customer putting the bank at risk. Receiving money into an account would not normally entail any risk. The court should not be cautious in imposing too fine a gradation in relation to what Mrs Arnull was or was not able to do, and HSBC's own expert evidence showed that on occasions banks did open accounts for the purpose of bond trading. There were various internal procedures which Mrs Arnull was required to carry out, but a failure on her part to carry them out did not have the consequence that Mrs Arnull was

deprived of the authority to bind the bank. In any event Mrs Arnull had actual authority to write the reference letter of 13 April 2005.

180. In my view the SLM Investors' submissions on actual authority to commit HSBC to contractual undertakings are bound to fail because they ignore Mrs Arnull's actual role at the bank as a premier manager and they are commercially unrealistic. When Mrs Arnull was appointed to her role it was not necessary for HSBC to spell out that she should limit her activities to those normally associated with being a manager for clients earning £75,000 or more annually. That was so obvious as to go without saying. Indeed, because the prospective banking activities of Mr Brown and his companies went far beyond those of such a customer Mrs Arnull at the outset made arrangements for Mr Leonard to act as "Relationship Manager". Similarly as regards Mr Leonard his role at HSBC was as a matter of ordinary common sense confined to the activities which should normally be undertaken by a commercial relationship manager. The role of each of Mr Leonard and Mrs Arnull had been given in the bank did not by any stretch of the imagination extend to making arrangements for bond trading. The fact that Mrs Arnull, and no doubt Mr Leonard, could open accounts including client accounts gives no logical basis for inferring that they had any entitlement to open accounts for the purposes of bond trading. The fact that there may be specialised accounts for bond trading makes no difference in this regard. The contentions of the SLM Investors do not involve a mere failure to comply with internal requirements before authorised activities are carried out – they involve an assertion that an activity of an entirely different kind from that contemplated by the role given to the particular employee would nevertheless be something that the employee was permitted by the bank to undertake so as to incur liability on the part of the bank. There is in my view no commercial basis for supposing that the employee could do anything of the kind. It would obviously expose the bank to huge risks for no good purpose. There is no reason to think that the internal documents, by saying nothing prohibiting such activity, were conferring authority to engage in it. Indeed, the passages quoted above from the report of Mr Hiscock in my view demonstrate that in the absence of express authority as a matter of banking practice there would be no reason whatever to think that either Mrs Arnull or Mr Leonard had any power to commit the bank in this regard.

181. So far as the reference letter of 13 April 2005 is concerned, if that document is said to constitute a contractual offer or acceptance, then for the reasons given above it went beyond the internal authority of Mrs Arnull.

182. Second, it was submitted that there was apparent authority to commit HSBC to contractual obligations to comply with provisions in the Letter of Instruction. Where there was authority to open accounts, one could not expect a customer or third party to enquire any more closely. Accordingly it was said that any limitation internally as to the authority to open accounts could not affect the customer or third party.

183. This submission, however does not reach the starting gate. Neither Mrs Arnull nor Mr Leonard was employed to open accounts concerned with bond trading nor to conduct any other activities on behalf of HSBC in relation to bond trading. The issue here is not whether they failed to comply with some internal obligation, it is more fundamental. The passages cited above from the report of Mr Hiscock are fatal to any contention of apparent authority. He did not suggest that designation as a "premier manager" or "commercial relationship manager" carried with it anything to suggest to

the outside world that the employee in question had authority to commit the bank to
contractual obligations in relation to bond trading. Moreover Mr Mann's oral
evidence in my view was entirely inconsistent with any assertion of apparent
authority. He said that he assumed that the Letter of Instruction had already been
authorised through the legal department. He went on to explain that most documents
in banks were approved through the legal department or a compliance department,
and the bankers then had authority to sign them. This is, in effect, what Mr Hiscock
was describing in the passages cited earlier from his report. It is completely
inconsistent with any suggestion that, in the absence of any prior approval from the
relevant bank department, Mrs Arnull, or for that matter Mr Leonard, could commit
the bank to a transaction of this kind.

184. For the same reasons any assertion that the reference letter of 13 April 2005
committed the bank to such a transaction by reason of apparent authority must fail.

185. Third, Mr Vineall relied on the fact that the bank conferred signing authority upon its
employees. These were the subject of an internal "aide mémoire". After lodging the
SLM Investor's supplementary written submissions, Mr Vineall made further oral
submissions relying on *First Energy (UK) Limited v Hungarian International Bank
Limited* [1993] 2 Lloyd's Law Reports 194. In that case the plaintiff company dealt
with the defendant bank through Mr Jamison, the senior manager in charge of the
Manchester office of the bank. Mr Jamison had authority to sanction large credit
transactions and authority to sign a facility letter in cases where the bank decided to
grant a facility. However Mr Jamison himself did not have authority to decide
whether to grant a facility and the company was aware of this limitation on his
authority. A letter was written dated 2 August 1990 on behalf of the bank offering a
facility, and this offer had been accepted by the company. The letter was signed by
Mr Jamison on behalf of the bank, but he had not in fact obtained head office
approval for the facility in question. The Court of Appeal held that on the particular
facts his position as a senior manager in Manchester was such that he was clothed
with ostensible authority to communicate that head office approval had been given for
the facility set out in the letter, and the fact that the company knew that his actual
authority to enter into transactions on behalf of the bank was limited did not necessary
mean that his authority to communicate decisions on their behalf was limited also.
The result was that the transaction was binding on the bank. Steyn LJ cited
extensively from the speech of Lord Keith in *Armagas Limited v Mundogas SA*. Lord
Keith has said that it must be a most unusual and peculiar case where an agent who is
known to have no general authority to enter into transactions of a certain type can by
reason of circumstances created by the principal reasonably be believed to have
specific authority to enter into a particular transaction of that type. Steyn LJ noted that
Lord Keith was careful not to say that as a matter of law apparent authority to
communicate approval can never arise where there is no authority in the agent on his
own to enter into the transaction. In that context Steyn LJ commented that the level at
which an apparent authority could be found to exist might vary and that generalisation
would be unhelpful. On the particular facts of the case he noted that Mr Jamison's
status, although below that of a managing director or general director, was
nevertheless considerable. He added that in the circumstances of that case, the idea
that the company should have checked with the managing director in London whether
the bank had approved the transaction seemed unreal. Evans LJ referred to the
practical consideration that any board of directors or other senior management cannot

always communicate directly with third parties – there must be someone authorised to communicate on its' behalf. In the present case, a requirement that the company seek confirmation from the head office in London would defeat the apparent object of appointing a senior manager in charge of the office in Manchester so that local businessmen could deal with him there. Earlier in his judgment Evans LJ stressed (at pages 204 – 205) that Mr Jamison had a role which was at a much higher level than that of the branch manager of a branch office of a major clearing bank. Nourse LJ concluded that a reasonable person in the position of the company would, on reading the letter of 2 August 1990, have understood that the banks head office had approved the facility offered in the letter. Mr Jamison was the senior manager in charge of the Manchester office and had dealt with the great majority of face to face negotiations, leading to an assumption that he had been given authority by head office to communicate their approval and to convey the offer accordingly. It could not be suggested that a reasonable person would have made some other assumption. It would have been most unreasonable to assume, or even to suspect, that Mr Jamison did not have the bank's authority to act as a mere channel of communication.

186.   Mr McQuater when answering this new submission drew attention to the discussion of the *First Energy* case at para 8 – 023 of the 18th edition of *Bowstead and Reynolds* on *Agency*, where the case is said to come close to taking the step which Lord Keith disapproved of in *Armagas*; agents can not have authority to say whether they have been authorised. Mr McQuater submitted that the reasoning in *First Energy* did not assist the SLM Investors. First, their own expert Mr Hiscock accepted that where a type of business activity did not fall within the normal course of business activities for a particular employee, the only people within the bank who should be dealing with the matter were the legal department or a specialised department in the bank. The particular employee ought to drop out, but there might be circumstances in which that employee could be a conduit for certain things. Whether it would be dangerous for that to happen would depend on specific circumstances, and it could be the case that the particular employee ought to leave any further negotiation, including the communication of any further decision by other bank departments, to those departments. Second, Mrs Arnull was not clothed with any special authority.

187.   I proceed on the footing that in law an employer may hold out a particular employee not merely as a person who can communicate an approval once given by the relevant specialist department, but also as the person whose communication will bind the employer even if the employee's communication mis-states the position as to whether or not the specialist department has given approval. The distinction between these two categories is an important one. I do not read the decision of the Court of Appeal in *First Energy* as blurring that distinction in any way. On the contrary, Steyn LJ accepted as valuable guidance Lord Keith's prediction that it will necessarily be somewhat rare for a principal to be *regarded as having authorised an agent to communicate whether or not that agent has authority* [page 203, my italics]. Evans LJ at pages 205 to 206 acknowledged that an agent who has no authority to enter into a transaction can not create the appearance of such an authority by making a representation to that effect. Nourse LJ agreed with the reasons given by Steyn LJ and Evans LJ. When Mr Hiscock gave oral evidence I was uncertain as to what he meant when he said at paragraph 4.2.1 of his report that "in normal circumstances, a bank expects its customers to accept the signatures of its employees without further enquiries." My questions in that regard led to further examinations of Mr Hiscock by

Mr McQuater, who asked Mr Hiscock to consider the position if someone at a high level within the bank were to find that a low level branch employee was sending out letters in the bank's name relating to sophisticated activities like bond trading. In those circumstances Mr Hiscock accepted that the senior management of the bank might not necessarily expect the customer to believe that those letters had been accepted by the bank. In my view the contrast between the position of Mr Jamison, responsible for the whole of his bank's activities in the north of England, and permitted by his bank to conduct detailed negotiations in relation to the proposed facility letter, is completely different from that of Mrs Arnull – or indeed for that matter of Mr Leonard. There was no reason for any of the SLM Investors to believe that it would be inappropriate to raise any questions to whether the bank had bound itself to a contract, whether with 5th Avenue or the relevant investor, on the terms of the letter of instruction with the department of the bank dealing with bond trading or the legal department. The circumstances of the present case appear to me plainly to fall within the category recognised by Mr Hiscock of circumstances where the bank might not necessary expect a customer to believe the employee in question had authority to state the bank's position. I can see nothing in HSBC's conduct to suggest that it was holding out either Mrs Arnull or Mr Leonard as a person falling within the second category that I have described. In those circumstances I can not accept the argument that HSBC was contractually bound as a result of a communication of its position by a person who had authority to bind the bank when communicating whether those within the bank with authority to decide on a particular transaction had in fact done so.

188.   Fourth, on 22 November 2007, immediately before Mr McQuater began his oral closing on behalf of HSBC, Mr Vineall applied to amend his clients' case in the event that Mrs Arnull had no authority to enter into a contract on the terms of the relevant letter of instructions. The proposed amendments had made two assertions. The first was that by accepting the incoming transfers from the investors, with imputed knowledge of the contract on the terms in the letter of instructions, HSBC ratified those contracts. Mr Vineall accepted orally that in order to explain how HSBC had ratified, it was necessary to add a further sentence to the effect that this was a corporate ratification, which arose not withstanding the fact that no one within HSBC with authority to enter into the suggested contract had actual knowledge of the contract. Mr Vineall acknowledges that he had not been able to find any authority to support a proposition that there could be corporate ratification in the circumstances. In my view it is elementary that in order for a suggested ratification to be effective it must have been performed by someone within HSBC who had authority to adopt the suggested contract. Accordingly the first part of the proposed new amendment discloses no basis in law for suggesting that ratification has occurred.

189.   The second way in which the SLM Investors sought to amend was clarified orally by Mr Vineall. The assertion that he wished to advance was HSBC was estopped from denying that the contract was ratified. The estoppel arose out of the acceptance by HSBC of the funds transferred by the investors to the 5th Avenue Account with HSBC. Mr Vineall accepted, however, that he could not say that any individual with authority to enter into the contract had accepted those funds on behalf of HSBC. In my view this adds nothing to the first way in which the proposed amendment was put. If there was no one within HSBC with authority to make the contract and whose action brought about the ratification of the contract, then equally the absence of any

one with authority to make the contract who represented to the investors that the contract had been made must be fatal to their case in law. In those circumstances I refused the application to make this further amendment.

190.   Turning to the suggested liability of HSBC for dishonest assistance and negligence, the SLM Investors placed reliance on the speech of Lord Nicholls in *Dubai Aluminium v Salaam* [2003] 2 AC 366 at paragraph 23. However in my view the difference between bond trading on behalf of a client and the acts Mrs Arnull and Mr Leonard were authorised to do is so great that any wrongful conduct is not to be regarded as done in the ordinary course of employment.

### HSBC's claims over against 5th Avenue and Mr Brown

191.   As explained earlier, I do not have any submissions from 5th Avenue or Mr Brown in response. On the material available to me I consider that if the claims over had arisen for decision I would have found in HSBC's favour for the reasons that it has advanced.

## Conclusion

192.   For these reasons I conclude that the SLM Investors' claims against HSBC fail, and that HSBC's claim for deceit against Mr Mann also fails.

## Annex A: criminal proceedings against Mr Brown

193.   Mr Brown was sentenced to a total of 2 years imprisonment for perjury and the offence in relation to obtaining a passport. He completed serving the custodial part of that sentence on 19 April this year. A day before his release he was charged with 18 further offences. Those offences had in the meantime been the subject of a second extradition process. They are now the subject of the current criminal proceedings, under indictment T2007 7282 in Southwark Crown Court. They focus on Mr Brown's dealings with Mr Edwards and his money. These dealings are alleged to have involved offences under the Theft Act 1968, and, in relation to transfers of funds originally emanating from Mr Edwards, to have involved the transfer of criminal property contrary to the Proceeds of Crime Act 2002. Some of these transfers are said to have involved payments to Mr So, Ms Lu and Mr Mann.

194.   In the current criminal proceedings Mr Brown has yet to lodge a Defence Case Statement. The reason for not doing so is that he has made an application for a stay of the criminal proceedings on grounds of abuse of process. At a Case Management Hearing on 5 September 2007 a timetable was set for the hearing of the abuse of process argument on 12 December 2007. If the proceedings are not stayed the criminal trial is likely to take place in the late spring or summer of 2008.[2]

---

[2] Note: In late 2008 Mr Brown was tried in his absence. Verdicts were delivered on 28.11.08 convicting him of various offences, and restrictions on publication of the present proceedings were removed: see paragraph 1 of the main judgment herein.

# Annex B: Aspects of Witness evidence

## *The attacks on the honesty of witness evidence*

195.   The closing submissions of HSBC attacked the honesty of the evidence of Mr So, Mrs Lu, and Mr Mann. The SLM Investors' closing submissions attacked the honesty of the evidence of Mr Leonard. I discuss below aspects of the evidence of each of these witnesses, including passages in his or her evidence which convinced me that the witness was giving dishonest testimony. In relation to Mr So and Mrs Lu I take into account the extent to which questions and answers had to be translated. I also take into account the fact that their cultural background differs from the western cultural background shared by Mr Mann and the HSBC witnesses. The deficiencies in relation to Mr So and Mrs Lu that I express below, however, in my view are deficiencies which retain their validity even allowing for differences in cultural background.

## *Mr So*

196.   HSBC said that in his oral evidence Mr So was often deliberately evasive and obtuse, requiring questions to be put multiple times before he would offer any response. Awkward or difficult questions would eventually be met with the reply that he did not remember, or that he had not thought about the issue, or that Ms Lu had not told him about the matter in question. He was not actually trying to assist the court with an honest account of events as he saw them at the time. Rather he was trying to reveal as little as possible and was prepared simply to lie when questioning became inconvenient.

197.   In support of Mr So it was said by Mr Vineall that evidence given through an interpreter is rarely entirely satisfactory, and the more distant the witness's language is from English the greater the problem becomes. He submitted that, making allowances for language difficulties, Mr So's evidence was straightforward and crystal clear on the key issues. Mr Vineall added that there were some differences between the accounts given by Mr So and by Mrs Lu. As to that, honest witnesses usually have differing recollections.

198.   I do not accept that the deficiencies in Mr So's evidence can be put down to language difficulties, or to mere difference of recollection. On the contrary, I am sure that HSBC's criticisms identified above were well established, for the reasons set out below. I add that Mrs Lu sought to explain apparent differences between her evidence and that of Mr So: I deal with this when I consider her evidence.

## Alleged ignorance of matters In Mr Millar's emails.

199.   Mr Millar's emails to Ms Lu predicted a spectacular level of profit. They claimed that the monies invested could be withdrawn at any time. They proposed that there would be a trading account, holding cash and securities. They referred to a proposal that there should be a joint account in London of which Mrs Lu would be the sole signatory. Mr So claimed in cross-examination that none of these aspects of the emails featured in the discussion that took place between himself and Mrs Lu. That was controverted by Mrs Lu's own evidence. In relation to being told that the funds could be withdrawn at

any time Mr So's oral evidence contradicted his own witness statement. In relation to being told about the proposed joint account of which Mrs Lu would be the sole signatory Mr So's initial evidence in cross-examination was controverted by his signature on documents which had been prepared for this purpose, and Mr So eventually accepted that his earlier evidence was wrong. While Mrs Lu cannot be regarded generally as an honest or satisfactory witness, in relation to these matters it is obvious common sense that she would have discussed them with Mr So and his evidence to the contrary was incredible.

## Motive for seeking to get involved in the proposed investment

200.   Mr So and Mrs Lu tried to maintain a pretence that the prospect of a spectacular level of profit was not the driving force behind their desire to be involved in a private placement investment. As was observed by HSBC, this was transparently false. There was no other credible motive for embarking on this venture.

## Mr So's enquiry letter dated 15 April 2005

201.   Mr So and Mrs Lu both lied to me about the motive for drafting Mr So's enquiry letter dated 15 April 2005 and sending it to Mrs Arnull and Ms Wong on 18 April 2005 by email. Mr So skirted round the true reason, although he went so far as to say, "...a written document to HSBC bank ... would kind of increase our confidence and trust." The letter itself, quite apart from the circumstances in which it was sent, makes it obvious that the reason for sending it was that Mr So and Mrs Lu doubted whether HSBC had given them the assurances that they wished to have. Mr So's refusal to accept that this was the case was less than frank.

## Ignorance of key points in Mr Brown's response

202.   Mr So claimed that, while he knew that Mr Brown was furious and had said that the enquiry letter to HSBC was unacceptable, nevertheless he had not known that Mr Brown had told HSBC to cease communication or that Mr Brown had asked HSBC not to respond to his letter. This was controverted by Mrs Lu, and again it is obvious common sense that Mrs Lu would have passed on this important information to Mr Brown.

## Alleged reliance on HSBC

203.   Mr So's evidence about his reaction to HSBC's failure to reply to the letter was confused. A central part of what he sought to say was that the failure to reply showed that Mr Brown was highly regarded by HSBC, and for that reason he and Mrs Lu therefore had confidence in this investment. This made little sense and I believe it was invented. The reason it was invented was because Mr So realised that the true course of events made him and Mrs Lu look even more foolish. I consider that the true course of events was that he and Mrs Lu grasped at Mr Lopatin's explanations about banking practice, nonsensical though they were, and allowed themselves to be persuaded that all was well. Thus at the time that they transferred funds I am willing to accept that they believed that HSBC intended to comply with the instructions in the LOI. The basis of that belief, however, was not anything said or done by HSBC – what HSBC had said and done, and not said and not done, had led them to doubt

whether they had the assurances that they wanted. When they transferred the funds they were relying on what Mr Lopatin had told Mrs Lu.

## Ignorance of reported level of returns

204.   Mr So claimed that he had not discussed the reported trades with Mrs Lu, had not asked what the level of profits was, and did not know the level of returns being reported. Again this was controverted by Mrs Lu. As HSBC observed, the idea that Mr So was uninterested in profits was entirely incredible.

## *Mrs Lu*

205.   The HSBC closing submissions described the oral evidence of Mrs Lu as "cynical and ... calculating..." As mentioned earlier, Mr Vineall sought to support her evidence by saying that in so far as there were differences between her and Mr So's accounts, honest witnesses usually have differing recollections. He added that while Mrs Lu was bright and confident, she was not financially sophisticated or financially astute. Nor was her English good enough to identify "weasel wording" in what she was told by others. I am sure, however, that the deficiencies in Mrs Lu's evidence cannot be explained away as arising from differences of recollection, lack of financial expertise, or difficulties with English. I set out my reasons below.

## Motive for the Proposed Investment

206.   Mrs Lu claimed that the motive was a desire to try a "new" type of investment. She accepted that she and Mr So wanted to get involved as soon as possible. The emails passing between Mrs Lu and Mr Millar, however, demonstrate that their desire was to get themselves involved as soon as possible not because it was a new type of investment but because it was a scheme which would produce spectacular profits.

## Motive for Mr So's Inquiry Letter

207.   Mrs Lu maintained that the reason for Mr So sending the enquiry letter was not because it was important to have confirmation direct from HSBC, but because up to that point he had not been directly involved and there was a need for an "enquiry from his side". This was simply absurd. Mr So had already signed two documents designed to ensure that Mrs Lu would have the sole power of signature. There was no need of any kind to involve Mr So for his own sake. As indicated earlier, the obvious reason for sending the letter was that Mr So and Mrs Lu doubted whether HSBC had given them the assurances that they wished to have.

## The LOI as the governing document

208.   In oral evidence Mrs Lu claimed that the LOI was an agreement between herself and Mr So on the one hand and Mr Brown on the other. When she first put forward this claim she asserted that the Land Base agreement only applied when the investment reached $100 million. Eventually Mrs Lu had to back track from that assertion, and claimed that Mr Lopatin of Land Base was "supervising" or "monitoring" at a stage before the investment reached $100 million. She accepted that this suggested understanding on her part of the LOI had not been mentioned on any previous occasion during the proceedings. The reason why she raised it in her oral evidence

was, however, transparently obvious. She had read transcripts of Mr So's evidence. HSBC had made considerable headway when cross-examining Mr So on the dangers to an investor arising out of the lack of any contract between Mr Brown and the investor. I agree with HSBC'S observations that Mrs Lu's oral evidence in this regard was a blatant attempt to concoct a new analysis in order to repair a perceived deficiency in Mr So's evidence and it demonstrated cynicism and contempt for the truth.

## Suggested difference between "discussion" and "explanation"

209.   Mr So's evidence that the contents of Mr Millar's emails had not been discussed with him was plainly a matter of some concern to Mrs Lu. She sought to explain it away by suggesting that Mr So's evidence was not a denial on his part that the relevant aspects of Mr Millar's emails had been explained to him by Mrs Lu, but merely amounted to him saying that they had not been the subject of a two way discussion. This was obvious nonsense. Mrs Lu was snatching at the word "discuss" and ignoring the whole tenor of everything that Mr So was saying in this regard. Her suggestion that she simply reported things to Mr So without any comment or questions from him is utterly implausible. What Mr So said in his evidence cannot be explained away as a mishap of translation.

## Reason for her conducting detailed negotiations

210.   Mrs Lu's witness statement said that she handled all the business aspects of the HSBC London investment because Mr So's other business commitments needed his undivided attention. However, when Mr So gave oral evidence he denied that this was the case. In cross-examination Mrs Lu tried to cope with this conflict of evidence by saying that the reason for her handling all the business aspects was that Mr So trusted her, and claiming that it was hard to say whether Mr So was very busy. When shown her witness statement she claimed that what she had said in it was the case, but that in addition Mr So had trusted her.

## Alleged reliance on HSBC

211.   Mrs Lu adopted much of Mr So's confusing testimony about the reaction to HSBC's failure to reply to the letter. In her case I believe that she did this both because she wanted to try to support Mr So and because she too realised that the true course of events made them look even more foolish. I consider that the true course of events was that which I have set out in relation to Mr So.

## *Mr Mann*

212.   Mr Mann in his evidence claimed to have met Mrs Arnull in order to seek confirmation from her that HSBC was willing to undertake the responsibilities apparently set out in the LOI. I am sure that in advancing this claim Mr Mann was engaged in a sustained and deliberate deception of the court. Before explaining my reasons for this conclusion, I mention two ancillary matters.

## Admitted lies

213.   At the start of his oral evidence I permitted Mr Mann to rely upon a fifth witness
statement. In paragraph 2 of that document Mr Mann referred to answer 25.2 of
Further Information which he gave on 10 April 2006. Mr Mann accepted that this
answer had untruthfully said that he was unable to recall with any certainty the
identity of the "finders" in this case – whereas he throughout knew that they were Mr
Sweatman and Mr Bradshaw. Mr Mann's fifth witness statement sought to explain by
saying that in April 2006 he believed he would ultimately obtain both the return of his
principal and at least some profits, and did not want to share the profits with Mr
Sweatman and Mr Bradshaw. Even though he thought they would have no valid claim
he did not want them to make such a claim.

214.   In paragraph 7 of his fifth witness statement Mr Mann noted that counsel on his
instructions on 8 October 2007 stated that he (Mr Mann) had received a letter of 17
February 2005 from Mr Bradshaw but had forgotten about receiving it. That letter was
a response from Mr Bradshaw to what Mr Mann described as a "cease and desist"
letter from him dated 13 February 2005. Mr Bradshaw's response of 17 February
contained a series of warnings about the proposed transaction with Land Base. In Mr
Mann's fifth witness statement he said that the true position was that he had always
been aware of having received a letter in response to his "cease and desist" email, but
- until he saw the response again in August this year - in his mind it was a letter which
was relevant to a potential dispute between him and Mr Sweatman and Mr Bradshaw
about their fees, and he had not recalled the detail of its contents.

215.   Under cross-examination Mr Mann accepted that in relation to the identity of the
"finders" he had also lied in a statement of truth dated 7 June 2006. At that stage Mr
Mann revealed the names of Mr Sweatman and Mr Bradshaw, but he did so in a
manner which was untruthful because it asserted that it was only at that time that Mr
Mann recalled their names. Mr Mann also admitted under cross-examination that in a
statement of truth dated 19 September 2007 he said had not recalled this letter, which
was a lie.

216.   Mr Vineall acknowledged that while these lies weighed in the balance against Mr
Mann, in his favour it could be said that he did identify Messrs Sweatman and
Bradshaw in the subsequent Part 18 response served in June 2006, he had not
attempted to prevent them providing documents to HSBC, his fifth witness statement
was frank, he had looked both ashamed and embarrassed when cross-examined on
this topic, and the explanation that he did not want to do anything which would invite
a claim by Messers Sweatman and Bradshaw was an explanation which rang true. I
acknowledge the first and second of these points. As to the fourth point, Mr Mann had
been found out and his tactic for handling this was to appear both ashamed and
embarrassed. I do not consider that a desire to avoid a possible claim was the reason
for the lies, and in that regard I am satisfied that his fifth witness statement is not
frank. The obvious reason for taking the course that he did was in the first instance to
seek to conceal from HSBC material in Mr Bradshaw's letter of 17 February which
appeared highly likely to assist HSBC, and thereafter to try to explain away his
attempts at concealment. To the extent that Mr Mann's fifth witness statement said
that there were different motives it did not ring true.

217.    HSBC rightly point out that on his own admission Mr Mann was willing to lie and in fact lied in order to try to gain personal financial advantage or avoid personal financial detriment.

## The concept of third part beneficiary

218.    During his oral evidence Mr Mann asserted for the first time that he had understood the LOI to be a "third party beneficiary agreement" giving him rights against both HSBC and 5th Avenue. Mr Mann is an American lawyer admitted to the bar in different jurisdictions of the United States and well aware that before concluding that a document gave any enforceable rights it would be necessary to consider the position under the law governing the relevant document. It would have been obvious to him that the LOI, being addressed by an English company to a bank in London, was likely to be governed by English law. He had no knowledge whatever of the content of English law as regards the enforceability of contractual promises by a third party. In re-examination Mr Vineall elicited that Mr Mann had spotted a reference in the ODL paper work to the Contracts (Rights of Third Parties) Act, but Mr Mann did not suggest that he had any understanding of the content of that statute. In my view HSBC is right to describe Mr Mann as having made this up late in the day, thereby demonstrating a cynical approach to these proceedings, treating them as a game to be won at all costs.

## The dishonest theme in Mr Mann's evidence

219.    It is difficult to understand how someone like Mr Mann, a lawyer of intelligence and ability, could have genuinely thought that HSBC might be willing to get involved in a scheme as obviously suspicious as that found in the Land Base Agreement, especially when, on a detailed reading, parts of the LOI echoed at least one of the suspicious provisions in that agreement. I nevertheless accept that Mr Mann did indeed think that it was possible that this *might* be the case. At the same time, however, he was well aware that it was no more than a possibility, and that on any objective assessment it was highly unlikely. How he came to think these things, and on that basis to proceed with the transaction, is explained by a history of involvement or attempted involvement in schemes of a similar kind – a history which Mr Vineall graced with overtones of chivalry by describing it as a search for the "holy grail". On analysis, however, the history points overwhelmingly to the conclusion that Mr Mann's approach to his financial affairs was just as cynical as his approach to these proceedings.

220.    Mr Mann's history of involvement or attempted involvement in similar investments is summarised in the written closing submissions of HSBC. I consider that a modified version of that summary is fully borne out by the evidence and suffices to demonstrate the key features:

> **"Ashar/Philip Lehman**
>
> (1) ... Mr Mann invested $1 million in this scheme which was run by Mr Philip Lehman and John Runft. The investment vehicle was Ashar Endeavor 1, LLC ("Ashar") ...Mr Mann received a whole series of status reports from Ashar's chairman Mr Runft which made it clear

that the investment was being handled primarily by Mr Lehman and his company Tower Equities, Inc ("Tower") ...

(2) On 7 September 2000 the SEC issued a cease and desist order imposing remedial sanctions against Mr Lehman and Tower on the basis of a typical high yield investment fraud. ... the investment did not ... exist. On 7 March 2002 following a full public hearing the Arizona Corporation Commission revoked the securities dealer registrations for [Mr Lehman] and for Tower ... with accompanying news release. ... evidence [filed by the FBI] in support of their warrants [against Mr Lehman] explains ... the warning signs of these investment frauds. Civil seizure and forfeiture proceedings against him by the United States of America followed in which Mr Lehman agreed to judgment and the SEC proceedings resulted in a judgment which comprehensively condemned him. The SEC proceedings included allegations and findings about the Ashar fraud.

(3) Mr Mann's experience of the Ashar investment was in accordance with the statement in the SEC's Initial Decision in its proceedings against Lehman that:

"Beginning in August 1999, ... investors were sent status reports on Ashar's efforts to invest the pool of funds. John L. Runft, an attorney who assisted Lehman in the preparation of the Ashar Operating Agreements, prepared these reports based on information he obtained from Lehman. Most of the reports claimed that Ashar was close to completing a transaction with investors' funds. However, subsequent reports always stated that the deal had fallen apart at the last minute. Ashar never entered into any 'reserved funds transaction' or any other investment that produced the large returns as represented to investors."

(4) Mr Mann  eventually "started to lose faith in the Ashar deal", became "tired of their delays and excuses" and wanted out because he was "frustrated at the delays and excuses." Fortunately for Mr Mann he got his money out from Mr Lehman's scheme in time. ...

**Bank One/Financial Ventures**

(5) Mr Mann became involved in this high yield investment fraud in 2000, over time investing a total of $6m. The scheme was run by one Steve Thorn through a number of investment vehicles with "Financial Ventures" in the title. The scheme is described in the Second Amended Complaint of the SEC against Mr Thorn and Financial Ventures and the similarities with the 5th Avenue scheme, particularly with what the investors were promised, are striking. Again the SEC proceedings refer to the warnings issued by various US Government bodies and the investment management agreement used by Mr Thorn also bore many of the same features as the Land Base Agreement in this case. In the Bank One fraud the investors' money was supposed to remain on deposit in a major Ohio bank called Bank One (Mr Mann was supposed to have a "non-depletion" account). Much of the money was

stolen by Mr Thorn or dishonestly used as collateral to obtain the issue of bank guarantees which Mr Thorn then used to try to raise money from other banks.

(6) Mr Mann's own correspondence with Mr Thorn and the various "members updates" he was sent tell a sorry tale of excuses and delays as to why no trading was taking place …

(7) When the fraud came to light Mr Mann became embroiled in … litigation and regulatory action. In January 2001 Bank One sued Mr Thorn, Financial Ventures and the investors. Mr Mann joined Mr Thorn in counterclaiming against Bank One, eventually getting separate representation. The SEC started an investigation and served a subpoena on Mr Mann who was himself briefly under suspicion from Bank One and had to explain his presence in Germany when one of Mr Thorn's fraudulently obtained guarantees was offered to a bank there. The FBI began an investigation into the scheme and raided Financial Ventures.

(8) In March 2001 Mr Mann was deposed in the ongoing civil proceedings between himself and Bank One. The Bank One fraud was … similar to the 5th Avenue fraud and in the Bank One litigation Mr Mann … [as] in these proceedings, [said] that he was relying on Bank One to protect his money and [insisted] that he had been given oral assurances by Bank One employees that his money would be safe. He realised that Bank One's attorney was effectively accusing him of being a "complete idiot" for having invested in the scheme, but professed himself shocked and stunned by what had happened.

(9) In April 2001 Mr Mann had to respond, through his attorneys, to the SEC subpoena, had to provide written answers to SEC questioning and had to provide an affidavit to the SEC.

(10)   … similarities between the Bank One litigation and these proceedings [include]:

(a)   In the Bank One litigation, one of the issues raised was the authority of the bank employees whom Mr Mann said made representations to him about the safety of his money.  Mr Mann's evidence [in these proceedings] was that it was obvious to him from questions asked at his deposition that Bank One were looking to argue that its employee Addi Matthis did not have authority to make the representations that Mr Mann said he was relying on and that those who had told him that his $6 million was "absolutely safe" did not have authority to do so. He also accepted that in consequence of the Bank One litigation he was very alive to the possibility that a bank sued in respect of representations made by its employees about the safety of funds might well contend that such employees did not have authority to make those representations.

(b) In the Bank One litigation Mr Mann relied heavily on a handwritten note he said he had written at the time recording assurances given to him by a Bank One employee, Craig Morgan, that his money was "absolutely safe". Mr Mann accepted that the note had been "helpful" to him in that litigation.

(11) Bank One eventually agreed to settle with Mr Mann and repay his deposit, but not before Judge Abel in the District Court for the Southern District of Ohio had expressed the view that the fantastic returns being offered to the investors in a matter of a few months without any use of their principal "objectively ... sound too good to be true"...

(12) ...

**Kira 1/Tomlinson**

(13) ... Mr Mann ... started to take an even more active role in trying to source opportunities for "closed end" or "private placement" investment on behalf of an investor group. The group operated first as the Kira 1 Investment Club, of which Mr Mann was the managing director: ... He together with a Mr Mark Bravi explored various possibilities for this type of investment ... Funds were sent to a brokerage called Max International and then on to UBS Berlin, but no trading occurred.

(14) Mr Mann and Mr Bravi were assisted by a Mr Ed Reizen to incorporate a BVI company called Tomlinson Group SA ("Tomlinson") as their investment vehicle. Tomlinson then transferred $10m to an account of a BVI company controlled by Mr Reizen called Connell Investment and Finance Limited ("Connell"), but once again no trading occurred ...

(15) At this point one of Mr Mann's investor group, Mr Ben Frizzell, sent him an ... email dated 5 February 2003 [stating]:-

"... None of us has been successful at this before ... Most of us have been warned that such programs do NOT exist and are FRAUDULENT ... Most of us personally know people who have invested and lost their money – or know others who have invested and are still waiting on profits and/or principal ... some stretching into years."

Mr Frizzell also referred to there being "so much bad press" about such investment programmes. Mr Mann's evidence was that by February 2003, he had personally experienced, with Ashar and with Bank One, the delays and excuses Mr Frizzell referred to in his email. He accepted that he was being told, in that email, that that was the experience of others known to Mr Frizzell.

(16) In a further memorandum to Mr Mann and his partner Mr Bravi dated 12 May 2003 Mr Frizzell again brought the serious risk of fraud to Mr Mann's attention:-

"All of us are aware that fraud is a possibility.... None of us have benefited from such a program in the past ... Our upcoming opportunity has several characteristics of what are warned to be red flags: Secrecy, Above Market Rates, Other Parties in Control of your Money, Profits are to be used for Projects or Charities".

Mr Frizzell also referred to the fact that two of his other "above market rate ventures" had just gone sour to the tune of US$1.6m.

(17) The response from Mr Mann and Mr Bravi on 12 May 2003 was in these terms:-

"Dear Ben:

Your concerns about fraud, as it (sic) so well documented in the Government web sites, as well as so many people loosing (sic) money searching and/or participating in these investments is justified.

At this point, since we have absolutely no guarantees of success, we suggest you have your funds returned.

Please indicate your desire to have your money returned by signing the bottom of this letter and we will instruct Mr Walter Schumacher to do so immediately."

(18) In other words Mr Mann was acknowledging the validity of Mr Frizzell's concerns about fraud and the well known and well documented nature of those concerns. In the event Mr Frizzell decided to stick with the investor group, saying his input was intended to make the group "more vigilant".

(19) Tomlinson went on to deposit funds with New Private Bank ("NPB") in Zurich. Mr Reizen had by this time formed another vehicle, a BVI company called Deming Finance Ltd ("Deming") and on 21 May 2003 Mr Mann and Mr Bravi on behalf of Tomlinson entered into an agreement with Deming, with the object that Deming would introduce "private placement" transactions to Tomlinson. On 23 May 2003 Tomlinson transferred US$9m to Deming's account at NPB and executed a power of attorney in Deming's favour. Mr Reizen was supposed to be sourcing "private placement" transactions for Tomlinson's $9m.

(20) Mr Reizen was unsuccessful in introducing Tomlinson to any private placement investments ... in December 2003 he was sued in the United States District Court Southern District of Florida in an

action alleging that he had participated in a fraudulent investment scheme and making claims of securities fraud and money laundering. A Miami Federal Jury (civil) subsequently found Mr Reizen liable in relation to fraud, breach of duty, fraudulent concealment, civil theft and conversion. Judgment was given against him for some $39m.

(21) No trading having taken place through Deming, by January 2004 Tomlinson was negotiating the terms of an agreement under which the Agora group ("Agora") represented by Mr Doutrepont was to buy and sell negotiable financial instruments for Tomlinson. Again, no trading occurred through Agora.

(22) In February 2004 Mr Mann and Mr Bravi instructed NPB to transfer the Tomlinson monies to Clariden Bank in Geneva ... . They continued to try to find "private placement" deals, in particular through Mr Dieter Furber, a friend of Mr Bravi. They met Mr Furber in Frankfurt in May 2004 to discuss an investment opportunity involving Mr Alfred Heinz, pursuant to which Mr Mann and Mr Bravi transferred some of their own funds (including $2m from Mr Mann's retirement trust) to Sparkasse Leverkusen, but the funds were sent back ... .

**Deutsche Bank**

(23) Mr Mann and Mr Bravi tried to pursue another proposal from Mr Furber and Mr Heinz and went to Dusseldorf to meet them. They were supposed to be the contacts of an unnamed "trader"... . In order to pursue this proposal Mr Mann and Mr Bravi proceeded to open accounts with Deutsche Bank in Dusseldorf, to transfer substantial funds there ($3m from Mr Mann) and entered into a power of attorney with Mr Heinz. Again, no trading took place.

(24) At this point (around July 2004) the Tomlinson group of investors seems to have disbanded ....

**ODL**

(25) On 12 January 2005 Mr Mann signed an agreement with Mr Sweatman's company CMFS pursuant to which CMFS would try to source transactions in return for a commission of 30% of any profits made through such introductions. Together with Mr Sweatman and his attorney Mr Bradshaw, Mr Mann investigated in some detail an opportunity with a London based assets management company ODL Securities Limited ("ODL", acting by a Mr Mark Holland). Mr Mann ... seems to have gone through the ODL documentation in some detail (see his many handwritten annotations ...). The ODL opportunity did not however proceed and was superseded by the introduction of Mr Mann to 5th Avenue.

(26) … despite the substantial period of time during which Mr Mann was searching for and investing in such schemes, and the number of schemes with which he was involved, he never received any genuine profits from the trading promised by such schemes. Mr Mann gave evidence that by February 2003, he was not aware of anyone "who had ever made any genuine profits from this kind of transaction", and as far as he was aware, that was true for the entire Tomlinson investor group.

**Mr Mann's knowledge of fraudulent schemes**

(27) …

(28) Mr Mann's evidence was that by 12 May 2003, when he received Mr Frizzell's memorandum to Bravi in relation to these investments, he was aware that, as Mr Frizzell stated, "fraud is a possibility" and was aware of the "red flags" identified by Mr Frizzell, ie "Secrecy, Above Market Rates, Other Parties in Control of your Money, Profits are to be used for Projects or Charities". He said he was by that date so familiar with warning signs relating to such investments that he did not even need to check them on a government website. Mr Frizzell had … specifically directed him to two such US Government sites.

(29) Mr Mann's response to Mr Frizzell confirms (as Mr Mann accepted in cross-examination) that Mr Mann was well aware of the existence of Government websites warning about this type of investment; that he was aware of many people losing their money in such transactions; and that he believed the warnings on the Government sites to be justified.

(30) Mr Mann also confirmed that he was aware by May 2003 that US Government bodies had been taking action against this type of fraudulent investment scheme, having himself seen aggressive action of that type being taken in the Bank One case."

221.   In cross-examination Mr Mann was taken through a series of aspects of the Land Base Agreement and asked about the extent to which red flags were present. Mr Mann had no choice but to accept that significant aspects of the Land Base Agreement involved what he knew at the time to be red flags:

(1) Confusing, incomprehensible or overly complex documentation, in particular in relation to articles 3.6 and 3.16;

(2) Irrelevant or bogus references to legislative or regulatory authorities; in particular a passage in article 3.3 of the Land Base agreement referring to "the regulatory and the appropriate related United States and/ or International Authorities";

(3) References to a high degree of secrecy, in relation to which Mr Mann accepted that the statement that the statement in article 3.6 that the investor could not enter into a transaction of the type contemplated "except by way of an invitation to participate it" should have been a red flag;

(4) The transaction involving "reserved funds": Mr Mann accepted that the Land Base Agreement was such a transaction, was similar in that regard to the schemes in Asher and Bank One, and that this was a further red flag in the Land Base Agreement.

(5) The Land Base Agreement contained a reference to humanitarian projects. Mr Mann agreed that he noticed this reference, and that something of that kind could be a red flag.

222.   Nevertheless Mr Mann denied that certain other aspects of the Land Base Agreement were or should have been recognised by him as red flags. At least four of these denials are in my view inexplicable and cause me to have grave reservations about Mr Mann's evidence. They are:

(1) Although he knew by 2004 that unrealistic promised returns constituted red flags, and he accepted that the levels of profits being forecast by Mr Brown amounted uncompounded to a return of 520 per cent to 1,040 per cent annually, Mr Mann nevertheless refused to accept that the forecast of this level of profit was a red flag;

(2) By April 2001 Mr Mann was aware that the SEC had concerns about unregistered trading programmes and "private placements"; he understood that the Land Base Agreement involved a private placement transaction of some kind; but Mr Mann nevertheless asserted that he was not concerned that the Land Base Agreement was described as a "private placement opportunity";

(3) Despite agreeing that references to a high degree of secrecy were red flags, Mr Mann said in evidence that the confidentiality wording included in the box at the top of every page of the Land Base Agreement did not cause him any concern;

(4) Mr Mann accepted that trading programmes in high grade bank bonds could be a red flag, and that the Ashar and Bank One schemes involved such programmes; he initially accepted that article 3.10 referring to trading in high grade bank bonds should have been a red flag, but on the following day refused to accept that paragraph 1 of the LOI was a red flag despite it being in similar terms to article 3.10

223.   The fourth of these denials is particularly significant. The lynchpin of Mr Mann's attempted explanation for proceeding despite identifying red flags in the Land Base Agreement was that he had the security offered by the LOI. Any acceptance by him that there was a red flag in the LOI itself undermined that argument. Mr Mann found himself in the embarrassing position where his argument was undermined, and he had no choice but to take a completely inconsistent stance in relation to wording which was essentially similar.

224.   Having observed Mr Mann in the witness box over a period of four days I am sure that his motive for entering into this transaction was greed. He was fully aware that there were red flags not only in the five respects that he accepted but also in the four respects that he denied. He was fully aware that it was highly unlikely that HSBC

would knowingly give any undertaking to anyone involved in such a scheme. Mr Vineall submitted that while Mr Mann was "something of an enigma", the answer was that he, like other people, wanted to believe and did believe in the "holy grail" of high return, low (or no) risk investment – people without whom high yield investment frauds would not be as widespread as they are. Mr Mann's evidence was that he hoped Mr Brown could achieve the profits he had forecast and that he, Mr Mann, did believe that it was possible to achieve such profits. Mr Mann had actively involved regulatory and investigatory authorities, expressly inviting them to investigate. Mr Mann's $5 million was money secured against his retirement trust and amounted to about half his total net assets if no distinction was drawn between his assets and those of the trust. His desperate desire to be involved in the scheme was said to be pathetic in the strict sense of that word.

225.    I accept these submissions. At the same time, however, Mr Mann knew that profits of the kind forecasted by Mr Brown were likely to be too good to be true and also that the making of such forecasts was a hallmark of fraud. He realised that there was a strong risk that he might be a victim of that fraud, but against that there was his conviction that somehow, somewhere, there existed the real possibility of spectacular profits from such schemes. His greed convinced him that the Land Base Agreement could, despite all the red flags, provide the "exciting opportunity" of significant gains. Remnants of common sense told him that this was highly unlikely and accordingly he must have protection against the danger that the scheme was fraudulent. Mr Mann decided to proceed, providing that he had the fallback of claiming against HSBC should things go wrong. The LOI itself did not give him satisfactory reassurance in that regard, but in the past he had been able to rely on oral assurances from a bank employee in order to recover his money from Bank One. Mr Mann determined to ensure that he could claim to rely on oral assurances on this occasion. Why did he not seek written assurances – and written assurances from someone within the bank who clearly had authority to give them? I am driven to the conclusion that Mr Mann's greed was so great that he avoided anything which might push the bank too far. He did not know how the bank had come to stamp and sign the LOI. It was probable that HSBC had not appreciated that the LOI sought to place responsibilities on HSBC to monitor and control what 5th Avenue did with the transferred funds. There again, however, there was a possibility that someone in HSBC had realised this and nevertheless committed HSBC to accepting those responsibilities. If anything he said or did alerted HSBC to what HSBC considered to be a red flag, the "exciting opportunity" might disappear. Mr Mann resolved to meet Mrs Arnull, the person to whom the LOI was addressed. If it was clear at the meeting that the bank had indeed understood and committed itself to the LOI, well and good. If, as he expected, she was not someone who had understood and authorised committing the bank to the LOI, then by asking her carefully phrased questions at such a meeting he would – should anything go wrong later - plausibly be able to assert that he had been given the assurances that he needed. He squared this with his own conscience by determining not to say anything at the meeting that was positively misleading.

226.    Mr Mann then put that plan into effect. Mrs Arnull's account of the meeting of 22 February was transparently honest: she would not have said the things Mr Mann claimed, for she knew that they were untrue. The closing submissions of the SLM Investors necessarily had to fall back to a suggestion that there was a series of misunderstandings. I accept the SLM Investors' submission that Mr Mann was right

when he says that he produced the LOI, but it does not follow from this that Mrs Arnull appreciated what it said. I do not accept that Mrs Arnull said anything to the effect that there had been approval by the legal department: this was something that Mr Mann decided to concoct after he had completed his manuscript note of what he would claim to have happened at the meeting. It was said by Mr Mann that Mr Brown brought to the meeting another person, a Mr Mut. Mrs Arnull thought he came to a separate meeting. Whether he was there or not does not seem to me of great significance.

227.    The matters which Mr Mann claimed to have noted in a taxi later that day were not misunderstandings: they were distortions of what Mrs Arnull had said. It was plain to him that Mrs Arnull knew nothing whatever about bond trading, and that she assumed that the LOI was concerned only with the position between 5th Avenue and Mr Mann. His limited questions to Mrs Arnull had deliberately skirted round the issue whether HSBC intended to undertake any contractual obligation as regards the transferred funds. It is suggested on his behalf that a forgery might be expected to be much more effectively self-serving that the note he did in fact make – but as against that, if the note was to be plausible it would be important not to over-egg the pudding. As to the word "segregated", said by Mr Mann to have been used both at the meeting and in a telephone call to Mrs Arnull after the $5m was transferred, I am sure that if that word was used Mr Mann appreciated that Mrs Arnull did not understand it to mean anything more than "separate".

228.    It follows from these findings that when Mr Mann came to transfer his funds he was not relying on HSBC. He continued to believe that it was probable that HSBC had not appreciated that the LOI sought to place responsibilities on HSBC to monitor and control what 5th Avenue did with the transferred funds. He decided to carry on with the investment because his own greed convinced him that there might be a possibility of spectacular profit, and he thought that he could plausibly give an account of his meeting with Mrs Arnull that would enable him to claim against HSBC should anything go wrong.

## The proposed examination of a witness in Germany

229.    HSBC earlier this year secured a letter of request seeking the examination of a witness in Germany in the belief that this might shed light on Mr Mann's involvement in the Bank One transaction. During the course of Mr Mann's cross-examination it became apparent that the examination was scheduled to take place imminently, and that Mr Mann was in some difficulty preparing for it. I considered that by that stage it had become apparent that the examination of this witness in Germany was disproportionate and oppressive. It was disproportionate because Bank One had not pursued this line of inquiry in the proceedings in 2001 and because I already had ample information about the Bank One transaction. It was oppressive not because of anything HSBC had done but because the timing happened to coincide with the end of a lengthy period of cross-examination of Mr Mann at the trial. For those reasons I made an order requiring HSBC to ask the German court not to proceed with the examination.

## *Mr Leonard*

230.   Mr Leonard's account both in his witness statement and in his oral evidence was that it was the Emulex letter of 29 September 2005 which first led him to think that there might be any problem in relation to Mr Browns' affairs, and that it was only on checking the file after meeting the legal department that he recalled that other Letters of Instruction had been sent to him. After finding them in that file he then assembled them and made copies of them, and in the course of doing this discarded compliments slips and other notes which had been attached to them by the Moorgate branch. In oral evidence he disclaimed any independent recollection of the Letters of Instruction before finding them in the file in October, and said he had no recollection of the email exchanges concerning Mr So's enquiry letter. Mr McQuater acknowledged that Mr Leonard's evidence was not in all respects satisfactory. Mr McQuater sought to explain aspects of Mr Leonard's oral evidence by repeating points he had made when opposing permission to amend. Mr Leonard had been accused of dishonesty at the last possible moment, in an amendment made long after the trail had commenced. He faced a serious, career threatening allegation against which he had to defend himself at short notice. That was, said Mr McQuater, a deeply unsettling and acutely oppressive set of circumstances, and a defensive or protective approach from a witness under such an attack was only to be expected.

231.   It is right that the amendment to plead fraud was made after the trial had commenced. I set out below my reasons for permitting the amendment. The proposal to amend, and the basis for the proposed amendment, were however explained at a very early stage in the opening of his clients' case by Mr Vineall, and Mr Leonard was aware of them for some time. During this period he had the opportunity to take independent legal advice and did so. I accept that it was deeply unsettling for him to face a charge of dishonesty. However, he had in these proceedings already been preparing himself to face cross examination which was likely to accuse him of gross negligence. That in itself must have been disturbing. The bringing of a specific charge of dishonesty is of course a difference in degree of gravity, and I do not minimise the significance of this. However, as HSBC's disclosure progressed it must have been increasingly apparent to him that cross-examination would be likely to involve not merely an accusation of gross negligence but also an assertion that his witness statements were dishonest. As the SLM Investors commented in their closing submissions, Mr Leonard's oral evidence was delivered with striking *sang froid*. I do not accept that the lateness of the charge of dishonesty, coming as it did in relation to events where he would inevitably face cross-examination asserting that the account he had given was a dishonest account, had any significant effect on the way in which he gave his evidence. I set out below my reasons for concluding that Mr Leonard's witness statements and oral evidence were deliberately designed to mislead the court.

232.   As to the reason for allowing the SLM Investors at such a late stage to make an assertion of dishonest assistance in breach of trust, the crucial factor in my view was the late discovery of the evidence relating to the post-it note. I considered it understandable that prior to that discovery the focus had been on Mrs Arnull rather than Mr Leonard. The discovery appeared to me to be such a dramatic development as could lead responsible counsel to conclude that an accusation of dishonesty was warranted. Giving full weight to the factors relied on by Mr McQuater and

summarised above, it nevertheless seemed to me that the interests of justice required that the SLM Investors be allowed to amend.

## Importance of Mr Brown

233.    As the SLM Investors observed, Mr Brown was a massive and unique customer for Mr Leonard. He dealt with a client base of 150 or so. That client base earned him a bonus of £28,000 for 2005. Without Mr Brown's business his bonus would have been £18,000. Mr Brown's business boosted that bonus by more than half as much again. Mr Leonard acknowledged that in terms of bonus generated Mr Brown was his "best account". Mr Leonard believed that Mr Brown's personal wealth was £50 to £60 million, and that his charity had funds of £7 million in hand with the prospect of it growing very quickly to some £75 million. Mr Brown was regarded as the outstanding prospect for the Eastcheap team in the autumn of 2005. Mr Leonard and Mr Brown had frequent contact, both at Mr Brown's flat and at his business premises in Mayfair. They regularly communicated by phone and email. Mr Brown was a demanding customer and he raised numerous queries with Mr Leonard relating to the transfers of funds.

234.    In this context repeated assertions by Mr Leonard of having "no recollection" of substantial parts of his handling of Mr Brown's accounts were inherently incredible. The SLM Investors rightly observed that during the course of his oral evidence assertions of having "no recollection" became such a mantra that when he was asked about Mr So's enquiry letter having been forwarded to him by Mrs Arnull, having accepted that there were people he could have passed it on to if he had been uncertain about it, he automatically said that he did not pass it on to anyone else "because I have no recollection of seeing it". He then had to correct himself and say that what he meant was that he had no recollection of seeing it and also had no recollection of passing it on to anyone else.

## Mr So's Enquiry Letter

235.    Mr Leonard asserted that he "never registered" receipt of Mr So's enquiry letter dated 15 April 2005. The enquiry letter had been attached to an email sent to Mr Leonard by Mrs Arnull mid morning on 19 April 2005. Initially Mr Leonard's explanation was that he did not open the attachment. It was then pointed out to him that the text of the enquiry letter was sent out in the body of an email the following day. He acknowledged that Mrs Arnull had told HSBC Hong Kong that she had asked him to reply to their query, and had herself asked him to reply, and that it was incumbent on him to do so. He also accepted Mr Vineall's suggestion that if he had seen "the emails in their entirety" it would have been appropriate to tell HSBC Hong Kong not to send funds. When he had to accept that he had received an email setting out the text of the Mr So's enquiry letter he nonetheless maintained that he had no recollection of that email or ever seeing the letter.

236.    This was obvious nonsense. The position was that Mr Leonard had received an alarming query, and that he failed to respond to it immediately. The notion that Mr Leonard would not have opened the attachment, or would not have read the body of the subsequent email, is absurd.

237.   In my view the documentary record explains how it was that Mr Leonard came not to reply to HSBC Hong Kong despite the request from Mrs Arnull. On 19 April 2005 Mrs Arnull emailed Mr Leonard saying that Mr Brown had asked that Mr Leonard should not speak to HSBC Hong Kong for the time being. Later that morning Mr Brown emailed Mr Leonard and Mrs Arnull to say that he would reply Mr So's enquiry letter. On 20 April Mr Brown emailed Mr Leonard to say that Mr So and Mrs Lu "now understand the position". Mr Brown thereafter emailed Mr Leonard;

> "Got the release I needed. Go ahead and credit, will send copy of email
> I sent to them for your records."

238.   It is unclear whether the "release" related to the currency of the account into which the $30 million would be paid, or to some other aspect of the transaction. What is clear, however, is that on 25 May 2005 Mr Leonard chased Mr Brown about the fact that he had not yet received "a copy of your email to your client in Hong Kong as previously discussed."

239.   This course of events indicated at best that Mr Leonard had been seriously negligent in the way he handled Mr So's enquiry letter, and is understandably replied upon by the SLM Investors as part of their case that Mr Leonard was dishonestly involved in Mr Brown's fraud. Whether that is right or not is something that I consider in the main body of this judgment. On the present question of whether Mr Leonard presented misleading evidence to the court, the decision that Mr Leonard had taken at an early stage to assert that he had a lack of recollection made it impossible for him to acknowledge his awareness of the subsequent exchanges with Mr Brown. I have no doubt whatever that in October 2005 Mr Leonard had a clear recollection of the alarming nature of Mr So's enquiry letter, and of the circumstances in which, having received assurances from Mr Brown, he failed to respond to the query from HSBC Hong Kong.

## Awareness of the LOIs

240.   A dramatic late development showed that Mr Leonard was lying when he said that he was not aware of other Letters of Instruction until after his discussion with the legal department about the Emulex LOI. As part of the preparation for trial attempts were made to see whether ESDA testing might verify what Mrs Arnull said she had written on compliments slips which accompanied the letters of instruction she forwarded to Mr Leonard. That attempt failed, as it was not possible to locate the original documents which would have had the compliments slips attached. However the documents subjected to ESDA testing included a photocopy of the letter of instruction in relation to Mr Edwards, this photocopy having been found in the Eastcheap file. Analysis showed that at some stage a post-it note had been attached to this document, and that on it had been written:

> "Jackie/Legal
>
> What does this mean?"

241.   Mr Leonard accepted that the hand writing revealed by the ESDA testing was his. The SLM Investors are clearly right when they say that this shows that when Mr Leonard wrote what was on the post-it he had read enough of the letter of instruction in

relation to Mr Edwards to have doubts about what it meant, and had decided either to refer it to either or both of Mrs Arnull and the HSBC Legal Department. They are also plainly right to say that the note could not have been written after Mr Leonard had spoken to the Legal Department on 6 October 2005. There was no suggestion by Mr Leonard or by anybody else that the note was written at that stage. It is beyond belief that Mr Leonard, having read enough of this document to have doubts about what it meant earlier in 2005, had had no recollection of this and other Letters of Instruction until after his meeting with the legal department on 6 October 2005.

242.   Even without the evidence concerning the post-it note, other evidence gave the lie to the assertion that he only became aware of other Letters of Instruction after his meeting with the Legal Department on 6 October 2005:

> (1)   When he became concerned about the Emulex letter on 30 September 2005 he emailed Mrs Arnull, "do not sign any more unless advised otherwise";
>
> (2)   Mr Brown sought to assuage Mr Leonard's concerns about Emulex by emailing Mr Leonard on 30 September 2005 that the Emulex letter of instruction "is the one that we have used before...";
>
> (3)   When cross-examined about Mr Brown's email of 30 September 2005 Mr Leonard fell back on his stock response of not being able to recollect the email.

243.   At what stage and to what extent did Mr Leonard become aware of the Edwards LOI and the other LOIs? It was clear from the evidence of both Mrs Arnull and Mr Leonard that he spent a great deal of time out of the office. He did not seem to me to be someone who paid any attention to detail of matters which were not active – he was instead someone who, if a transaction was developing or underway, would concentrate on the matter in hand. If he had spotted a concern about the Edwards LOI around the time that it came in, then I think it likely that he would have raised that concern at once. I infer that it was some weeks later that he came across the Edwards LOI by chance, glanced at the document, and took sufficient time to see that it appeared incomprehensible. He decided to flag it as something to follow up, quite possibly having a photocopy taken for that purpose. He put the post-it note on it, meaning to raise it with one or both of Mrs Arnull and the legal department. However, having flagged it, he did not get round to doing anything about it. The matter was then overtaken by events when assurances were given by Mr Brown about the LOI relating to Mr So and Mrs Lu. I have no doubt that when Mrs Arnull sent him Emulex's letter of 29 September Mr Leonard well recalled both the post-it note that he had placed on the photocopy of the Edwards letter and the assurances that had been given by Mr Brown. He realised that he had been foolish to accept those assurances, and in short order he made sure that no money was transferred by Emulex. He needed time to think about how to handle the matter internally. It plainly had to be raised with the legal department, and after a few days he took steps to do this. By this time he had gone through the file again and – if he had not done so already – spotted the other LOIs. The way forward he decided upon and adopted was to claim to the legal department that he found all these LOIs only after speaking to them. Consistently with this, when he came to photocopy the LOIs for the legal department, he disposed of

anything which might suggest he ought to have studied them earlier – in particular the compliments slips and notes which the Moorgate branch had attached to them.

## General Unreliability of Mr Leonard's Evidence

244.    Having observed Mr Leonard in the witness box, I concluded that he had prepared for giving evidence by determining to adopt a strategy of refusing to recollect the detail of anything that happened during the course of material events. He was concentrating so hard on sticking to the mantra of "I do not recall" that his evidence is completely unreliable in two respects. First, as to his evidence about not recollecting the detail of events, it is conceivable that there may be some details that he could not recollect. However the vast majority of points put to him were points which I am sure must have stuck in his mind, and he lied when he denied this. Second, he was concentrating so hard on sticking to the mantra that when a point was put to him which did not proceed on the basis that he must recollect what had happened, he failed to consider his answers with any care. He agreed without taking any time to consider the matter that if he had seen the whole of relevant exchanges his reply to HSBC Hong Kong would have been, "do not send the money". That answer failed to have regard to the context, in which Mr So had sent a letter to Mrs Arnull asking her to verify certain things. The obvious reply to Mr So was that HSBC could not verify those things. I am by no means satisfied that a banker who had received Mr So's enquiry letter and had considered it would have felt under an obligation to go beyond this and advise that money should not be transferred into an account held by the banker's own customer at the bank.

# Annex C: the Land Base Agreements

Particular parts of the LBA deserve mention:

245.    At the top of each page the following wording appeared within a box:

> **This Confidential Private Enterprise Document in its Entirety, and Total Contents,
> Including Translations, Procedures, with all Facets and Counterparts Thereof, are the
> Exclusive Properties of Land Base, LLC, and are "Trade Secrets", Protected Under the
> "Economic Espionage Act"**

246.    The body of the agreement began with the heading:

> **PRIVATE ENTERPRISE ASSETS EXCHANGE
> BENEFITS PARTICIPATION AGREEMENT
> (Hereinafter Referred to as: Transaction Code: 3505276-723)**

247.    Article 1.1 of Mr Mann's LBA described Land Base as "a management team of individuals and/or corporate entities and/or foundation represented by Mr Boris Lopatin … referred to as "LB" Article 1.2 gave the name of Mr Mann and his address and other details, followed by the description: "a management team of individuals and/or corporate entities represented by Mr Robert William Mann…referred to as RWM"

248.   In the case of Mr So and Mrs Lu, they too were described as "a management team of individuals and/or cooperate entities", in their case said to be represented by Mr So and Mrs Lu, referred to in the agreement as "SKLYL".

249.   Except where indicated otherwise below, the agreement in the case of Mr So and Mrs Lu was identical to that for Mr Mann, with "SKLYL" appearing instead of "RWM"

250.   Article 1.3 was in these terms:

> **LB** and **RWM** shall hereinafter be referred to collectively as the **Parties**. The **Parties** have concluded this **Private Enterprise Assets Administration Benefit Participation Agreement (hereinafter referred to as Transaction Code: 3505276-723)** at the Terms and Conditions as set forth hereinafter, and evidenced by this present **Transaction Code 3505276-723.**

> (4) Article 2 was headed "Representations". Article 2.1 said that RWM had assets in the amounts stated in one or more schedules, and article 2.2 said that LB had the capacity to administer the exchange of the assets to generate income for the benefit of the parties. Article 2.3 said that the parties had "mutually agreed to enter into **Transaction Code: 3505276-723** for the purpose of facilitating, and jointly participating in the proceeds of a **Private Placement Opportunities (PPO)**....

> (5) Article 3 was headed, "**The Contributions Warrants Undertakings of the Parties.**" By article 3.1 RWM agreed to provide assets which met certain requirements. Article 3.2 was in these terms:

> That **RWM** also agrees and undertakes to assist **LB** in whatever way is necessary and generally to co-operate with **LB** and the parties structuring **Transaction Code: 3505276-723**, to the fullest to ensure the successful completion of **Transaction Code: 3505276-723**, including but not limited to the provision of any and all due diligence material required by the various transacting parties, including **regulatory** authorities, and to execute without undue delay any and all documents and agreements required of **RWM** to facilitate **Transaction Code: 3505276-723**

> (6) Article 3.3 stated:

> That **RWM** agrees and acknowledges that **RWM** has been informed through **LB** that in certain instances after the amount of benefits received by **RWM**, due to **Transaction Code: 350276-723**, is in excess of **One Hundred Million Dollars ($100MM) and then further to be defined in herein Schedule(s) "A", ("A1", "A2", "A3", "A*", if any)** not less than Seventy Five Percent (75%) of **RWM** portion of the than net proceeds of **Transaction Code: 350526-723** may be required, **upon the agreement of both parties, whose consent shall not be unreasonably withheld,** to be used for **RWM's** humanitarian and related purposes for the betterment of mankind, including but not limited to; the creation of long term

permanent jobs, education, health and medical facilities, restructuring and rebuilding of communities and all forms of infrastructures, communications and related work, and as requested, to provide **evidence** of such **RWM's** projects and their approximate value in US Dollars. **RWM** further confirms that **RWM** was informed by **LB**, and **RWM** understands that the regulatory and the appropriate related United States and/or international authorities shall approve thereto **RWM's Projects**, and could require an audit of said expenditure."

(7) Article 3.4 stated:

That **RWM** agrees and acknowledges that **in the event Transaction Code: 3505276-723** requires that the **principal sum (funds)** set as the **value** of the **Assets** be reserved **in its bank** to establish a **value** in another mutually acceptable bank, **RWM** will do all within RWM's power to arrange and facilitate such a reservation of **value** by giving an **irrevocable direction** to the bank holding the **funds** to reserve the **value** as per RWM's direction, including but not limited to the **reservation** of said **value** to the other branch of bank currently holding the **funds,** or to such other bank as may be determined. That **RWM** agrees and acknowledges that in the event of **Transaction Code: 3505276-723** requires the **principal sum (funds)** set as the value of the **Assets** be moved from its current bank to another mutually acceptable bank, **RWM** will do all within RWM's power to arrange and facilitate such a transfer of **funds** by giving an **irrevocable direction** to the bank holding the **funds** to transfer the funds as per **RWM's** direction, including but not limited to the **transfer** of said **funds** to the other branch of bank currently holding the **funds,** or to such other **bank** as may be determined.

251.  Article 3.5 promised that RWM would sign or procure execution of further documents to give proper and full effect to the LBA, and provide Land Base with copies correspondence.

252.  Article 3.6 stated:

**3.6**   That **RWM** agrees and acknowledges that **Transaction Code: 3505276-723** is being structured specifically to create **Benefits** to accommodate **RWM's** own major **Projects** and those of LB's, and that this **Transaction Code: 3505276-723** is necessary in order to accommodate **RWM** and **LB**, and one cannot proceed without the other. **RWM** further agrees and acknowledges that neither **RWM** nor **LB** can enter into **Transaction Code: 3505276-723,** of the type contemplated herein except by way of an **invitation to participate.**

253.  Article 3.7 stated:

That **RWM** acknowledges and agrees that **RWM** is a sophisticated investor, and that **RWM** has sufficient time to consult any and all professional, legal or other advisors it deemed necessary prior to

> entering into **Transaction Code: 3505276-723**. **RWM** further agrees and undertakes to hold **LB** free and clear of any liability, responsibility, expenses or obligation for any losses **RWM** may incur (**outside of Transaction Code: 3505276-723**) because of entering into **Transaction Code: 3505276-723**.

254.   Article 3.8 warranted that LB had been negotiating with experienced professionals and would be in a position to introduce RWM to the individuals and firms with whom LB had been dealing. Article 3.9 was an undertaking by LB to work with and assist RWM in establishing the necessary structures.

255.   Article 3.10 stated:

> The **Parties** hereto acknowledge and agree that **Transaction Code: 3505276-723** herein, is structured with the services of qualified and experienced professionals who deal with the underlying **Investment Managers, Professionals, and Banks** and carry out a pivotal role in the identification, negotiation and structuring of **Transaction Code: 3505276-723**. In certain instances **LB** is authorized to purchase or to reserve or cause to be purchased *Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's* or herein **Assets** for hereto **Transaction Code: 3505276-723**, or effectuating **purchase** of *Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's* **Investment Grade Financial Instruments** through various **Joint Venture Agreements**, as well as **LB** has rights to appoint Agents, Representatives, "Traders" for hereto **Transaction Code: 3505276-723**, or to cause the **purchase** and re/sell of, *Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's* to generate **benefits** as stated hereto.

256.   In article 3.11 LB warranted that RWM's Account must hold either cash or certain assets "of equal or greater value than the value of Assets on deposit, or may remain in the same form but reserved via banking means."

257.   Article 3.12 contained a definition of "Benefits generated due to each trading Cycle Activities" as:

> That due to **LB's Assets Exchange Private Enterprise Administration Services** and/or upon completion of *each trading Cycle Activities benefits are generated.* ***"Benefits generated due to each trading Cycle Activities"*** *shall be defined as the differential between Gross Amount of Funds that is utilized to Purchase Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's and the re-sale*

*of hereto-purchased **Fixed Income Instruments (Assets)** in which the* ***Issuers** shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's,* **or any other activities** due to **Transaction Code: 3505276-723,** the benefits are to be generated and therefore shall be paid as hereinafter stated below.

258.  At article 3.13 both parties warranted that the transaction was non-solicited.

259.  At article 3.14 it was stated that the transaction did not create an employer/employee relationship, a partnership or a joint venture.

260.  Article 3.15 stated that each party should be individually liable for taxes, debts, liabilities, contracts or obligations of that party.

261.  Article 3.16 stated:

> That any **Change or Modification** to **Transaction Code: 3505276-723** shall only be made **in writing** and agreed to by and between the **Parties.** **No verbal Agreement** shall have any **binding effect** whatsoever. **No previously negotiated Agreements** (if any) shall have any **binding effect** whatsoever. All amendments must be executed by all of the **Parties** hereto. **Transaction Code: 3505276-723,** and amendments thereto, if any, applies to all transactions throughout the full term after termination of **Transaction Code: 3505276-723** as well as throughout **all extensions** thereof, and this includes all transactions being discussed or in progress on the effective date of **Transaction Code: 3505276-723,** as well as all follow-up, repeat, extended, and renegotiated transactions. **In all cases cessation of Transaction Code: 3505276-723,** must be activated upon the **completion of an exchange,** or series of exchanges in progress, or any contractual obligations that had been entered as a result of **Transaction Code: 3505276-723.** It shall be expressly stated that the **term** of **Transaction Code: 3505276-723,** shall be for **five years** from the date of the **last contact** between the **Parties** regarding any matter that may relate, either directly or indirectly, to **Transaction Code: 3505276-723,** including any activity or transaction or other agreement or document that may relate to **Transaction Code: 3505276-723,** either directly or indirectly. For the purpose of this paragraph, the term **"last contact"** means any contact that is made directly or through another person or intermediary and is made orally and/or in writing and/or by electronic means. Therefore, the full force and effect of **Transaction Code: 3505276-723** with all of its words, sentences, terms, provisions, conditions, and appendices, shall govern any and all plans, actions, inactions, activities, communications, documents, agreements, and any other matter or process that may relate, either directly or indirectly, to the provision of services or the performance of duties in accordance with **Transaction Code: 3505276-723.** **Transaction Code: 3505276-723** is effective immediately upon execution for the full term even when the last contact occurred at the time of execution and even though a **Party** makes the decision

immediately upon or after execution not to proceed with any type of business activity and even though one or all activities and/or transactions fail or are not concluded, regardless of the cause and reason.

262.   Article 3.17 dealt with amendments, and concluded: "an amendment that simply restates transaction code: 3505276-723, without identifying changes is void even if signed and dated by all signatory hereto."

263.   In article 3.18 the parties warranted that they would cooperate closely with each other in good faith.

264.   Article 3.19 stated that the transaction should become legally binding when all signatories had executed the agreement. It also contained a severance clause.

265.   Article 3.20 contained a prohibition on assignment without consent; article 3.21 was a warranty of competence to enter into the transaction.

266.   Article 3.22 in Mr Mann's LBA stated:

> The **Parties** hereto undertake to protect each other regarding standard **nondisclosure** and **non-circumvention** practices and **to act at all times in good faith** towards each other herein and in any subsequent transactions, extensions, additions or otherwise, as well as to maintain a **"Total Silence"**.

> [This article is found in article 5 in the agreement signed by Mr So and Mrs Lu.]

267.   Article 3.23 [3.22 for Mr So and Mrs Lu] warranted that RWM would disclose the name and other details of "all agents, intermediaries, and persons who may have made referrals."

268.   There was no article 3.24 in Mr Mann's Land Base agreement.

269.   Article 3.23 in Mr So and Mrs Lu's Land Base agreement stated:

> **Neither Party** shall be liable for any failure under the **"Force Majeure Clause"** as stated in the International Chamber of Commerce (ICC) Paris, rules and regulations, which are deemed to be incorporated herein.

270.   Article 3.25 in Mr Mann's Land Base Agreement stated:

> The **Parties** agree that **Transaction Code: 3505276-723** is **valid** for Five (5) years and is automatically renewable for an additional Five (5) years unless terminated under the terms hereof. No **Party** hereto shall, after the initial or extended term of **Transaction Code: 3505276-723**, use to his own advantage, or to the advantage of any other person, corporation, firm, partnership, trust, or representative of any government agency or ministry, any identifying or other information gained for or from the files or business of the other.

[This was article 3.24 in Mr So and Mrs Lu's LBA]

271.   Article 3.26 stated:

> In the event that **RWM** wishes to terminate **Transaction Code: 3505276-723** and to withdraw the **Assets due to no return of above market rates as indicated by US Department of Treasury, RWM** may provide Thirty (30) London, UK business days written notice to **LB** after initial Thirty (30) London, UK business days but within initial Ninety (90) London, UK business days, during the first year, and within Ninety (90) to Sixty (60) London, UK, business days period, prior to the following yearly anniversaries. **LB** shall have the same right to termination by similar written notice.

> Article 3.25 in Mr So and Mrs Lu's Land Base agreement was in the same terms, and added:

> **In all cases Termination of Transaction Code: 8885276-723, can only occur** upon the **completion of trading cycles,** and satisfactory **conclusion** of any other **contractual obligations** that had been entered by **LB** as a result of **Transaction Code: 8885276-723.**

272.   Mr So and Mrs Lu's LBA contained an article 3.26 dealing with the delivery of notices.

273.   Article 4 in Mr Mann's LBA dealt with law and jurisdiction, and provided that the law of England and Wales should be the proper law of the transaction, with provision for arbitration by each side nominating an arbitrator, and those arbitrators nominating a third person to be chairman, with appointment of the chairman by the president of the Law Society for England and Wales in default of agreement. Mr So and Mrs Lu's Land Base agreement contained an article 4 which was headed "non-disclosure, non-circumvention, good faith". This article began with wording identical to article 3.22 of Mr Mann's Land Base agreement, and continued with provision in article 4.1 as to respecting proprietary rights and interests of each party, including confidential information, a list of information not to be disclosed without consent in article 4.2, and a non-circumvention clause in article 4.3 where provision as to non-disclosure was made in article 4.4 and 4.5, article 4.6 permitted either party to report volitional breach of the transaction to the appropriate United States investigative and enforcement agencies for action. Article 4.7 provided that disputes in relation to article 4 were to be resolved by arbitration under the procedures of the American Arbitration Association. Article 5 of Mr So and Mrs Lu's agreement contained similar provision to article 4 of Mr Mann's Land Base agreement, with the exception that article 4 was to be governed by the laws of the district of Columbia, USA.

274.   Article 5 [article 6 in the case of Mr So and Mrs Lu's LBA] stated:

> Article 5.   Distribution of Benefits

> The **Parties** acknowledge and agree that the intended result of

> **Transaction Code: 3505276-723**, activities shall be to generate **net**

benefits for the **Parties**, which they shall distribute at **LB's Instructions** between them, in the percentage set out and agreed to herein. The **net benefits** shall be defined, as **Gross revenue** to the herein **Parties**, less **Professional Services fees (if any)**. The **net benefits** will be divided into two equal parts and will be paid at **LB's Instructions** on a **per occurrence basis** as follows.

**5.1**   **One part** in amount of **one half** of **net benefits** shall be to the account of, or as directed by **RWM**.

**5.2**   **One part** in amount of **one half** of **Net Benefits** shall be to the account of, or as directed by **LB**.

**5.3**   All costs of the **Assets Exchange**, fees, all and any bank charges related directly to **Transaction Code: 3505276-723** will be borne equally by **LB** and **RWM**.

275.   Immediately prior to the signatures of the parties the following appeared:

**IN WITNESS WHEREOF, SINCE THE PARTIES AND SIGNATORIES HAVE A COMPLETE AND UNAMBIGUOUS UNDERSTANDING OF ALL OF THE WORDS, TERMS, PROVISIONS, AND CONDITIONS OF TRANSACTION CODE: 3505276-723, AND SINCE THE PARTIES AND SIGNATORIES HAVE DETERMINED ON THEIR OWN INITIATIVE AND INDEPENDENT DECISION TO ACCEPT AND EXECUTE TRANSACTION CODE: 3505276-723, WITHOUT ANY IMPROPER OR UNDUE INFLUENCE, EITHER REAL OR PERCEIVED, AND/OR WITHOUT ANY KIND OF IMPROPER EXTERNAL PRESSURE OR THREAT OR COMPULSION OR DURESS OR COERCION, EITHER REAL OR PERCEIVED, AND IN LIGHT OF THEIR COMPLETE AND UNAMBIGUOUS UNDERSTANDING OF TRANSACTION CODE: 3505276-723, EACH SIGNATORY HEREUNTO SETS HIS OR HER HAND IN PLACE, ON THE DATE SET FORTH BELOW.**

276.    Mr Mann's LBA contained a schedule "A" as set out in annex D to this judgment, and exhibit "HSA1" as set out in annex E to this judgment. The Land Base Agreement for Mr So and Mrs Lu contained an identical schedule and exhibit, save that their names and initials appeared in place of those of Mr Mann, the amount identified was "an approximate Principal Amount" of $30 million, and the exhibit was headed "HAS" rather than "HSA1".

# Annex D: Schedule "A" to the LBA

### Schedule "A"
### TO PRIVATE ENTERPRISE ASSETS EXCHANGE BENEFITS PARTICIPATION AGREEMENT
### Between Land Base, LLC And Robert William Mann

As of this date of 10th day of February, 2005, the amount of Assets that Robert William Mann, RWM, of Private Enterprise Asset Exchange Management Benefits Participation Agreement, under Transaction Code: 3505276-723, is ready to place for the Administration under Land Base, LLC, LB, an approximate amount of Five Million dollars ($5,000,000.00), the description, and other pertinent data of the Assets are attached hereto.

SCA1.1 The hereto Placement under Schedule "A1" shall be known under Transaction Code: 3505276-723 (5AP) and shall be administered under the auspices of "5th Avenue Partners Ltd.", Ten Dominion Street, London, EC2M 2EE, United Kingdom.

SCA1.2 Under Transaction Code: 3505276-723 (5AP), RWM shall receive the benefits in amount of Fifty Percent (50%) of the *"Benefits generated due to each trading Cycle Activities". "Benefits generated due to each trading Cycle Activities" shall be defined as the differential between Gross Amount of Funds that is utilized to Purchase Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's and the re-sale of hereto-purchased Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's. Benefits to RWM at the direction of LB shall be paid without any deductions of Bank fees, other Professional Services fees and Intermediaries (Introducing Parties) fees (if any). Benefits to 5th Avenue Partners Ltd. shall be the rest of the revenue benefits generated and paid with deductions of Bank fees, Professional Services fees and Intermediaries (Introducing Parties) fees (if any). The benefits shall be paid at the 5th Avenue Partners Ltd. Instructions on a per occurrence basis to the accounts as instructed by the 5th Avenue Partners Ltd.*

.3 Under Transaction Code: 3505276-723 (5AP), 5th Avenue Partners Ltd shall issue an Irrevocable Bank Instruction to govern RWM's segregated account that is to be lodged with the Bank as stated hereto (Exhibit "HSBA").

SCA1.4 Under Transaction Code: 3505276-723 (5AP), LB shall report to RWM once a month, all monthly *Trading Cycle Activities* of 5th Avenue Partners Ltd, regarding *Purchase of Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's and the re-sale of hereto-purchased Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's. Trading Cycle Activities* shall be within lodged Irrevocable Bank Instruction that are governing RWMs account. Such report shall be delivered by LB to RWM via Secured

electronic means, and shall include the pertinent data, not limited to the Name of the Issuer, ISN of each Instrument, e.t.c.

**IN WITNESS WHEREOF, SINCE THE PARTIES AND SIGNATORIES HAVE A COMPLETE AND UNAMBIGUOUS UNDERSTANDING OF ALL OF THE WORDS, TERMS, PROVISIONS, AND CONDITIONS OF TRANSACTION CODE: 3505276-723 (5AP), AND SINCE THE PARTIES AND SIGNATORIES HAVE DETERMINED ON THEIR OWN INITIATIVE AND INDEPENDENT DECISION TO ACCEPT AND EXECUTE THIS TRANSACTION CODE: 3505276-723 (5AP), WITHOUT ANY IMPROPER OR UNDUE INFLUENCE, EITHER REAL OR PERCEIVED, AND / OR WITHOUT ANY KIND OF IMPROPER EXTERNAL PRESSURE OR THREAT OR COMPULSION OR DURESS OR COERCION, EITHER REAL OR PERCEIVED, AND IN LIGHT OF THEIR COMPLETE AND UNAMBIGUOUS UNDERSTANDING OF TRANSACTION CODE: 3505276-723 (5AP), EACH SIGNATORY HEREUNTO SETS HIS OR HER HAND IN PLACE, ON THE DATE SET FORTH BELOW.**

# Annex E: Exhibit "HSA" to the LBA

**Exhibit "HSA1"**
**Irrevocable Bank Instruction**

To: Bank Officer

We, **5th Avenue Partners Ltd**, on behalf of our client, Robert William Mann hereby irrevocably instruct you to proceed with the following:

1. Purchase or cause to be purchased **Fixed Income Instruments (Assets)** in which the Issuers shall have and maintain a current credit rating of Single **"A+" or better** as evidenced by Standard and Poor's, or equivalent such as Moody's, as directed by undersigned, **5th Avenue Partners Ltd**. Execute the re-sale of such herein described **Fixed Income Instruments (Assets)** as directed by undersigned, **5th Avenue Partners Ltd**. Benefits due to the trade shall be disbursed as directed by undersigned, **5th Avenue Partners Ltd**, as stated below:

*Robert William Mann shall receive an amount of Fifty Percent (50%) of the "Benefits generated due to each trading Cycle Activities". "Benefits generated due to each trading Cycle Activities" shall be defined as the differential between Gross Amount of Funds that is utilized to Purchase Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's and the re-sale of hereto-purchased Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's. Benefits to Robert William Mann shall be paid without any deductions of Bank fees, other Professional Services fees and Intermediaries (Introducing Parties) fees (if any). Benefits to 5th Avenue Partners Ltd. shall be the rest of the revenue benefits generated and paid with deductions of Bank fees, Professional Services fees and Intermediaries (Introducing Parties) fees (if any). The benefits shall be paid at the 5th Avenue Partners Ltd. Instructions to the accounts as instructed by the 5th Avenue Partners Ltd.*

2. Upon receipt and clearance of the payments for the **Fixed Income Instruments (Assets)**, into this segregated account please proceed with further Purchase of **Fixed Income Instruments (Assets)** in which the **Issuers** shall have and maintain a current credit rating of Single **"A+"**

or better as evidenced by Standard and Poor's, or equivalent such as Moody's, as directed by undersigned, **5th Avenue Partners Ltd**. Also execute the further re-sale of such hereto described **Fixed Income Instruments (Assets)** as directed by undersigned, **5th Avenue Partners Ltd. Distribution of revenue benefits shall be as above stated.**

3.      Please ensure that all transactions with regard to **Fixed Income Instruments (Assets)** and/or corporate bonds shall be settled and cleared through DTC or Euroclear, or Clearstream.

4.      All counterparties to each Transaction shall be solely comprised of major licensed financial institutions, professional broker-dealers, or other recognized and approved institutional entities.

5.      Under no circumstances shall **Principal amount of funds** deposited in the amount of Five **Million United States Dollars** ($5,000,000.00) be permitted to be withdrawn, unless as stated hereto and for the payment of wire charges (if any).

6.      All bank fees excluding wire charges shall be paid by undersigned, **5th Avenue Partners Ltd.**

7.      These **Irrevocable Instructions** shall be valid until the **Instruction of Termination and Closing of said account**. At the time of **Account closure** please remit the **Principal** amount of funds in the amount of Five **Million United States Dollars** ($5,000,000.00) with deduction of wire charges (if any) to the following **Bank account:**

| | |
|---|---|
| **Bank:** | **Neue Privat Bank** |
| **Address:** | **Limmatquai 122, CH-8001 Zurich** |
| **SWIFT NO:** | **UBS AG STAMFORD CONN, UBSWUS33, FOR AC 101 WA358967, WEGECH2G** |
| **Account No:** | **50.018256-2200USD** |
| **Account Name:** | **Robert William Mann Retirement Trust** |

**Sincerely,**

**5th Avenue Partners Ltd**

CC: Robert William Mann

**Receipt Acknowledgement (Bank)**