# EXHIBIT N

1 | Haig Kalbian (Admitted *pro hac vice*)
2 | D. Michelle Douglas (CA Bar No. 190248)
  | Aaron Knights (Admitted *pro hac vice*)
3 | KALBIAN HAGERTY L.L.P.
  | The Brawner Building
4 | 888 17th Street, N.W., Suite 1000
5 | Washington, DC 20006
  | Phone:     (202) 223-5600
6 | Facsimile: (202) 223-6625
7 | E-mail:    hkalbian@kalbianhagerty.com
  |            mdouglas@kalbianhagerty.com
8 |            aknights@kalbianhagerty.com

9 | Kevin J. Moore (CA Bar No. 134284)
10 | Cameron H. Totten (CA Bar No. 180765)
   | MOORE & ASSOCIATES, PLC
11 | 301 E. Colorado Blvd., Suite 600
   | Pasadena, CA 91101
12 | Phone:     (626) 568-9300
13 | Facsimile: (626) 568-9374
   | E-mail:    KMoore@kjmlaw.com
14 |            CTotten@kjmlaw.com
   | *Counsel for Plaintiff Kevin So*

15

16 | IN THE UNITED STATES DISTRICT COURT
   | FOR THE CENTRAL DISTRICT OF CALIFORNIA

17

18 | KEVIN SO,
19 |       Plaintiff,
20 | v.
21 | LAND BASE, LLC, et al., UNIVEST FINANCIAL
22 | SERVICES, INC., BORIS LOPATIN, individually
   | and d/b/a BORIS LOPATIN ASSOCIATES,
23 | CHARLES W. WOODHEAD, KEVIN R.
24 | KONDAS, KEITH MILLAR, KM & ASSOCIATES
   | INTERNATIONAL, LLC, KB&M PROJECTS,
25 | INTERNATIONAL, LLC, CTL PROJECTS
   | INTERNATIONAL, LLC, SUILKEE KIM a/k/a
26 | CAMERON S. KIM, LUCY LU, HENRY YANG,
27 | and MIRA MELTZER,
28 |       Defendants.

CASE NO. CV 08-3336 DDP (AGRx)

**FIRST AMENDED COMPLAINT**

FILED
CLERK, U.S. DISTRICT COURT

JAN 16 2009

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

1
First Amended Complaint

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 3 of 91   Page ID
#:6118
Case 2:08-cv-03336-DDP-AGR   Document 95   Filed 01/16/09   Page 2 of 56

Plaintiff, Kevin So (Plaintiff or "So"), by his counsel Kalbian Hagerty LLP, states the following for his claims against Defendants Land Base LLC ("Land Base"), Boris Lopatin, individually and d/b/a Boris Lopatin Associates (Defendants Land Base and Lopatin shall be referred to collectively as "Lopatin" or "the Lopatin Defendants"), Suilkee Kim a/k/a Cameron S. Kim ("Kim"), Kevin R. Kondas ("Kondas"), Keith Millar ("Millar") and KM & Associates International LLC ("KM&A") (the Lopatin Defendants along with Kim, Kondas, Millar, and KM&A shall be referred to collectively as the "Conspiring Defendants"), and Mira Meltzer ("Meltzer"), Henry Yang ("Yang"), Lucy Lu ("Lu"), Charles W. Woodhead ("Woodhead"), KB&M Associates International LLC ("KB&M"), CTL Projects International, LLC ("CTL") and Univest Financial Services, Inc. ("Univest")[1].

## I.    Nature of the Case

1.     This action arises from the fraud perpetrated by the Conspiring Defendants acting in concert with various non-party co-conspirators, through a conspiracy wherein these Defendants intended to and did steal millions of dollars from unsuspecting investors like the Plaintiff. Acting in concert, the Conspiring Defendants each played a role in what amounted to a sophisticated Ponzi scheme that left a trail of deceit from California to London to Hong Kong.

## II.    Parties

2.     Plaintiff Kevin So is a non-resident of the United States, a citizen of the People's Republic of China, and a resident of Hong Kong. So is a successful businessman and CEO of Guangdong Arche Cosmetics Co. Ltd. ("Arche"), which is principally in the business of manufacturing cosmetic products.

---

[1]     It is, as yet, unclear whether Univest was involved in the conspiracy described herein.

2
First Amended Complaint

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 4 of 91   Page ID
#:6119
Case 2:08-cv-03336-DDP-AGR   Document 95   Filed 01/16/09   Page 3 of 56

3.      Defendant Land Base is a Nevada limited liability company, duly registered to do business in the State of California, with its California office at 1431 Ocean Avenue, Suite 1210, Santa Monica, California 90401. Upon information and belief, the principal place of business of Land Base is in California. Upon further information and belief, Land Base is in the business of private placement projects administered by asset exchanges, which are purportedly used to finance infrastructure projects throughout the world.

4.      Defendant Univest is a corporation organized under the laws of the State of California, having its principal place of business at 1504 Eureka Road, Suite 390, Roseville, California 95661. Upon information and belief, Univest's primary business objective was to finance Proprietary Media, Inc., which was in the business of providing public relations and marketing advice to aquariums and zoos.

5.      Defendant Lopatin is an adult individual over the age of 18 years and a resident of California. He is one of two principals of Land Base. On information and belief, the elaborate scheme described in this First Amended Complaint originated with Lopatin.

6.      Defendant Woodhead is an adult individual over the age 18 years and a resident of California. Woodhead was, in addition to Lopatin, the other principal of Land Base.

7.      Defendant Kondas is an adult individual over the age of 18 years and a resident of the State of Maryland. Kondas was one of at least two principals of KM&A. KM&A and Defendant Boris Lopatin, through his d/b/a Boris Lopatin & Associates, are both principals in KB&M.

8.      Defendant Millar is an adult individual over the age of 18 years and a resident of Canada. Defendant Millar was one of at least two principals of KM&A. KM&A and Defendant Boris Lopatin, through his d/b/a Boris Lopatin & Associates, are both principals in KB&M.

9.      Defendant KM&A is a Maryland limited liability company, registered with the Nevada Secretary of State to do business in Nevada.[2]   KM&A, along with Defendant Boris Lopatin, through his d/b/a Boris Lopatin & Associates, was a director of Defendant KB&M. Upon information and belief, KM&A was purportedly in the business of recruiting investors for private placement projects administered by asset exchanges, which purportedly are used to finance infrastructure and humanitarian projects throughout the world.

10.     Defendant KB&M is a Nevada limited liability company.  Upon information and belief, KB&M was in the business of recruiting investors to participate in private placement projects administered by asset exchanges, which purportedly are used to finance infrastructure and humanitarian projects throughout the world.

11.     Defendant CTL is a Nevada limited liability company.  Upon information and belief, CTL was purportedly in the business of recruiting investors for private placement projects.

12.     Defendant Kim is an adult individual over the age of 18 years who, at all times relevant to this action, resided in California.  Defendant Kim maintains a business relationship with Lopatin.  Upon information and belief, Defendant Kim (i) maintains financial records and bank accounts for Lopatin and his various business interests, (ii) shares a joint banking account with Lopatin, (iii) acted on behalf of Michael Brown, a non-party co-conspirator of the fraudulent scheme at issue herein, in opening and/or managing bank accounts to process the proceeds of the fraud.

---

[2]      According to the Nevada Secretary of State's webpage, KM&A is listed as a Maryland company.  However, the Maryland Secretary of State's public access database shows no entity registered under this name.

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 6 of 91   Page ID
#:6121
Case 2:08-cv-03336-DDP-AGR   Document 95   Filed 01/16/09   Page 5 of 56

13.     Defendants Yang and Lu are husband and wife and reside in Canada. Yang and Lu sought to recruit So into a private placement project beginning in 2004. Beginning in 2005, Lu was retained by So to serve as his agent in regard to making such an investment. At all relevant times and in all actions alleged herein, Defendants Lu and Yang acted in concert and as agent for each other and for the marital community of Yang and Lu, and acted within the scope of that agency.

14.     Defendant Meltzer is an adult individual over the age of 18 years who resides in Virginia. Upon information and belief, at all times relevant to this Complaint, Meltzer has maintained a business relationship with Defendants Kondas and Millar. Additionally, Meltzer, along with Kondas and non-party co-conspirator Robert Minton, were managing members of CTL.

### III.    Jurisdiction and Venue

15.     Jurisdiction is vested in this Court under 28 U.S.C. §1332(a)(2). The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the action is between citizens of different states and citizens or subjects of a foreign state in that Plaintiff Kevin So is a citizen of China, and, upon information and belief, Defendants Land Base, KM&A and KB&M are citizens of Nevada, Defendants Univest, Lopatin, and Woodhead are citizens of California, Defendants Millar, Lu and Yang are citizens of Canada, Defendant Meltzer is a citizen of Virginia, and Defendant Kondas is a citizen of Maryland. Upon information and belief, Kim is a citizen of Korea, but resided in California at all times relevant hereto.

16.     On information and belief, the conspiracy to defraud Plaintiff So arose in California, where the Conspiring Defendants, along with representatives of KB&M and CTL, held various meetings at which the scheme was furthered. Defendants Kondas, Meltzer and Lu

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 7 of 91   Page ID
#:6122
Case 2:08-cv-03336-DDP-AGR   Document 95   Filed 01/16/09   Page 6 of 56

attended one or more such meetings in California. Upon information and belief, Defendant Millar has systematic ties to California, and is a business partner with Lopatin, who at all times relevant hereto has done business and continues to do business in California. Upon information and belief, Defendants KM&A and KB&M also have systematic ties to California.

17.  Venue is proper pursuant to 28 U.S.C. §1391, because Defendants Univest and Land Base are registered to do business in California. Additionally, Land Base maintains its office in the Central District of California. Upon information and belief, Defendants Lopatin, and Woodhead are residents of California. Additionally, Defendants Lopatin and Woodhead are officers and principals of Defendant Land Base.

## IV.  Facts Common to All Counts

### A.  The Fraudulent Scheme

18.  At issue in this case is a sophisticated cabal by which the Conspiring Defendants stole millions of dollars from Plaintiff.

19.  In or around December 2004, the Conspiring Defendants developed a scheme whereby they would entice wealthy investors to deposit money into accounts to be managed by supposed bond-trader and non-party co-conspirator, Michael Brown. Plaintiff Kevin So was one such investor.

20.  Brown utilized various business entities he formed to assist with the perpetration of the scheme, including, *inter alia*, 5th Avenue Partners Limited, Devonshire Capital Limited, Lamberhurst Developments Limited, and 5th Avenue Partners GMBH. Specifically, Brown utilized bank accounts opened in the names of these various entities to facilitate financial transactions underlying the fraud. Brown and his various business entities will be referred to collectively hereinafter as "Brown."

21.     Lopatin, Millar, Brown and others[3] -- with the knowledge and assent of each of the other Conspiring Defendants' -- promised investors that the principal they invested would remain safe in bank accounts Brown maintained at HSBC Bank, plc in London ("HSBC"). These Defendants represented that these accounts would be segregated in the investors' favor. Brown would utilize the investors' funds to obtain significant profits by leveraging the investors' funds through bond purchases and sales.   Lopatin, Brown, Millar and others promised the investors they could withdraw their funds at any time.

22.     Lopatin and Millar promised the investors that Brown would purchase bonds only after having secured bank-approved institutions to repurchase them.   According to Lopatin, Millar and Brown, the bonds Brown purchased would, only seconds later, be repurchased by the bank-approved institutions at great profit to the investors.  Lopatin, Millar and Brown convinced the investors that, as these bonds would only be held for a matter of seconds before being re-sold to institutional buyers, these transactions posed very little risk.   This bond purchase and sale scheme shall be referred to hereinafter as the "Private Placement Project."

23.     The representations to So and other investors regarding the bank accounts into which the investors' funds would be placed were false when made. The Conspiring Defendants and Brown neither segregated nor intended to segregate investors' funds in the manner represented, which would have supposedly protected the investors' principal investment. Rather, at all times the Conspiring Defendants and Brown were able to and did access and utilize these funds for any purpose, including for their own accounts.

---

[1]     These "others" who made representations included Robert Minton, who, along with Kondas and Meltzer, was a managing member of CTL.  Upon information and belief, Minton is a citizen of the United Kingdom.

7

First Amended Complaint

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 9 of 91   Page ID
#:6124
Case 2:08-cv-03336-DDP-AGR   Document 95   Filed 01/16/09   Page 8 of 56

24.     Brown, a purported international bond trader with a British passport and a permanent resident of the U.S., together with Lopatin, served as the front-men for this endeavor. Lopatin, Millar and Minton facilitated the fraudulent scheme by recruiting investors and introducing them to Brown.  Lopatin, Millar and Minton also assisted Brown by convincing investors that the Private Placement Project was a legitimate opportunity for investors to enjoy remarkable profits on their investments.  These representations directly and proximately caused investors, including Plaintiff, to comfortably part with their money.

25.     In preparation for implementing this scheme, the Lopatin Defendants entered into a business relationship with Univest, the purported goal of which was for Land Base to place $10 million belonging to Univest into high-return investments.  In this respect, Land Base acted as an agent for and on behalf of Univest.  Moreover, Univest's involvement permitted the Conspiring Defendants and Brown to test HSBC's institutional controls and assess whether HSBC would prevent Defendants from carrying out the Private Placement Project.

26.     In or about December 2004, Univest transferred $10 million from its bank in California to one of Brown's accounts at HSBC London.  In fact, the Lopatin Defendants' true purpose behind entering into the Land Base-Univest relationship was not to obtain legitimate, high return investments for Univest, but rather was (i) to add an aura of legitimacy to a fraudulent investment scheme, (ii) to assist with efforts to induce other potential investors into entering into such a relationship, and, most importantly, (iii) to allow the Conspiring Defendants and Brown to learn whether HSBC would take the necessary steps to protect unsuspecting investors.

27.     Shortly after Univest invested its $10 million in one of Brown's accounts, and throughout January, February and March 2005, it was apparent that Brown was not executing the

number of trades required to generate the profits anticipated by the placement. Upon information and belief, during this period Univest's principal, Craig Christensen, voiced complaints to Lopatin on this very issue. Still, the Conspiring Defendants continued to participate in the recruitment of additional investors for Brown, including the recruitment of Kevin So, the details of which will be discussed in more detail below.

28.   In or around early to mid-April 2005, and at least several days prior to Plaintiff investing his $30 million, Univest's representatives, including Principal Craig Christensen and its attorney Jeffrey Moritz, demanded that Brown refund Univest's $10 million and remit profits to Univest. These demands were transmitted to Lopatin. In the absence of an investment by Plaintiff, the Lopatin Defendants and Brown were unable to refund Univest's investment.

29.   In fact, on or about April 20, 2005, Kevin So invested in the Private Placement Project by depositing $30 million[4] into one of Brown's HSBC London accounts. *See* Wire Transfer dated April 20, 2005, attached hereto as **Exhibit A**. Immediately thereafter, Brown and Lopatin, now able to meet Univest's demands, refunded Univest's $10 million "investment" -- which amount was drawn directly from the $30 million Kevin So invested. Refunding Univest enabled the Conspiring Defendants and Brown to continue their charade for many months and keep the Ponzi scheme alive.

30.   Throughout the perpetration of the fraud and to further convince the potential investors of the legitimacy of the purported investment opportunity and advance their fraudulent scheme, Defendant Lopatin and Brown arranged meetings in the offices of a prestigious London

---

[4]   A portion of these funds belonged to Birui Wang ("Wang"), So's business partner. Wang and So agreed that So would locate an appropriate investment vehicle for these funds. For purposes of this lawsuit, Ms. Wang has assigned any and all claims emanating out of the fraudulent scheme to So.

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 11 of 91   Page ID
#:6126
Case 2:08-cv-03336-DDP-AGR   Document 95   Filed 01/16/09   Page 10 of 56

law firm, Fox Williams, and with representatives of HSBC London.  Defendants Millar and Kim, among others attended many of these meetings.  These meetings served to assure investors like So that Messrs. Brown and Lopatin were legitimate businessmen whom the investors could and should trust to invest their money wisely.

31.    Additionally, the Lopatin Defendants and Brown presented investors, including Univest, with nearly identical letters titled "Irrevocable Bank Instruction," which purport to instruct HSBC London to take various steps to safeguard the investors' funds.  This letter was signed on behalf of and stamped as received by an HSBC representative, which added to Conspiring Defendants' aura of legitimacy.  A copy of the Irrevocable Bank Instruction governing Plaintiff's investment is attached as **Exhibit B.**

32.    According to the Irrevocable Bank Instruction relating to So's investment, "[u]nder no circumstances shall **Principal amount of funds** deposited in the amount of **Thirty Million United States Dollars ($30,000,000.00)** be permitted to be withdrawn, unless as stated hereto and for the payment of wire charges (if any)."  Exhibit B at ¶ 5 (emphasis in original). The Conspiring Defendants and Brown never intended to abide by the terms of this Irrevocable Bank Instruction and, as a result of their knowledge and experience from Univest's earlier-issued HSBC Irrevocable Bank Instruction, were confident that HSBC would fail to abide by the letter's terms.

33.    To participate in the Private Placement Project, the Lopatin Defendants and Brown required investors to execute a document known as the "Land Base Agreement."  The Land Base Agreement was florid, wordy, replete with superfluous clauses, and was intended to give investors the impression that it reflected a sophisticated and complex financial and legal arrangement.  In fact, it was in large part devoid of any commercial meaning and purpose, by

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 12 of 91   Page ID
#:6127
Case 2:08-cv-03336-DDP-AGR   Document 95   Filed 01/16/09   Page 11 of 56

which the Conspiring Defendants and Brown intended to reinforce with investors an aura of legitimacy to the Private Placement Project. *See* Land Base Agreement, attached as **Exhibit C.**

34.    As discussed below, a British court later entered a judgment against Brown and his companies and in Kevin So's and other investors' favor. Additionally, Brown was convicted of perjury relating to false statements he made in efforts to gain access to funds he fraudulently obtained from Kevin So and others, as well as false statements made in connection with his efforts to flee the U.K. Brown later fled the U.K. to avoid trial on further charges. However, on or about November 28, 2008, Brown was convicted *in absentia* of theft and other charges in relation to the Private Placement Project.

## B.    Defendants Defraud Kevin So

### i.    So's Relationship with Lucy Lu and Henry Yang and Preparations for Investing.

35.    So was first introduced to Henry Yang, Lucy Lu's husband, in or around April of 2004, at which time, Yang began trying to recruit So as an investor in an investment scheme similar to that described herein. Specifically, Yang represented the investment scheme to Plaintiff as a high level investment opportunity, of which very few people are aware, involving the purchase and re-sale of highly rated instruments.

36.    Yang told Plaintiff there were only seven traders in the world qualified to execute such transactions, and Yang knew six of them. Yang further represented that, to participate, an investor must demonstrate that he has at least $100 million at his or her disposal. Yang promised Plaintiff that the investment opportunity would yield very high returns.

37.    Finally, Yang promised So that the investor's funds would face absolutely no risk, as the investor's principal would remain in his or her own account and would only be utilized as leverage so that the trader could execute bond trades.

38.     To further entice So to participate in an investment scheme, Yang and Lu told So that a portion of the substantial profits So stood to gain through his participation would be directed to various humanitarian and charitable projects of So's choosing.  It is common in fraudulent investment schemes that the perpetrators attempt to entice the participant by promising that a portion of the profits derived would be used for charitable purposes.

39.     Lu worked with her husband to persuade So to invest in such an investment scheme.

40.     Over the course of several months, Yang and his wife Lu, continued their efforts to entice Plaintiff to participate in a private placement project.  In or around August of 2004, Yang arranged for Lu to travel from their home in Canada to Guangzhou, China to meet with So and discuss the private placement opportunity that Yang had told So about in April 2004.  This was the first time So met Lu.

41.     After Lu returned to Canada from her meeting with Plaintiff, Yang again contacted him in or around September 2004.  Yang persisted in seeking to convince So to invest funds into a private placement project, and inquired as to whether So had between $20 and $50 million to invest.  Again, Yang guaranteed the safety of So's funds.

42.     So's company, Arche, was involved in a number of significant projects that required considerable amounts of capital to be invested, with which he had hoped the investment described by Lu and Yang could assist.  Therefore, in reliance on their express representations regarding substantial returns and those regarding the safety of his investment, So decided to permit Yang and Lu to arrange for him to invest approximately $30 million.

43.     In or around mid November 2004, Yang informed Plaintiff that he had located a suitable investment opportunity and, to participate, So must transfer his $30 million to an

account at HSBC Bank in Hong Kong. Yang stated that the transfer of funds to HSBC Hong Kong was necessary, as that bank was qualified to oversee and participate in a private placement project. So transferred his funds to his account at HSBC Hong Kong ("HSBC-HK Account") on or about December 4, 2004.

44.     Several days later, Yang informed So that, in light of a request by the "Investment Program Manager," Lu's name must be added to So's HSBC-HK Account. According to Yang, So's investment could not otherwise be accepted into the private placement program. Around this time and based on representations by Lu and Yang, So agreed that Lu would serve as his agent and fiduciary with respect to his $30 million investment.

45.     As a result of Yang and Lu's representations, So understood that the investment opportunities Yang and Lu would pursue, purportedly on So's behalf, in the financial market for So's $30 million involved investing in Medium-Term Notes (also known as "MTNs" or "bonds") of governmental, public, and private institutions in various jurisdictions. So's investment objectives included generating profits by purchasing and subsequently selling bonds issued by financial institutions with a very high credit rating: A+ or better. Notwithstanding this objective, So's priority was the security of the principal he invested, a fact that was well known to Yang, Lu and, ultimately, each of the Conspiring Defendants.

46.     In particular, Yang, Lu and So discussed private placements consisting of the purchase and re-sale of highly rated bonds in circumstances where the re-purchaser was already in place before the commitment to purchase the bond was made. In light of his discussions with Yang and Lu, So understood that, with respect to these investment vehicles, the return on each individual bond trade would be conservative, but that a good trader making many trades per week could achieve large overall investment returns. So also understood that, typically, the

principal invested in such a private placement is to be safeguarded by a bank. So's understanding of the mechanics of the private placement investment also was reinforced by the other Conspiring Defendants.

47.    Upon information and belief, Yang and Lu knew that the private placement investment opportunity they pushed on So was, in fact, a fiction which provided Yang and Lu an opportunity to profit from the fraud committed against So.

48.    Upon information and belief, in or around January 2005, Yang introduced Lu to Defendant Millar who then introduced Lu to the Lopatin Defendants and Brown. Upon information and belief, Lu informed Millar that she controlled significant funds to invest and that these funds belonged to Plaintiff So.

49.    Millar and Lu corresponded with each other via e-mail from approximately late January 2005 through early April 2005. Several of these e-mails indicated they were sent by Millar on behalf of KM&A, an entity in which Kondas was the other principal. Lu never shared these e-mails with So and, on information and belief, shared limited information regarding the substance of her communications with Millar. The purpose of Millar and Lu's communications was to make arrangements for the investment of So's $30 million. Specifically, Millar intended to entice So to invest in the bond trading scheme developed and spearheaded by the Lopatin Defendants and Brown.

50.    In the course of their e-mail communications, Millar represented to Lu that, upon investing So's $30 million, the trader (Brown) would require two to three weeks before he could partake in any trades. According to Millar, this delay was due to the large demand for these investment vehicles and because the investment had to be run through some form of a compliance procedure, which required investors to disclose certain personal and financial

information.    Millar and Lu intended and understood that Millar's representations would reinforce with So the legitimacy of the Private Placement Project.

51.    On or about February 16, 2005, Millar informed Lu and Kevin So that Lu and So must travel to London to meet with the trader (Brown), in order to proceed with the investment. Millar also informed them that So would need to transfer the $30 million to HSBC London, where these funds would be placed in a non-depletion account.  According to Millar, the HSBC London account that was to house So's funds was regulated by HSBC such that it would be required to maintain $30 million in cash, A-rated bank securities, and/or a combination thereof.

52.    On information and belief, Lu recognized that if So personally attended meetings related to the Private Placement Project, the role she and Yang played in bringing So into the investment would not yield them a fee or commission.   Accordingly, Lu orchestrated the exclusion of So from these meetings and told So that if he wanted to participate, he needed to give her authority to act on his behalf.  Because he has a limited knowledge of the English language and extensive business commitments to meet at home, and because he trusted Lu to be acting on his behalf, So agreed to have Lu act as his agent and gave her authority to attend the meetings and invest his funds in the investment plan that she and Lu had outlined to him.

53.    Specifically, on or about February 21, 2005, at Lu's urging, So executed an "Affidavit of Representation and Authorization of Signatory," which gave Lu authority to enter into the Private Placement Project on So's behalf.  Lu utilized her authority to exercise complete dominion over So's money and his investment decision.

54.    At some point, So reached an agreement with Yang and Lu whereby, in exchange for their role in bringing So to the investment opportunity, Yang and Lu would receive payments of a portion of the profits derived from trading in the Private Placement Project.

55.     After So executed the Affidavit of Representation, which Lu forwarded to Millar, it was apparent to Millar that Lu had successfully gained control over the decision to invest So's $30 million.  As a precondition to participating in the Private Placement Project (and to ensure Kondas and Millar received a payout from So's $30 million), Millar requested that Lu and So execute an "Irrevocable Project Funding Agreement" ("IPFA").  The IPFA was executed on March 24, 2005.  A copy of the IPFA is attached as **Exhibit D.**

56.     Pursuant to the IPFA, KM&A was to receive "project funding," essentially a twenty percent (20%) fee from any profits So earned in the Private Placement Project.  It is common in fraudulent investment schemes that the perpetrators tell the participant that strict confidentiality is required.  True to form, the IPFA included a covenant by the parties to maintain *"'TOTAL SILENCE' REGARDING THE AFOREMENTIONED, IN ALL REGARDS, AND WITHOUT COMPROMISE."* *Id.* (Emphasis in original).

57.     Millar, through Lu, sought to assure So that this form of trading was safe and was highly regulated by the UK's Financial Services Authority, the Bank of England, and the U.S. Securities and Exchange Commission.  Throughout February, March and April 2005, Millar repeatedly sought to reinforce So's confidence in the Private Placement Project by representing to Lu that So's principal investment would be safe and not subject to any risk.

58.     Millar informed Lu that Brown, whom he referred to only as "the trader," required evidence that So had funds sufficient to participate in the private placement.  Thereafter, at Lu's request, So provided a certificate evidencing the balance of funds maintained in his HSBC Hong Kong account, which Lu then transmitted to Millar.

59.     The London meetings were arranged for April 2005.  Millar told Lu they would be attended by the trader (Brown), Brown's lawyer, and someone he referred to as the "Fed

representative." Before Lu traveled to London, So had no contact with anyone at HSBC London, any of the Conspiring Defendants, nor Brown. Prior to the London meetings, neither Lu nor Yang had informed So that the Lopatin Defendants or Brown were involved.

60.     So sent his agent and fiduciary Lu to the London meetings -- not suspecting at the time that her allegiance might lie elsewhere. Before she left for London, So told Lu his primary concern was that Lu confirm with HSBC that the principal investment would be held safely by HSBC, and that it could not be removed except at So's direction.

61.     Upon information and belief, before Lu went to London, Millar presented the Affidavit of Representation to Brown and the Lopatin Defendants. Consequently, at all relevant times, the Conspiring Defendants understood that Lu was acting as So's representative and that she would transmit to him any and all representations they made.

ii.     April 2005 London Meetings

62.     The London meetings took place from April 10-13, 2005. Lu was accompanied to London by her friend and Chinese-English interpreter, Jane Zhou ("Zhou"). Ms. Zhou is not a party to this action.

63.     On information and belief, the goal of the Conspiring Defendants in holding the London meetings was to convince So of the legitimacy of the Private Placement Project. Each also understood that, in fact, the Private Placement Project was a fiction. Millar and non-party, Robert Minton, were present at these meetings each day.

64.     It is not yet clear at what point in time Lu and Yang became active participants in the Private Placement Project conspiracy. On information and belief, however, she and Yang always understood that such investment schemes were fictions, and at all relevant times, they sought to exploit So for their personal gain.

65.     On April 10, 2005, Lu met with Millar and Minton. According to notes taken by Zhou, during this meeting, Millar previewed the upcoming meetings with the trader, Brown and strongly cautioned Lu that complete secrecy was absolutely necessary. Millar further cautioned her that she should not ask the trader (i) for his business card, (ii) what it is, exactly, he does, or (iii) for whom he works. Millar also indicated that Lu would only have the opportunity to question the trader at the meeting, and not thereafter.

66.     On April 11, 2005, accompanied by Millar and Minton, Lu and Zhou met Brown. Brown explained that he was licensed by the UK government to serve as a trader and made representations aimed at convincing Lu (and ultimately Kevin So) of the legitimacy of his business and the Private Placement Project.

67.     Specifically, Brown represented that his offices were full of hidden cameras and that every phone call and correspondence in and out was being monitored by the Financial Services Authority. Brown further represented that, as he was being monitored, he had to make sure his dealings with investors were completely honest and above board. To further impress Lu regarding his bona fides and character, Brown told her that his grandfather was wealthy, and that he left significant stock shares to Brown's father. Both passed away, and Brown managed a fund in his father's memory where he deposited his investment profits. On information and belief, Brown's statements regarding his background and trading experience were false.

68.     After Brown explained his background and credentials, Defendant Lopatin arrived at the meeting. Lopatin explained that he was a principal of Defendant Land Base, which he claimed was in the business of contracting with investors to place money into a private placement where the value of the initial investment would be protected. According to Lopatin, usually Land Base worked with a single investor and started with a fund of at least $100 million.

Case 2:08-cv-03336-DDP-AGR    Document 95    Filed 01/16/09    Page 19 of 56

Land Base would then place 75% of its share of participation into mainly infrastructure projects that return long-term profits and benefit society.    Lopatin's statements regarding Land Base and its experience in placing investors into private placements were false.

69.    Lopatin next explained that, at this time, he and Land Base were assisting Brown in securing participants with less than $100 million to invest and locating potential investment projects. Lopatin explained that Brown would buy and sell high rated bonds, and that, once the investment value reached $100 million, Brown would drop out and Lopatin would commence trading. Profits after the goal of $100 million would be split, with half going to Land Base, and half to So, but 75% of So's profits should be invested into infrastructure projects.    In short, Lopatin promised So high returns coupled with virtually no risk.

70.    Throughout this meeting and thereafter, Brown and Lopatin repeatedly assured Lu that So's investment would be safe, and that HSBC would ensure that the principal investment sums would not be depleted.  Brown and the Conspiring Defendants knew that HSBC, in fact, would not take the steps necessary to protect So.  Brown and Lopatin also assured Lu and So that the funds they deposited would be maintained in an account segregated in their favor.

71.    Lopatin knew these assurances were false when he gave them to Lu, and he specifically intended that So would rely on such statements. Brown already demonstrated by his track record with Univest that he actually executed very few trades -- many less than were promised to So. This fact was known to the Lopatin Defendants.

72.    Lu continued her meetings with Lopatin the next day, April 12, 2005. During her second day of meetings, Lu was presented with a copy of the Letter of Instruction, which was stamped by HSBC's Moorgate Branch and signed by HSBC representative, Jackie Arnull.  Lu also requested that the Letter of Instruction be revised. The first letter given to Lu only reflected

an account in the name of 5th Avenue Partners, one of Brown's companies.  Eager to maintain as much control as possible over So's funds, Lu requested that the letter indicate that So and Lu be co-holders of this account.  Confident that HSBC would not honor this letter, Lopatin and Brown made the requested changes.  Finally, Lu requested that Lopatin and Brown arrange for her to meet with Jackie Arnull.

73.     It was at meetings on April 12 and 13, 2005 that Lopatin discussed with Lu the "Land Base Agreement," which he said was a contract that would set out clearly what was expected of Land Base and investors, and to confirm the benefit sharing of the parties, and the use to which those benefits would be placed.  *See* Land Base Agreement, attached as Exhibit C.

74.     Brown and the Conspiring Defendants intended the Land Base Agreement to give So the impression of a sophisticated and complex financial and legal arrangement.  Moreover, by the Land Base Agreement, Brown and the Conspiring Defendants sought to appeal to So by promising that a substantial portion of profits after So's investment reached $100 million would be directed to various humanitarian and charitable projects of So's choosing.  *See* Exhibit C at Article 3.3.

75.     In fact, this Agreement was in large part devoid of any commercial meaning and purpose.  In sum, the Conspiring Defendants intended the Land Base Agreement to reinforce with So that the Private Placement Project was both legitimate and humanitarian in nature.  *See* Exhibit C.

76.     In the Land Base Agreement, Land Base specifically warranted that So's account would at all times be holding either cash or highly rated Fixed Income Instruments.  *See* Exhibit C at Article 3.11.  Upon information and belief, Lopatin and Land Base never intended

that So's investment be maintained with cash or highly rated Fixed Income Instruments and, in fact, So's investment was never so maintained.

77.    Ultimately, Lu executed the Land Base Agreement on So's behalf on or about April 13, 2005. The Agreement Lu signed was a bound document on heavy gold-colored paper, and it was signed and sealed on behalf of Land Base by Lopatin. Lu has often referred to this Agreement as the "golden agreement."

78.    During her meetings with Lopatin, Lopatin furnished Lu with a recommendation letter from HSBC in which Ms. Arnull, an employee and agent of HSBC working at HSBC's Moorgate branch in London, described Brown as a good customer. Additionally, Lopatin furnished Lu with an amended Letter of Instruction, which reflected an account not only in the name of 5th Avenue Partners, but also in the name of Kevin So and Lu.

79.    Lu returned to Canada on April 14, 2005. Although she had requested to meet with Ms. Arnull, no meeting ever occurred. Lopatin informed Lu that Ms. Arnull would not be available until April 14, 2005 – the day Lu returned to Canada.

80.    At no time during the London meetings did Lu contact So. Rather, only after her return to Canada on April 14, 2005 did Yang inform So, through So's business partner Wang, that Lu had signed the Land Base Agreement on his behalf in London. Wang and So agreed that a full discussion of the events in London with Lu was warranted, and a subsequent meeting between Wang, Lu and Yang was arranged for later in the day.

81.    During this meeting, Lu discussed the details of her London meetings, including her discussions with Lopatin, Brown, Millar and Minton. Lu provided Wang with copies of the Land Base Agreement, which she referred to as the "golden agreement." Lu and Yang emphasized that the Land Base Agreement was highly confidential.

82.     Lu described Brown to be a very wealthy, key trader with HSBC. She further represented that Brown's company, 5th Avenue Partners Limited ("5th Avenue"), was very famous. Lu described Lopatin as a high-level trader -- senior to Brown's level -- and a trader with Standard Chartered Bank Hong Kong Limited.

83.     Lu informed Wang that she had opened an account with HSBC in London, and it was a joint account under the names of 5th Avenue, Kevin So, and Lucy Lu. According to Lu, HSBC "guaranteed" that it would protect the funds So deposited.

84.     To bolster her representations, Lu showed Wang the Letter of Instruction, and Ms. Arnull's recommendation letter, as well as Arnull's, Lopatin's and Brown's business cards.

85.     Lu also informed Wang that Brown invited Lu or So to contact Ms. Arnull directly if they had any concerns. Wang reported the substance of her meeting with Yang and Lu to So. Thereafter, So did transmit an e-mail to Ms. Arnull and to Janet Wong, who managed So's account at HSBC Hong Kong, seeking assurances that his funds would be held in a segregated, non-depletion account. Ms. Arnull referred So's inquiries to Brown directly.

86.     Brown reacted angrily upon hearing that So had contacted HSBC. Lopatin sought to diffuse the situation by assuring Lu that, had there been any problems with the Letter of Instruction, HSBC's fraud department would have contacted them immediately.

87.     So was concerned that Ms. Arnull never responded to his inquiry directly, and, through Lu, inquired about this fact with Lopatin. Lopatin again allayed So's concerns by telling Lu that, (i) because the inquiry did not contain legal verbiage, HSBC might not reply and (ii) if HSBC thought there were any problems, they would have responded vigorously and immediately.

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 24 of 91   Page ID
#:6139
Case 2:08-cv-03336-DDP-AGR   Document 95   Filed 01/16/09   Page 23 of 56

88.     Lu and Yang also sought to diffuse the situation. Specifically, Yang contacted So to relay to him a message from Lopatin, namely that Brown was very unhappy with So's inquiry e-mail. Yang represented to So that Brown must be a very big player at HSBC, otherwise Brown would not have received So's inquiry e-mail. Finally, Yang sought to reassure So by indicating that everything was perfectly fine and under Lopatin's control.

89.     On April 19, 2005, Lu sent a wiring instruction she had signed to So via e-mail, and she asked So to sign it and send it to HSBC Hong Kong to arrange for the $30 million fund transfer to HSBC London. At this point, and in reliance on Lu, Yang, Brown and Lopatin's repeated assurances, as well as the Letter of Instruction (which Brown and Lopatin knew HSBC would ignore), So was confident that his principal investment would be safe.

### iii.     So Invests $30 Million in Private Placement Project

90.     On or about April 20, 2005, So transferred $30 million to HSBC London. *See* **Exhibit A.** The wire from So's HSBC Hong Kong account identified the account into which the $30 million should be transferred as a Euro account, with beneficiaries listed as "5th Avenue Partners Ltd So Kevin Lu Yan Lucy." However, such an account did not actually exist. By now, Brown, who had transacted in millions of dollars with HSBC London, was confident in his ability to arrange for HSBC to accept the transfer into an account other than that instructed on the wire. In fact, Brown was able to convince HSBC to divert So's money to a U.S. dollar account in the name of another of Brown's companies, Devonshire Capital Ltd.

91.     By the time that So's $30 million reached the Devonshire Capital Ltd. Account, the $10 million invested by Univest was depleted to $2.6 million. Univest had received several payments totaling $506,000, which amounts were delineated by Brown and Lopatin as profits. As soon as Kevin So's money posted to the Devonshire Capital Ltd. account at HSBC, Brown

arranged to transfer $10 million from the Devonshire Capital Ltd. account to Univest. Therefore, Univest, by receiving $506,000 in payments accounted for as "profits," as well as $10 million, profited from its dealings with Mr. Brown. Upon information and belief, Univest is the only investor in the Private Placement Project to have made a profit.

92.    On April 22, 2005, HSBC faxed wire details regarding So's $30 million wire transfer to Brown, who forwarded them to Lopatin. Either Brown or Lopatin redacted the final entry, which would have demonstrated that the beneficiary bank account did not match Kevin So's wire instructions. *See* HSBC Electronic Payments Details dated April 22, 2005, attached hereto as **Exhibit E.**

93.    Following the transfer of So's $30 million to the Devonshire account, neither So nor Lu received any confirmation or communication from HSBC regarding any trades. At So's behest, Lu contacted Lopatin and inquired about receiving statements from HSBC. Lopatin assured her that Brown was reporting to him and Land Base regarding Brown's trading activities, and that Land Base would provide reports to her and Kevin So. In total, So and Lu only received a handful of trading confirmations from Land Base.

94.    In or around the end of October 2005, Lopatin contacted Lu and informed her that he no longer wanted Brown to be a trader for So's funds. He stated that he negotiated a settlement with Brown to return a sum of $62,428,220 to Kevin So, which supposedly represented the $30 million principal and a $32,428,220 profit derived from trading. Lopatin failed to disclose that HSBC had already frozen Brown's accounts.

95.    In fact, upon information and belief, because Lopatin had compiled investment statements for Kevin So relating to the $30 million he invested, Lopatin knew that Brown had not achieved any profits on So's investment. Moreover, Lopatin knew that Brown had not

maintained the $30 million principal that Kevin So invested. As such, upon information and belief, based upon Lopatin's knowledge of the principal loss by Brown, Lopatin's call to Lu in October 2005 was merely an attempt at damage control. Knowing the house of cards was collapsing and that Brown faced significant civil and criminal liability, Lopatin sought to mask his and the other Conspiring Defendants' true roles in the scheme to defraud So. He sought to convince Lu and So that Conspiring Defendants' interests were aligned with theirs so as to avoid facing a lawsuit or criminal penalties.

### iv.   HSBC Takes the Offensive

96.   HSBC, in anticipation of litigation against it by So and other investors for its failure to protect So's funds from transfer as promised, took the offensive and filed a lawsuit against Brown. In addition, HSBC filed suit against So and other investors, seeking, in effect, a declaratory judgment finding HSBC not liable for the conversion of the investors' money (the "HSBC Litigation").

97.   So filed a counterclaim in the HSBC Litigation against HSBC, and pursued a claim against Brown through which he obtained a judgment for restitution against him.

98.   Believing at that time that all the Defendants in this action were innocent bystanders to Brown's theft rather than co-conspirators, So cooperated with them over the course of the HSBC Litigation from early 2006 through trial in late October 2007. Plaintiff particularly worked closely with Lopatin and Defendants Yang and Lu in an effort to establish HSBC's culpability in permitting Brown's theft.

99.   Only in early 2008 -- after an October 2007 trial in that case -- did Plaintiff become aware of facts which, upon further investigation, led him to conclude that each of the

Conspiring Defendants had conspired with Brown and each other in a scheme to defraud investors like himself.

100.    Plaintiff thereafter learned that, upon information and belief, Defendants Yang and Lu also at some point entered into the conspiracy with the Conspiring Defendants.

101.    The Conspiring Defendants and Defendants Yang and Lu maintained their charade during the HSBC Litigation in an effort to obtain additional money from HSBC, all the while requiring that Plaintiff pay most or all of the legal expenses for that litigation, purportedly because it was his principal at stake.

102.    Their continued deception prior to and during trial in the HSBC Litigation contributed to HSBC prevailing as against the investors at trial.

103.    Accordingly, Plaintiff incurred several million dollars in attorneys' fees in the course of the HSBC Litigation and also was ordered on March 12, 2008 to pay HSBC's costs of £787,500.

104.    The HSBC Litigation is presently on appeal, and Plaintiff's damages incurred in those proceedings continue to accrue.

105.    Lopatin's efforts at concealing his and the other Conspiring Defendants' involvement in the scheme was aided greatly when he convinced So to retain Lopatin's friend and business associate, Leonard J. Suchanek ("Suchanek"), an attorney working out of Washington, D.C., to assist him in the HSBC Litigation.  Suchanek was assisted at all relevant times by Defendant Meltzer, whom Suchanek employed as a legal assistant.

C.    **Complicity of the Defendants**

106.    During the course of their relations with Plaintiff So, the Conspiring Defendants made false representations of material fact either directly or through their agents to Plaintiff and/or his agents, including *inter alia* the following:

(a)    the principal Kevin So invested would remain safe in bank accounts Brown maintained at HSBC Bank plc in London;

(b)    So's investment would be and in fact had been segregated in a bank account held jointly by both So and Brown;

(c)    So could withdraw his funds at any time;

(d)    Brown would execute multiple trades per week, thus generating significant returns for So;

(e)    So's investment principal would be protected by HSBC consistent with the instructions found in the Letter of Instruction;

(f)    So's principal investment would not be subject to any risk;

(g)    So's principal investment would be maintained in $30 million cash, A-rated bank securities, or a combination of these;

(h)    So's investment would quickly reach $100 million in value; and

(i)    Lopatin negotiated a settlement whereby Brown would pay So $62,428,220, when he knew, but failed to disclose to So, that HSBC had frozen Brown's accounts.

107.    With respect to private placement investment mechanisms, Defendants Lu and Yang made false representations of material fact to Plaintiff and/or his agents, including, *inter alia*, the following:

(a)     that private placement trading mechanisms were legitimate, viable investment vehicles of which very few people are aware worldwide;

(b)     that only seven traders worldwide were qualified to execute trades under private placement investments, and that Yang knew six of these traders;

(c)     that private placement trading mechanisms would subject So's funds to absolutely no risk;

(d)     that, upon investing, So's funds would remain in his own account and would only be utilized as leverage so that the trader could execute trades; and

(e)     that So's investment would accrue incredibly high returns.

108.     With respect to the Private Placement Project, Defendants Lu and Yang transmitted information to So given to them by Millar, Lopatin, Brown and others that Lu and Yang knew were false representations of material fact, including, *inter alia*, the following:

(a)     that in light of a request by the "Investment Program Manager," Lu's name must be added to So's HSBC-HK Account;

(b)     that HSBC guaranteed that it would protect the principal So invested in the Private Placement Project;

(c)     that So could withdraw his funds from the Private Placement Project at any time;

(d)     that the trader, Michael Brown, would execute multiple trades per week, thus generating significant returns for So;

(e)     So's investment would not be subject to any risk;

(f)     So's investment would quickly reach $100 million in value; and

(g)   So's principal investment would be mained in $30 million cash, A-rated
bank securities, or a combination of these.

109.   Lu's complicity in the Private Placement Project became clear during the HSBC
Litigation, where she submitted false information to the British court regarding her background,
her relationship with So, and her purported rights regarding to the $30 million that So invested
with Brown, including that a portion of these moneys belonged to her.  Moreover, Lu also
drafted a false witness statement which she attributed to So, and which was submitted to the
British court in So's name.  When So learned of Lu's actions, he approached his counsel,
Suchanek, who instructed him that no action could be taken to remedy Lu's conduct.  These
actions greatly prejudiced So in those proceedings.

110.   At all times, Brown, Lopatin and the Conspiring Defendants were assisted by
Defendant Cameron Kim, who was Lopatin's business partner and who worked as agent to both
Lopatin and Brown.

111.   Upon information and belief, Land Base and its two principals, Defendants
Lopatin and Woodhead, profited by over $4 million for their role in this fraudulent scheme.
Upon information and belief, Lopatin's close confidant and business partner, Cameron Kim,
shared in these profits.

112.   KM&A and its principals, Millar and Kondas, along with their business partner,
Mira Meltzer, received in excess of $600,000 in "project funding" payments directly from the
$30 million in principal So invested.  These payments were made pursuant to the IPFA for
purportedly profitable trades.

113.   Lu and Yang received approximately $800,000 in "commission" payments.
These payments were purportedly a portion of profits So derived Brown's trading.  However, as

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 31 of 91   Page ID
#:6146
Case 2:08-cv-03336-DDP-AGR   Document 95   Filed 01/16/09   Page 30 of 56

with the payments made to KM&A, these funds came directly from the $30 million in principal
So invested.

114.    Upon information and belief, the individual Defendants utilized various
companies to assist with sharing, hiding and distributing the proceeds from the Private Placement
Project.  Among these companies was:  (a) Defendant KM & Associates, which was comprised
of Kondas and Millar, and affiliated with Meltzer; (b) Defendant KB&M Projects International
LLC, which was formed by Defendants Boris Lopatin & Associates, Keith Millar, and KM &
Associates only weeks after So deposited $30 million with Michael Brown in London; and (c)
Defendant CTL Projects International, which was formed by conspirators Kondas, Meltzer, and
non-party Robert Minton.  Defendants KB&M and CTL were dissolved on October 12, 2007.
This date coincided with the first day of trial in the HSBC Litigation in London.

115.    Plaintiff Kevin So lost nearly $27 million in the Private Placement Project.  He
pursued and secured a judgment against Brown in the United Kingdom, as a result of which the
British court awarded him some of Brown's funds and property that had been seized when the
British police first discovered the fraud.  However, litigation expenses negated much of his
recovery.

116.    Plaintiff has suffered and continues to suffer additional direct and consequential
monetary damages in excess of $30,000,000 and irreparable harm in the form of, *inter alia*,
damage to his reputation.

## V.    CAUSES OF ACTION

### Count One:  Fraud/Intentional Misrepresentation
### (Against the Conspiring Defendants and Defendants Lu and Yang)

117.    Plaintiff incorporates and re-alleges Paragraphs 1 through 116 as if fully set forth
herein.

30
First Amended Complaint

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 32 of 91   Page ID
#:6147
Case 2:08-cv-03336-DDP-AGR   Document 95   Filed 01/16/09   Page 31 of 56

118.    The Conspiring Defendants and Defendants Lu and Yang owed Plaintiff a duty to refrain from using deceit to cause him harm.

119.    The Conspiring Defendants and Defendants Lu and Yang at all times owed Kevin So an additional duty to exercise reasonable care to provide complete, accurate, and truthful disclosure of all facts material to his investment in private placements generally and the Private Placement Project in particular.

120.    Each of these Defendants had or purported to have unique, superior and/or specialized knowledge with regard to the formation, status, condition, and operations of the Private Placement Project or similar purported investment vehicles.

121.    As alleged herein, the Conspiring Defendants and Defendants Lu and Yang made numerous false representations of material fact to Plaintiff.

122.    In making the misrepresentations set forth herein, the Conspiring Defendants and Defendants Lu and Yang knew their representations to Plaintiff and/or his agent were false and/or acted with utter disregard and recklessness as to whether they were true or false.

123.    Each of these Defendants, acting within the course and scope of his, her or its agency, employee, partner, and/or joint venture relationships, participated in, approved, sanctioned, cooperated in, assisted in, consented to, acquiesced in, benefited from, or otherwise participated in and/or failed to prevent the generation and dissemination of materially false, incomplete, and inaccurate information described herein.

124.    Each of these Defendants knew, intended, and understood that So would act in reliance on their representations and/or omissions.

125.    Plaintiff received and relied on the false representations and omissions of material fact. Plaintiff reposed trust and confidence in each of these Defendants, based on their purported

unique and superior knowledge and expertise, and trusted the information that they provided to him with each other's knowledge, consent, and authority.

126.   So's reliance on Defendants' false representations was foreseeable, reasonable, and justified.

127.   So's reliance on Defendants' false representations and omissions directly and proximately caused injury and pecuniary loss to So, for which he is entitled to an award of actual and consequential damages in an amount to be proven at trial but believed to be in excess of $30,000,000.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in his favor and against Defendants Lopatin, Land Base, Woodhead, Kim, Kondas, Millar, KM&A, Lu and Yang on Count One of the First Amended Complaint, and:

(a)   Award Plaintiff compensatory damages in the amount of at least $30,000,000 or such other amount as may be proved at trial;

(b)   Award Plaintiff punitive damages in the amount of at least $10,000,000;

(c)   Award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs incurred and such other and further relief as the Court may deem just.

### Count Two:  Negligent Misrepresentation
### (Against the Conspiring Defendants and Defendants Lu and Yang)

128.   Plaintiff incorporates and re-alleges Paragraphs 1 through 127 as if fully set forth herein.

129.   The Conspiring Defendants and Defendants Lu and Yang at all times owed a duty to Kevin So to exercise reasonable care in obtaining and conveying information regarding private placement investments in general and the Private Placement Project in particular.

130.    Each of these Defendants, acting within the course and scope of his or its agency, employee, partner, and/or joint venture relationship, failed to exercise reasonable care to ensure, at all times, the complete, accurate, and truthful disclosure of these material facts to So.

131.    Each of these Defendants, acting within the course and scope of his or its agency, employee, partner, and/or joint venture relationships, participated in, approved, sanctioned, cooperated in, assisted in, consented to, acquiesced in, benefited from, or otherwise participated in and/or failed to prevent the generation and dissemination of materially false, incomplete, and inaccurate information described herein.

132.    The generation and dissemination of materially false, incomplete, and inaccurate information was caused by these Defendants' failure to exercise reasonable care or competence in obtaining or communicating the information, and/or their failure to exercise reasonable care or competence to prevent the communication of false information. Each of these Defendants had or purported to have unique, superior and/or specialized knowledge expertise with regard to the formation, status, condition, and operations of the Private Placement Project.

133.    These Defendants knew, intended, and understood that such information would be supplied to So for his benefit and guidance.

134.    These Defendants knew, intended, and understood that the information would be used to influence So in his determination as to whether or not to invest in the Private Placement Project.

153.    So was a known, intended, and foreseeable recipient of the false, incomplete, and inaccurate information supplied. These Defendants knew that the information was desired for a serious purpose, that false or erroneous information would cause significant injury, and that the

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 35 of 91   Page ID
#:6150
Case 2:08-cv-03336-DDP-AGR   Document 95   Filed 01/16/09   Page 34 of 56

relationship between the parties was such that So had the right to rely on the Defendants for accurate information, and Defendants owed a duty to give this information with due care.

136.    So received and relied upon the false, incomplete, and inaccurate information supplied to him.  Plaintiff reposed trust and confidence in each of these Defendants, based on their purported unique and superior knowledge and expertise, and trusted the information that they provided to him with each other's knowledge, consent, and authority.

137.    So's reliance on Defendants' representations was foreseeable, reasonable, and justified.

138.    So's reliance on Defendants' representations directly and proximately caused him to suffer significant injury and pecuniary loss, for which he is entitled to an award of direct and consequential damages in an amount to be proven at trial, but believed to be in excess of $30,000,000.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in its favor and against Defendants Lopatin, Land Base, Kim, Kondas, Millar, and KM&A on Count Two of the First Amended Complaint, and:

(a)    Award Plaintiff compensatory damages in the amount of at least $30,000,000 or such other amount as may be proved at trial;

(b)    Award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs incurred and such other and further relief as the Court may deem just.

### Count Three: Fraud Based on Concealment of Material Facts
### (Against the Conspiring Defendants and Defendants Lu and Yang)

139.    Plaintiff incorporates and re-alleges Paragraphs 1 through 138 as if fully set forth herein.

140.    The Conspiring Defendants, acting within the course and scope of their agency,

34
First Amended Complaint

Case 2:08-cv-03336-DDP-AGR  Document 344-1  Filed 05/07/10  Page 36 of 91  Page ID
#:6151
Case 2:08-cv-03336-DDP-AGR  Document 95  Filed 01/16/09  Page 35 of 56

employee, partner, and/or joint venture relationships, knowingly or recklessly concealed and/or failed to disclose material facts that these Defendants had a duty to disclose, including, *inter alia*: (a) the compensation each stood to receive as a result of and from So's investment; (b) that Brown failed to execute trades with respect to Univest's investment of the frequency promised; (c) that Brown failed to execute trades with respect to So's investment of the frequency promised; (d) that the principal So invested was not and would not be safeguarded by HSBC; (e) that So's investment was not deposited into any account to which he was a beneficiary; (f) that $10 million of So's investment was immediately transferred to Univest; (g) that So could not withdraw his funds at any time; and (h) that, at the time Lopatin purportedly entered into a settlement on So's behalf, HSBC had frozen Brown's accounts.

141. Defendants Lu and Yang, acting within the course and scope of their agency, employee, partner, and/or joint venture relationships, knowingly or recklessly concealed and/or failed to disclose material facts that these Defendants had a duty to disclose, including, *inter alia*: (a) that private placement investments are, in fact, a fiction; (b) that the funds invested would be subject to a substantial risk of being depleted by the trader, Brown, and his co-conspirators; (c) that HSBC would not safeguard So's funds; and (d) that no trades actually would transpire.

142. Each of these Defendants had or purported to have unique, superior and/or specialized knowledge expertise with regard to the formation, status, condition, and operations of the Private Placement Project. Plaintiff reposed trust and confidence in each of these Defendants, based on their purported unique and superior knowledge and expertise, and trusted the information that they provided to him with each other's knowledge, consent, and authority in connection with his decision to invest money in such a venture and such projects.

143. Prior to and during the April 2005 meetings with Lopatin and Brown, and continuing thereafter, these Defendants, acting within the course and scope of their agency, employee, partner, and/or joint venture relationships, knowingly or recklessly concealed material facts that they had a duty to disclose, including, *inter alia*, those material facts described in Paragraphs 106 through 108, above. These Defendants had or purported to have unique, superior and/or specialized knowledge expertise with regard to the formation, status, condition, and operations of the Private Placement Project, and its purported assets and management (or lack thereof). Plaintiff reposed trust and confidence in each of these Defendants, based on their purported unique and superior knowledge and expertise, and trusted the information that they provided to him with each other's knowledge, consent, and authority in connection with his decision to invest money in the Private Placement Project.

144. These Defendants concealed and/or failed to exercise reasonable care to disclose these material facts with the knowledge, intent, and understanding that the concealment and/or nondisclosure would defraud So by creating a false impression on the part of So as to such matters.

145. These Defendants knowingly or recklessly concealed these material facts, with the knowledge, intent, and understanding that So, a known party, would take action he would or might not take if he knew the true facts. In particular, these Defendants knew that the information was desired for a serious purpose, that the false or erroneous information would cause injury, and that the relationship between the parties was such that So had the right to rely on each of these Defendants for such information, and they owed a duty to give such information with due care.

Case 2:08-cv-03336-DDP-AGR  Document 344-1  Filed 05/07/10  Page 38 of 91  Page ID
#:6153
Case 2:08-cv-03336-DDP-AGR  Document 95  Filed 01/16/09  Page 37 of 56

146.  So was unaware of the true state of the facts, and acted in reliance on the assumption that the concealed and/or non-disclosed facts did not exist or were different from the actual truth.

147.  So's reliance on Defendants' representations was foreseeable, reasonable and justified.

148.  So's reliance on Defendants' representations directly and proximately caused injury and pecuniary loss to So, for which he is entitled to an award of actual and consequential damages in an amount to be proven at trial, but believed to be in excess of $30,000,000.

149.  These Defendants' conduct, as outlined above, was intentional and/or deliberate, and involved circumstances of malice, fraud, bad motive, circumstances of aggravation or outrage, and was reckless, willful, wanton and consciously disregarded or was indifferent to Plaintiff's rights.  As a result, Plaintiff is entitled to an award of punitive damages.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in its favor and against Defendants Lopatin, Land Base, Kim, Millar, Kondas, Yang and Lu on Count Three of the First Amended Complaint, and:

(a)  Award Plaintiff compensatory damages in the amount of at least $30,000,000 or such other amount as may be proved at trial;

(b)  Award Plaintiff punitive damages in the amount of at least $10,000,000;

(c)  Award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs incurred and such other and further relief as the Court may deem just.

### Count Four: Conversion
### (Against the Conspiring Defendants and Defendants Lu and Yang)

150.  Plaintiff incorporates and re-alleges Paragraphs 1 through 149 as if fully set forth herein.

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 39 of 91   Page ID
#:6154
Case 2:08-cv-03336-DDP-AGR   Document 95   Filed 01/16/09   Page 38 of 56

151.   Each of these Defendants fraudulently and otherwise wrongfully and without authority assumed and exercised dominion and control over property belonging to Kevin So — namely, $30 million.

152.   The Lopatin Defendants fraudulently and otherwise wrongfully disposed of So's property in a manner contrary to So's directives and understanding with the Defendants by (a) failing to invest So's $30 million; (b) failing to return the $30 million to So; (c) transferring $10 million of So's funds to Univest; (d) retaining at least $4 million of So's funds for their own benefit; and (e) allowing So's $30 million to be depleted by Lopatin, Brown and others.

153.   Defendants Millar, Kondas, and KM&A fraudulently and otherwise wrongfully disposed of So's property in a manner contrary to So's directives and understanding by retaining at least $600,000 of So's funds.  These Defendants knew or should have known that these funds were not proceeds of any investment profit, but instead came directly from the principal $30 million Plaintiff invested.

154.   Defendants Yang and Lu fraudulently and otherwise wrongfully disposed of So's property in a manner contrary to So's directives and understanding by (a) causing So's $30 million to be placed in the Private Placement Project, which they knew to be a fraud; (b) retaining approximately $800,000 of So's funds for their own use, which they knew were not the proceeds of any investment; and (c) permitting So's $30 million to be depleted by the Conspiring Defendants, Brown and others in derivation of their fiduciary obligations to So.

155.   Each of these Defendants' conduct, as outlined above, directly and proximately caused injury and pecuniary loss to So, for which he is entitled to an award of actual and consequential damages in an amount to be proven at trial.

156. Moreover, Defendants' conduct, as outlined above, was intentional and/or deliberate, and involved circumstances of malice, fraud, bad motive, circumstances of aggravation or outrage, and was reckless, willful, wanton and consciously disregarded or was indifferent to Plaintiff's rights. As a result, Plaintiff is entitled to an award of punitive damages.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in its favor and against Defendants Lopatin, Land Base, Kim, Millar, Kondas, KM&A, Lu and Yang on Count Four of the First Amended Complaint, and:

(a) Award Plaintiff compensatory damages in the amount of at least $30,000,000 or such other amount as may be proved at trial;

(b) Award Plaintiff punitive damages in the amount of at least $10,000,000;

(c) Award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs incurred and such other and further relief as the Court may deem just.

## Count Five: Unjust Enrichment/Quasi Contract
### (Against Univest)

157. Plaintiff incorporates and re-alleges Paragraphs 1 through 156 as if fully set forth herein.

158. As set forth above, Plaintiff conferred a benefit on Defendant Univest in the amount of at least $10 million.

159. These circumstances described in the preceding paragraphs render it inequitable, unfair and unjust to allow Defendant Univest to retain any of the moneys it obtained from Plaintiff.

160. As a direct and proximate result of the unjust enrichment of Defendants, So is entitled to an award of damages in an amount to be proven at trial, but believed to be in excess of $10,000,000.

39
First Amended Complaint

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in its favor and against Defendant Univest on Count Five of the First Amended Complaint, and:

(a)     Award Plaintiff compensatory damages in the amount of at least $10,000,000 or such other amount as may be proved at trial; and

(b)     Award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs incurred and such other and further relief as the Court may deem just.

**Count Six: Unjust Enrichment/Quasi Contract**
**(Against the Conspiring Defendants and**
**Defendants Lu, Yang, Woodhead, Meltzer, KB&M and CTL)**

161.     Plaintiff incorporates and re-alleges Paragraphs 1 through 160 as if fully set forth herein.

162.     Plaintiff conferred a benefit on the Lopatin Defendants in the amount of at least $4,141,078.

163.     Plaintiff conferred a benefit on Defendants Millar, Kondas and KM&A in an amount greater than $600,000.

164.     Plaintiff conferred a benefit on Defendants Lu and Yang in an amount of approximately $800,000.

165.     Upon information and belief, Defendants Woodhead, Kim, Meltzer, KB&M and CTL each came to possess an amount greater than $75,000 of those funds deposited by So into the Private Placement Project and thus, Plaintiff conferred a benefit on these Defendants.

166.     These circumstances render it inequitable, unfair and unjust to allow these Defendants to retain any of the moneys they fraudulently obtained from Plaintiff.

167.    As a direct and proximate result of the unjust enrichment of the Lopatin Defendants, So is entitled to an award of damages in an amount to be proven at trial, but believed to be in excess of $4,000,000.00.

168.    As a direct and proximate result of the unjust enrichment of Defendants Millar, Kondas and KM&A, So is entitled to an award of damages in an amount to be proven at trial, but believed to be in excess of $600,000.

169.    As a direct and proximate result of the unjust enrichment of Defendants Lu and Yang, So is entitled to an award of damages in an amount to be proven at trial, but believed to be approximately $800,000.

170.    As a direct and proximate result of the unjust enrichment of Defendants Woodhead, Kim, Meltzer, KB&M and CTL, So is entitled to an award of damages in an amount to be proven at trial, but believed to be in excess of $75,000.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in its favor and against Defendants Lopatin, Land Base, Kim, Millar, Kondas, KM&A, Lu, Yang, Woodhead, Meltzer, KB&M and CTL on Count Six of the Complaint, and:

(a)    Award Plaintiff compensatory damages against Defendants Lopatin and Land Base in the amount of at least $4,148,078, or such other amount as may be proved at trial;

(b)    Award Plaintiff compensatory damages against Defendants Millar, Kondas, and KM&A in the amount of at least $600,000, or such other amount as may be proved at trial;

(c)    Award Plaintiff compensatory damages against Defendants Lu and Yang in the amount of approximately $800,000, or such other amount as may be proved at trial.

(d)    Award Plaintiff compensatory damages against Defendants Woodhead, Kim, Meltzer, KB&M and CTL in an amount to be proved at trial, but in excess of $75,000; and

41
First Amended Complaint

(e)     Award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs incurred and such other and further relief as the Court may deem just.

### Count Seven:  Constructive Trust
### (Against Defendant Univest)

171.    Plaintiff incorporates and re-alleges Paragraphs 1 through 170 as if fully set forth herein.

172.    As set forth herein, on or about April 20, 2005, Univest came to possess approximately $10 million of So's funds.   Specifically, Brown arranged to transfer approximately $10 million of the $30 million of So's funds deposited into an account maintained by Brown at HSBC to Defendant Univest.  Therefore, Univest took possession of these funds by fraud, accident, mistake, undue influence, the violation of a trust, or some other wrongful act.

173.    At all times relevant hereto, So's rights to these funds were superior to any rights possessed by Univest.

174.    Therefore, Univest became and is an involuntary trustee for these funds, which it has held for the benefit of Mr. So, who would otherwise have had it.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in his favor and against Defendant Univest on Count Seven of the First Amended Complaint, and:

(a)     Order Univest to restore funds in the amount of at least $10,000,000, or such other amount as may be proved at trial, to Plaintiff; and

(b)     Award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs incurred and such other and further relief as the Court may deem just.

### Count Eight: Constructive Trust
### (Against the Conspiring Defendants and
### Defendants Lu, Yang, Woodhead, Meltzer, KB&M and CTL)

175.   Plaintiff incorporates and re-alleges Paragraphs 1 through 174 as if fully set forth herein.

176.   As set forth herein, the Lopatin Defendants came to possess at least $4,141,078 of So's funds.   Specifically, the Lopatin Defendants accepted these funds as their portion of purported profits from trades they knew did not occur.   The Lopatin Defendants took possession of these funds by fraud, accident, mistake, undue influence, the violation of a trust, or some other wrongful act.

177.   As set forth herein, Defendants Millar, Kondas and KM&A came to possess at least $600,000 of So's funds.   Specifically, these Defendants accepted these funds as a portion of purported profits from trades that each knew did not occur.   These Defendants took possession of these funds by fraud, accident, mistake, undue influence, the violation of a trust, or some other wrongful act.

178.   As set forth herein, Defendants Lu and Yang came to possess approximately $800,000 of So's funds.   Specifically, these Defendants accepted these funds as proceeds from the fraudulent Private Placement Project.   These Defendants took possession of these funds by fraud, accident, mistake, undue influence, the violation of a trust, or some other wrongful act.

179.   Upon information and belief, Defendants Woodhead, Kim, Meltzer, KB&M and CTL each came to possess an amount greater than $75,000 of those funds deposited by So into the Private Placement Project.   These Defendants took possession of So's funds by fraud, accident, mistake, undue influence, the violation of a trust, or some other wrongful act.

180.   At all times relevant hereto, So's rights to these funds were superior to any rights possessed by each of Defendant subject to this Count.

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 45 of 91   Page ID
#:6160
Case 2:08-cv-03336-DDP-AGR   Document 95   Filed 01/16/09   Page 44 of 56

181.   Therefore, these Defendants became and serve as involuntary trustees for the funds, which they have held for the benefit of Mr. So, who would otherwise have had it.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in his favor and against Defendants Lopatin, Land Base, Kim, Millar, Kondas, KM&A, Lu, Yang, Meltzer, Woodhead, KB&M and CTL on Count Eight of the First Amended Complaint, and:

(a)   Order Defendants Lopatin and Land Base to restore funds in the amount of at least $4,141,078, or such other amount as may be proved at trial, to Plaintiff;

(b)   Order Defendants Millar, Kondas, and KM&A to restore funds in the amount of at least $600,000, or such other amount as may be proved at trial, to Plaintiff;

(c)   Order Defendants Yang and Lu to restore funds in the amount of approximately $800,000, or such other amount as may be proved at trial, to Plaintiff;

(d)   Order Defendants Woodhead, Kim, Meltzer, KB&M and CTL to restore funds in an amount to be proved at trial, but in excess of $75,000, to Plaintiff; and

(e)   Award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs incurred and such other and further relief as the Court may deem just.

### Count Nine:  Civil Conspiracy
### (Against the Conspiring Defendants and Defendants Lu and Yang)

182.   Plaintiff incorporates and re-alleges Paragraphs 1 through 181 as if fully set forth herein.

183.   Defendants, acting as a malicious concern or combination of two or more persons, agreed upon a common objective to be accomplished involving unlawful and tortious acts and unlawful purposes, as described fully herein.  These unlawful acts and purposes included the perpetration of a fraud upon So, the intentional concealment of material facts, and breach of fiduciary and trust duties.

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 46 of 91   Page ID
#:6161
Case 2:08-cv-03336-DDP-AGR   Document 95   Filed 01/16/09   Page 45 of 56

184.    Each Defendant committed one or more unlawful overt acts in furtherance of the common objective, including committing the fraudulent acts described in Counts I and III, above.

185.    Each Defendant acted with malice toward Plaintiff and intent to cause him monetary and other injury.

186.    As a proximate result of Defendants' conspiracy and illegal acts carried out in furtherance of the conspiracy, Plaintiff incurred injury and pecuniary loss, for which he is entitled to actual and consequential damages in an amount to be proven at trial, but believed to be in excess of $30,000,000.

187.    Defendants' conduct was intentional and deliberate, and involved circumstances of malice, fraud, bad faith, bad motive, circumstances of aggravation or outrage, and was reckless, willful, wanton and in conscious disregard or indifference to Plaintiff's rights.  As a result, Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in its favor and against Defendants Lopatin, Land Base, Kim, Millar, Kondas, KM&A, Lu and Yang on Count Nine of the Complaint, and:

(a)    Award Plaintiff compensatory damages in the amount of at least $30,000,000 or such other amount as may be proved at trial;

(b)    Award Plaintiff punitive damages in the amount of at least $10,000,000; and

(c)    Award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs incurred and such other and further relief as the Court may deem just.

### Count Ten:  Respondeat Superior
### (Against the Lopatin Defendants and Woodhead)

188.   Plaintiff incorporates and re-alleges Paragraphs 1 through 187 as if fully set forth herein.

189.   At all relevant time periods stated herein, Lopatin acted as an officer, director, agent, sub-agent, partner, joint venturer, employee, and/or controlling person of Land Base.

190.   At all relevant time periods stated herein, Woodhead acted as an officer, director, agent, sub-agent, partner, joint venturer, employee, and/or controlling person of Land Base.

191.   At all relevant time periods stated herein, Lopatin acted as a partner of and joint venturer with Woodhead.

192.   At all relevant time periods stated herein, Woodhead acted as partner of and joint venturer with Lopatin.

193.   At all relevant time periods stated herein, Land Base held out to the public and to So that Lopatin and Woodhead were qualified, competent, worthy of trust and confidence, and duly appointed principals of Land Base, and members of Land Base's management team.

194.   Thus, at all relevant time periods stated herein, the knowledge and conduct of Lopatin and Woodhead was directly attributable and imputable to each other and to Land Base.

195.   In addition, at all relevant time periods stated herein, Lopatin and Woodhead acted as agents, partners, and/or joint venturers of each other and Land Base.  Thus, at all relevant time periods stated herein, the knowledge and conduct of Lopatin and Woodhead was directly attributable and imputable to each other and Land Base.

196.   At all relevant time periods herein, Defendant Land Base:

(a)   Had actual or imputed knowledge of the acts, conduct, representations, and omissions of their respective agents and representatives;

46
First Amended Complaint

(b) Accepted the benefits of the acts, conduct, representations, and omissions of their respective agents and representatives;

(c) Exercised inadequate supervision over the acts, conduct, representations, and omissions of their respective agents and representatives.

197. At all relevant time periods herein, Defendants Woodhead and Lopatin:

(a) Had actual or imputed knowledge of the acts, conduct, representations, and omissions of their respective partners and/or joint venturers;

(b) Accepted the benefits of the acts, conduct, representations, and omissions of their respective partners and/or joint venturers;

(c) Exercised inadequate supervision over the acts, conduct, representations, and omissions of their respective partners and/or joint venturers.

198. Land Base is jointly and severally liable for all actual, consequential, restitutionary, and/or punitive damages assessed against Lopatin and/or Woodhead on the basis of *respondeat superior* and/or their status as officers, directors, agents, sub-agents, employees, partners, and/or joint venturers of these Defendants.

199. Lopatin and Woodhead are jointly and severally liable for all actual, consequential, restitutionary, and/or punitive damages assessed against each of them on the basis of *respondeat superior* and/or their status as partners and/or joint venturers.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in its favor and against Defendants Land Base, Lopatin and Woodhead on Count Ten of the First Amended Complaint, and:

(a)     Hold that Land Base is jointly and severally liable for all actual, consequential, restitutionary, and/or punitive damages assessed against Lopatin and/or Woodhead on the basis of *respondeat superior* and/or their status as officers, directors, agents, sub-agents, employees, partners, and/or joint venturers of these Defendants;

(b)     Hold that Lopatin and Woodhead are jointly and severally liable for all actual, consequential, restitutionary, and/or punitive damages assessed against each other on the basis of *respondeat superior* and/or their status as partners and/or joint venturers.

(c)     Award Plaintiff such other and further relief as the Court may deem just.

### Count Eleven: Respondeat Superior
### (Against Millar, Kondas and KM&A)

200.    Plaintiff incorporates and re-alleges Paragraphs 1 through 199 as if fully set forth herein.

201.    At all relevant time periods stated herein, Millar acted as an officer, director, agent, sub-agent, partner, joint venturer, employee, and/or controlling person of KM&A.

202.    At all relevant time periods stated herein, Kondas acted as an officer, director, agent, sub-agent, partner, joint venturer, employee, and/or controlling person of KM&A.

203.    At all relevant time periods stated herein, Millar acted as a partner of and joint venturer with Kondas.

204.    At all relevant time periods stated herein, Kondas acted as partner of and joint venturer with Millar.

205.    At all relevant time periods stated herein, KM&A held out to the public and to So that Millar and Kondas were qualified, competent, worthy of trust and confidence, and duly appointed principals of KM&A, and members of KM&A's management team.

206.   Thus, at all relevant time periods stated herein, the knowledge and conduct of Millar and Kondas was directly attributable and imputable to each other and to KM&A.

207.   In addition, at all relevant time periods stated herein, Millar and Kondas acted as agents, partners, and/or joint venturers of each other and KM&A.  Thus, at all relevant time periods stated herein, the knowledge and conduct of Millar and Kondas was directly attributable and imputable to each other and KM&A.

208.   At all relevant time periods herein, Defendant KM&A:

   (a)   Had actual or imputed knowledge of the acts, conduct, representations, and omissions of their respective agents and representatives;

   (b)   Accepted the benefits of the acts, conduct, representations, and omissions of their respective agents and representatives;

   (c)   Exercised inadequate supervision over the acts, conduct, representations, and omissions of their respective agents and representatives.

209.   At all relevant time periods herein, Defendants Millar and Kondas:

   (a)   Had actual or imputed knowledge of the acts, conduct, representations, and omissions of their respective partners and/or joint venturers;

   (b)   Accepted the benefits of the acts, conduct, representations, and omissions of their respective partners and/or joint venturers;

   (c)   Exercised inadequate supervision over the acts, conduct, representations, and omissions of their respective partners and/or joint venturers.

210.   KM&A is jointly and severally liable for all actual, consequential, restitutionary, and/or punitive damages assessed against Millar and/or Kondas on the basis of *respondeat*

First Amended Complaint

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 51 of 91   Page ID
#:6166
Case 2:08-cv-03336-DDP-AGR   Document 95   Filed 01/16/09   Page 50 of 56

*superior* and/or their status as officers, directors, agents, sub-agents, employees, partners, and/or joint venturers of these Defendants.

211.   Millar and Kondas are jointly and severally liable for all actual, consequential, restitutionary, and/or punitive damages assessed against each of them on the basis of *respondeat superior* and/or their status as partners and/or joint venturers.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in its favor and against Defendants Millar, Kondas and KM&A on Count Eleven of the First Amended Complaint, and:

(a)   Hold that KM&A is jointly and severally liable for all actual, consequential, restitutionary, and/or punitive damages assessed against Millar and/or Kondas on the basis of *respondeat superior* and/or their status as officers, directors, agents, sub-agents, employees, partners, and/or joint venturers of these Defendants;

(b)   Hold that Millar and Kondas are jointly and severally liable for all actual, consequential, restitutionary, and/or punitive damages assessed against each other on the basis of *respondeat superior* and/or their status as partners and/or joint venturers.

(c)   Award Plaintiff such other and further relief as the Court may deem just.

### Count Twelve: Lack of Separate Corporate Existence/Alter Ego (Relating to Lopatin, Woodhead, and Land Base)

212.   Plaintiff incorporates and re-alleges Paragraphs 1 through 211 as if fully set forth herein.

213.   At all times relevant hereto, Lopatin and Woodhead owned 100% of Land Base and exercised complete domination and control of Land Base and its purported assets, such that Land Base is or was a mere instrumentality of Lopatin and Woodhead.

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 52 of 91   Page ID
#:6167
Case 2:08-cv-03336-DDP-AGR   Document 95   Filed 01/16/09   Page 51 of 56

214.    Lopatin and Woodhead have used their domination and control of Land Base and its assets to commit and to cause fraud, public wrong, and similar injustice, as described herein.

215.    Lopatin and Woodhead have used their domination and control of Land Base to commit and cause violations of legal duties, as described herein.

216.    The domination and control of Land Base by Lopatin and Woodhead has directly and proximately caused the injury and unjust loss sustained by So, as described herein.

217.    Under agency, alter ego, and piercing the corporate veil principles, Lopatin and Woodhead are liable for the amounts owed by Land Base, including all actual, consequential, restitutionary and punitive damages sustained by So as a result of Land Base's breach of contract and tortious conduct.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter a declaratory judgment on Count Twelve of the First Amended Complaint:

(a)    Holding that the corporate form of Land Base may be ignored and any liability of that entity proved by the evidence in this case shall be borne, jointly and severally, by Lopatin and Woodhead; and

(b)    Awarding Plaintiff such other and further relief as the Court may deem just.

**Count Thirteen: Lack of Separate Corporate Existence/Alter Ego
(Relating to Kondas, Millar and KM&A)**

218.    Plaintiff incorporates and re-alleges Paragraphs 1 through 217 as if fully set forth herein.

219.    At all times relevant hereto, Millar and Kondas owned 100% of KM&A and exercised complete domination and control of KM&A and its purported assets, such that KM&A is or was a mere instrumentality of Millar and Kondas.

220.   Millar and Kondas have used their domination and control of KM&A and its assets to commit and to cause fraud, public wrong, and similar injustice, as described herein.

221.   Millar and Kondas have used their domination and control of KM&A to commit and cause violations of legal duties, as described herein.

222.   The domination and control of KM&A by Millar and Kondas has directly and proximately caused the injury and unjust loss sustained by So, as described herein.

223.   Under agency, alter ego, and piercing the corporate veil principles, Millar and Kondas are liable for the amounts owed by KM&A, including all actual, consequential, restitutionary and punitive damages sustained by So as a result of KM&A's breach of contract and tortious conduct.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter a declaratory judgment on Count Thirteen of the First Amended Complaint:

(a)   Holding that the corporate form of KM&A may be ignored and any liability of that entity proved by the evidence in this case shall be borne, jointly and severally, by Millar and Kondas; and

(b)   Awarding Plaintiff such other and further relief as the Court may deem just.

### Count Fourteen: Breach of Contract
### (Lopatin, Woodhead and Land Base)

224.   Plaintiff incorporates and re-alleges Paragraphs 1 through 223 as if fully set forth herein.

225.   The Land Base Agreement constituted a valid and existing contract between So and Land Base, Lopatin and Woodhead (although some of its provisions may well be unenforceable).

226.   All conditions precedent to the enforcement of the Land Base Agreement and Plaintiff's right to enforce thereunder have been met or otherwise satisfied.

227.   Kevin So at all times complied with the Agreement and fully performed his obligations.

228.   Defendants breached the Agreement, *inter alia*, by: (1) failing to ensure that So's principal investment was safe; and (2) allowing So's principal investment to be depleted.

229.   Defendants' actions constitute breach of contract.  So suffered irreparable harm as a direct and proximate result of Defendants' breach.  Additionally, So suffered monetary and other damages to its reputation and good will as a direct and proximate result of Defendants' unlawful actions, omissions and breach of contract.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in its favor and against Defendants Lopatin, Woodhead and Land Base on Count Fourteen of the First Amended Complaint, and:

(a)   Award Plaintiff compensatory damages in the amount of at least $27,000,000 or such other amount as may be proved at trial; and

(b)   Award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs incurred and such other and further relief as the Court may deem just.

### Count Fifteen:  Breach of Fiduciary Duty
### (Against  Lopatin, Woodhead, Land Base, Millar, Kondas, KM&A, Lu and Yang)

230.   Plaintiff incorporates and re-alleges Paragraphs 1 through 229 as if fully set forth herein.

231.   Defendants Lopatin, Woodhead, and Land Base, by the Land Base Agreement, agreed to safeguard So's investment.  Therefore, these Defendants owed Kevin So a fiduciary duty and were required to exercise the utmost good faith and loyalty toward Kevin So.

232.   Defendants Millar, Kondas, and KM&A, by virtue of their agreeing to locate a viable investment opportunity for So, owed So a fiduciary duty and were required to exercise the utmost good faith and loyalty toward Plaintiff.

233.   Defendants Lu and Yang, by agreeing to represent So with respect to his efforts to locate a viable investment opportunity, owed So a fiduciary duty and were required to exercise the utmost good faith and loyalty toward Plaintiff.

234.   As fiduciaries, Defendants Lopatin, Woodhead, and Land Base owed So, *inter alia*, the duty to ensure that the principal amount of So's investment was not depleted.

235.   Moreover, Defendants Lopatin, Woodhead, Land Base, Millar, Kondas, KM&A, Lu and Yang each maintained a duty and obligation to act in the best interest of So, to inform So of every development affecting that interest, and not to profit to the detriment of So.

236.   These Defendants breached their fiduciary duty to So, *inter alia,* by (a) failing to safeguard the principal amount of So's investment; (b) failing to inform So about the nature of the Defendants' own involvement and interest in the Private Placement Project; (c) failing to keep So informed of Brown's failure to execute trades; (d) acting against So's interests by profiting from the Private Placement Project; and (e) otherwise concealing, failing to disclose and misrepresenting material facts, as fully described above, regarding the Private Placement Project.

237.   As a direct and proximate cause of Defendants' multiple breaches of their fiduciary duty, So has suffered and continues to suffer significant monetary and other damages.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in its favor and against Defendants Lopatin, Woodhead, Land Base, Millar, Kondas, KM&A, Lu and Yang on Count Fifteen of the First Amended Complaint, and:

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 56 of 91   Page ID
#:6171
Case 2:08-cv-03336-DDP-AGR   Document 95   Filed 01/16/09   Page 55 of 56

(a)     Award Plaintiff compensatory damages in the amount of at least $30,000,000 or such other amount as may be proved at trial;

(b)     Award Plaintiff punitive damages in the amount of at least $10,000,000; and

(c)     Award Plaintiff pre-judgment interest, post-judgment interest, reasonable attorneys' fees, costs incurred and such other and further relief as the Court may deem just.

## Count Sixteen:  Accounting
### (Against All Defendants)

238.   Plaintiff incorporates and re-alleges Paragraphs 1 through 237 as if fully set forth herein.

239.   By virtue of the facts and circumstances described in this Complaint, Kevin So is entitled to a full accounting of all sales, transfers, assignments, liens, encumbrances, or other dispositions of any and all of Defendants' funds and/or assets since January 1, 2005 and until the present, and a full accounting of all ownership interests that have been issued to anyone in any entity or entities that currently own or formerly owned such assets or projects.

WHEREFORE, Plaintiff Kevin So respectfully requests that this Court enter judgment in its favor and against Defendants on Count Sixteen of the First Amended Complaint and Order a full accounting as described herein.

## JURY DEMAND

Plaintiff Kevin So demands a trial by jury on all issues raised in this First Amended Complaint for which a jury trial is available.

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 57 of 91   Page ID
#:6172
Case 2:08-cv-03336-DDP-AGR   Document 95   Filed 01/16/09   Page 56 of 56

1   Dated December 18, 2008

2                                          Respectfully submitted,

3                                          KALBIAN HAGERTY L.L.P.

4                                          _Michelle Douglas_

5                                          Haig V. Kalbian (*pro hac vice*)
                                           D. Michelle Douglas (CA Bar No. 190248)
6                                          Aaron W. Knights (*pro hac vice*)
                                           888 17th Street, N.W., Suite 1000
7                                          The Brawner Building
                                           Washington, D.C. 20006
8                                          Phone:     (202) 223-5600
                                           Facsimile:  (202) 223-6625
9

10                                         *Counsel for Plaintiff Kevin So*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 58 of 91   Page ID
#:6173
Case 2:08-cv-03336-DDP-AGR      Document 95-2      Filed 01/16/2009      Page 1 of 2

**EXHIBIT A**

The Hongkong and Shanghai Banking Corporation Limited 香港上海滙豐銀行有限公司
Network Services Centre, Payment Services Department 電腦服務中心・付款部

DUPLICATE ADVICE

REMITTANCES ADVICE   匯款通知書

| Transaction Reference 交易編號 | |
| --- | --- |
| TT   G2C183636 | 20 APR 2005 |

HSBC BANK PLC                                                LONDON

TT   G2C183636

```
                    TO  HSBC BANK PLC
                        INTL DIVISION LONDON
                    F/O 5TH AVENUE PARTNERS LTD/SO KEVIN/
                        LU YAN LUCY
                    A/C 60947833
                    O/O MR SO KEVIN + MS LU YAN LUCY
                    DTL REF SO KEVIN/LU YAN LUCY
                        MESSAGE FOR A/C 625-019930 DEP 0001
                    AID.G SH MIDLGB22
              BK TO BK /ACC/YR OFC AT 1 SOUTH PLACE THE
                        //HELICON LONDON EC2M 5C 40-05-15


TT AMOUNT           USD 30000,000.00
TOTAL CHARGES       HKD       160.00 DR 625-018437-880
DR AMOUNT           USD 30000,000.00 DR 625-019930-0001
```

 

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 60 of 91   Page ID
#:6175
Case 2:08-cv-03336-DDP-AGR   Document 95-3   Filed 01/16/2009   Page 1 of 5

**EXHIBIT B**

KS/4

# 5TH AVENUE PARTNERS LTD

28 Upper Brook St, London W1K 7QE
Tel: (020) 729 78464 Fax: (020) 729 78479
https://www.5ave.co.uk

## Exhibit "HSA"
## Irrevocable Bank Instruction

To: Jackie Arnull
    HSBC Bank Plc
    1 South Place
    London
    EC2M

We, 5th Avenue Partners Ltd, on behalf of our client, So Kevin and / or Lu Yan Lucy hereby irrevocably instruct you to proceed with the following:

1. Purchase or cause to be purchased Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's, as directed by undersigned, 5th Avenue Partners Ltd. Execute the re-sale of such herein described Fixed Income Instruments (Assets) as directed by undersigned, 5th Avenue Partners Ltd. Benefits due to the trade shall be disbursed as directed by undersigned, 5th Avenue Partners Ltd, as stated below:

*So Kevin and / or Lu Yan Lucy shall receive an amount of Fifty Percent (50%) of the "Benefits generated due to each trading Cycle Activities up to the trading amount of Four Times of the approximate Principal Amount of Thirty Million dollars ($30,000,000.00)". "Benefits generated due to each trading Cycle Activities up to the trading amount of Four Times of the approximate Principal Amount of Thirty Million dollars ($30,000,000.00)" shall be defined as the differential between Gross Amount of Funds that is utilized to Purchase Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's and the re-sale of hereto-purchased Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's. Benefits to So Kevin and / or Lu Yan Lucy shall be paid without any deductions of Bank fees, other Professional Services fees and Intermediaries (Introducing Parties) fees (if any). Benefits to 5th Avenue Partners Ltd. shall be the rest of the revenue benefits generated and paid with deductions of Bank fees, Professional Services fees and Intermediaries (Introducing Parties) fees (if any). The benefits shall be paid at the 5th Avenue Partners Ltd. Instructions to the accounts as instructed by the 5th Avenue Partners Ltd.*

5

# 5TH AVENUE PARTNERS LTD

28 Upper Brook St, London W1K 7QE
Tel: (020) 729 76484 Fax: (020) 729 76479
https://www.5ave.co.uk

2. Upon receipt and clearance of the payments for the Fixed Income Instruments (Assets), into this segregated account please proceed with further Purchase of Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's, as directed by undersigned, 5th Avenue Partners Ltd. Also execute the further re-sale of such hereto described Fixed Income Instruments (Assets) as directed by undersigned, 5th Avenue Partners Ltd. Distribution of revenue benefits shall be as above stated.

3. Please ensure that all transactions with regard to Fixed Income Instruments (Assets) and/or corporate bonds shall be settled and cleared through DTC or Euroclear, or Clearstream.

4. All counterparties to each Transaction shall be solely comprised of major licensed financial institutions, professional broker-dealers, or other recognized and approved institutional entities.

5. Under no circumstances shall Principal amount of funds deposited in the amount of Thirty Million United States Dollars ($30,000,000.00) be permitted to be withdrawn, unless as stated hereto and for the payment of wire charges (if any).

6. All bank fees excluding wire charges shall be paid by undersigned, 5th Avenue Partners Ltd.

7. These Irrevocable Instructions shall be valid until the Instruction of Termination and Closing of said account. At the time of Account closure please remit the Principal amount of funds in the amount of Thirty Million United States Dollars ($30,000,000.00) with deduction of wire charges (if any) to the following Bank account:

| | |
|---|---|
| Bank: | The Hongkong and Shanghai Banking Corporation Limited |
| Address: | Convention Plaza HSBC Premier Centre |
| | Shop No. 103 1/F Shopping Arcade Convention Plaza 1 |
| | Harbour Road, Wan Chai, Hong Kong |
| Fax: | 2824 1380 |
| Telex: | 73205 hsbc hk |
| Account No: | 625-019930 |
| Account Name: | Mr. So Kevin and Ms. Lu Yan Lucy |

6

23

# 5ᵀᴴ AVENUE PARTNERS LTD

26 Upper Brook St, London W1K 7QE
Tel: (020) 729 76404 Fax: (020) 729 76479
https://www.5ave.co.uk

Sincerely,

5th Avenue Partners Ltd

*April 11, 2005*
CC: So Kevin and Lu Yan Lucy

Receipt Acknowledgement:
(Bank)

HSBC Bank plc
THE HEALTON
1 SOUTH PLACE
LONDON
EC2M 2UP

MOORGATE

24

# 5TH AVENUE PARTNERS LTD

26 Upper Brook St, London W1K 7QE
Tel: (020) 729 70404 Fax: (020) 729 70470
https://www.5ave.co.uk

| | |
|---|---|
| Name of Bank : | HSBC Bank Plc |
| Address: | 1 South Place, |
| | The Holleon |
| | London |
| | EC2M |
| | |
| SWIFT: | MIDLGB2L |
| Sort Code: | 40-05-15 |
| Account Number: | 89947633 |
| Name of Account: | 5th Avenue Partners Ltd/ So Kevin/Lu Yan Lucy |
| REFERENCE: | So Kevin/Lu Yan Lucy |

Please note that it is imperative to put the reference on the transfer as without this reference the funds  shall be returned.

Thank you

5th Avenue Partners Ltd., a company registered in England and Wales, registered office is 19 Grosvenor Street, London SC1N 2EE.
A wholly owned subsidiary of 5 Avenue Partners Group, registered at 11, Oll 9005 Zug, Switzerland

**EXHIBIT C**

This Confidential Private Enterprise Document in its Entirety, and Total Contents, including Transactions, Procedures, with all Facets and Counterparts Thereof, are the Exclusive Properties of Land Base, LLC, and are "Trade Secrets", Protected Under the "Economic Espionage Act".

## PRIVATE ENTERPRISE ASSETS EXCHANGE BENEFITS PARTICIPATION AGREEMENT
### (Hereinafter Referred to as: Transaction Code: 8885276-723)

Article 1. Parties.

1.1   Land Base, LLC, a management team of individuals and / or corporate entities, and / or foundation represented by Mr. Boris Lopatin, of Land Base, LLC, P.O. Box 586, Beverly Hills, Ca. 90213 USA, United States of America citizen of Legal Age, bearer of United States Passport Number: 038825561 (Telephone: +1 310 917 1218, Facsimile No.: +1 310 393-7216, Mobil: +1 310 901-7474, E-mail: landbasellc@aol.com)(Hereinafter referred to as: "LB")

1.2   So Kevin and / or Lu Yan Lucy, a management team of individuals and / or corporate entities represented by Mr. So Kevin, Hong Kong Special Administrative Region, Peoples Republic Of China citizen of Legal Age, bearer of Hong Kong Special Administrative Region, Peoples Republic Of China Passport No: HA9022486, FT B 21/F Tower 1Park Towers, 1 King's Road North Point HK, HK SAR, Telephone: +86-20-3873-0888, Facsimile: +86-20-3873-0999, and / or Lu Yan Lucy, Canadian citizen of Legal Age, bearer of Canadian Passport No: VK095744, 51 Kimbark Crescent , Markham, Ontario, L3R 8P5 Canada, Telephone: +1 416 837-7687, Facsimile: +1 905 513-0552, E-mail: yanglucy@rogers.com (hereinafter referred to as: "SKLYL").

1.3   LB and SKLYL shall hereinafter be referred to collectively as the Parties. The Parties have concluded this Private Enterprise Assets Administration Benefit Participation Agreement (hereinafter referred to as Transaction Code: 8885276-723) at the Terms and Conditions as set forth hereinafter, and evidenced by this present Transaction Code: 8885276-723.

Article 2.   Representations

2.1   Whereas,        SKLYL has certain assets in the amount(s) as stated in Schedule(s) "A" ("A1", "A2", "A3", "A_", if any) (hereinafter referred to

Initials:              SKLYL:              LB:

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 67 of 91   Page ID
#:6182
Case 2:08-cv-03336-DDP-AGR   Document 95-4   Filed 01/16/2009   Page 3 of 21

This Confidential Private Enterprise Document in its Entirety, and Total Contents,
Including Transactions, Procedures, with all Facets and Counterparts Thereof, are the
Exclusive Properties of Land Base, LLC, and are "Trade Secrets", Protected Under the
"Economic Espionage Act"

as the Assets) and has the intent and the capacity to place the Assets, for
the purpose herein set forth into an account in a mutually acceptable
bank, (hereinafter referred to as SKLYL's Account), and

2.2    Whereas,     LB has the capability to administer the exchange of the
assets under the terms hereof to generate income for the benefit of the
Parties.

2.3    Whereas,     The Parties have mutually agreed to enter into
Transaction Code: 8885276-723, for the purpose of facilitating, and jointly
participating in the proceeds of a Private Placement Opportunities
(PPO), and in consideration of the mutual covenants and agreements
hereinafter set forth and other good and valuable consideration, the
receipt and sufficiency of which is hereby acknowledged, Parties hereby
represent and warrant to each other that they have the full legal authority
and power to enter into Transaction Code: 8885276-723, and that no
consent or approval of any third party shall be required as a condition of
the execution of Transaction Code: 8885276-723, or the performance of
either Party hereinafter. Parties hereby agree and acknowledge that the
execution of Transaction Code: 8885276-723, shall immediately establish
any and all relationships between them for the purposes of participating
in Transaction Code: 8885276-723, as set out herein.

Article 3. The Contributions, Warrants and Undertakings of the Parties.

3.1    SKLYL hereby agrees to provide Assets which are good, clean and clear
of non-criminal origin, free from any and all liens, encumbrances, and / or
restrictions of whatsoever nature, readily available, fully transferable, and
by affiliation are legally generated, and are not in breach of any Anti-
Money Laundering regulations as subscribed to member states of the
Financial Actions Task Force, an pan-national entity organized by the
Organization of Economic Cooperation and Development to initiate
Transaction Code: 8885276-723. SKLYL hereby warrants that no person,
entity, organization, group and / or country / state / nation that engages
in, and / or sponsors, and / or directs, and / or funds, and / or gives any
aid, comfort, and / or sanctuary or support, in any form and kind, to any
person, entity, organization, group and / or country / state / nation that
advocates, and / or engages in, and / or perpetrates acts of terrorism as
defined and / or designated, and / or recognized by the Government of

Initials:        SKLYL:             LB:

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 68 of 91   Page ID
#:6183
Case 2:08-cv-03336-DDP-AGR      Document 95-4      Filed 01/16/2009      Page 4 of 21



This Confidential Private Enterprise Document in its Entirety, and Total Contents, including Transactions, Procedures, with all Facets and Counterparts Thereof, are the Exclusive Properties of Land Base, LLC, and are "Trade Secrets", Protected Under the "Economic Espionage Act".

the United States of America, are not now, nor will they hereafter be a party to, share in, or derive any direct or indirect benefit from Transaction Code: 8885276-723.

3.2   That SKLYL also agrees and undertakes to assist LB in whatever way is necessary and generally to co-operate with LB and the parties structuring Transaction Code: 8885276-723, to the fullest, to ensure the successful completion of Transaction Code: 8885276-723, including but not limited to the provision of any and all due diligence material required by the various transacting parties, including regulatory authorities, and to execute without undue delay any and all documents and agreements required of SKLYL to facilitate Transaction Code: 8885276-723.

3.3   That SKLYL agrees and acknowledges that SKLYL has been informed through LB that in certain instances after the amount of benefits received by SKLYL, due to Transaction Code: 8885276-723, is in excess of One Hundred Million Dollars ($100MM) and then further to be defined in herein Schedule(s) "A1", ("A2", "A3", "A_", if any) not less than Seventy Five Percent (75%) of SKLYL portion of the than net proceeds of Transaction Code: 8885276-723 may be required, upon the agreement of both parties, whose consent shall not be unreasonably withheld, to be used for SKLYL's development and related purposes for the betterment of mankind, including but not limited to: the creation of long term permanent jobs, education, health and medical facilities, restructuring and rebuilding of communities and all forms of infrastructures, communications and related work, and as requested, to provide evidence of such SKLYL's projects and their approximate value in US Dollars. SKLYL further confirms that SKLYL was informed by LB, and SKLYL understands that the regulatory and the appropriate related United States and/or international authorities shall approve thereto SKLYL's Projects, and could require an audit of said expenditure.

3.4   That SKLYL agrees and acknowledges that in the event Transaction Code: 8885276-723 requires that the principal sum (funds) set as the value of the Assets be reserved in its bank to establish a value in another mutually acceptable bank, SKLYL will do all within SKLYL's power to arrange and facilitate such a reservation of value by giving an irrevocable direction to the bank holding the funds to reserve the value as per

Initials:          SKLYL:          LB:

This Confidential Private Enterprise Document in its Entirety, and Total Contents, including Transactions, Procedures, with all Facets and Counterparts Thereof, are the Exclusive Properties of Land Base, LLC, and are "Trade Secrets", Protected Under the "Economic Espionage Act"

SKLYL's direction, including but not limited to the reservation of said value to the other branch of bank currently holding the funds, or to such other bank as may be determined. That SKLYL agrees and acknowledges that in the event of Transaction Code: 8885276-723 requires the principal sum (funds) set as the value of the Assets be moved from its current bank to another mutually acceptable bank, SKLYL will do all within SKLYL's power to arrange and facilitate such a transfer of funds by giving an irrevocable direction to the bank holding the funds to transfer the funds as per SKLYL's direction, including but not limited to the transfer of said funds to the other branch of bank currently holding the funds, or to such other bank as may be determined.

3.5   That SKLYL will sign or if appropriate will procure the execution of any documents subsequently required to give proper and full effect to this document for exclusive administration of hereto exchanges of the Assets as stated in Schedule(s) "A" ("A1", "A2", "A3", "A⁴", if any) by LB, That SKLYL further agrees and undertakes to provide LB with copies of all correspondence in relation to Transaction Code: 8885276-723, and to enter such other agreements or undertakings as may be required, from time to time, in order to complete Transaction Code: 8885276-723, and meet the obligations of the Parties hereunder.

3.6   That SKLYL agrees and acknowledges that Transaction Code: 8885276-723 is being structured specifically to create Benefits to accommodate SKLYL's own major Projects and those of LB's, and that this Transaction Code: 8885276-723 is necessary in order to accommodate SKLYL and LB. SKLYL further agrees and acknowledges that SKLYL can not enter into Transaction Code: 8885276-723, of the type contemplated herein except by way of an invitation to participate.

3.7   That SKLYL acknowledges and agrees that SKLYL is a sophisticated investor, and that SKLYL has sufficient time to consult any and all professional, legal or other advisors it deemed necessary prior to entering into Transaction Code: 8885276-723. SKLYL further agrees and undertakes to hold LB free and clear of any liability, responsibility, expenses or obligation for any losses SKLYL may incur (outside of Transaction Code: 8885276-723) because of entering into Transaction Code: 8885276-723.

Initials:          SKLYL:          LB:



> This Confidential Private Enterprise Document in its Entirety, and Total Contents, including Transactions, Procedures, with All Facets and Counterparts Thereof, are the Exclusive Properties of Land Base, LLC, and are "Trade Secrets", Protected Under the "Economic Espionage Act"

3.8   That LB hereby agrees and warrants that through its extensive range of international contacts in the financial service industry, it has been negotiating with experienced professionals in the matter of identifying, structuring, and facilitating Transaction Code: 8885276-723, and that when all the necessary documents have been provided to these professionals by SKLYL and LB, LB will be in a position to introduce SKLYL to the Individual(s), and their respective firms, with whom LB has been successfully dealing in this matter.

3.9   That LB agrees and undertakes to work with SKLYL and assist SKLYL in establishing the necessary structure(s) to participate in Transaction Code: 8885276-723 including, as necessary, all negotiations and provision of documents etc.

3.10   The Parties hereto acknowledge and agree that Transaction Code: 8885276-723 herein, is structured with the services of qualified and experienced professionals who deal with the underlying Investment Managers, Professionals, and Banks and carry out a pivotal role in the identification, negotiation and structuring of Transaction Code: 8885276-723. In certain instances LB is authorized to purchase or to reserve or cause to be purchased *Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's or herein Assets for hereto Transaction Code: 8885276-723, or causing the purchase of Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's* Investment Grade Financial Instruments through various Joint Venture Agreements, as well as LB has rights to appoint Agents, Representatives, "Traders" for hereto Transaction Code: 8885276-723, or to cause the purchase and re/sell of, *Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's* to generate benefits as stated hereto.

3.11   That LB warrants and undertakes that at all times, SKLYL's Account must be holding either cash, *Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or*

Initials:          SKLYL:          LB:

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 71 of 91   Page ID
#:6186
Case 2:08-cv-03336-DDP-AGR     Document 95-4     Filed 01/16/2009     Page 7 of 21



This Confidential Private Enterprise Document in its Entirety, and Total Contents, Including Transactions, Procedures, with all Facets and Counterparts Thereof, are the Exclusive Properties of Land Base, LLC, and are "Trade Secrets", Protected Under the "Economic Espionage Act"

*better as evidenced by Standard and Poor's, or equivalent such as Moody's (if applicable) or combination thereof, of equal or greater value than the value of Assets on deposit, or may remain in the same form but reserved via Banking means.*

3.12   That due to LB's Assets Exchange Private Enterprise Administration Services and / or upon completion of *each trading Cycle Activities benefits are generated. "Benefits generated due to each trading Cycle Activities" shall be defined as the differential between Gross Amount of Funds that is utilized to Purchase Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's and the re-sale of hereto-purchased Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's,* or any other activities due to Transaction Code: 8885276-723, the benefits are to be generated and therefore shall be paid as hereinafter stated below.

3.13   Parties to this Transaction Code: 8885276-723, hereby warrant that this Transaction Code: 8885276-723, is not solicited and is non-security per the Security & Exchange Acts 1933/1934 and any and all-applicable amendments.

3.14   That Transaction Code: 8885276-723 does not create an employer/employee relationship, a partnership or a joint venture for tax purposes or for any other reason. Specifically, the Parties hereby agree that Transaction Code: 8885276-723 does not in any way constitute the formation of a partnership or a joint venture, and the Parties agree that each and every reasonable construction or interpretation of any of the terms, provisions, or conditions of this Transaction Code: 8885276-723 compels the conclusion that the formation of a partnership or a joint venture was not attempted and that neither a partnership nor a joint venture has been formed hereby. Thus, Transaction Code: 8885276-723 shall not be construed in any way as an agreement to form a partnership or a joint venture. Further, that Transaction Code: 8885276-723 shall not be construed as an Investment Management Agreement or an Agency with any and all Investment Institutions.  Furthermore, Transaction Code: 8885276-723 shall not be construed as establishing a Partnership

Initials:             SKLYL:              LB:

This Confidential Private Enterprise Document in its Entirety, and Total Contents, including Transactions, Procedures, with all Facets and Counterparts Thereof, are the Exclusive Properties of Land Base, LLC, and are "Trade Secrets", Protected Under the "Economic Espionage Act"

relationship between the Parties, nor an agency of one party to the other, nor any other joint venture business structure other than that intended herein that is being the provision of mutually essential services delivered on an equal basis for the benefit of the proposed business and the sharing and distribution of all revenue, net benefits and other disbursement as set out herein.

3.15   That each party shall be Individually and Separately Liable for any taxes or Government impositions of any sort that may be due on income arising out of Transaction Code: 8885276-723, and also any other individual debts, liabilities, contracts or obligations of such Party to Transaction Code: 8885276-723. That the Parties acknowledge and agree that each of them shall be responsible to make all required filing, including tax returns, with the Federal and/or State and /or Provincial Governments in which they are respectfully domiciled and to pay any and all taxes, imposts, or levies which may be assessed to any of them respectively. That the Parties hereby authorize each other to disclose any information or details relative to such payments, provided such a demand for disclosure is legally made upon them by any Federal, State or Provincial Tax Authority, the local Tax Office or by a valid Court Order and only written notice is received by the Party to be reported upon.

3.16   That any Change or Modification to Transaction Code: 8885276-723 shall only be made in writing and agreed to by both Parties. No verbal Agreement shall have any binding effect whatsoever. No previously negotiated Agreements (if any) shall have any binding effect whatsoever. All amendments must be executed by all of the Parties hereto. Transaction Code: 8885276-723, and amendments thereto, if any, applies to all transactions throughout the full term after termination of Transaction Code: 8885276-723 as well as throughout all extensions thereof, and this includes all transactions being discussed or in progress on the effective date of Transaction Code: 8885276-723, as well as all follow-up, repeat, extended, and renegotiated transactions. In all cases Termination of Transaction Code: 8885276-723, can only occur upon the completion of trading cycles , and satisfactory conclusion of any other contractual obligations that had been entered by LB as a result of Transaction Code: 8885276-723. It shall be expressly stated that the term of Transaction Code: 8885276-723, shall be five years from the date of the

Initials:            SKLYI:            LB:

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 73 of 91   Page ID
#:6188
Case 2:08-cv-03336-DDP-AGR      Document 95-4      Filed 01/16/2009      Page 9 of 21

This Confidential Private Enterprise Document in its entirety, and Total Contents,
including Transactions, Procedures, with all Facets and Counterparts Thereof, are the
Exclusive Properties of Land Base, LLC, and are "Trade Secrets", Protected Under the
"Economic Espionage Act"

last contact between the Parties regarding any matter that may relate,
either directly or indirectly, to Transaction Code: 8885276-723, including
any activity or transaction or other agreement or document that may
relate to Transaction Code: 8885276-723, either directly or indirectly. For
the purpose of this paragraph, the term "last contact" means any contact
that is made directly or through another person or intermediary and is
made orally and/or in writing and/or by electronic means. Therefore, the
full force and effect of Transaction Code: 8885276-723 with all of its
words, sentences, terms, provisions, conditions, and appendices; shall
govern any and all plans, actions, inactions, activities, communications,
documents, agreements, and any other matter or process that may relate,
either directly or indirectly, to the provision of services or the
performance of duties in accordance with Transaction Code: 8885276-723.
Transaction Code: 8885276-723 is effective immediately upon execution
for the full term even when the last contact occurred at the time of
execution and even though a Party makes the decision immediately upon
or after execution not to proceed with any type of business activity and
even though one or all activities and/or transactions fail or are not
concluded, regardless of the cause and reason.

3.17   All amendments to Transaction Code: 8885276-723 must be clearly
identified at the top of each page as an amendment. For example,
"AMENDMENT NUMBER 1 EFFECTIVE --------------, 200-. " Each
amendment shall clearly state the nature of the change to Transaction
Code: 8885276-723, so that the change can be clearly understood by
reading the amendment itself. An amendment that simply restates
Transaction Code: 8885276-723, without identifying changes is void even
if signed and dated by all signatories hereto.

3.18   The Parties hereby agree that all of the Parties are required to cooperate
closely with each other in order to achieve implementation of Transaction
Code: 8885276-723. The Parties hereby warrant that they will cooperate
closely with each other in good faith to implement herein Transaction
Code: 8885276-723.

3.19   That Transaction Code: 8885276-723 shall become legally binding and
have full effect when all signatories hereto have executed this document.
Transaction Code: 8885276-723 and Amendments thereto may be
executed in two or more counterparts, each of which shall be construed as

Initials:          SKLYL:                LB:

This Confidential Private Enterprise Document in its Entirety, and Total Contents, including Transactions, Procedures, with all Facets and Counterparts Thereof, are the Exclusive Properties of Land Base, LLC, and are "Trade Secrets", Protected Under the "Economic Espionage Act"

an original, and all of which shall constitute one and the same instrument. One copy of Transaction Code: 8885276-723 shall be lodged with SKLYL's Financial, Banking, Accounting or Legal Institution. In the event that any clause hereof shall be held to be invalid under the proper law hereof the remainder of Transaction Code: 8885276-723 shall remain valid and binding provided that the result thereof shall be to give substantial and proper effect to the terms hereof as executed by the Parties originally. Transaction Code: 8885276-723 shall be binding on the Parties hereto, their heirs, successors, and assigns by any course of events or legal action.

3.20   The Parties hereby agree that either Party without written consent of Both Parties may not assign Transaction Code: 8885276-723.

3.21   The Parties warrant and attest to each other with full responsibility that they are fully authorized and competent to enter into Transaction Code: 8885276-723 and are bound by its terms.

3.22   With respect to each transaction, SKLYL hereto specifically warrants and agrees that he will disclose to LB the name, address, telephone number, and facsimile numbers of all agents, intermediaries, and persons who may have made referrals (if any). SKLYL shall make all such disclosures immediately upon execution of Transaction Code: 8885276-723. Disclosure of the names, addresses, telephone numbers, and facsimile numbers of persons or firms who are intermediaries or referrals but who are not executing Transaction Code: 8885276-723 must be disclosed to LB who shall have knowledge of such persons or firms.

3.23   Neither Party shall be liable for any failure under the "Force Majeure Clause" as stated in the International Chamber of Commerce (ICC) Paris, rules and regulations, which are deemed to be incorporated herein.

3.24   The Parties agree that Transaction Code: 8885276-723 is valid for Five (5) years and is automatically renewable for an additional Five (5) years unless terminated under the terms hereof. No Party hereto shall, after the initial or extended term of Transaction Code: 8885276-723, use to his own advantage, or to the advantage of any other person, corporation, firm, partnership, trust, or representative of any government agency or

Initials:          SKLYL:                    LB:

This Confidential Private Enterprise Document in its Entirety, and Total Contents, including Transactions, Procedures, with all Facets and Counterparts Thereof, are the Exclusive Properties of Land Base, LLC, and are "Trade Secrets", Protected Under the "Economic Espionage Act"

ministry, any identifying or other information gained for or from the files or business of the other.

3.25   In the event that SKLYL wishes to terminate Transaction Code: 8885276-723 and to withdraw the Assets due to no return of above market rates as indicated by US Department of Treasury, SKLYL may provide Thirty (30) London, UK business days written notice to LB after initial Thirty (30) London, UK business days but within initial Ninety (90) London, UK business days, during the first year, and within Ninety (90) to Sixty (60) London, UK, business days period, prior to the following yearly anniversaries. LB shall have the same right to termination by similar written notice. In all cases Termination of Transaction Code: 8885276-723, can only occur upon the completion of trading cycles, and satisfactory conclusion of any other contractual obligations that had been entered by LB as a result of Transaction Code: 8885276-723.

3.26   All notices or other communications required or permitted to be given hereunder shall be in writing and shall be delivered personally or mailed, certified mail, return receipt requested, postage prepaid, or in a manner to insure mail delivery and evidence thereof, to the Party's last known valid address.

Article 4. Non-disclosure, Non-circumvention, Good Faith.

The Parties hereto undertake to protect each other regarding standard nondisclosure and non-circumvention practices and to act at all times in good faith towards each other herein and in any subsequent transactions, extensions, additions or otherwise, as well as to maintain a "Total Silence".

4.1 Proprietary Interest.      Each Party to this Transaction Code: 8885276-723 agrees to respect the proprietary interests and rights (hereinafter "the Property") of the other Party. Property shall include locations, communication numbers, documents, contracts, relationships and any and all relevant information relating to the herein Transaction Code: 8885276-723 including but not limited to the Banking relationships. Each and every associated Principal party introduced by one Party to another or by the other shall remain the exclusive Property of the introducing Party. Confidential information is the property and the business secret of a Party, notwithstanding disclosure by a Party or by a non-party source. Each Party

Initials:                 SKLYL:                    LB:

---

This Confidential Private Enterprise Document in its Entirety, and Total Contents, Including Transactions, Procedures, with all Facets and Counterparts Thereof, are the Exclusive Properties of Land Base, LLC, and are "Trade Secrets", Protected Under the "Economic Espionage Act"

---

hereto specifically warrants that he will keep all confidential information secret, and that any disclosure of the same shall be subject to written approval by the affected Party. Each Party hereto specifically warrants and agrees that he will not solicit or accept, in any manner, any business from sources or through contacts that are made known to him by another Party without the express written permission of the Party who made the source or contact known or available. Unauthorized disclosure of confidential information that is the property of LB, or other Party hereto, is a breach of this Transaction Code: 8885276-723 and shall subject the Party in breach to liquidated damages and to arbitration proceedings, upon proper notice hereunder, to determine additional damages and remedies.

4.2  The Parties hereto agree that they will protect and not disclose, either directly or indirectly, any confidential information disclosed by a Party without the prior express, written consent of the affected Party. For the purposes of this Transaction Code: 8885276-723, *"confidential information"* shall include, but is not limited to, any and all disclosures made by each to the other concerning:

    (a) Facts;
    (b) Figures;
    (c) Contracts;
    (d) Contacts;
    (e) Names of available or potential buyers and sellers;
    (f) Names of agents of available or potential buyers and sellers;
    (g) Descriptions;
    (h) Address;
    (i) Employees name;
    (j) Telephone numbers; telex numbers, facsimile numbers, or other means of access thereto;
    (k) Bank information, codes, or references;
    (l) Names of ministry or government officials;
    (m) Corporations, firms, partnerships, trusts, groups, brokers, individuals;
    (m) Information relating, directly or indirectly, to trade secrets, patents, or copyrights; and
    (n) Any such other information, either directly or indirectly, introduced or made known by a Party hereto that the disclosing Party asserts is confidential information.

Initials:          SKLYI:                    LB:

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 77 of 91   Page ID
#:6192
Case 2:08-cv-03336-DDP-AGR   Document 95-4   Filed 01/16/2009   Page 13 of 21

> This Confidential Private Enterprise Document in its Entirety, and Total Contents,
> Including Transactions, Procedures, with all Facets and Counterparts Thereof, are the
> Exclusive Properties of Land Base, LLC, and are "Trade Secrets", Protected Under the
> "Economic Espionage Act"

Any confidential information that comes into the possession of a Party
from a non-party source which a Party to this Transaction Code:
8885276-723 asserts is confidential information or which falls within the
definitions contained in subparagraphs: 4.2 (a) through 4.2 (tt) is
protected by this Transaction Code: 8885276-723 as if disclosed by the
affected Party. The Party whose confidential information is disclosed is
the "affected Party".

4.3   Each Party hereto agrees that he will not circumvent, either directly or
indirectly, commissions, fees, remuneration, considerations, or benefits
due to any other Party hereto. Each Party hereto agrees not to circumvent
a Party regardless of whether any transaction is completed. For the
purposes of this Transaction Code: 8885276-723, "circumvent" is defined
as any act, contact, or negotiation with a person or entity that is made
possible by the disclosure of confidential information which results in:
a) The damage or loss of "good will";
b) The loss of an opportunity or opportunities for business;
c) The loss of business; or
d) The loss or diminution of commissions, fees, remuneration,
considerations, or benefits due to a Party hereto. The Parties shall not
plan and act to avoid responsibilities and to circumvent obligations
and commitments. This shall include any plan that is conceived, made,
developed, formed, and executed and/or initiated and/or any action,
inaction, activity, communication, document, agreement, and matter or
process or means of interference that may relate, either directly or
indirectly, to the provision of services and/or the performance of
duties and/or the exercise of responsibilities and/or the full
compliance with obligations and commitments in accordance with this
Transaction Code: 8885276-723. Any plan, action, inaction, activity,
communication, document, agreement, and matter or process or means
of interference that may relate, either directly or indirectly, to this
Transaction Code: 8885276-723, is prohibited if such is a cause or
source of avoidance and/or circumvention, and it makes no difference
that a Party or representative person or representative entity is an
instrument an/or cause. Thus, included is "anything" by a Party or
representative of a Party that may affect, either directly or indirectly,
the exercise and/or fulfillment of responsibilities and/or complete
compliance with obligations and commitments under this Transaction
Code: 8885276-723, and/or any effort and/or action and/or inaction

Initials:        SKLYL:              LB:



This Confidential Private Enterprise Document in its Entirety, and Total Contents, Including Transactions, Procedures, with all Facets and Counterparts Thereof, are the Exclusive Properties of Land Base, LLC, and are "Trade Secrets", Protected Under the "Economic Espionage Act"

and/or activity and/or transaction and/or contract allowed and/or planned and/or pursued and/or made under and/or in relation to or in connection with this Transaction Code: 8885276-723. Also, the foregoing phrase: "Any effort to dislodge LB from his position or relationship is a breach of this Transaction Code: 8885276-723 and shall subject the Party in breach to liquidated damages and to arbitration proceedings, upon notice by LB, to determine additional damages and remedies.

4.4   This Transaction Code: 8885276-723 shall be binding on the Parties hereto and their:
   a) Corporations, firms, partnerships, trusts, and groups and their employees, agents, and representatives;
   b) Principals;
   c) Associates;
   d) Employees;
   e) Representatives;
   f) Agents;
   g) Consultants;
   h) Subsidiary or associated corporations, firms, partnerships, trusts, and groups and their employees, agents, and representatives; and
   i) Heirs, executors, successors, and assigns of the Parties.

4.5   The non-disclosure as set forth herein shall not apply as to information necessary to be disclosed to Accountants, Bankers, Solicitors, Lawyers, Governmental Agencies, Trustees, Directors, Brokers, Shareholders, or those to whom partial or full disclosure has previously been disclosed, as set forth and to be attached hereto and made apart hereof as if done verbatim. If disclosure is made to anyone in this section, they shall be also bound by the terms set forth herein.

4.6   In the event of a violation or breach of this Transaction Code: 8885276-723, each Party may report such violation or breach to the appropriate United States investigative and enforcement agencies for action. In addition, each Party may report such violation or breach to the appropriate investigative, enforcement and other authorities in the country or countries where the alleged offending Party is domiciled,

Initials:      SKLY:      LB:

This Confidential Private Enterprise Document in its Entirety, and Total Contents, Including Transactions, Procedures, with all Facets and Counterparts Thereof, are the Exclusive Properties of Land Base, LLC, and are "Trade Secrets", Protected Under the "Economic Espionage Act"

resides, or is conducting business, as well as to the appropriate international investigative and enforcement authorities.

4.7   Any controversy or claim arising out of or relating to this Transaction Code: 8885276-723 regarding herein Article 4 Non-disclosures and / or non-circumvention, Good Faith which is not settled by the Parties, shall be subject to binding arbitration. In the event of a dispute, the following terms shall apply:

a)   Written notice, which shall include an explicit statement of the dispute, shall be given to the other Party by the aggrieved Party Upon breach of this Transaction Code: 8885276-723 by a Party, such Party in breach, may be granted a period of three (3) Washington, DC, U.S.A., business days in which to cure the breach by complying fully with the provision of this Transaction Code: 8885276-723 that has been breached. If the breach is fully cured within the three (3) Washington, DC, U.S.A., business days, an election may be made by LB to continue with performance and to waive liquidated damages. Exercise of the option to permit cure of a breach does not waive the right of LB in the absence of an express written waiver in the event that an election is made not to proceed or in the event of a later breach.

b)   If the dispute is not settled within thirty (30) Washington, DC, U.S.A., business days from service of the notice, then the aggrieved Party shall initiate arbitration of the dispute immediately, in accordance with the terms and procedures for arbitration of international disputes by the American Arbitration Association. The place of arbitration shall be Washington, DC. U.S.A. Failure of a Party to appear, without a showing of good cause, shall entitle for other Party to an award.

c)   The decision and award made by the arbitrators shall include the award of all costs and expenses including attorney's fees and expenses, incurred by a Party as a result of the dispute, which shall be paid to the successful Party by the unsuccessful Party within thirty (30) Washington, DC, U.S.A., business days after the award. In the event of circumvention, either directly or indirectly, or other dispute arising out of or relating to this Transaction Code: 8885276-723, the aggrieved Party shall be entitled to monetary compensation equal to the maximum fee, commission, remuneration, consideration, or benefit he would have received from such

Initials:        SKLYL:              LB:

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 80 of 91   Page ID
#:6195
Case 2:08-cv-03336-DDP-AGR   Document 95-4   Filed 01/16/2009   Page 16 of 21

This Confidential Private Enterprise Document in its Entirety, and Total Contents, Including Transactions, Procedures, with all Facets and Counterparts Thereof, are the Exclusive Properties of Land Base, LLC, and are "Trade Secrets", Protected Under the "Economic Espionage Act"

transaction, and such other damages and relief as may be deemed appropriate. The sum allowed and relief granted shall be paid and become effective within the thirty (30) Washington, DC, U.S.A., business days period required for the payment of fees and expenses, unless otherwise specified in the arbitration decision. In addition, the aggrieved Party shall be entitled to damages, plus interest, and to such other relief as may be deemed appropriate. In the event of delay in complying with the order or decision or refusal or failure to comply, the aggrieved Party may file an enforcement action in the Courts of the District of Columbia, USA to compel compliance

### Article 5. Law, Jurisdiction and Arbitration

5.1   The Law of England and Wales shall be the proper Law of Transaction Code: 8885276-723 with exception of Article 4 that is to be governing by the Laws of District Columbia, USA.

5.2   In the event of the need for the arbitration, the Arbitration under Transaction Code: 8885276-723 shall be as follows with the exception as stated under Article 4 above:

5.2.1  Each Party shall nominate a person and such persons shall in turn nominate a third person, which shall be the Chairman of the arbitration procedure. In the event of a failure to agree on such third person, aforesaid person shall be appointed by the President for the time being of the Law Society of England and Wales.

5.  _ The decision of the said Arbitration shall be final and binding on the Parties hereto.

### Article 6.   Distribution of Benefits

The Parties acknowledge and agree that the intended result of Transaction Code: 8885276-723, activities shall be to generate net benefits for the Parties, which they shall distribute at LB's Instructions between them, in the percentage set out and agreed to herein. The net benefits shall be defined, as Gross revenue to the herein Parties, less Professional Services fees (if any). The net benefits will be divided into two parts and will be paid at LB's Instructions on a per occurrence basis as follows.

Initials:        SKLYL:            LB:

This Confidential Private Enterprise Document in its Entirety, and Total Contents, Including Transactions, Procedures, with all Facets and Counterparts Thereof, are the Exclusive Properties of Land Base, LLC, and are "Trade Secrets", Protected Under the "Economic Espionage Act"

6.1   One part in amount of one half of net benefits shall be to the account of, or as directed by SKLYL, unless otherwise is stated in Schedule(s) "A" ("A1", "A2", "A3", "A*", if any).

6.2   One part in amount of one half of Net Benefits shall be to the account of, or as directed by LB, unless otherwise is stated in Schedule(s) "A" ("A1", "A2", "A3", "A*", if any).

6.3   All costs of the Assets Exchange, fees, all and any bank charges related directly to Transaction Code: 8885276-723 will be borne equally by LB and SKLYL, unless otherwise is stated in Schedule(s) "A" ("A1", "A2", "A3", "A*", if any).

In witness whereof, since the Parties and Signatories have a complete and unambiguous understandings of all of the words, terms, provision and conditions Transaction Code: 8885276-723, and since the Parties and Signatories have determined on their own initiative and independent decision to accept and execute Transaction Code: 8885276-723, without any improper and undue influence, either real or perceived, and / or without any kind of improper external pressure or threat or compulsion or duress or coercion, either real or perceived, and in light of their complete and unambiguous understanding of Transaction Code: 8885276-723, EACH SIGNATORY HEREUNTO SETS HIS OR HER HAND IN PLACE, ON THE DATE SET FORTH BELOW.

For and on behalf of LB:

Boris Lopatin                          Witness:

For and on behalf of SKLYL:

So Kevin and / or Lu Yan Lucy          Witness:

Initials:          SKLYL:          LB:

This Confidential Private Enterprise Document in its Entirety, and Total Contents, including Transactions, Procedures, with all Facets and Counterparts Thereof, are the Exclusive Properties of Land Base, LLC, and are "Trade Secrets", Protected Under the "Economic Espionage Act"

Schedule "A"
## TO PRIVATE ENTERPRISE ASSETS EXCHANGE BENEFITS PARTICIPATION AGREEMENT
Between Land Base, LLC And So Kevin and / or Lu Yan Lucy

As of this date of 11th day of April, 2005, the amount of Assets that So Kevin and / or Lu Yan Lucy, SKLYL, of Private Enterprise Asset Exchange Management Benefits Participation Agreement, under Transaction Code: 8885276-723, is ready to place for the Administration under Land Base, LLC, LB, an approximate Principal Amount of Thirty Million dollars ($30,000,000.00), the description, and other pertinent data of the Assets are attached hereto.

SCA.1 The hereto Placement under Schedule "A" shall be known under Transaction Code: 8885276-723 (SAP) and shall be administrated under the auspices of "5th Avenue Partners Ltd.", Ten Dominion Street, London, EC2M 2EE, United Kingdom.

SCA.2 Under Transaction Code: 8885276-723 (SAP), SKLYL shall receive the benefits in amount of Fifty Percent (50%) of the "Benefits generated due to each trading Cycle Activities up to the trading amount of Four Times of the approximate Principal Amount of Thirty Million dollars ($30,000,000.00)". "Benefits generated due to each trading Cycle Activities up to the trading amount of Four Times of the approximate Principal Amount of Thirty Million dollars ($30,000,000.00)" shall be defined as the differential between Gross Amount of Funds that is utilized to Purchase Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's and the re-sale of hereto-purchased Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's. Benefits to SKLYL at the direction of LB shall be paid without any deductions of Bank fees, other Professional Services fees and Intermediaries (Introducing Parties) fees (if any). Benefits to 5th Avenue Partners Ltd. shall be the rest of the revenue benefits generated and paid with deductions of Bank fees, Professional Services fees and Intermediaries (Introducing Parties) fees (if any). The benefits shall be paid at the 5th Avenue Partners Ltd. Instructions on a per occurrence basis to the accounts as instructed by the 5th Avenue Partners Ltd.

Initials:        SKLYL:                LB:

This Confidential Private Enterprise Document in its Entirety, and Total Contents, Including Transactions, Procedures, with all Facets and Counterparts Thereof, are the Exclusive Properties of Land Base, LLC, and are "Trade Secrets", Protected Under the "Economic Espionage Act"

SCA.3 Under Transaction Code: 8885276-723 (5AP), 5th Avenue Partners Ltd shall issue an Irrevocable Bank Instruction to govern SKLYL's segregated account that is to be lodged with the Bank as stated hereto (Exhibit "HSA").

SCA.4 Under Transaction Code: 8885276-723 (5AP), LB shall report to SKLYL once a month, all monthly *Trading Cycle Activities* of 5th Avenue Partners Ltd, regarding *Purchase of Fixed Income Instruments (Assets)* in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's and the re-sale of hereto-purchased Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's. *Trading Cycle Activities* shall be within lodged Irrevocable Bank Instruction that is governing SKLYL's account. Such report shall be delivered by LB to SKLYL via Secured electronic means, and shall include the pertinent data, not limited to the Name of the Issuer, ISN of each Instrument, e.t.c.

In witness whereof, since the Parties and Signatories have a complete and unambiguous understandings of all of the words, terms, provision and conditions Transaction Code: 8885276-723 (5AP), and since the Parties and Signatories have determined on their own initiative and independent decision to accept and execute Transaction Code: 8885276-723 (5AP), without any improper and undue influence, either real or perceived, and / or without any kind of improper external pressure or threat or compulsion or duress or coercion, either real or perceived, and in light of their complete and unambiguous understanding of Transaction Code: 8885276-723 (5AP), EACH SIGNATORY HEREUNTO SETS HIS OR HER HAND IN PLACE, ON THE DATE SET FORTH BELOW:

For and on behalf of LB:

Boris Lopatin                          Witness:

For and on behalf of SKLYL:

So Kevin and / or Lu Yan Lucy          Witness:

Initials:            SKLYL:            LB:

This Confidential Private Enterprise Document in its Entirety, and Total Contents, Including Transactions, Procedures, with all Facets and Counterparts Thereof, are the Exclusive Properties of Land Base, LLC, and are "Trade Secrets", Protected Under the "Economic Espionage Act"

## Exhibit "HSA"
## Irrevocable Bank Instruction

To: Bank Officer

We, 5th Avenue Partners Ltd, on behalf of our client, So Kevin and / or Lu Yan Lucy hereby irrevocably instruct you to proceed with the following:

1. Purchase or cause to be purchased Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's, as directed by undersigned, 5th Avenue Partners Ltd.  Execute the re-sale of such herein described Fixed Income Instruments (Assets) as directed by undersigned, 5th Avenue Partners Ltd. Benefits due to the trade shall be disbursed as directed by undersigned, 5th Avenue Partners Ltd, as stated below:

*So Kevin and / or Lu Yan Lucy shall receive an amount of Fifty Percent (50%) of the "Benefits generated due to each trading Cycle Activities up to the trading amount of Four Times of the approximate Principal Amount of Thirty Million dollars ($30,000,000.00)". "Benefits generated due to each trading Cycle Activities up to the trading amount of Four Times of the approximate Principal Amount of Thirty Million dollars ($30,000,000.00)" shall be defined as the differential between Gross Amount of Funds that is utilized to Purchase Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's and the re-sale of hereto-purchased Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's.  Benefits to So Kevin and / or Lu Yan Lucy shall be paid without any deductions of Bank fees, other Professional Services fees and Professional Services fees (if any). Benefits to 5th Avenue Partners Ltd. shall be the rest of the revenue benefits generated and paid with deductions of Bank fees, Professional Services fees and Intermediaries (Introducing Parties) fees (if any). The benefits shall be paid at the 5th Avenue Partners Ltd. Instructions to the accounts as instructed by the 5th Avenue Partners Ltd.*

2. Upon receipt and clearance of the payments for the Fixed Income Instruments (Assets), into this segregated account please proceed with further Purchase of Fixed Income Instruments (Assets) in which the Issuers shall have and maintain a current credit rating of Single "A+" or better as evidenced by Standard and Poor's, or equivalent such as Moody's, as directed by undersigned, 5th Avenue Partners Ltd. Also execute the further re-sale of such hereto described Fixed Income Instruments (Assets) as directed by undersigned, 5th Avenue Partners Ltd. Distribution of revenue benefits shall be as above stated.

Initials:          SK/LYL:                    LB:

This Confidential Private Enterprise Document in its Entirety, and Total Contents, Including Transactions, Procedures, with all Facets and Counterparts Thereof, are the Exclusive Properties of Land Base, LLC, and are "Trade Secrets", Protected Under the "Economic Espionage Act"

3. Please ensure that all transactions with regard to Fixed Income Instruments (Assets) and/or corporate bonds shall be settled and cleared through DTC or Euroclear, or Clearstream.

4. All counterparties to each Transaction shall be solely comprised of major licensed financial institutions, professional broker-dealers, or other recognized and approved institutional entities.

5. Under no circumstances shall Principal amount of funds deposited in the amount of Thirty Million United States Dollars ($30,000,000.00) be permitted to be withdrawn, unless as stated hereto and for the payment of wire charges (if any).

6. All bank fees excluding wire charges shall be paid by undersigned, 5th Avenue Partners Ltd.

7. These Irrevocable Instructions shall be valid until the Instruction of Termination and Closing of said account. At the time of Account closure please remit the Principal amount of funds in the amount of Thirty Million United States Dollars ($30,000,000.00) with deduction of wire charges (if any) to the following Bank account:

Bank:          The Hongkong and Shanghai Banking Corporation Limited

Address:       Convention Plaza HSBC Premier Centre
               Shop No. 103 1/F Shopping Arcade Convention Plaza 1 Harbour Road,
               Wan Chai, Hong Kong
Fax:           2824 1380
Telex:         73205 hsbc hk
Account No:    625-019930
Account Name:  Mr. So Kevin and Ms. Lu Yan Lucy

Sincerely,


5th Avenue Partners Ltd


CC: So Kevin and Lu Yan Lucy

                              Receipt Acknowledgement:


                              (Bank)


Initials:        SKLYL:          LB:

# EXHIBIT D

## IRREVOCABLE PROJECT FUNDING AGREEMENT

THIS AGREEMENT DATED: 24TH OF MARCH, 2005 FOR PRIVATE PROJECT FUNDING TRANSACTIONS

BETWEEN:

LUCY YAN LU WITH AN ADDRESS OF
51 KIMBARK CRES., MARKHAM, ONTARIO, L3R 0SP, CANADA.   AND
KEVIN SO WITH AN ADDRESS OF
2#F 680 TIAN HE ROAD NORTH, GUANGZHOU 510530, CHINA.

AND:

KM & ASSOCIATES INTERNATIONAL LLC, (HEREINAFTER KNOWN AS KMAI), ITS SUCCESSORS OR PERMITTED ASSIGNS, WITH AN ADDRESS OF PO BOX 1053, WHITE PLAINS, MARYLAND 20695, USA

IN REFERENCE:   PRIVATE PROJECT FUNDING TRANSACTIONS

THE   UNDERSIGNED   HEREBY   IRREVOCABLY   AGREES   NOT   TO CIRCUMVENT, AVOID, BYPASS, OR OBVIATE KMAI AND/OR ASSIGNS, DIRECTLY OR INDIRECTLY, TO EVADE PROVIDING PROJECT FUNDS. THIS AGREEMENT SHALL BE THE BASIS FOR A PAYORDER TO THE DISBURSING AGENT FOR PAYMENT OF AGREED UPON PROJECT FUNDS TO THE ABOVE MENTIONED KMAI AND/OR ASSIGNS IN THE MATTER OF THE PRIVATE PROJECT FUNDING TRANSACTIONS.

IT IS AGREED THAT KMAI AND/OR ASSIGNS WILL BE PROVIDED PROJECT FUNDING FROM THIS TRANSACTION, AND IT IS FURTHER AGREED THAT THE PROJECT FUNDS DUE TO KMAI AND/OR ASSIGNS HERETO FOR SHALL BE DUE AND PAYABLE SIMULTANEOUSLY WITH DISBURSEMENT PAYMENT TO THE PRINCIPAL, SUBJECT TO BANK TIMING OF TRANSFER, AND THE FUNDS BEING RECEIVED IN THE PAYMASTER'S ACCOUNT.

Irrevocable Project Funding Agreement~        Dated: 24 March, 2005

Case 2:08-cv-03336-DDP-AGR   Document 344-1   Filed 05/07/10   Page 88 of 91   Page ID
#:6203
Case 2:08-cv-03336-DDP-AGR      Document 95-5     Filed 01/16/2009     Page 3 of 4

KWAI, and/or assigns, and LUCY YAN LU & KEVIN SO, and/or assigns.
Page 2 of 3

IN THE EVENT THE TRANSACTION IS CONCLUDED IN MULTIPLE
TRANCHES, THEN SAID AMOUNTS SHALL APPLY TO EACH AND EVERY
TRANCHE UNTIL THE TOTAL OF THE TRANSACTION AMOUNT HAS BEEN
CLOSED IN FULL.  IN ADDITION, ALL EXTENSIONS, ROLLOVERS OR
NEGOTIATIONS BETWEEN SAID PRINCIPALS ALSO SHALL BE COVERED
UNDER THIS AGREEMENT AND, THE ABOVE MENTIONED KWAI AND/OR
ASSIGNS SHALL BE DULY FUNDED FOR PROJECTS UNDER THE SAME
PROVISIONS  SUBJECT  TO  SUCCESSFUL  CLOSURE  OF  EACH
TRANSACTION.

SAID PROJECT FUNDS ARE TO BE PAID IN US DOLLARS.  SAID PROJECT
FUNDS IN THIS TRANSACTION WILL BE ONE-FIFTH OR TWENTY PERCENT
(20.0%) OF THE BENEFITS PAID TO THE INVESTOR.  SAID PROJECT FUNDS
SHALL BE THE TOTAL AMOUNT DUE TO KWAI AND/OR ASSIGNS.  FOR
EXAMPLE:
       LUCY YAN LU & KEVIN SO AND/OR ASSIGNS: EIGHTY PERCENT (80%)
                  KWAI AND/OR ASSIGNS: TWENTY PERCENT (20%)

THE TOTAL RESPONSIBILITY FOR PAYMENT OF TAXES/FEES DUE AND
PAYABLE TO ANY GOVERNMENT BODY, WHETHER STATE, FEDERAL,
LOCAL OR OTHER, AND WHATEVER APPLICABLE TO EACH INDIVIDUAL
RECEIVING THE ABOVE MENTIONED BENEFITS, IS SOLE RESPONSIBILITY
OF THE RECIPIENT.

THE LAW OF WASHINGTON DC SHALL BE THE PROPER LAW OF THIS
AGREEMENT.  ALL UNDERSIGNED HERETO AGREE TO PROTECT EACH
OTHER  REGARDING  STANDARD  NON-DISCLOSURE  AND  NON-
CIRCUMVENTION PRACTICES AND TO EXERCISE ITS BEST EFFORTS IN
ACTING IN GOOD FAITH TOWARDS EACH OTHER.  ALL INFORMATION
FROM THE DATE OF THE SIGNING OF THIS INSTRUMENT, SPECIFICALLY
REGARDING COMPLETION AND FRUITION OF ANY ARRANGEMENT
BETWEEN THE ABOVE MENTIONED, KWAI AND/OR ASSIGNS, OR PROJECT

Irrevocable Project Funding Agreement          Dated: 24 March, 2005

KMAI and/or assigns, and LUCY YAN LU & KEVIN SO, and/or assigns,
Page 3 of 3

FUNDS TO OR FROM ALL PARTIES CONTAINED HEREIN, IS NEVER TO BE
REVEALED TO ANY THIRD PARTY WHATSOEVER. KMAI AND/OR ASSIGNS
AND (NAME OF INVESTOR), AND/OR ASSIGNS AGREE WITH ALL THE
STATEMENTS CONTAINED IN THIS DOCUMENT, AND THAT KMAI AND/OR
ASSIGNS AND LUCY YAN LU & KEVIN SO AND/OR ASSIGNS ARE
COVENANTED, TO UNDERTAKE A PROMISE AND COMMITMENT TO
MAINTAIN *"TOTAL SILENCE" REGARDING THE AFOREMENTIONED, IN ALL
REGARDS, AND WITHOUT COMPROMISE.*

FACSIMILE COPIES OF THIS AGREEMENT WITH SIGNATURES WILL BE
DEEMED AS VALID AND LEGALLY BINDING DOCUMENTS

SAID AGREEMENT MAY BE EXECUTED IN COUNTERPARTS AND WILL BE
CONSIDERED IN THE AGGREGATE AS ONE DOCUMENT.

AGREED BY THE UNDERSIGNED ON THIS 24TH DAY OF MARCH, 2005.

LUCY YAN LU
(ON BEHALF OF LUCY YAN LU & KEVIN SO)

AGREED BY THE UNDERSIGNED ON THIS 24TH DAY OF MARCH, 2005.

KMAI, LLC
MANAGING MEMBER

Irrevocable Project Funding Agreement          Dated: 24 March 2005

**EXHIBIT E**

22/04 2005 12:55 FAX 0207 795 8888        HSBC MIDGATE

# HSBC

fax - 0034 971 2170?.

ELECTRONIC PAYMENT DETAILS                          Date 22Apr2005   Time 12:58
                                                                           Page 1

Product 58947825 NEW DEPOSIT 5TH AVENUE PARTNERS LTD

Process date 20Apr2005
Payment reference number 7C2004SM02007383

Payment type          Inward payment
Value date            20Apr2005
Amount                USD 30,000,000.00Cr

Senders reference

Beneficiary customer  5103
                      5TH AVENUE PARTNERS LTD SO KEVIN LU
                      YAN LUCY

Ordering customer     MR SO KEVIN AND MS LU YAN LUCY

Statement details     ADVICE CONFIRMS
                      7C2004SM02007383
                      MR SO KEVIN AND MS

Payment details       REF SO KEVIN LU YAN LUCY MESSAGE
                      FOR AC 625 019930 DEP 0001

4/54