Haig Kalbian (Admitted *pro hac vice*)
Mary M. Baker (Admitted *pro hac vice*)
D. Michelle Douglas (CA Bar No. 190248)
Aaron Knights (Admitted *pro hac vice*)
KALBIAN HAGERTY L.L.P.
The Brawner Building
888 17th Street, N.W., Suite 1000
Washington, D.C. 20006
Phone:      (202) 223-5600
Facsimile: (202) 223-6625
E-mail:     hkalbian@kalbianhagerty.com
            mmb@kalbianhagerty.com
            mdouglas@kalbianhagerty.com
            aknights@ kalbianhagerty.com

Louis R. Miller, Esq. (CA Bar No. 54141)
Alexander Frid, Esq. (CA Bar No. 216800)
Miller Barondess, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Phone:      (310) 552-4400
Facsimile:  (310) 552-8400
E-mail:     smiller@millerbarondess.com
            sfrid@millerbarondess.com

*Counsel for Plaintiff Kevin So*

UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA
(Western Division-Los Angeles)

| | |
|---|---|
| KEVIN SO,<br><br>          Plaintiff,<br><br>v.<br><br>LAND BASE, LLC, et al.<br><br>          Defendants. | CASE NO. CV 08-3336 DDP (AGRx)<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS KEVIN KONDAS, MIRA MELTZER, KM & ASSOCIATES INTERNATIONAL, LLC, KB&M PROJECTS INTERNATIONAL, LLC, AND CTL PROJECTS INTERNATIONAL, LLC's MOTION FOR SUMMARY JUDGMENT**<br><br>**Oral Argument Scheduled**<br><br>Date:  June 28, 2010<br>Time:  10:00 a.m.<br>Location:  Courtroom 3 |

1

Plaintiff's Memorandum of Points and Authorities in Opposition to
Defendants Kevin Kondas, Mira Meltzer, KM & Associates International, LLC, KB&M Projects
International, LLC and CTL Projects International, LLC's Motion for Summary Judgment

# **TABLE OF CONTENTS**

PAGE

I.    STATEMENT OF FACTS .................................................................3

    A.    Defendant Millar, acting on behalf of Defendants KM&A,
    Kondas and Meltzer, Recruited Plaintiff into the Private
    Placement Project ............................................................3

    B.    Millar Makes Material Misrepresentations to So's Agent, Lu,
    Many of Which are Transmitted to So by Lu .........................5

    C.    Moving Defendants Have Admitted that Millar Secured
    the Irrevocable Project Funding Agreement for KM&A .............6

    D.    KM&A Paid Kondas, Meltzer and Minton Over $1 Million
    in Fraudulent Proceeds .......................................................8

    E.    Conspiring Defendants Concealed Their Roles Throughout
    Litigation in the United Kingdom ..........................................9

    F.    The UK Judgment, and the Findings of Fact and Law Issued by
    U.S. District Court Judge James Robertson .........................12

II.   ARGUMENT ..............................................................................14

    A.    Legal Standard ...............................................................14

    B.    Defendants' Statute of Limitations Defense Fails as a Matter
    of Law ...........................................................................14

        1.    *The UK Judgment Does Not Support Collateral Estoppel with*
        *Regard to Mr. So's Notice of Claims Against*
        *the MovingDefendants* ..................................................14

        2.    *So Was Not on Notice of The Fraud until March or April of*
        *2006, and He Was Not on Notice of Moving Defendants'*
        *Role in the Fraud Until Late 2007* .....................................15

a.    Plaintiff was Not Aware of Facts Constituting the Moving Defendants' Fraud Until The Fall of 2007 ......16

b.    Moving Defendants Fraudulently Concealed Their Roles In the Fraud ................................................17

c.    The Moving Defendants Were Parties to a Civil Conspiracy, And Overt Act Pursuant to the Conspiracy ..........................................................19

C.    Moving Defendants' Motion Should Be Denied As To Plaintiff's First, Second, Third, Ninth and Fifteenth Causes of Action ...............19

1.    *Millar Served as the Moving Defendants' Authorized Agent* ..................................................................20

2.    *Moving Defendants Engaged in An Ongoing Conspiracy to Defraud Plaintiff* ....................................20

3.    *Breach of Fiduciary Duty* ........................................21

III.    CONCLUSION ..........................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>**FEDERAL CASES**</u>                                                          <u>Page No.</u>

*Ali v. Fasteners for Retail, Inc.*,
544 F. Supp. 2d 1064 (C.D. Cal. 2008).................................................24

*Am. Cas. Co. of Reading, Pennsylvania v. Krieger*,
181 F.3d 1113 (9th Cir. 1999)..............................................................20

*Baggett v. Hewlett-Packard Co.*,
582 F. Supp. 2d 1261 (C.D. Cal. 2007).................................................22

*Balint v. Carson City*,
180 F.3d 1047 (9th Cir. 1999)..............................................................14

*Bank of N.Y. v. Fremont Gen. Corp.*,
523 F.3d 902 (9th Cir. 2008)..................................................................4

*Cedars Sinai Med. Ctr. v. Mid-West Nat'l Life Ins. Co.*,
118 F. Supp. 2d 1002 (C.D. Cal. 2000)...........................................22, 23

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..............................................................................14

*Curnow v. Ridgecrest Police*,
952 F.2d 321 (9th Cir. 1991)................................................................11

*Dias v. Elique*,
436 F3d 1125 (9th Cir. 2006)...............................................................14

*Edwards v. Toys "R" Us*,
27 F. Supp. 2d 1197 (C.D. Cal. 2007)..................................................21

*Lee Myles Assocs. Corp. v. Paul Rubke Enters.*,
557 F. Supp. 2d 1134 (S.D. Cal. 2008).................................................16

*Meaux v. Northwest Airlines, Inc.*,
2010 U.S. Dist. LEXIS 14301 (N.D. Cal. Feb. 18, 2010).....................11

*Migliori v. Boeing N. Am., Inc.*,
114 F. Supp. 2d 976 (C.D. Cal. 2000) ................................................................ 17

*Negrete v. Fid. & Guar. Life Ins. Co.*,
444 F. Supp. 2d 998 (C.D. Cal. 2006) ................................................................ 24

*NLRB v. Don Burgess Constr. Corp.*,
596 F.2d 378 (9th Cir. 1979) .............................................................................. 17

*Portney v. CIBA Vision Corp.*,
2008 U.S. Dist. LEXIS 84158, 5-6 (C.D. Cal., 2008) ....................................... 24

*Sanderson v. International Flavors & Fragrances*,
1996 U.S. Dist. LEXIS 20671 (C.D. Cal. 1996) ........................................... 15, 16

*Sonoma Foods, Inc. v. Sonoma Cheese Factory*, LLC,
2007 U.S. Dist. LEXIS 84751 (N.D. Cal., Oct. 30, 2007) .................................. 24

*Stitt v. Williams*,
919 F.2d 516 (9th Cir. Cal. 1990) .................................................................. 17, 19

## STATE CASES

*Alliance Mortgage Co. v. Rothwell*,
10 Cal. 4th 1226 (1995) ...................................................................................... 23

*Barbara A. v. John G.*,
145 Cal.App.3d 369 (1983) ................................................................................. 24

*Bedolla v. Logan & Frazer*,
52 Cal. App. 3d 118 (Cal. App. 1st Dist. 1975) ................................................. 17

*Brandon G. v. Gray*,
111 Cal. App. 4th 29 (Cal. App. 1st Dist. 2003) ................................................ 17

*Committee On Children's Television, Inc. v. General Foods Corp.*,
35 Cal. 3d 197 (1983) ......................................................................................... 24

*Deveny v. Entropin, Inc.*,
139 Cal. App. 4th 408 (Cal. App. 4th Dist. 2006)................................17

*Doctors' Co. v. Superior Court of Los Angeles County*,
49 Cal.3d 39 (1989)................................25

*Esenbaum v. Western Energy Resources, Inc.*,
218 Cal.App. 3d 314 (Cal. App. 1990)................................19

*Fox v. Ethicon Endo-Surgery, Inc.*,
35 Cal. 4th 797 (Cal. 2005)................................15

*Gaglione v. Coolidge*,
134 Cal App 2d 518 (1955, Cal App 1st Dist)................................19

*Mosier v. Southern California Physicians Ins. Exchange*,
63 Cal.App.4th 1022 (Cal. Ct. App. 1998)................................22, 25

*Pacific Lumber Co. v. State Water Resources Control Bd.*,
37 Cal.4th 921 (2006)................................14

*Peterson v. Cruickshank*,
144 Cal.App.2d 148 (Cal. Ct. App. 1956)................................23

*Wyatt v. Union Mortg. Co.*,
24 Cal. 3d 773 (Cal. 1979)................................19, 22, 23

## <u>RULES</u>

Fed.R.Evid. 801(d)(2)(A)................................5

Fed. R. Civ. P. 56(c)................................14

## <u>STATUTES</u>

Cal. Code Civ. Proc. § 338(d) (2010)................................16

Cal. Civ. Code § 2298, 2300................................20

Plaintiff Kevin So ("Plaintiff" or "So"), by counsel, respectfully submits this Memorandum of Points and Authorities in Opposition to Defendants Kevin Kondas ("Kondas"), Mira Meltzer ("Meltzer"), KM & Associates International, LLC ("KM&A"), KB&M Projects International, LLC ("KB&M") and CTL Projects International, LLC's ("CTL") ("Moving Defendants") Motion for Summary Judgment ("Motion").

### PRELIMINARY STATEMENT

The Motion for Summary Judgment fails because the undisputed evidence—including admissions by Moving Defendants—demonstrates conclusively that Kevin Kondas, Mira Meltzer and KM&A played critical roles in perpetrating the fraud against Kevin So and were paid handsomely. Moreover, the undisputed evidence highlights the close relationships among these persons and entities and that they were used to accomplish the fraud or hide the money trail.

The Moving Defendants do not dispute these facts in their Motion, but instead claim that Plaintiff's claims are untimely or, alternatively, that several of Plaintiff's claims should fail because Moving Defendants acted through co-conspirators and agents rather than directly. However, the evidence clearly demonstrates that Plaintiff only learned of the fraud in March or April 2006, and, in owing in large part to the Moving Defendants' fraudulent concealment, did not learn of any potential claims against Moving Defendants until the late 2007. Consequently, the claims Plaintiff asserted against Moving Defendants in January 2009 are timely. Moreover, Moving Defendants <u>admit</u> facts establishing a principal-agent relationship with at least one co-conspirator who facilitated their introduction to and agreement with Plaintiff, which resulted in their receiving substantial proceeds out of the scheme directly from Plaintiff's funds.

For these reasons, and those discussed below, Moving Defendants' Motion for Summary Judgment must be denied.

## I.   STATEMENT OF FACTS

Plaintiff Kevin So ("So" or "Plaintiff") is a Chinese citizen who lives in Hong Kong. (So Decl. [**Ex. 5**]. at ¶ 2[1]) He is a successful businessman and CEO of Guangdong Arche Cosmetics Co. Ltd.  In their Motion, Moving Defendants do not dispute that So was the victim of a sophisticated investment fraud.  The investment scheme, known as the "Private Placement Project" ("the Project") in actuality was akin to a Prime Bank Fraud, which deceived at least four wealthy investors, a London law firm and HSBC.  (Expert Report of Daniel W. Ray ("Ray Report") [**Ex. 4**] at 9.)  The hallmarks of investor frauds such as the Project include (1) the promise of excessive guaranteed returns, (2) the use of fictitious financial instruments, (3) the requirement of extreme secrecy, (4) the claim of exclusive opportunity, and (5) claims of inordinate complexity.  (*Id.* at 9-10.)

Prior to the loss, So entered into a business relationship with Defendants Henry Yang ("Yang") and Lucy Lu ("Lu") whereby they would serve as Mr. So's agents and fiduciaries with respect to investing the $30 million. (So Decl. [Ex. 5] at ¶ 3.) In fact, So gave Lu power of attorney with respect to investing Mr. So's funds.  (So. Decl. at ¶ 3; 2/21/10 "Resolution and Authorization of Signatory" [**Ex. 7**].)  When he executed this power of attorney, So had no reason to suspect that Lu and Yang's loyalties may lie elsewhere. (So Decl. [Ex. 5] at ¶ 4.)  Thereafter, Lu took control in all material respects of the investment.  (*Id.* at ¶ 5.)

### A.   Defendant Millar, acting on behalf of Defendants KM&A, Kondas and Meltzer and with their full knowledge, Recruited Plaintiff into the Project.

Along with non-party Robert Minton ("Minton"), Kondas and Meltzer were business partners and founded Defendant KM&A together in 1999. (Kondas Dep. on

---

[1] Each of the Exhibits referenced herein are attached to the Declaration of Aaron W. Knights, which is filed herewith in support of this Memorandum of Points and Authorities.

behalf of KM&A, KB&M and CTL ("KM Corp.") [Ex. 9] at 47:11-13; 48:19-22; 49:8-11; 52:6-17.)  The undisputed facts demonstrate that KM&A and its members maintained a business relationship with Defendant Keith Millar ("Millar"). (*See*, e.g., KM Entities' Arts. of Incorp. [**Ex. 33**].)    In fact, Meltzer and Kondas (via KM&A) partnered with "Boris Lopatin & Associates" and Millar to form Moving Defendant KB&M.  (Ex. 33.)

Millar, on behalf of KM&A and with Kondas's and Meltzer's knowledge and consent, corresponded with Lu from January 2005 through April 2005 to convince So to participate in the Project.  In his March 2010 deposition for KM&A, KB&M and CTL, Kondas freely admitted that he knew that Millar was communicating with Lu in 2005 to explore investment opportunities for So, and that Boris Lopatin ("Lopatin") had informed KM&A that he knew of a trader that might be suitable for KM&A's clients.  (KM Corp. [**Ex. 9**] at 76:8-15 and 89:21-90:18.) Many of the e-mails Millar transmitted to Lu were signed off by Millar as "on behalf of K M Associates International, LLC."  (*See*, e.g., Exs. **6, 10** and **11**; Wang Decl. [**Ex. 8**] at ¶¶ 8, 10.)[2]  Meltzer and Kondas have admitted that Millar brought Plaintiff to KM&A, which then introduced So to the Project by introducing him to Land Base and Lopatin.  (*See* Meltzer Test. in *So v. Suchanek*[3], C.A.

---

[2] Kondas admits he knew Millar was meeting with Lu and that Millar facilitated the acquisition for KM&A of the IPFA. However, he denied that Millar had the authority to send e-mails. (See KM Corp. at 214:25-215:3.) This is not credible but it does not matter as Kondas/KM&A already admitted the grounds for agency and actual authority and ratified all actions by Millar.  Additionally, at the summary judgment stage, Plaintiff gets the benefit of all reasonable factual inferences. *See Bank of N.Y. v. Fremont Gen. Corp.*, 523 F.3d 902, 909 (9th Cir. 2008) (holding the evidence on summary judgment is weighed in the light most favorable to the non-moving party and courts must draw all reasonable inferences in favor of that party).

[3] So sued his former U.S. counsel, Leonard Suchanek ("Suchanek"), in December 2008. On May 6, 2010, Judge Robertson ruled in So's favor, and a copy of his ruling is attached hereto as **Ex. 3**.

No. 08-2091 (D.D.C.) ("Suchanek Action") ("Meltzer Trial Test."), 12/9/09 a.m. [**Ex. 20**], at 79:16-80:2, 91:9-11[4]; KM Corp. [Ex. 9] at 76:8-15 and 84:3-8.)

> **B.    Millar Makes Material Misrepresentations to So's Agent, Lu, Many of Which are Transmitted to So by Lu.**

Millar's representations to Lu in early 2005 included his touting the trading project with Michael Brown[5] as (i) a "real 'front door' transaction where you will meet a director of the trade group and the bank trader"; and (ii) that, "[i]nitially, with your $30M you will enter into a 'narrow margin' trade which is trading A+ up to AAA grade bank paper – your funds will be leveraged X 4 so you will make typically 4 pts per trade," and the investment would "start with two trades per week and accelerate rapidly up towards a larger number …"  (Wang Decl. [Ex. 8] at ¶ 10; 2/18/05 E-mail from Millar to Lu [**Ex. 12**].)

Moreover, Millar assured Lu and So that the $30 million invested would be "safe and secure in a non-depletion account," and would be in an account "regulated by the British Government and the Bank of England," and, as trading would occur in U.S. Dollars, the SEC would also be involved.  (Wang Decl. [Ex. 8] at ¶ 10; 2/20/05 E-mail from Millar to Lu [**Ex. 13**]; 2/17/05 E-mail from Millar to Lu [**Ex. 14**].)  According to Millar, "your funds will not be at any risk, and HSBC are fully aware of, and stand behind, this arrangement," and that investor-funds could be withdrawn "principal plus accumulated profits, by giving 30 days written notice at any time." (Wang Decl. [Ex. 8] at ¶ 10; Ex. 11.)

---

[4] Meltzer's testimony in the *Suchanek* action is not hearsay.  Instead, it is admissible as an admission by a party opponent.  *See* Fed.R.Evid. 801(d)(2)(A).

[5] Brown is the London-based "trader" who ran the Ponzi scheme.  On November 28, 2008, a London jury convicted him *in absentia* of various crimes related to the fraud. http://www.timesonline.co.uk/tol/news/uk/crime/article5252726.ece

1    Each of these claims was false and exemplified the misrepresentations made in the

2    course of executing an investor scheme akin to the Project.  (*See* Ray Report [Ex. 4] at 9-

3    10.)  As intended by Moving Defendants and their agent, Lu transmitted many of these

4    representations to So, such as that his investment would be safe, protected by HSBC, and

5    held in a non-depletion account at no risk. (So Decl. [Ex. 5] at ¶¶ 5 and 6; So Dep. [**Ex. 2**]

6    at 15:9-15; 38:16-23.)  So relied on these representations when he decided to invest. (*Id.*)

7    **C.    Moving Defendants Have Admitted that Millar Secured the Irrevocable**
       **Project Funding Agreement for KM&A.**
8

9    On March 24, 2005, Millar arranged for Lu to execute a document known as the

10   Irrevocable Project Funding Agreement ("IPFA"), signed by Kondas, whereby So agreed

11   to pay KM&A a commission on profitable trades under the Project.  (KM Corp. [Ex. 9] at

12   80:21-81:4; IPFA [**Ex. 15**].)  Together with Kondas' own admissions, e-mails from

13   Millar to Lu demonstrate that Millar was acting to facilitate the execution of the IPFA on

14   KM&A's behalf.  On April 2, 2005, Millar noted to Lu that "Dr Kondas will return the

15   signed IPFA to you tomorrow," and on April 5, 2005, Millar inquired of Lu whether she

16   "received the counter-signed copy of the IPFA from Dr Kondas."  (4/2/2005 and 4/5/2005

17   E-mails from Millar to Lu [**Ex. 35**].)  Kondas admitted that Millar helped KM&A obtain

18   the IPFA and facilitated its execution, pursuant to which Kondas, Meltzer and Minton

19   personally were paid substantial sums.  (KM Corp. [Ex. 9], at 81:13-22 and 189:9-15.)

20   KM&A paid Millar in the spring and summer of 2005 for his role in recruiting So's

21   investment.  (Trans. Details [**Ex. 16**]; KM Corp. [Ex. 9] at 220:1-221:9.)  The wire

22   transfers refer to the Project by its transaction code and a reference to one of Brown's

23   companies.  (Ex. 16; KM Corp. [Ex. 9] at 108:21-109:17.)  The IPFA provides that

24   KM&A would be entitled to 20% of any profits earned through the Project. (Ex. 15 at 2.)

25   It also provides that the relationship was "Never To Be Revealed To Any Third Party

26   Whatsoever," Requiring "Total Silence Regarding The Aforementioned, In All Regards,

27   And Without Compromise." (Ex. 15 at 3.)

28

1   To recruit So into the scheme and get paid for doing so, Millar, KM&A member

2   Minton, Michael Brown and Lopatin participated in meetings in London in April 2005

3   and pitched Brown and the Project to Lu.  During these meetings, Millar and Minton

4   introduced Lu to Lopatin.  (KM Corp. [Ex. 9] at 76:8-15 and 84:3-8.)  Lu executed the

5   "Land Base Agreement" on So's behalf during these meetings.  (So Decl. [Ex. 5] at ¶ 7;

6   Land Base Agreement [Ex. 17].)  The conspirators also provided Lu with a document

7   known as the "Irrevocable Bank Instruction" ("LOI"), which provided that "[u]nder no

8   circumstances shall Principal amount of funds deposited in the amount of Thirty Million

9   United States Dollars ($30,000,000.00) be permitted to be withdrawn." ( LOI [**Ex. 38**].)

10   After the meetings, So confirmed with HSBC that Brown was a customer in good

11   standing, and, on April 20, 2005, he transferred his $30 million to an HSBC account

12   maintained by 5th Avenue Partners ("5AVE"), one of Brown's companies.  (So Decl. [Ex.

13   5] at ¶ 8; 4/20/05 Wire Transfer [Ex. 18].)  While So's wire transfer instructed the funds

14   to be deposited into an account in Brown and So's[6] names, Brown convinced HSBC to

15   divert Mr. So's money to an account controlled by Brown alone. (So Dec. [Ex. 5] at ¶ 7.)

16   The investment plan was a sham.  The trading Millar and KM&A described in e-

17   mails during early 2005 to So's agent, Lu, was a fantasy.  (Ray Report [Ex. 4] at 11.[7])

18   Brown executed little or no trades.  (*Id.* at 13-16.)  Instead, Brown stole the money and

19   paid substantial amounts to those who helped facilitate his scheme, including, Land Base,

20   Lopatin, Kondas, Meltzer, KM&A and others.  (*See*, *e.g*., Land Base Payments to KM&A

21   [**Ex. 19**]; Ray Report [Ex. 4] at 12.)  For approximately six to eight months, Brown sent

22   Mr. So and other investors fabricated trade tickets and sent wire transfers from HSBC

23   payable to the investors as their "profits."  These wire transfers were comprised of the

24   _____

25   [6] In addition to So, Lu, his personal representative in the investment, was to have her

26   name on the 5AVE account.

27   [7] It is notable that the Defendants have not identified any expert witnesses in this matter.

28   Therefore, the expert opinions expressed by Klein and Ray are undisputed.

invested principal, further deceiving the investors and/or their agents that Brown's trade activities were successfully developing. (Ray Report [Ex. 4] at 13-16.)

**D.    KM&A Paid Kondas, Meltzer and Minton Over $1 Million in Fraudulent Proceeds.**

Pursuant to the IPFA, KM&A and its members were paid approximately $627,000 in so-called commissions on fictitious trades directly from the Plaintiff. (KM Corp. [Ex. 9] at 149:25-150:6.)[8]  Further, uncontroverted proof demonstrates that KM&A and its members were paid an additional $730,000 by Lopatin through Land Base directly from the money So had placed in the Project.[9]  So did not know that Land Base paid KM&A and its members until after November of 2008, when his counsel received Land Base's Union Bank records pursuant to a duly issued subpoena from Union Bank. (So Decl. [Ex. 5] at ¶ 10.)

As a result of the fraud, KM&A's members, including Kondas and Meltzer, received approximately $300,000 in proceeds from the Project. (Meltzer Test. 12/9/09 a.m. [Ex. 20] at 93:15-96:13; Meltzer Dep. [Ex. 21] at 165:6-167:20; Klein Supp. [Ex. 29B] at 8-14.)  KM&A also transmitted payments totaling approximately $67,955 to its agent Millar in the spring and summer of 2005, which were financed by the funds So had placed in the the Project. (Trans. Details [Ex. 16]; KM Corp. [Ex. 9] at 220:1-221:9; Klein Supp. at 12.)  Finally, KM&A paid $125,000 to KB&M, the company it formed with Millar and Lopatin, which funds also originated from So's investment. (Trans.

---

[8] Land Base member Charles Woodhead complained that he was unaware that KM&A was receiving funds from So directly and that, by doing so, KM&A appeared to have been doing "some sort of double dip." (Woodhead Dep. (10/7/08) at 191:13-192:6 [Ex. 1].

[9]  *See* KM Corp. [Ex. 9] at 225:5-8 and 226:13; Incoming Wires from 5AVE to Land Base [Ex. 27]; Outgoing Wires from Land Base to KM&A [Ex. 28]; Expert Report of Gordon L. Klein ("Klein Report") at 5-6 and Supplemental Expert Report of Gordon L. Klein ("Klein Supp.") at 5-6, both reports attached as **Ex. 29 A** and **B**, respectively.)

1  Details [**Ex. 16**]; Klein Supp. at 8.) The Moving Defendants do not deny that they

2  received payments from So's money in the Project.

3       **E.    Conspiring Defendants Concealed Their Roles Throughout Litigation in
            the United Kingdom.**
4

5       Throughout the pendency of litigation in the U.K., the Moving Defendants actively

6  concealed their roles in the fraud. As discussed below, as a result of their conduct, So was

7  not aware that the Moving Defendants were involved in the conspiracy to defraud him

8  until "the end of 2007."  (So Dep. at 172:6-19.)

9       HSBC uncovered the fraudulent scheme in or around October 2005.[10]   Rather than

10  wait for the investors to bring suit, in November or December 2005, HSBC initiated

11  litigation against Brown, his companies, and So and the other investors in London ("the

12  UK Action").[11]   (So Decl. [Ex. 5] at ¶ 11.)  HSBC asserted it was not responsible for the

13  lost funds, that it was not liable for breach of trust, contract, and negligent

14  misrepresentation.[12]  So lodged counterclaims against HSBC and Brown.  Although So

15  asserted that Brown and HSBC were liable for his losses, he never asserted that Brown

16  and HSBC were <u>solely</u> liable for his losses.

17       Mr. So did not learn that his investment may have been stolen or of the HSBC UK

18  Action until April 2006, which was when Lu first informed them.  (So Dep. [Ex. 2] at

19  35:7-16; 275:14-23; So Decl. [Ex. 5] at ¶ 11; Wang Decl. [Ex. 8] at ¶ 9.)  It was at this

20  ────────────────────

21  [10] At all relevant times, Lu falsely maintained that she owned part of the $30 million.  In
    fact, she never held any ownership rights in these funds. (*See* So Decl. at ¶ 15.)

22  [11]  *See* Order of Mr. Justice Walker, *HSBC Bank plc v. So, et al.*, Case No: 2005 Folio 841
23  (Royal Courts of Justice, December 7, 2007) ("UK Judgment") at ¶ 4, attached to Moving
    Defendants' Motion as Ex. J.  This Court may take judicial notice of the UK litigation and
24  the appellate opinion. However, the case does not have any preclusive effect as argued by
25  Defendants.

26  [12] The High Court found that HSBC had owed Kevin So a duty and breached it but HSBC
27  was not the proximate cause of his loss. *See* Approved Judgment, *So v. HSBC, et al.*, Case
    No. 2008/0563 (Supreme Court of Judicature Court of Appeal) [**Ex. 34**].

28

1  time that So also first learned that Lu had retained UK counsel on his behalf without his

2  knowledge.  (So Decl. at ¶ 11.)  In or around March 2006, Lopatin sent Lu the resume of

3  retired administrative law judge, Leonard Suchanek ("Suchanek"), whom he

4  recommended for legal services relating to the pending UK Action. (Ex. 5 at ¶ 12.)

5  Meltzer and Kondas had both maintained personal and professional relationships with

6  Suchanek. (KM Corp. [Ex. 9] at 287:7-17; Meltzer Dep. [Ex. 21] at 177:23-178:6.)  In

7  July 2006, Lu traveled to Defendant Charles Woodhead's home in Monterrey, California,

8  where she met with Suchanek, Meltzer, Kondas, Lopatin and Woodhead, apparently to

9  discuss "recovery efforts" relating to So's $30 million investment.  (*See* Meltzer Trial

10 Test., 12/9/09 a.m., at 96:9-18.)

11         It was around this time that Suchanek began representing So and Lu, although a

12 formal engagement letter was not executed until September 2006.  (So Dec. [Ex. 5] at ¶

13 11.)   Suchanek was assisted at all material times by co-conspirator and admitted

14 beneficiary of the Placement Project, Mira Meltzer.  (*See* Meltzer Trial Test. [Ex. 20]

15 12/9/2009 a.m. at 68:8-10; So Decl. [Ex. 5] at ¶ 12; Meltzer Dep. [**Ex. 21**] at 180:1-

16 191:20.)  Suchanek had prior relationships with Kondas and Lopatin, and had represented

17 Lopatin and So simultaneously.   (Robertson Order [**Ex. 3**] at ¶ 26.)   Meltzer and

18 Suchanek never disclosed Meltzer's role in the fraud to So. (So Decl. at ¶ 14.)

19         Moreover, on August 8, 2006, Suchanek gave Land Base an opinion letter in which

20 he opined that the Land Base Agreement contained no evidence of money laundering or

21 of any illegal scheme or activity.  (8/8/06 Opinion Issued by Leonard J. Suchanek [**Ex.**

22 **30**].) Meltzer described what she did for Suchanek when he represented So as follows:

23         My e-mail address was the only e-mail address that all e-mails came to; I received
           the e-mails and I read them to Judge Suchanek.  My fax number was the only fax
24         number available; I received the faxes and read them to Judge Suchanek.  And my
           telephone number was the only telephone number given, and I received all calls,
25         and when appropriate or asked to speak with Judge Suchanek, I would conference
           the judge.
26

27

28

(Meltzer Trial Test. [Ex. 20] 12/9/09 a.m. at 68:13-19; 68:22-23 and 69:2-12.)  Although working closely with Suchanek, Meltzer claimed she did not inform Suchanek of her role in or that she received funds from the fraudulent scheme until the eve of the UK trial in October of 2007.[13]

Throughout Suchanek's representation of So, Meltzer sought to insulate herself, KM&A, her business partners, and even Boris Lopatin from suspicion of wrongdoing for their role in the fraud.  In fact, So specifically questioned Suchanek as to whether Kondas and KM&A were involved in the Project, and Suchanek assured him that they were legitimate.  (So Decl. [Ex. 5] at ¶ 14.)

To this day, despite So's financial losses in the Project, Meltzer maintains that she should be entitled to keep the funds she received from So because she claims those funds are proceeds of legitimate trades.  (Meltzer Dep. [Ex. 21] at 68:13-23.)  Throughout his representation of So, Suchanek maintained that the Project was legitimate and that Brown's trading resulted in substantial profits.  (Suchanek Trial Test. 12/8/2009 a.m. [**Ex. 22**] at 66:17-23[14]; So Decl. [Ex. 5] at ¶13; 8/30/07 Suchanek Letter to So [**Ex. 31**] at 2.)  In fact, Suchanek testified that he did not conclude until about October 20, 2007, that evidence supported claims against Lopatin and Land Base.  (*See* Suchanek Trial Test. 12/16/09 p.m. [Ex. 22] at 14:6-21; 16:3-18:9; and 70:25-72-1.)

---

[13]  Specifically, Meltzer testified as follows: Q. When was the first time that you know that [Suchanek] became aware of the role of KMA in this transaction. A. **[I] don't think I told Judge Suchanek that I had been involved whatever I had been involved, that I had been paid, until possibly just before the trial.**  (Meltzer Trial Test. [**Ex. 20**], 12/10/2009 a.m., at 67:15-24 (emphasis added).)

[14]  Suchanek's testimony is admissible for purposes of this Opposition.  *See Meaux v. Northwest Airlines, Inc.*, 2010 U.S. Dist. LEXIS 14301 (N.D. Cal. Feb. 18, 2010) (Permitting the use of testimony taken during a previous arbitration in the context of a summary judgment motion as these statements were taken under oath and are admissible under Federal Rule of Civil Procedure 56(e) as affidavits) (citing *Curnow v. Ridgecrest Police*, 952 F.2d 321, 324 (9th Cir. 1991)).

While participating in the UK Action and to maintain the fiction that she owned part of the funds invested in the Placement Project, Defendant Lu presented false testimony to the UK trial court and drafted a false witness statement dated August 11, 2006, which she attributed to So. (So Dep. [Ex. 2] at 9:15-10:20; 13:12-20; 23:8-24; 158:23-159:2; So Decl. [Ex. 5] at ¶ 15.) In fact, So had only met Lu for the first time in 2004, and she had no ownership rights in the money invested. (*Id.*)[15]

Meltzer's present claims notwithstanding, the evidence clearly demonstrates she knew of and understood Lu's conduct in this regard. On September 5, 2007, she wrote an e-mail to So stating that he should not "be concerned about what the Court Order says with regard to money and you and Lucy, because the Court Order is based upon misrepresentations by Lucy. Therefore all of the money that is said to be for you and Lucy, is actually for you." (So Decl. [Ex. 5] at ¶15; 9/5/07 Meltzer E-mail to So [**Ex. 25**].) A week later, on September 12, 2007, Suchanek professed to So that she "deeply regret[s] that this matter has come to a situation involving misrepresentation with respect to you." (So Decl. [Ex. 5] at ¶15; 9/12/07 Suchanek E-mail to So [Ex. 26].) Still, Suchanek failed to take any steps to correct So's witness statement. (*See* So Dep. [**Ex. 2**] at 32:2-9.)

F.   **The UK Judgment, and the Findings of Fact and Law Issued by U.S. District Court Judge James Robertson.**

Ultimately, in no small part due to Suchanek, Meltzer, and Lu's above-described conduct, the UK Litigation was unsuccessful for So. Still, the UK Litigation and its outcome do not bear on the issues to be decided by the Court with regard to the Moving Defendants' Motion. In short, the UK Court made <u>absolutely no</u> findings with regard to when Mr. So was on notice of the fraud – much less whether and when Mr. So was, if at

---

[15] So agreed to pay Lu a portion of any profits earned for her role in locating an investment. (*See* So Decl. [Ex. 5] at ¶ 3.)

1   all, on notice as to potential claims against the Moving Defendants for their roles in the

2   fraud.   Notwithstanding Moving Defendants' misleading claims otherwise, the UK

3   Court's decision was "confined to issues of liability between HSBC" and those who

4   invested in the Project.  (*See* UK Judgment at ¶ 7.)   Moreover, the Moving Defendants

5   falsely claim that the UK Court found that So was on "notice" of the fraud complained of

6   in this litigation in April 2005.  In fact, that Court only addressed whether, as of April,

7   2005, So should have understood that HSBC did not intend to be bound by a "Letter of

8   Instruction" used by the conspirators to convince the investors that their funds would be

9   safeguarded by HSBC.  (*Id*. at ¶ 137.)   In any event, the High Court reversed and ruled

10  that the Letter of Intent created a duty of care on HSBC's part vis-à-vis Kevin So.  (*See*

11  Approved Judgment, *So v. HSBC, et al.*, Case No. 2008/0563 [**Ex. 34**].)  Moreover, the

12  finding regarding whether So had reasonably relied on the Letter of Instruction was

13  overruled on appeal.  That is, the appellate court noted that "there was no reason for an

14  investor to seek advice on the truthfulness and reliability of HSBC's own representation

15  that it had accepted the [Letter of Instruction] and intended to comply with its terms."

16  (*Id.* at ¶¶ 50-52.)

17        Finally, and has been noted herein, So initiated Suchanek Action in DC in

18  December 2008.  *So v. Suchanek*, Civil Action No. 08-2091 (JR).  After a bench trial,

19  United States District Court Judge James Robertson ruled in So's favor, and explicitly

20  held that So did not even know of the UK Action, or that the $30 million was no longer in

21  the bank at HSBC London, until March or April of 2006.  (Ex. 3, Robertson Order at ¶¶ 9

22  and 10.)[16]

23

24

25  _____

26  [16] Other factual findings by Judge Robertson corroborate many of the facts asserted in
    support of this Opposition, and are set forth at page 15 fn. 7 of Plaintiff's Statement of
27  Genuine Issues of Material Fact filed herewith and incorporated here by reference.

28

II.   **ARGUMENT**

  A.   **Legal Standard**

  Summary judgment is warranted only where the movant establishes both (1) that it is entitled to judgment as a matter of law, and (2) that there are no genuine issues of material fact pertinent to the questions of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  All inferences that can be drawn from the documents must be viewed in a light most favorable to the party opposing summary judgment. *Dias v. Elique*, 436 F3d 1125, 1131 (9th Cir. 2006).  Moreover, the "court does not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999).

  B.   **Defendants' Statute of Limitations Defense Fails as a Matter of Law**.

  1.   *The UK Judgment Does Not Support Collateral Estoppel with Regard to Mr. So's Notice of Claims Against the Moving Defendants.*

  Collateral estoppel does not apply here, because whether and when Plaintiff was on notice of the Moving Defendants' fraud has never been litigated.  "Collateral estoppel precludes relitigation of issues argued and decided in prior proceedings." *Pacific Lumber Co. v. State Water Resources Control Bd.*, 37 Cal.4th 921, 943 (2006).  That is, "the issue sought to be precluded from relitigation must be *identical to that decided in a former proceeding*" and "this issue must have been *actually litigated in a former proceeding*." *Id.* (emphasis added).  Finally, "[t]he party asserting collateral estoppel bears the burden of establishing these requirements." *Id.*

  Moving Defendants have failed to establish the requirements of collateral estoppel. As discussed above, the issue of "notice" as it applies here – whether and when So was on notice of the Moving Defendants' fraud – was <u>never</u> litigated and decided in the former proceeding.  (*See* UK Judgment at ¶ 7)  As noted, the UK Court's decision was "confined to issues of liability between HSBC" and those who purportedly invested in the Project.  (*Id.*) The UK Court did not address–and had no reason to address–whether So

had notice of the Moving Defendants' fraud.  (*Id*. at ¶ 7 and 137.)[17]  To claim otherwise is disingenuous at best.[18]

        2.     *So Was Not on Notice of The Fraud until March or April of 2006, and had no Notice of Moving Defendants' Role in the Fraud Until Late 2007.*

     It is well settled under California law that "[r]esolution of the statute of limitations issue is normally a question of fact."  *Fox v. Ethicon Endo-Surgery, Inc*., 35 Cal. 4th 797, 810 (Cal. 2005) (internal citation omitted); *see also Sanderson v. International Flavors & Fragrances*, 1996 U.S. Dist. LEXIS 20671 at *6 (C.D. Cal. 1996).  Only where the facts established through discovery are uncontradicted *and* susceptible of only one legitimate inference is summary judgment proper.  *Sanderson,* 1996 U.S. Dist. LEXIS 20671 at *6 (emphasis added).  In other words, "[t]he motion must be denied if the factual and legal issues are not sufficiently clear to permit a determination with certainty whether the action was timely."  *Lee Myles Assocs. Corp. v. Paul Rubke Enters*., 557 F. Supp. 2d 1134, 1137 (S.D. Cal. 2008).  "It is defendants' burden to establish the applicability of their affirmative defense of the statute of limitations," and, only when defendants establish that defense is it "plaintiff's burden to establish the applicability of the discovery rule to toll the statute." *Sanderson*, 1996 U.S. Dist. LEXIS 20671 at *6.

---

[17] It is again worth noting that, on appeal, a UK appellate court reversed the trial court's finding on the very issue Moving Defendants claim is dispositive of whether So was on notice of their fraud.  (*See* **Ex. 34** at ¶ ¶ 50-52.)

[18] This Court may take judicial notice that a U.S. District Court has expressly held that So did not know that his funds were stolen until March or April of 2006. (Robertson Order [Ex. 3] at ¶¶ 9 and 10.).  Although, Judge Robertson did not address when So understood he had claims against the Moving Defendants, this understanding necessarily comes after the point he learned his funds were stolen. Therefore, the claims So filed in January of 2009 against the Moving Defendants are timely.

a.   Plaintiff was Not Aware of Facts Constituting the Moving Defendants' Fraud Until The Fall of 2007.

While, generally, "a claim accrues upon the occurrence of the last element essential to the cause of action, even if the plaintiff is unaware of the cause of action," under the delayed discovery rule, "the accrual date of a cause of action is delayed until the plaintiff is aware of his or her injury <u>and</u> its cause." *Brandon G. v. Gray*, 111 Cal. App. 4th 29, 35 (Cal. App. 1st Dist. 2003) (emphasis added).  California has codified the delayed discovery rule and provides that the cause of action "is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." *Id.*; Cal. Code Civ. Proc. § 338(d) (2010).

In the instant case, the evidence demonstrates that Plaintiff (i) learned about the fraud only in or around March April 2006, when he learned that his $30 million investment was stolen, and (ii) did not know of the Moving Defendants' involvement in the scheme any earlier than the end of litigation on the UK Action.[19]  Plaintiff has testified that he was not aware that the Moving Defendants were involved in the conspiracy to defraud him until "the end of 2007."[20]  The undisputed facts are that (1) Moving Defendants hid their roles; (2) even legal counsel was unclear of the roles of Kondas and Meltzer and their entities; and (3) Kevin So had no knowledge of any potential claims against Moving Defendants until the end of 2007.[21]  At the least, disputed issues of fact exist as to the timeliness of the claim, which preclude summary judgment.  *See Deveny v. Entropin, Inc.*, 139 Cal. App. 4th 408, 429 (Cal. App. 4th Dist.

---

[19] *See* So Dep. **[Ex. 2]** at 35:7-16; 275:14-23; So Decl. [Ex. 5] at ¶¶ 11, 13 and 14; Wang Decl. **[Ex. 8]** at ¶ 9.

[20] *See* So Dep. at 172:6-19.

[21] Because it is clear that substantial evidence demonstrates that So was unaware of <u>any</u> potential fraud – much less that perpetrated by the Moving Defendants—until March or April of 2006, the Court need not address whether the claims lodged against the Moving Defendants in January of 2009 relate back to the original complaint in this action.

1   2006) (denying summary judgment because whether a plaintiff is on notice of a fraud for

2   purposes of the statute of limitations is a fact-intensive question inappropriate for

3   summary judgment).

4                               b.      Moving Defendants Fraudulently Concealed Their

5                                       Roles In the Fraud.

6          "It is clear that fraudulent concealment tolls a statute of limitations." *NLRB v. Don*

7   *Burgess Constr. Corp.*, 596 F.2d 378, 382 (9th Cir. 1979).  For fraud, "the question of

8   notice … is for the trier of fact."  *Stitt v. Williams*, 919 F.2d 516, 522 (9th Cir. 1990).  A

9   plaintiff is put on notice "as of the date he or she suspects or should suspect that the

10  injury was caused by someone's wrongful act" or, in other words, "when he or she has

11  notice of information of circumstances to put a reasonable person on inquiry." *Brandon*,

12  111 Cal. App. 4th at 35 (citations omitted).  In addition, the duty to investigate in the

13  context of the confidential relationship may arise later "by reason of the fact that the

14  plaintiff is entitled to rely upon the assumption that his fiduciary is acting in his behalf."

15  *Bedolla v. Logan & Frazer*, 52 Cal. App. 3d 118, 131 (Cal. App. 1st Dist. 1975).

16  Moreover, mere notice of a fraud does not suffice for purposes of the statute of

17  limitations.  Rather, it is clear that a plaintiff must be on notice of both the fraud and its

18  cause. *See Gray*, 111 Cal. App. 4th at 35 (emphasis added); *see also Migliori v. Boeing N.*

19  *Am., Inc.*, 114 F. Supp. 2d 976, 984 (C.D. Cal. 2000) (holding that "the question is not

20  whether a plaintiff was on notice of *some wrongdoing*" but is, "[i]nstead, the question is

21  whether the plaintiff had knowledge of facts, or should have known about facts, that

22  placed him or her on notice of the *specific cause of action*.") (emphasis added).

23          Here, as noted above, Plaintiff was not on notice of any potential fraud until March

24  or April of 2006.[22]  Thereafter, he reasonably relied on the statements and conduct of his

25

26  _____

27  [22] So Dep. [Ex. 2] at 35:7-16; 275:14-23; So Decl. [Ex. 5] at ¶¶ 11, 13 and 14; Wang Decl.
    [Ex. 8] at ¶ 9.

28

attorney, Suchanek and his assistant Meltzer, who both assured him that the Moving Defendants were not involved in any way in the fraud.  Through her role in working with Suchanek, Defendant Meltzer actively concealed the role of Moving Defendants involvement in the fraud by, *inter alia*:

- Assuring So from July of 2006 though January of 2008 that Defendants' KM&A and Kondas were legitimate and that So had no claims against them.[23]

- Concealing from Plaintiff that Land Base had also paid KM&A proceeds from the Project, which Plaintiff only discovered in November 2008, when Union Bank produced Land Base account records in this litigation.[24]

- Maintaining that the Project was a veritable investment vehicle for So's funds, and that Brown had actually executed trades contemplated by the scheme yielding substantial profits, which, at the very least, suggests that KM&A were paid *legitimate* proceeds pursuant to the IPFA – a claim Meltzer maintains to this day.[25]

Moreover, Meltzer has claimed that she did not inform Judge Suchanek of her role in the fraud until just prior to trial in the UK in the fall of 2007.[26] These facts underscore why So could not reasonably have known that Meltzer, Kondas, KM&A and the other Conspiring Defendants, including Lopatin, Woodhead and Kim, were potentially liable for the fraud until after the trial in the UK Action concluded in November of 2007.  (*See* So Dep. [**Ex. 2**] at 34:13-22.)  *See Stitt,* 919 F.2d at 523 (doctrine of equitable estoppel "may be available when the defendant lulls the plaintiff into failing to bring suit") (internal citations omitted); *see also Gaglione v. Coolidge* 134 Cal App 2d 518 (1955,

---

[23] So Decl. [Ex. 5] at ¶¶ 11-13.

[24] So Decl. [Ex. 5] at ¶ 9.

[25] Suchanek Trial Test [Ex. 22] at 66:17-23, Dec. 8, 2009 a.m.; August 30, 2007 letter from Suchanek to So [Ex. 31] at 2; So Dec. at ¶¶ 12-13; Meltzer Dep. [**Ex. 21**] at 68:13-23; IPFA [Ex. 15] at 2.

[26] Meltzer Trial Test. [Ex. 20] 12/10/09 a.m. at 67:15-24.

Cal.App. 1st Dist) (holding that the "[s]tatute of limitations may not be availed of by defendant whose conduct induces plaintiff's delay in commencing action"); *Esenbaum v. Western Energy Resources, Inc.*, 218 Cal.App. 3d 314, 323 (Cal. App. 1990) (internal citations omitted) (holding that "[t]he distinction between the rules excusing a late discovery of fraud and those allowing late discovery in cases 'in the confidential relationship category is that in the latter situation *the duty to investigate may arise later by reason of the fact that  the plaintiff is entitled to rely upon the assumption that his fiduciary is acting in his behalf*") (emphasis added).

                c.        The Moving Defendants Were Parties to a Civil Conspiracy, And Overt Act Pursuant to the Conspiracy

Finally, Moving Defendants were parties to a conspiracy, and Plaintiff has asserted a claim of civil conspiracy against each.  California law is clear that, "[w]hen a civil conspiracy is properly alleged and proved, the statute of limitations does not begin to run on any part of a plaintiff's claims until the 'last overt act' pursuant to the conspiracy has been completed." *Wyatt v. Union Mortg. Co.*, 24 Cal. 3d 773, 786 (Cal. 1979).  Here, the Defendants committed overt acts in the course of the conspiracy in the fall of 2007 (and past).  These acts, outlined above, include but are not limited to, their efforts to hide bank records; Lu's submission of a false witness statement to the UK Court in August of 2009, Meltzer's ongoing efforts to conceal her, KM&A and her business partners' roles in the fraud, which continued at least throughout the course of the UK litigation.

In short, because So's reasonable reliance on his U.S. counsel and Defendant Meltzer's concealment of the facts pertaining to fraud and the Moving Defendants' true roles, Plaintiff was not on notice of his claims against the Moving Defendants until at least the Fall of 2007 – after the trial in the UK Action.

**C.**        **Moving Defendants' Motion Should Be Denied As To Plaintiff's First, Second, Third, Ninth and Fifteenth Causes of Action.**

Moving Defendants argue in the alternative that the Court should grant them summary judgment as to plaintiff's claims of fraud, negligent misrepresentation, fraud by

1  omission, civil conspiracy and breach of fiduciary duty, claiming lack of ties to the

2  fraudulent statements.  Their arguments, however, contradict material facts admitted by

3  Moving Defendants.

4        1.    *Millar Served as the Moving Defendants' Authorized Agent.*

5        In California, "an agency is either actual or ostensible."  Cal. Civ. Code § 2298.

6  "An agency is ostensible when the principal intentionally, or by want of ordinary care,

7  causes a third person to believe another to be his agent who is not really employed by

8  him." Cal. Civ. Code § 2300.  To establish a triable issue of fact that an agent otherwise

9  unaffiliated with the principal was the principal's agent, the plaintiff need only produce

10  some evidence that the principal "intentionally or by want of ordinary care has caused or

11  *allowed [plaintiff]* to believe the agent possesses such authority… ."  *Am. Cas. Co. of*

12  *Reading, Pennsylvania v. Krieger*, 181 F.3d 1113, 1121 (9th Cir. 1999) (emphasis added)

13  (internal citations omitted).  A principal could still be liable where he or she "knows that

14  the agent holds himself out as clothed in certain authority, and remains silent."  *Id.*

15  Generally, "ostensible authority is 'for a trier of fact to resolve'" and "<u>should</u> <u>not</u>…[be]

16  decided by an order granting summary judgment." *Id.* (emphasis added) (internal

17  citations omitted).

18        Overwhelming evidence—including their own sworn admissions—confirms not

19  only that Millar was Kondas, Meltzer and KM&A's ostensible agent, but also that he was

20  their <u>actual</u> agent and, acting as such, recruited So into the Project.  *See* Section I (A-C),

21  *supra*.  Here, Meltzer and Kondas have both admitted that Millar acted on their behalf,

22  *inter alia*, as follows: (a) Millar introduced So to KM&A, and KM&A then introduced So

23  to the Project by introducing him to Land Base/Lopatin[27]; (b) Kondas dispatched Millar

24  to facilitate Lu's execution of the IPFA on behalf of So, which Kondas himself executed

25

26

27  [27] Meltzer Trial Test  [Ex. 20], 12/9/09 a.m. at 76:16-80:2, 91:9-11; KM Corp., at 76:8-15; 84:3-8; and 89:21-90:17

28

and pursuant to which KM&A and its members were paid approximately $627,000 in so-called commissions on fictitious trades directly from the Plaintiff (and an additional $730,000 from Land Base)[28]; (c) Millar, with Kondas's knowledge, attended meetings with KM&A member Minton in London in April 2005, where they introduced Lu to Lopatin.[29]   For these efforts, KM&A also paid Millar directly $67,955 in funds that originated with the $30 million So invested in the Project.  (Trans. Details [Ex. 16]; Klein Supp. [Ex. 29 B] at 12.)

Lastly, no evidence exists that Kondas, Meltzer or KM&A ever made any efforts to disavow Kondas's and KM&A's association with Millar – nor have Moving Defendants asserted this in their Motion.  Indeed, they signed the IFPA that he brokered and on June 1, 2005, KM&A formally partnered with Millar and Boris Lopatin & Associates to form Moving Defendant KB&M, which KM&A paid $125,000 in funds emanating from the money So placed in the Project.  (*See* Ex. 34; Trans. Details [**Ex. 16**]; Klein Supp. at 8.) Moving Defendants are responsible and liable for Millar's conduct in recruiting So into the Project for which they were well paid.  *See Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1212-13 (C.D. Cal. 2007) (principal vicariously liable for an agent's tortious conduct if the principal expressly or implicitly authorized the conduct).

> 2.   *Moving Defendants Engaged in An Ongoing Conspiracy to Defraud Plaintiff.*

The evidence shows that the Moving Defendants entered into an ongoing conspiracy to defraud the Plaintiff with, among others, each other, Millar and Lopatin.  In California, the elements of fraud are: (1) a misrepresentation (false representation, concealment or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage."

---

[28] KM Corp. **[Ex. 9]** at 149:25-150:6; 189:9-15.

[29] KM Corp. **[Ex. 9]** at 76:8-15 and 84:3-8.

1  *Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1268 (C.D. Cal. 2007) (cite

2  omitted).   Under California law, a concealment under the first prong can constitute

3  actionable fraud when the defendant had a duty to disclose what was concealed. *Cedars*

4  *Sinai Med. Ctr. v. Mid-West Nat'l Life Ins. Co.*, 118 F. Supp. 2d 1002, 1012 (C.D. Cal.

5  2000).  "This duty arises in four circumstances: (1) when the defendant is in a fiduciary

6  relationship with the plaintiff; (2) when the defendant had exclusive knowledge of

7  material facts not known to the plaintiff; (3) when the defendant actively conceals a

8  material fact from the plaintiff; and (4) when the defendant makes partial representations

9  but also suppresses some material fact." *Id*. (citation omitted)).

10      Moving Defendants joined in a conspiracy and operated it in concert with others.

11  Therefore, each of the Defendants is equally liable for the others tortious conduct.  *Wyatt*

12  *v. Union Mortgage Co.*, 24 Cal.3d 773, 784 (1979).[30]  "It is well settled that a conspirator

13  is liable for all the acts done in furtherance of a common scheme or plan even though he

14  is not a direct actor."  *Peterson v. Cruickshank*, 144 Cal.App.2d 148, 168 (Cal. Ct. App.

15  1956).  It is equally well established that "a party may be liable even if the intentional tort

16  is committed before he participates, if he, knowing the facts, then participates therein."

17  *Id*.  Moreover, "the requisite concurrence and knowledge 'may be inferred from the

18  nature of the acts done, the relation of the parties, the interests of the alleged conspirators,

19  and other circumstances,' and "[t]acit consent as well as express approval will suffice to

20  hold a person liable as a coconspirator."  *Wyatt*, 24 Cal.3d at 785.

21      Here, the evidence, described in detail at Section I (A-C), *supra*, demonstrates that

22  Moving Defendants formed and operated a conspiracy to defraud the Plaintiff.  The

23  Moving Defendants, by and through their agent Millar, made misrepresentations of

24

25  [30]  The elements of civil conspiracy are "(1) the formation and operation of the conspiracy;

26  (2) the wrongful act or acts done pursuant thereto; and (3) the damage resulting."  *Mosier*

27  *v. Southern California Physicians Ins. Exchange*, 63 Cal.App.4th 1022, 1048 (Cal. Ct.

   App. 1998).

28

material fact to So's then-agent, Lu, intending to induce So to rely on these misrepresentations.  Because the Moving Defendants knew and* intended Millar's misrepresentations to be transmitted to So by his then-agent Lu to entice his participation in the Project, it matters not whether any of the Moving Defendants actually spoke with So directly.  Among these misrepresentations were, *inter alia*, that (a) the principal invested would be safeguarded by HSBC and monitored by the authorities (Exs. 13 and 14; So Decl. at ¶6); (b) the principal invested would not be at risk (Ex. 11; So Decl. at ¶6); and (c) the bond trader, executing multiple trades, would achieve substantial returns. (Ex. 12; So Decl. at ¶6.)

     As known and intended by the Moving Defendants, Lu transmitted these representations to So, who, in reasonable reliance on them, decided to participate in the Project.  (So Decl. at ¶6.)  *See Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995) (Whether the injured party relied on a misrepresentation or whether that reliance was justified and reasonable are questions of fact); *see also Cedars Sinai*, 118 F. Supp. 2d at 1012 (same).  This conspiracy continued at least through the 2007 UK trial, where Moving Defendant Meltzer materially assisted Suchanek in his purported defense of Plaintiff.  Consequently, each of the Moving Defendants is liable as a matter of law for each tortious act committed by their co-conspirators in furtherance of that conspiracy. Their Motion for Summary Judgment should be denied.

### 3.     Breach of Fiduciary Duty.

     To make a claim for breach of fiduciary duty "the claimant must allege (1) the existence of a fiduciary relationship giving rise to a fiduciary duty, (2) breach of that duty, and (3) damage proximately caused by the breach." *Negrete v. Fid. & Guar. Life Ins. Co.*, 444 F. Supp. 2d 998, 1003 (C.D. Cal. 2006).  For a fiduciary relationship giving rise to a fiduciary duty to exist, a party "must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law." *Sonoma Foods, Inc. v. Sonoma Cheese Factory*, LLC, 2007 U.S. Dist. LEXIS 84751, *14 (N.D. Cal., Oct. 30, 2007) (quoting *Committee On*

23

1   *Children's Television, Inc. v. General Foods Corp.*, 35 Cal. 3d 197, 221 (1983)); *See also*

2   *Portney v. CIBA Vision Corp.*, 2008 U.S. Dist. LEXIS 84158, *5-6 (C.D. Cal., Sept. 17,

3   2008) (same).[31]   Under California law, "[w]hether a fiduciary relationship exists in any

4   given situation is a question of fact."  *Negrete*, 444 F. Supp. 2d at 1003.

5       Here, the Moving Defendants knowingly undertook to act on behalf of Plaintiff and

6   to point him to what they said was a good, safe investment opportunity. Specifically, by

7   their agent Millar, Moving Defendants recruited So into the fraudulent scheme and

8   executed the IPFA by which they received proceeds of the fraud.  *See Portney, supra*,

9   2008 U.S. Dist. LEXIS at *5-6.  Consequently, Moving Defendants were So's fiduciary.

10  Moreover, even accepting, *arguendo*, that Moving Defendants did not owe So a fiduciary

11  obligation, they are nevertheless liable for civil conspiracy.  That is, whereas here, the

12  defendants have engaged in a civil conspiracy, "a plaintiff, defrauded by means of one

13  defendant's violation of a fiduciary duty, [is] allowed to recover against another

14  defendant who, though not subject to the fiduciary duty, had conspired in the fraud.[32]"

15  *Doctors' Co. v. Superior Court of Los Angeles County*, 49 Cal.3d 39, 47 (1989).

16      Finally, as outlined above, the Moving Defendants acknowledge that they were

17  each paid funds directly out of the funds So placed into the Project.  Where  defendants

18  claim to be nonfiduciaries but act in furtherance of their own financial gain, "they could

19  not have been relieved from liability" of the tort of breach of fiduciary duty.  *Id.*; *see also*

20  *Mosier*, 63 Cal. App. 4th. at 1048 (holding that a conspirator acts in furtherance of his or

21  her own financial gain, they cannot be relieved of liability for a coconspirator's breach of

22  _____

23  [31] "The essence of a fiduciary or confidential relationship is that the parties do not deal on

24  equal terms, because the person in whom trust and confidence is reposed and who accepts

    that trust and confidence is in a superior position to exert unique influence over the

25  dependent party." *Ali v. Fasteners for Retail, Inc.*, 544 F. Supp. 2d 1064, 1071 (C.D. Cal.

26  2008) (citing *Barbara A. v. John G.*, 145 Cal.App.3d 369, 383 (1983)).

27  [32] The evidence outlined in Section I(A-C), above, amply supports a finding that co-
    conspirator Millar owed So a fiduciary duty.

28

1  a fiduciary obligation). Accordingly, Plaintiff's claim for breach of fiduciary duty against

2  the Moving Defendants must stand.

3  **CONCLUSION**

4        WHEREFORE, Plaintiff, Kevin So, respectfully requests that this Court enter an

5  order (i) denying Moving Defendants' Motion for Summary Judgment; and (ii) granting

6  such further and additional relief as the Court deems just and proper.

7

8  Dated:  June 1, 2010               KALBIAN HAGERTY, LLP

9                                     /s/ Aaron W. Knights

10                                    _____

11                                    AARON W. KNIGHTS (admitted pro hac vice)
                                      *Counsel for Plaintiff Kevin So*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff's Opposition to Kondas/Meltzer Defendants' Motion for Summary Judgment

## CERTIFICATE OF SERVICE

I am employed in the District of Columbia; I am over the age of eighteen years and not a party to the above-entitled action; my business address is 888 17th Street, NW, Suite 1000, Washington, DC 20006.

I hereby certify that on the date set forth below, I have electronically filed the foregoing: **Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants Kevin Kondas, Mira Meltzer, KM & Associates International, LLC, KB&M Projects International, LLC, and CTL Projects International, LLC's Motion for Summary Judgment.**

with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Thomas W. Dressler, Esq.
Dennis M. McPhillips, Esq.
Dressler Law Group
707 Wilshire Blvd., Ste. 3700
Los Angeles, California 90017
*Attorneys for Defendants Univest Financial Services, Inc., Jeffrey M. Moritz and Laurent Gerschel,*

Todd D. Thibodo, Esq.
Law Offices of Todd D. Thibodo
16133 Ventura Boulevard, Suite 580
Encino, California 91436
*Attorney for Defendants KM & Associates International LLC, KB&M Associates International LLC, and CTL Projects International, LLC*

Wayne E. Beaudoin, Esq.
The Law Offices of Wayne Beaudoin
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
*Attorney for Defendant Mira Meltzer*

William Donovan, Esq.
Brendan E. Starkey, Esq.
DLA Piper LLP (US)
1999 Avenue of the Stars, Fourth Floor
Los Angeles, California 90067-6022
*Attorneys for Defendant Kevin Kondas*

John P. Hannon II, Esq.
Law Offices of John P. Hannon II
716 Capitola Avenue, Suite F
Capitola, California 95010
*Attorney for Defendant Charles W. Woodhead*

I hereby certify that I served via e-mail and U.S. Mail, postage prepaid, the documents identified above on the following non-efiling user(s):

Boris Lopatin
Land Base, LLC
1431 Ocean Avenue, # 1210
Santa Monica, CA 90401
(and via e-mail at *laconfide@aol.com*)

Dated: June 1, 2010               KALBIAN HAGERTY, LLP

                                    /s/ Aaron W. Knights

                                    AARON W. KNIGHTS (admitted pro hac vice)
                                    *Counsel for Plaintiff Kevin So*