Haig Kalbian (Admitted *pro hac vice*)
Mary M. Baker (Admitted *pro hac vice*)
D. Michelle Douglas (CA Bar No. 190248)
Aaron Knights (Admitted *pro hac vice*)
KALBIAN HAGERTY L.L.P.
The Brawner Building
888 17th Street, N.W., Suite 1000
Washington, D.C. 20006
Phone:      (202) 223-5600
Facsimile: (202) 223-6625
E-mail:    hkalbian@kalbianhagerty.com
           mmb@kalbianhagerty.com
           mdouglas@kalbianhagerty.com
           aknights@ kalbianhagerty.com

Louis R. Miller, Esq. (CA Bar No. 54141)
Alexander Frid, Esq. (CA Bar No. 216800)
Miller Barondess, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Phone:      (310) 552-4400
Facsimile:  (310) 552-8400
E-mail:    smiller@millerbarondess.com
           sfrid@millerbarondess.com

*Counsel for Plaintiff Kevin So*

UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA
(Western Division-Los Angeles)

| | |
|---|---|
| KEVIN SO,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>LAND BASE, LLC, et al.<br><br>　　　　　Defendants. | CASE NO. CV 08-3336 DDP (AGRx)<br><br>**PLAINTIFF'S STATEMENT OF GENUINE ISSUES OF MATERIAL FACT IN OPPOSITION TO DEFENDANTS KEVIN KONDAS, MIRA MELTZER, KM & ASSOCIATES INTERNATIONAL, LLC, AND CTL PROJECTS INTERNATIONAL, LLC MOTION FOR SUMMARY JUDGMENT** |

**PLAINTIFF'S STATEMENT <u>OF</u> GENUINE ISSUES OF MATERIAL FACT**

Plaintiff Kevin So ("Plaintiff" or "So"), by his undersigned counsel, and pursuant to Fed. R. Civ. P. 56 and L.R. 56-2, respectfully submits the following statement of genuine

1

Plaintiff's Statement of Genuine Issues of Material Fact in Opposition to
Defendants Kevin Kondas, Mira Meltzer, KM & Associates International, LLC, KB&M Projects
International, LLC, and CTL Projects International, LLC's Motion for Summary Judgment

issues of material fact in Opposition to Defendants Kevin Kondas ("Kondas"), Mira Meltzer ("Meltzer"), KM & Associates International, LLC ("KM&A"), KB&M Projects International, LLC, and CTL Projects International, LLC's ("CTL") (collectively "Moving Defendants") Motion for Summary Judgment ("Motion") and states as follows:

1. Plaintiff denies Moving Defendants' statement that the subject matter of this lawsuit was also the subject of more than three years of litigation in England (to which he was a party) to the extent that it implies in any way that the two actions are identical and/or that the UK action has any collateral estoppel or other preclusive effect. (*See* Defs' Statement at ¶¶ 1-2.)

> While the litigation in the United Kingdom did involve Plaintiff and his $30 million investment, the UK action was a declaratory relief action brought by HSBC-UK against Brown, his companies, Plaintiff and the other investors and involved different issues.   (So Decl. [**Ex. 5**] at ¶ 11; *see also* Defs' **Exh. J**, Judgment in *HSBC Bank PLC v. 5th Ave. Partners Ltd.*, Case No. 2005 Folio 841, [2007] EWHC 2819 (Comm) (the "UK Judgment")).
>
> In the UK Action, HSBC asserted that it was not responsible for depletion of funds from the accounts, and that it was not liable for breach of trust, contract, and negligent misrepresentation.  In addition, HSBC indicated that should any of the investors assert a claim against HSBC, HSBC would rely on the features of the Land Base Agreement that suggest Land Base was part of a money laundering scheme.

2. Plaintiff denies that he was represented by Kalbian Hagerty LLP in the U.K. litigation.   (*See* Defs' Statement at ¶3.)  Kalbian Hagerty's representation was related only to the U.S. aspects and was completely ancillary to the U.K. litigation. (*See* Hagerty Decl. in Support of Opp. To Motion to Disqualify, Docket # 361, Att. #2, at ¶20.)

3. Plaintiff agrees that during the Suchanek litigation he affirmed the truthfulness[1] of his testimony in the UK litigation. (*Cf.* Defs' Statement at ¶4 citing So Depo., Vol. 1, 8:25-9:4.)

However, in the same deposition, a few lines later Plaintiff testified that he did not prepare his Written Statement in the UK litigation, and did not sign it either. (So Depo., [**Ex. 2**], Vol. 1, at p.9:15-19.)

4. Plaintiff disputes that he submitted a witness statement in the UK litigation dated August 11, 2006 to the extent it implies in any way that he authorized or was aware of the substance of that witness statement. (*See* Defs' Statement at ¶ 5-7.)

In the course of participating in the UK Action, Defendant Lu drafted a witness statement that contained false statements and she attributed to the witness statement to Kevin So. (So Decl. at ¶ 15.) On or about August 21, 2007, So told his attorney, Leonard Suchanek ("Suchanek"), that the signature on the August 11, 2006, witness statement was not his. (*Id.*, *see also* So Dep., Vol. 1 at 9:15-10:20; 13:12-20; 23:8-24; 158:23-159:2.)

5. Plaintiff disputes Moving Defendants' Uncontroverted Fact at ¶8 to the extent it implies that the UK judgment was affirmed as to all factual findings and legal conclusions.

Specifically, the High Court reversed Justice Walker's judgment and ruled that the Letter of Intent had in fact created a duty of care on HSBC's part vis-à-vis

---

[1] "Questions of credibility, of course, are particularly appropriate for jury determination. . . . [I]t is not the function of the trial judge to weigh the evidence when the case is only at a preliminary state of a motion for summary judgment." *Hoover v. Switlik Parachute Co.*, 663 F.2d 964, 968 (9th Cir. 1981).

3

Plaintiff's Statement of Genuine Issues of Material Fact in Opposition to
Defendants Kevin Kondas, Mira Meltzer, KM & Associates International, LLC, KB&M Projects
International, LLC and CTL Projects International, LLC's Motion for Summary Judgment

Kevin So. (*See* Approved Judgment, *So v. HSBC, et al.*, Case No. 2008/0563 [**Ex. 34**].) Moreover, the finding regarding whether So had reasonably relied on the Letter of Instruction was overruled on appeal. That is, the appellate court noted that "there was no reason for an investor to seek advice on the truthfulness and reliability of HSBC's own representation that it had accepted the [Letter of Instruction] and intended to comply with its terms." (*Id.* at ¶¶ 50-52.)

6. Plaintiff disputes that 10% of $30 million investment belonged to Lu's family and that the approval from Lu's family was necessary for the private placement investment. (*See* Defs' Statement at ¶ 11, 13.)

Lu had no ownership interest in the funds that were invested in the Private Placement Project. (So Decl. at ¶ 15; *see also* So Dep. at 13:12-20.) So had only met Lu for the first time in 2004, and she had no ownership rights in the money invested. (So Decl. at ¶3; *see also* Wang Decl. [**Ex. 8**] at ¶6.) Instead, Lu had an interest in any profits which were made from the investment, which of course never occurred. (*Id.* at ¶3.) Meltzer and Suchanek knew of and understood Lu's false claims in this regard. (*See* So Decl. at ¶15; *see also* September 5, 2007 E-mail from Meltzer to So, attached as **Ex. 25**.; September 12, 2007 E-mail from Suchanek to So, attached as **Ex. 26.**) Specifically, on September 5, 2007, Meltzer wrote an e-mail to So stating that he should not "be concerned about what the Court Order says with regard to money and you and Lucy, because the Court Order is based upon misrepresentations by Lucy. Therefore all of the money that is said to be for you and Lucy, is actually for you." (So Decl. at ¶15; 9/5/07 Meltzer Email to So [Ex. 25].) A week later, on September 12, 2007, Suchanek professed to So that she "deeply regret[s] that this matter has come to a situation involving misrepresentation with respect to you." (So Decl. at ¶15; 9/12/07 Suchanek E-mail

4
Plaintiff's Statement of Genuine Issues of Material Fact in Opposition to
Defendants Kevin Kondas, Mira Meltzer, KM & Associates International, LLC, KB&M Projects
International, LLC and CTL Projects International, LLC's Motion for Summary Judgment

to So [Ex. 26].)  Still, Suchanek failed to take any steps to correct So's witness statement.  (*See* So Dep. [**Ex. 2**] at 32:2-9.)

7.  Plaintiff disputes Moving Defendants' Uncontroverted Fact at ¶ 12, because any statements taken from allegedly his witness statement were not drafted by or in any way authorized by Plaintiff. (So Decl. at ¶ 15.)

8.  Plaintiff disputes that Millar was never authorized to act for and on behalf of KM&A.  (*See* Defs' Statement at ¶¶ 15, 16.)

Along with non-party Robert Minton ("Minton"), Kondas and Meltzer were business partners and founded Defendant KM&A together in 1999. (Kondas Dep. on behalf of KM&A, KB&M and CTL ("KM Corp.") [Ex. 9] at 47:11-13; 48:19-22; 49:8-11; 52:6-17.) KM&A and its members—Kondas, Meltzer and Minton—maintained a business relationship with Defendant Keith Millar, including but not limited to his 2005 agency related to Lu and So and the formation of KB&M. (*See* Certified Copy of KM Entities' Articles of Incorporation, attached as **Ex. 33**.) In fact, Meltzer and Kondas (via KM&A) partnered with "Boris Lopatin & Associates" and Millar to form Moving Defendant KB&M.  (*See* Ex. 33.)

Millar, on behalf of KM&A and with Kondas's and Meltzer's knowledge, approval and consent, corresponded with Lu from January 2005 through April 2005 in a successful effort to recruit and convince So to participate in the Private Placement Project. In his March 2010 deposition for KM&A, KB&M and CTL, among other things, Kondas testified and admitted that he knew that Millar was in communications with Lu in 2005 to explore investment opportunities for So, and that Boris Lopatin ("Lopatin") had informed KM&A that he knew of a trader that might be suitable for KM&A's clients.  (*See* KM Corp. [Ex. 9] 76:8-15 and 89:21-

90:18.) Additionally, Meltzer and Kondas have admitted that Millar brought Plaintiff to KM&A, which then introduced So to the Project by introducing him to Land Base and Lopatin. (*See* Meltzer Test. in *So v. Suchanek*[2], C.A. No. 08-2091 (D.D.C.) ("Suchanek Action") ("Meltzer Trial Test."), 12/9/09 a.m. [**Ex. 20**], at 79:16-80:2, 91:9-11[3]; (KM Corp. [Ex. 9] at 76:8-15 and 84:3-8.)

Many of the e-mails Millar transmitted to Lu were signed off by Millar as "on behalf of K M Associates International, LLC." (*See*, e.g., Exs. 6, 10 and 11; Wang Decl. at ¶ 10.) Millar, with Kondas's knowledge, approval and consent, attended meetings with KM&A member Robert Minton in London in April 2005, where they introduced Lu to Lopatin. (*See* KM Corp at 76:8-15 and 84:3-8.) For his efforts, KM&A also paid Millar $67,955 in funds that originated with the $30 million So invested in the Private Placement Project. (Transaction details [**Ex. 16**]; Klein Supplemental Report [**Ex. 29**] at 12.)

9. Plaintiff disputes that Lu regularly informed So of the substance of her conversations with Millar. (*See* Defs' Statement at ¶ 17.)

Lu, acting as So's then trusted agent shared with So the substance of some conversations and communications with Millar. (*See* So Decl. at ¶ 6). Lu took control of the investment in all material respects. Specifically, Lu handled all correspondence with relevant players, attended all meetings in the lead-up to the investment and, consequently, controlled what information was passed along to Mr. So. (*See* So Decl. at ¶ 5.)

---

[2] So sued his former U.S. counsel, Suchanek, in December 2008. On May 6, 2010, Judge Robertson ruled in So's favor, and a copy of his ruling is attached hereto as **Ex. 3**.

[3] Meltzer's testimony in the *Suchanek* action is not hearsay. Instead, it is admissible as an admission by a party opponent. *See* Fed.R.Evid. 801(d)(2)(A).

Plaintiff's Statement of Genuine Issues of Material Fact in Opposition to Defendants Kevin Kondas, Mira Meltzer, KM & Associates International, LLC, KB&M Projects International, LLC and CTL Projects International, LLC's Motion for Summary Judgment

10. Plaintiff disputes Moving Defendants' Uncontroverted Facts at ¶¶18-19 to the extent that they imply that Lu had meetings only with Michael Brown and relied exclusively on his representations in order to invest in the private placement.

Prior to the investment, Millar and KM&A member Minton, along with Michael Brown and Boris Lopatin, participated in meetings in London in April 2005 and pitched Michael Brown and the Private Placement Project. During these meetings, Millar and KM&A member Minton also introduced Lu to Lopatin. (KM Corp. [**Ex. 9**] at 76:8-15 and 84:3-8.) As a result of these meetings and numerous assurances made by Millar and KM&A and Moving Defendants, Lu executed the "Private Enterprise Assets Exchange Benefits Participation Agreement" ("Land Base Agreement") on So's behalf. (*See* So Decl. [**Ex. 5**] at ¶ 6; Land Base Agreement, attached as **Ex. 17**.) The conspirators provided Lu with a document known as the "Irrevocable Bank Instruction" ("Letter of Instruction"), which provided that "[u]nder no circumstances shall **Principal amount of funds** deposited in the amount of **Thirty Million United States Dollars** ($30,000,000.00) be permitted to be withdrawn, unless as stated hereto …" (*See* Letter of Instruction, attached as **Ex. 38**.)

11. Plaintiff disputes that he *directly* entered into the "Land Base Agreement". (*See* Defs' Statement at ¶ 19) and Irrevocable Project Funding Agreement ("IPFA") (*See* Defs' Statement at ¶40).

Lu executed a document titled "Private Enterprise Assets Exchange Benefits Participation Agreement" ("Land Base Agreement") on So's behalf. So Decl. at ¶ 6; Land Base Agreement, attached as **Ex. 17**.)

7

Plaintiff's Statement of Genuine Issues of Material Fact in Opposition to
Defendants Kevin Kondas, Mira Meltzer, KM & Associates International, LLC, KB&M Projects
International, LLC and CTL Projects International, LLC's Motion for Summary Judgment

On March 24, 2005, Millar arranged for Lu to execute a document known as the Irrevocable Project Funding Agreement ("IPFA"), signed by Kondas, whereby So agreed to pay KM&A a commission on profitable trades under the Project. (KM Corp. [Ex. 9] at 80:21-81:4; IPFA [Ex. 15].) Together with Kondas' own admissions, e-mails from Millar to Lu demonstrate that Millar was acting to facilitate the execution of the IPFA on KM&A's behalf. On April 2, 2005, Millar noted to Lu that "Dr Kondas will return the signed IPFA to you tomorrow," and on April 5, 2005, Millar inquired of Lu whether she "received the counter-signed copy of the IPFA from Dr Kondas." (4/2/2005 and 4/5/2005 E-mails from Millar to Lu [Ex. 35].) Kondas admitted that Millar helped KM&A obtain the IPFA and facilitated its execution, pursuant to which Kondas, Meltzer and Minton personally were paid substantial sums. (KM Corp. [Ex. 9], at 81:13-22 and 189:9-15.)

KM&A paid Millar in the spring and summer of 2005 for his role in recruiting So's investment. (Trans. Details [Ex. 16]; KM Corp. [Ex. 9] at 220:1-221:9.) The wire transfers refer to the Project by its transaction code and a reference to one of Brown's companies. (Ex. 16; KM Corp. [Ex. 9] at 108:21-109:17.) The IPFA provides that KM&A would be entitled to 20% of any profits earned through the Project. (Ex. 15 at 2.) It also provides that the relationship was "Never To Be Revealed To Any Third Party Whatsoever," Requiring "Total Silence Regarding The Aforementioned, In All Regards, And Without Compromise." (Ex. 15 at 3.)

12. Plaintiff denies any references in Moving Defendants' Uncontroverted Fact at ¶21 that Lu had any ownership interest in the funds that were invested in the Private Placement Project. (So Decl. at ¶ 15; *see also* para. 6 above incorporated by reference

8

Plaintiff's Statement of Genuine Issues of Material Fact in Opposition to
Defendants Kevin Kondas, Mira Meltzer, KM & Associates International, LLC, KB&M Projects
International, LLC and CTL Projects International, LLC's Motion for Summary Judgment

herein.) Instead, Lu had an interest in any profits which were made from the investment, which of course never occurred. (*Id.* at ¶3.)

13. Plaintiff disputes Moving Defendants' Uncontroverted Facts at ¶¶22-28 to the extent they imply he failed to do due diligence regarding the investment. Plaintiff was entitled to rely upon Millar and KM&A' representations regarding Michael Brown and the Private Placement Project. Additionally, Plaintiff made independent inquiries regarding Michael Brown's customer status with HSBC. (So Decl. at ¶ 8.). Moreover, So relied on Lu as his trusted agent in handling all aspect of the investment. (So Decl. at ¶¶3-5.).

14. Plaintiff disputes that (i) he "never received assurances" regarding the investment, (ii) was not pressured by anyone to make his investment and (iii) that he could have, but never wanted to or never sought professional advice regarding the Land Base Agreement and the investment. (*See* Defs' Statement at ¶¶ 29, 30.) Plaintiff further disputes the fact that the whole reason he and Lu decided to go forward with the investment was because the funds were with HSBC. (*See* Defs' Statement at ¶¶ 31-33, 64.)

Moving Defendants' statements of the facts are either legal conclusions or inferences from the facts which are biased in favor of Moving Defendants. Contrary to what Moving Defendants assert, the undisputed evidence demonstrates that Millar, as an agent for and on behalf of Kondas, Meltzer and KM&A, provided repeated and convincing assurances to Lu (So's agent at that time) that the $30 million invested by So would be "safe and secure in a non-depletion account," and would be in an account "regulated by the British Government and the Bank of England," and, as trading would occur in U.S. Dollars, the SEC would also be involved. (Wang Decl. at ¶ 10; 2/20/05; February 20, 2005 E-mail from

9
Plaintiff's Statement of Genuine Issues of Material Fact in Opposition to
Defendants Kevin Kondas, Mira Meltzer, KM & Associates International, LLC, KB&M Projects
International, LLC and CTL Projects International, LLC's Motion for Summary Judgment

Millar to Lu attached as **Ex. 13**; and February 17, 2005 E-mail from Millar to Lu attached as **Ex. 14**.)

According to Millar and KM&A, "your funds will not be at any risk, and HSBC are fully aware of, and stand behind, this arrangement," and that investor-funds could be withdrawn "principal plus accumulated profits, by giving 30 days written notice at any time." (Wang Decl. at ¶ 10; Ex. 11.) Millar noted that "the trader is trading Billions of USD each year and is making substantial profits not only for each client, but also for himself and the parent company – he is not going to jeopardize his reputation, freedom or lifestyle by stealing money from the client." (**Ex. 14**.)

Millar described the potential trading project with Michael Brown as a "real 'front door' transaction where you will meet a director of the trade group and the bank trader." (Wang Decl. at ¶ 10; *see also* 2/18/05 E-mail from Millar to Lu attached as **Ex. 12**.) He also noted that, "[i]nitially, with your $30M you will enter into a 'narrow margin' trade which is trading A+ up to AAA grade bank paper – your funds will be leveraged X 4 so you will make typically 4 pts per trade," and the investment would "start with two trades per week and accelerate rapidly up towards a larger number…" (*Id.*) Each of these claims was false and is exemplary of misrepresentations made in the course of executing a Prime Bank Fraud. (*See* Ray Report [**Ex. 4**] at 9-10.)[4]

---

[4] The investment plan was a sham. The trading Millar and KM&A described in e-mails during early 2005 to So's agent, Lu, was a fantasy. (Ray Report [Ex. 4] at 11.) Brown executed little or no trades. (*Id.* at 13-16.) Instead, Brown stole the money and paid substantial amounts to those who helped facilitate his scheme, including, Land Base, Lopatin, Kondas, Meltzer, KM&A and others. (*See*, e.g., Land Base Payments to KM&A [Ex. 19]; Ray Report [Ex. 4] at 12.) For approximately six to eight months, Brown sent Mr. So and other investors fabricated trade tickets and sent wire transfers from HSBC payable to the investors as their "profits." These wire transfers were comprised of the invested principal, further deceiving the investors and/or their agents that Brown's trade activities were successfully developing. (Ray Report [Ex. 4] at 13-16.)
(footnote continued)

Lu transmitted some of these representations to So, such as that his investment would be safe, protected by HSBC, and held in a non-depletion account at no risk. (So Decl. at ¶¶ 5 and 6.)  Lu also told So the funds would be monitored by the authorities, such as the Bank of England, the Securities Exchange Commission, and the World Bank. (So Decl. at ¶6.) Lu represented that she sought advice from investment professionals, who assured her that this was a veritable investment opportunity. (*Id.*)  At that time, So also trusted Lu and Yang's experience and expertise in structuring this kind of investment. (*Id.*, *see also* Wang Decl. at ¶¶6-7.)  So reasonably relied on these representations in deciding to participate, especially her representations that the funds would be safeguarded by HSBC and monitored by the authorities. (So Decl. at ¶¶6, 7.)

15.  Plaintiff disputes that by October 2005 HSBC commenced the UK litigation and that Plaintiff engaged an attorney in England. (*See* Defs' Statement at ¶ 34.)

HSBC commenced the UK litigation on October 14, 2005, but did not add Mr. So, Ms. Lu and Robert Mann as defendants until approximately November 18, 2005.  In addition, Moving Defendants cite to So's trial testimony with respect to the allegations that he hired an attorney in England. (*See* Defs' Statement at ¶ 34 citing So Trial Tr., 10/18/07, 62:19-63:10.) Moving Defendants omit key portions of related testimony. For example, on the cited pp. 62-63, So testified that he did not remember that he had ever instructed a lawyer called "Mr. Larue," signed a document to engage Mr. Larue or had any conversation with Mr. Larue. Moreover, a few pages later on p. 68, So testified that he had learned about the U.K. litigation and the allegations that Michael Brown had stolen money only

sometime in March 2006. (*Id*. at 68:10-22; *see also* So Decl. at ¶11; So Dep. at 35:7-16; 275:14-23). Around the same time, So learned that Lu, without notifying him or seeking his authority, had retained UK counsel to act on So's behalf in October or November of 2005. (So Decl. at ¶11.)

16. Plaintiff disputes Moving Defendants' Uncontroverted Fact at ¶ 35 to the extent they try to assert that Plaintiff was put on notice by virtue of that a representative of HSBC contacted So.

> In or around November of 2005, a representative from HSBC contacted Plaintiff regarding Michael Brown and his investment program. (So Decl. at ¶11.) However, when So inquired of Lu about HSBC's phone call, Lu told him she spoke with Lopatin and confirmed that the call related to a problem between HSBC and Brown, and that the funds invested were safe at HSBC. (*Id*.) She repeatedly confirmed this information thereafter. (*Id*.)

17. Plaintiff disputes Moving Defendants' Uncontroverted Facts at ¶¶37 and 38. The statements constitute legal conclusions as to reasonableness of Plaintiff's reliance on fraudulent representations and inferences from the facts, which are biased in favor of Defendants.  Moreover the statement ¶37 is not a true representation of the cited paragraphs from the Plaintiff's Second Amended Complaint and taken completely out of context. In fact, the cited in the statement para. 54 of the Second Amended Complain refers to "the classic hallmarks of a Prime Bank Fraud" (*Cf*. Sec. Am. Complaint at ¶54) whereas para. 120 refers to the representations made by the defendants in this case (*Cf*. Sec. Am. Complaint at ¶120).  As discussed in Paragraph 14 above, incorporated by reference herein, Moving Defendants via their authorized agent Millar made a series of representations to So's agent Lu, on which So reasonably relied. (So Decl. at ¶¶6, 7.)

12
Plaintiff's Statement of Genuine Issues of Material Fact in Opposition to
Defendants Kevin Kondas, Mira Meltzer, KM & Associates International, LLC, KB&M Projects
International, LLC and CTL Projects International, LLC's Motion for Summary Judgment

18.  Plaintiff disputes Moving Defendants' Uncontroverted Fact at ¶39 to the extent (ii) it implies that the U.K. court made any finding of what was reasonable person would do in the Plaintiff's place; and (ii) that the UK action has any collateral estoppel or other preclusive effect.  Plaintiff further disputes that he filed his original complaint more than three years after the U.K. court finding that there was "something terribly wrong" with the Private Placement investment. (*Cf.* Defs' Statement at ¶43.)

In fact, the UK court's findings related to the investment were made in December 2007, whereas the Complaint was filed in May, 2008.  *See* UK Judgment; *see also* Complaint.

Moreover, the UK Court made absolutely no findings with regard to when Mr. So was on notice of the fraud – much less whether and when Mr. So was, if at all, on notice as to potential claims against the Moving Defendants (or any defendant in this case) for their roles in the fraud. Notwithstanding Moving Defendants' misleading claims otherwise, the UK Court's decision was "confined to issues of liability between HSBC" and those who purportedly invested in the Private Placement Project. (*See* UK Judgment at ¶ 7.) That is, the UK Court's findings cited by Moving Defendants relate to the Court's findings with regard to whether So should have understood that HSBC did not intend to be bound by a "Letter of Instruction" used by some of the conspirators to ensure the investors that their funds would be safeguarded by HSBC – <u>not</u> whether So was on "notice" of the fraud complained of in this litigation.  (*See* UK Judgment at ¶ 137.)

19.  Plaintiff disputes Moving Defendants' Uncontroverted Fact at ¶41 to the extent that Moving Defendants allege Plaintiff was aware of **all** commissions paid to KMAI.

Pursuant to the IPFA, which was executed by Lu on behalf of So, KM&A and its members were paid approximately $627,000 in so-called commissions on fictitious trades directly from the Plaintiff. (KM Corp. [Ex. 9] at 149:25-150:6.)[5] However, uncontroverted proof demonstrates that KM&A and its members were paid an additional $730,000 by Lopatin through Land Base directly from the money So had placed in the Project.[6] So did not know that Land Base paid KM&A and its members until after November of 2008, when his counsel received Land Base's Union Bank records pursuant to a duly issued subpoena from Union Bank. (So Decl. at ¶ 10.)

As a result of the fraud, KM&A's members, including Kondas and Meltzer, received approximately $300,000 in proceeds from the Project. (Meltzer Test. 12/9/09 a.m. [Ex. 20] at 93:15-96:13; Meltzer Dep. [Ex. 21] at 165:6-167:20; Klein Supp. [Ex. 29B] at 8-14.)  KM&A also transmitted payments totaling approximately $67,955 to its agent Millar in the spring and summer of 2005, which were financed by the funds So had placed in the the Project. (Trans. Details [Ex. 16]; KM Corp. [Ex. 9] at 220:1-221:9; Klein Supp. at 12.)  Finally, KM&A paid $125,000 to KB&M, the company it formed with Millar and Lopatin, which funds also originated from So's investment. (Trans. Details [**Ex. 16**]; Klein Supp. at 8.) The Moving Defendants do not deny that they received payments from So's money in the Project.

---

[5] Land Base member Charles Woodhead complained that he was unaware that KM&A was receiving funds from So directly and that, by doing so, KM&A appeared to have been doing "some sort of double dip." (Woodhead Dep. (10/7/08) at 191:13-192:6 [Ex. 1].

[6] *See* KM Corp. [Ex. 9] at 225:5-8 and 226:13; Incoming Wires from 5AVE to Land Base [Ex. 27]; Outgoing Wires from Land Base to KM&A [Ex. 28]; Expert Report of Gordon L. Klein ("Klein Report") at 5-6 and Supplemental Expert Report of Gordon L. Klein ("Klein Supp.") at 5-6, both reports attached as Ex. 29 A and B, respectively.)

20. Plaintiff also disputes Moving Defendants' Uncontroverted Facts at ¶¶ 44-55 to the extent they attempt to imply in any way or establish when Plaintiff was on notice with respect to Moving Defendants' fraud.

Moving Defendants' statements of the facts constitute either legal conclusions or inferences from the facts, which are biased in favor of Defendants. First, So testified that he had learned about the U.K. litigation and the allegations that Michael Brown had stolen money only sometime in March-April 2006. (*See* So Decl. at ¶11; *see also* So Dep. at 35:7-16; 275:14-23; Robertson Order[7] at ¶¶ 9 and 10.

Second, the UK Court made absolutely no findings with regard to when Mr. So was on notice of the fraud – much less whether and when Mr. So was, if at all, on notice as to potential claims against the Moving Defendants for their roles in the fraud. (*See* UK Judgment at ¶¶ 7,137.)

---

[7] This Court may take judicial notice of the Court's ruling in *So v. Suchanek*, Civil Action No. 08-2091 (JR). After a full bench trial, United States District Court Judge James Robertson ruled in So's favor and explicitly held that So did not even know of the UK Action or that the $30 million was no longer in the bank at HSBC London until March or April of 2006. Other findings, which are consistent with the facts set forth herein and of which this Court may take judicial notice include: (1) Judge Suchanek was "assisted in his representation of So by Mira Meltzer, a non-attorney" (Robertson Order at ¶ 4); (2) Lu had no interest in the funds that were invested in the Private Placement Project (Robertson Order at ¶ 6); (3) Suchanek's services were recommended to Lu and So by Lopatin (Robertson Order at ¶ 13); (4) Suchanek, Meltzer and Kondas attended a meeting in California at the end of July 2006 at the home of Lopatin's partner in Land Base, Charles Woodhead, and "[t]he purpose of the meeting was to discuss the UK Litigation and hear a briefing concerning the recovery of assets from Michael Brown" (Robertson Order at ¶ 21); (5) In August of 2006, Suchanek issued a 13-page opinion letter for Land Base and, although he was representing So at that time, Suchanek did not believe that So had been the victim of an illegal scheme that was related to the Land Base Agreement (Robertson Order at ¶ 23); (6) On August 21, 2007, So told Suchanek that the signature on the August 11, 2006, witness statement was not his, and, on September 5, 2007, Suchanek told So he knew that Lu had made misrepresentations to the UK court, and that that court had relied upon those misrepresentations in issuing an order. (Robertson Order at ¶ 30.)

Moreover, as demonstrated by the facts, Plaintiff was not on notice with respect to the Moving Defendants' fraud, because throughout the pendency of litigation in the U.K. (and beyond), Defendants actively concealed their roles in the Private Placement Fraud. In particular, at all material times one of the Moving Defendants and admitted beneficiary of the Placement Project, Mira Meltzer assisted retired administrative law judge, Leonard Suchanek, who headed So's legal team in the UK litigation when it went to trial. (*See* Meltzer Trial Test. [**Ex. 20**] 12/9/2009 a.m. at 68:8-10; So Decl. [Ex. 5] at ¶ 12; Meltzer Dep. [Ex. 21] at 180:1-191:20.) Suchanek had also prior relationships with Kondas and Lopatin, and had represented Lopatin and So simultaneously. (Robertson Order **[Ex. 3]** at ¶ 26.; KM Corp. **[Ex. 9]** at 287:7-17.) Meltzer and Suchanek never disclosed Meltzer's role in the Private Placement Project to So. (So Decl. at ¶ 14.)

In July 2006, Lu traveled to Defendant Charles Woodhead's home in Monterrey, California, where she met with Suchanek, Meltzer, Kondas, Lopatin and Woodhead, apparently to discuss "recovery efforts" relating to So's $30 million investment. (*See* Meltzer Trial Test., 12/9/09 a.m., at 96:9-18.)

On August 8, 2006, Suchanek gave Land Base an opinion letter in which he opined that the Land Base Agreement contained no evidence of money laundering or of any illegal scheme or activity. (*See* Land Base Agreement [**Ex. 17**]; 12/8/06 Opinion Issued by Leonard J. Suchanek [**Ex. 30**].) Meltzer described what she did for Suchanek when he represented of Plaintiff So as follows:

> My e-mail address was the only e-mail address that all e-mails came to; I received the e-mails and I read them to Judge Suchanek. My fax number was the only fax number available; I received the faxes and read them to Judge Suchanek. And my telephone number was the only telephone number given, and I received all calls, and when appropriate or asked to speak with Judge Suchanek, I would conference the judge.

(Meltzer Trial Test. [**Ex. 20**] 12/9/09 a.m. at 68:13-19; 68:22-23 and 69:2-12.)

In spite of working this closely with Suchanek, Meltzer says she did not inform Suchanek of her role in or that she received funds from the fraudulent scheme until the eve of the UK trial in October of 2007.[8] Indeed, throughout Suchanek's representation of So, Meltzer sought to insulate herself, her entity (KM&A), her business partners, and even Boris Lopatin from suspicion of wrongdoing for their role in the fraud. In fact, So specifically questioned Suchanek as to whether Kondas and KM&A were involved in the Private Placement scheme, and Suchanek assured him that they were legitimate. (*See* So Decl. at ¶ 14.) Meltzer and Suchanek even arranged a meeting between Lopatin, Woodhead and So in Hong Kong in 2007 – after litigation in the UK was well under way – so that Lopatin and Woodhead could pitch further investment opportunities. (*See* So Dep. [Ex. 2] at 71:25-73:4; 252:13-253:16; 254:12-256:4. Although So wanted to discuss the UK litigation, Lopatin and Woodhead insisted on presenting him with investment opportunities. (*Id.*) So treated them courteously, as he did not yet suspect their involvement in the investment scheme. (So Dep. at 73:1-4.)

Moreover, throughout his representation of So, Suchanek maintained that the Project was legitimate and that Brown's trading resulted in substantial profits. (Suchanek Trial Test. 12/8/2009 a.m. [Ex. 22] at 66:17-23[9]; So Decl. at ¶13;

---

[8] Specifically, Meltzer testified as follows: Q. When was the first time that you know that [Suchanek] became aware of the role of KMA in this transaction. A. **[I] don't think I told Judge Suchanek that I had been involved whatever I had been involved, that I had been paid, until possibly just before the trial.** (Meltzer Trial Test. [**Ex. 20**], 12/10/2009 a.m., at 67:15-24 (emphasis added).)

[9] Suchanek's testimony is admissible for purposes of this Opposition. *See Meaux v. Northwest Airlines, Inc.*, 2010 U.S. Dist. LEXIS 14301 (N.D. Cal. Feb. 18, 2010) (Permitting the use of testimony taken during a previous arbitration in the context of a

(footnote continued)

8/30/07 Suchanek Letter to So [**Ex. 31**] at 2.) In fact, Suchanek testified that he did not conclude until about October 20, 2007, that evidence supported claims against Lopatin and Land Base. (*See* Testimony of Leonard Suchanek in the Trial of *So v. Suchanek*, Civil Action No. 08-2091 (D.D.C.) ("Suchanek Trial Test."), 12/16/09 p.m., at 14:6-21; 16:3-18:9; and 70:25-72-1, attached as **Ex. 22.**)

As of September, October and early November, 2007, even So's UK legal counsel, Bivonas, did not understand Kondas's role in the Private Placement Project. (*See* So Decl. at ¶ 14.) When they questioned Suchanek on this topic, Suchanek assured them that Kondas, Land Base, and other conspirators who had financially benefited from the scheme were legitimate. For example, on September 20, 2007, Antony Brown of Bivonas noted to Meltzer that "[w]e do not properly understand the SLM investors' relationship with Landbase, Lopatin, Dr Kondas or Byrne." [10] (*See* 9/20/2007 E-mail from Antony Brown to Meltzer [**Ex. 23**]; see also E-mail thread from 10/21/2007 through 11/1/2007 between Brown and Suchanek [**Ex. 24**].) Observing that "Kondas was paid by Landbase," and wondered whether "this was from our client's money." (*Id.*) They expressed their hope that Suchanek was "correct and Messer's Lopatin, Byrne, Millar, and Kondas are completely legitimate and acted in good faith. (*Id.*)

21. Lastly, Plaintiff disputes Moving Defendants' Uncontroverted Facts at ¶¶ 56-62 relating to the purported lack of direct communication between So and Moving Defendants, because they are irrelevant and are either legal conclusions or inferences

---

summary judgment motion as these statements were taken under oath and are admissible under Federal Rule of Civil Procedure 56(e) as affidavits) (citing *Curnow v. Ridgecrest Police*, 952 F.2d 321, 324 (9th Cir. 1991)).

[10] SLM represents So, Lu and Mann.

18
Plaintiff's Statement of Genuine Issues of Material Fact in Opposition to
Defendants Kevin Kondas, Mira Meltzer, KM & Associates International, LLC, KB&M Projects
International, LLC and CTL Projects International, LLC's Motion for Summary Judgment

from the facts which are biased in favor of Defendants and ignore undisputed facts. The bulk of relevant communications with Moving Defendants were made by So's then trusted agent—Lu.

In particular, Mr. So provided an affidavit which gave Ms. Lu power of attorney with respect to investing So's funds. (*See* April 1, 2005 E-mail from Millar to Lu, attached as **Ex. 6**; Affidavit Granting Power of Attorney to Lu, attached as **Ex. 7**.)  So also provided a resolution which purported to give Lu power of attorney with respect to investing So's funds. (*See* 2/21/10 "Resolution and Authorization of Signatory," attached as **Ex. 32**.) Consequently, Ms. Lu took control in all material respects of the investment. (*See* So Decl. at ¶ 4.)  At the time he executed this affidavit, So did not suspect that Lu and Yang's loyalties may lie elsewhere.  (*Id.*)  Specifically, she handled all correspondence with relevant players, attended all meetings in the lead-up to the investment and, consequently, controlled what information was passed along to So.  (*Id.*)

Similarly, and as described in detail above, Moving Defendants worked through their agent, Keith Millar (as well as other co-conspirators). *See* Paragraph 8 above, which is incorporated by reference herein. Much of Meltzer's misrepresentations would have been by omission (e.g., her concealment of her role in KM&A and the IPFA) (So Decl. at ¶ 14.). However, it is clear that she made misrepresentations to So, including but not limited to about Lu's statement. (*See* So Decl. at ¶ 15; *see also* September 5, 2007 E-mail from Meltzer to So, attached as **Ex. 25**.; September 12, 2007 E-mail from Suchanek to So, attached as **Ex. 26.**)

Dated: June 1, 2010              KALBIAN HAGERTY, LLP

/s/ Aaron W. Knights

_____
Aaron W. Knights (Admitted *Pro Hac Vice*)
*Counsel for Plaintiff Kevin So*

Plaintiff's Statement of Genuine Issues of Material Fact in Opposition to Defendants Kevin Kondas, Mira Meltzer, KM & Associates International, LLC, KB&M Projects International, LLC and CTL Projects International, LLC's Motion for Summary Judgment