O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| KEVIN SO, | ) | Case No. CV 08-03336 DDP (AGRx) |
| Plaintiff, | ) | **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT FILED BY KONDAS, MELTZER, KM&A, KM&B, AND CTL** |
| v. | ) | |
| LAND BASE, LLC; UNIVEST FINANCIAL SERVICES, INC.; BORIS LOPATIN, individually and d/b/a BORIS LOPATIN ASSOCIATES and CHARLES W. WOODHEAD, | ) | [Motion filed on May 7, 2010] |
| Defendants. | ) | |

This matter comes before the Court on Moving Defendants' Motion for Summary Judgment or, alternatively, for Summary Adjudication.

**I.   Background**

    **A.   Ponzi Scheme and HSBC Litigation**

The plaintiff Kevin So ("Plaintiff") has participated in several lawsuits to recoup a $30 million investment he made in 2005 in an investment called the Private Placement Project, which turns out to have been a Ponzi scheme operated by a British man named Michael Brown.

1    Plaintiff alleges that his financial advisor and agent, Lucy

2  Lu ("Lu"), conspired with several defendants in the United States-

3  Boris Lopatin, Land Base, the Moving Defendants, and others- to

4  induce Plaintiff to invest in the Ponzi scheme.

5    Once the Ponzi scheme came to light, HSBC Bank- whose accounts

6  were used to further the scheme- filed a lawsuit for declaratory

7  relief (the "U.K. Litigation") against several investors, and named

8  Plaintiff as one such defendant in November 2005.  Plaintiff filed

9  counterclaims for breach of contract, breach of trust, and

10 negligence, arguing that HSBC and Michael Brown- the man who

11 operated the Ponzi scheme- were solely responsible for his losses.

12 Following seven-week trial in October and November of 2007, the

13 court issued a Judgment rejecting Plaintiff's claims against HSBC.

14    **B.    Present Case and Allegations Against Moving Defendants**

15       **1.    Complaint**

16    Plaintiff filed this case in May 2008, naming Boris Lopatin,

17 Land Base LLC, Charles W. Woodhead, and Univest Financial Services,

18 Inc. as defendants.  The Complaint alleged that in December 2004,

19 Lopatin, through his company Land Base LLC, "developed a scheme

20 whereby they, along with non-party Keith Millar, would entice

21 wealthy investors to deposit money into accounts to be managed by

22 supposed bond-trader and non-party co-conspirator, Michael Brown."

23 (Compl. ¶ 10.)  The Complaint alleged Millar was a friend of his

24 agent and fiduciary, Lucy Lu, and that he (1) introduced Lu to the

25 Lopatin Defendants and (2) convinced Lu that Plaintiff should

26 invest in the Ponzi scheme by representing that it was a legitimate

27 investment with no risk.  (Id. ¶¶ 29-33.)  The Complaint did not

28 name any Doe defendants.

2

## 2.   First Amended Complaint

On January 16, 2009, Plaintiff filed the First Amended
Complaint ("FAC"), which asserted claims against Moving Defendants,
Kevin Kondas, Keith Millar, KM & Associates International, LLC,
KB&M Projects International, LLC, CTL Projects International LLC,
and Mira Meltzer.  According to the FAC, (1) Kondas and Millar are
both principles of KM&A, (2) Lopatin and KM&A are both principals
of KB&M, (3) Meltzer maintained a business relationship with Kondas
and Millar, and (4) Meltzer and Kondas were managing members of
CTL.  (FAC ¶¶ 7-14.)

The FAC alleges that, after convincing Lu to invest
Plaintiff's money in the Private Placement Project, "Millar
requested that Lu and So execute an 'Irrevocable Project Funding
Agreement' ('IPFA')," which provided that "KM&A was to receive
'project funding, essentially a twenty percent (20%) fee from any
profits So earned in the Private Placement Project."  (Id. ¶ 56.)
In addition, "KM&A and its principals, Millar and Kondas, along
with their business partner Mira Meltzer, received in excess of
$600,000 in 'project funding' payments directly from the $30
million in principal So had invested.  These payments were made
pursuant to the IPFA for purportedly profitable trades."  (Id. ¶
112.)  The IPFA, attached to the FAC as exhibit C, is signed by
Kondas on behalf of KM&A.  (Id. Ex. C.) Plaintiff alleges that KB&M
and CTL were entities used "to assist with sharing, hiding, and
distributing the proceeds from the Private Placement Project."
(Id. ¶ 114.)

The FAC alleges that once the Ponzi scheme came to light,
Lopatin convinced Plaintiff "to retain Lopatin's friend and

1   business associate, Leonard J. Suchanek ('Suchanek'), an attorney

2   working out of Washington, D.C., to assist him in the HSBC

3   Litigation.  Suchanek was assisted at all relevant times by

4   Defendant Meltzer, whom Suchanek employed as a legal assistant."

5   (Id. ¶ 105.)

6        The FAC refers to KM&A, Kondas, Millar, and Lopatin as the

7   "Conspiring Defendants" and asserts claims against them for

8   fraud/intentional misrepresentation, negligent misrepresentation,

9   breach of fiduciary duty, fraud based on concealment of material

10  facts, conversion, and civil conspiracy.  The FAC also asserts

11  claims for unjust enrichment/quasi contract and constructive trust

12  against all of the Moving Defendants, including Meltzer.

13              **3.    Second Amended Complaint**

14       On June 12, 2009, Plaintiff filed a motion to amend the

15  complaint, seeking to add "Meltzer, who we learned served as a

16  director of Defendant KM& Associates International LLC ('KM&A') to

17  the existing causes of action" against the other Moving Defendants.

18  The Court granted the motion and Plaintiff filed the Second Amended

19  Complaint ("SAC") on July 16, 2009.

20       **C.    Motion and Moving Defendants' Evidence**

21       Moving Defendants argue that a three-year statute of

22  limitations applies to all claims against them, that Plaintiff had

23  notice of the claims in the fall of 2005, and that all claims-

24  which were raised no earlier than January 2009- are time barred.

25       In support of this argument, Defendants have submitted a

26  privilege log produced by Plaintiff indicating (1) that he retained

27  counsel in connection with the HSBC matter in October 2005, (2)

28  that he was forwarded draft pleadings by counsel in connection with

1   the HSBC litigation in December 2005, and (3) that he personally

2   communicated with counsel in December 2005.  (Second Thibodo Decl.

3   Ex. D, So Privilege Log at pp. 76-77, 446, 451.)  Defendants argue

4   this evidence shows Plaintiff was on notice of the existence of the

5   Ponzi scheme in the Fall of 2005.

6        In addition, Defendants have submitted the deposition

7   testimony of Plaintiff, in which he stated that (1) defendant Lu

8   told him that "she had already signed a contract with KM. And KM is

9   an entity of the U.S. Federal Bank, and Kondas is an official at

10  U.S. Federal Bank, and this 20-percent commission is something that

11  has to be paid to him," (First Thibodo Decl. Ex. B 55:13-17); and

12  (2) "[e]very time when funds were needed to be wired to KM & A, Lu

13  would bring it up.  And she would say that pursuant to the contract

14  . . . there was a 20-percent commission payable to KM & A.  And at

15  each payment, KM & A would issue a receipt."  (Id. 55:4-9.)

16       Finally, Defendants submit transcripts of Plaintiff's

17  testimony in the U.K. trial, in which he stated that he was

18  contacted by an HSBC representative in November 2005.  Plaintiff

19  testified: "During my conversation with this gentleman, I was told

20  there was some problem between HSBC bank and Mr. Brown.  He asked

21  me to co-operate with the investigation in order for me to get my

22  $30 million investment back."  (First Thibodo Decl., Ex. I, So

23  Trial Testimony 65:3-66:23.)

24       Alternatively, Defendants argue that they are entitled to

25  summary adjudication of Plaintiff's claims for fraudulent

26  misrepresentation, negligent misrepresentation, fraudulent

27  concealment, and conspiracy to commit fraud because (1) "none of

28  the KM Defendants made any representation to him that caused him to

5

act to his detriment," (Mot. 22:18-21) and (2) Plaintiff cannot

show justifiable reliance because he admitted "that the very

misrepresentations he alleges in his Second Amended Complaint were

'completely incredible.'" (Id. 22:22-25.)

## D.   Plaintiff's Opposition and Evidence

Plaintiff opposes the motion, arguing that the accrual of the

statute of limitations is delayed by the discovery rule and the

"last overt act" doctrine and that equitable tolling based on

fraudulent concealment applies.  Plaintiff relies heavily on his

own declaration.  Plaintiff states in his declaration that (1) he

did not know that KM&A received a "commission" until his lawyers

informed him of this fact in November 2008; (2) when he was

contacted by an HSBC representative in November 2005, he was simply

asked some questions regarding Michael Brown and the investment;

(3) he did not learn that his money was stolen until March or April

of 2006, when he discovered that Lu, without his permission or

knowledge, had retained counsel for him in the HSBC litigation.

(So Decl. ¶¶ 10-11.)

Plaintiff's declaration also states that Lu convinced him to

hire Suchanek, who was assisted by Meltzer, as an attorney in 2006.

(Id. ¶¶ 12-13.)  Meltzer did not reveal to Plaintiff (or,

apparently, to Suchanek) that she was involved with KM&A and had

received proceeds from his investment.  Suchanek failed to disclose

to Plaintiff that he was representing Lopatin at the same time,

and, while representing Lopatin, continued to advise Plaintiff

until late 2007 that the Private Placement Project was legitimate.

///

///

6

## II.   LEGAL STANDARD

Summary judgment and summary adjudication are appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The nonmoving party is not, however, required to "produce evidence in a form that would be admissible at trial in order to avoid summary judgment." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 324 (1986).

All reasonable inferences from the evidence must be drawn in favor of the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 255 (1986).  A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." Id. at 248.  No genuine issue of fact exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. DISCUSSION

### A.   Statute of Limitations

Plaintiff does not dispute that a three-year statute of limitations applies to all claims against the Moving Defendants, nor that the face of the FAC indicates that the claims are time-barred absent some basis for equitable tolling or delayed accrual. Rather, Plaintiff argues that his claims are not time-barred because of (1) the "last overt act" doctrine, (2) the discovery rule, and (3) equitable tolling based on fraudulent concealment.

1        **1.  "Last Overt Act"**

2        Plaintiff argues that the statute of limitations does not

3 begin to run until the "last overt act" in furtherance of the

4 conspiracy is complete.  According to Plaintiff overt acts in

5 furtherance of the conspiracy include defendants "efforts to hide

6 bank records; Lu's submission of a false witness statement to the

7 UK Court in August of 2009, Meltzer's ongoing efforts to conceal

8 her, KM&A and her business partners' roles in the fraud, which

9 continued <u>at least</u> throughout the course of the UK litigation."

10 (Opp'n 19:17-20.)

11        Under California law, "when a civil conspiracy is properly

12 alleged and proved, the statute of limitations does not begin to

13 run . . . until the 'last overt act' pursuant to the conspiracy has

14 been completed." <u>Wyatt v. Union Mortgage Co.</u>, 598 P.2d 45, 53

15 (Cal. 1979).  This is because "[s]o long as a person continues to

16 commit wrongful acts in furtherance of a conspiracy to harm

17 another, he can neither claim unfair prejudice at the filing of a

18 claim against him nor disturbance of any justifiable repose built

19 upon the passage of time." <u>Id.</u>  An "overt act is an outward act

20 done in pursuance of the crime and in manifestation of an intent or

21 design, looking toward the accomplishment of the crime." <u>People v.</u>

22 <u>Zamora</u>, 557 P.2d 75, 82 n.8 (Cal. 1976) (internal quotation marks

23 and citation omitted).[1]  Therefore, an overt act "cannot succeed

24

25 ────────────────

26        [1]Although <u>Zamora</u> involved a criminal conspiracy, "its
conclusions are applicable as well to a civil conspiracy" because

27 "'[t]he differences between civil and criminal conspiracies are
somewhat beside the point' in applying the statute of limitations."

28 <u>Livett v. F. C. Financial Assoc.</u>, 177 Cal. Rptr. 411, 419 (Ct. App.
1981) (quoting <u>Wyatt</u>, 598 P.2d at 53).

1   the completion of the substantive offense which is the object of
2   the conspiracy." Id.

3       An act of concealment will only be considered a "last overt
4   act" delaying accrual of the statute of limitations where
5   concealment is itself the underlying offense and the object of the
6   conspiracy.  In Zamora, the defendants were convicted of conspiracy
7   to commit arson, conspiracy to burn insured property with intent to
8   defraud the insurer, and conspiracy to commit grand theft in
9   connection with their scheme to burn down a residential building in
10  order to collect insurance proceeds.  Id. at 77.  On appeal, Zamora
11  argued that the counts were barred by a three-year statute of
12  limitations.  Id. at 78.  As to the conspiracy convictions, the
13  Government pointed to the defendants' efforts to conceal the
14  injuries one of them sustained in the fire, arguing that such
15  concealment should constitute the "last overt act" in furtherance
16  of each of the three conspiracies.  Id. at 83.

17      The court rejected this argument, holding that an act of
18  concealment cannot constitute the "last overt act" in furtherance
19  of a conspiracy whose object has already been accomplished.  The
20  court explained that because "every conspiracy will inevitably be
21  followed by actions taken to cover the conspirators' traces,"
22  allowing "such a conspiracy to conceal to be inferred or implied
23  from the mere overt acts of concealment would . . . extend the life
24  of a conspiracy indefinitely" and would "for all practical purposes
25  wipe out the statute of limitations in conspiracy cases . . . ."
26  Id. at 89 n.18 (internal quotation marks and citations omitted).
27  Therefore, the court also rejected the notion that an act of
28  concealment can constitute the "last overt act" where an explicit

1 agreement to conceal is shown, since an "arbitrary" distinction
2 between explicit and implicit agreements would be "contrary to the
3 well established rule that the unlawful design of a conspiracy may
4 be proved by circumstantial evidence without the necessity of
5 showing that the conspirators met and actually agreed to commit the
6 offense which was the object of the conspiracy." Id. at 89.

7       Ultimately, the court concluded that "acts committed by
8 conspirators subsequent to the completion of the crime which is the
9 primary object of a conspiracy cannot be deemed to be overt acts in
10 furtherance of that conspiracy." Id. "Consequently, upon
11 successful attainment of the substantive offense which is the
12 primary object of the conspiracy, the period of the statute of
13 limitations begins to run at the same time as for the substantive
14 offense itself." Id. In so holding, the court noted that because
15 it "perceive[d] little distinction between concealment of a crime
16 by conspirators and the concealment usually undertaken by a single
17 criminal offender," there was "little reason to create a special
18 conspiracy exception which would afford, in effect, an extended
19 limitation period." Id. at 87. As a result, the court reversed
20 the conspiracy convictions because "[t]he conspiracies to commit
21 arson and to burn insured property were completed . . . when the
22 fire was ignited" and "[t]he conspiracy to commit grand theft was
23 complete with receipt of the last insurance payment . . . ." Id.
24 at 90.

25      On the other hand, in People v. Williams, 158 Cal. Rptr. 778
26 (Ct. App. 1979) [hereinafter Williams II], the court held that an
27 act of concealment could constitute the "last overt act" in
28 furtherance of a conspiracy to conceal stolen property where

concealing stolen property was itself the underlying offense and
the object of the conspiracy.  In that case, the defendants were
charged with  receiving and concealing stolen property and
conspiring to do the same.  The court held that because "the
substantive crime underlying the alleged conspiracy is concealment
of stolen property," in violation of California Penal Code section
496, the conspiracy to conceal stolen property "terminated when the
crime of concealment terminated."  Id. at 782.

However, in the companion case, Williams v. Super. Ct., 146
Cal. Rptr. 311, 319 (Ct. App. 1978) [hereinafter Williams I], the
court "assume[d] for purposes of this decision that there were two
separate conspiracies, one to receive and another to conceal" the
stolen property.  The court concluded that although the act of
concealment constituted a "last overt act" in furtherance of the
conspiracy to conceal stolen property, it did not constitute a
"last overt act" in furtherance of the conspiracy to receive stolen
property because the underlying offense was completed upon the
transfer of the property to the defendant.  Id. As a result, the
court held that while the conspiracy to conceal stolen property was
not time-barred, the conspiracy to receive stolen property was
"barred by the statute of limitations."  Id.

In this case, Plaintiff alleges that Moving Defendants
conspired to defraud Plaintiff into investing in the Private
Placement Project Ponzi scheme.  Following the reasoning in Zamora,
the court concludes that the acts of concealment subsequent to
Plaintiff's investment in the Private Placement Project cannot
constitute "overt acts" in furtherance of the conspiracy to defraud
Plaintiff into making that investment.  Zamora, 557 P.2d at 89

11

1   ("[U]pon successful attainment of the substantive offense which is

2   the primary object of the conspiracy, the period of the statute of

3   limitations begins to run at the same time as for the substantive

4   offense itself.")

5       Following the reasoning in <u>Williams I</u> and <u>Williams II</u>, it is

6   perhaps conceivable that Plaintiff could have attempted to

7   establish that defendants entered into a separate conspiracy to

8   defraud Plaintiff into paying their legal bills or into hiring

9   Suchanek once the Ponzi scheme was discovered.  But, the FAC does

10  not plead such a claim with the required degree of particularity.

11  <u>Wasco Prods., Inc. v. Southwall Techs., Inc.</u>, 435 F.3d 989, 992

12  (9th Cir. 2006) (affirming summary judgment on statute of

13  limitations grounds where specific elements of conspiracy in

14  support of "last overt act" doctrine were not adequately alleged).

15  Nor would such a claim, even if properly pled, delay accrual of the

16  statute of limitations with respect to the conspiracy to defraud

17  Plaintiff into investing in the Private Placement Project in the

18  first place.  <u>Williams II</u>, 146 Cal. Rptr. at 319 (holding that

19  where "there were two separate conspiracies, one to receive and

20  another to conceal" stolen property, the former was time-barred

21  notwithstanding the fact that the last overt act in furtherance of

22  the latter occurred within the statutory period).

23          **2.  Discovery Rule**

24      Alternatively, Plaintiff argues that his claims fall within

25  the statute of limitations based on the discovery rule.  The

26  statute of limitations typically commences when the cause of action

27  accrues, which occurs on the date of injury.  <u>Jolly v. Eli Lilly &</u>

28  <u>Co.</u>, 751 P.2d 923, 926 (Cal. 1988).  However, this general rule is

12

1 modified by the common law "discovery rule." Id. "Under the

2 discovery rule, the statute of limitations begins to run when the

3 plaintiff suspects or should suspect that her injury was caused by

4 wrongdoing, that someone has done something wrong to her." Id. at

5 927. Thus, "the limitations period begins once the plaintiff has

6 notice or information of circumstances to put a reasonable person

7 on inquiry." Id. at 928 (internal quotation marks and citation

8 omitted). As the California Supreme Court put it:

9     A plaintiff need not be aware of the specific 'facts'
    necessary to establish the claim; that is a process

10     contemplated by pretrial discovery. Once the plaintiff
    has a suspicion of wrongdoing, and therefore an incentive

11     to sue, she must decide whether to file suit or sit on her
    rights. So long as a suspicion exists, it is clear that

12     the plaintiff must go find the facts; she cannot wait for
    the facts to find her.

13 Id. But, while "ignorance of a generic element of the cause of

14 action" will delay accrual of the statute of limitations,

15 "ignorance of the identity of the defendant does not . . . ." Fox

16 v. Ethicon Endo-Surgery, Inc., 110 P.3d 914, 923 (Cal. 2005)

17 (emphasis added).

18     In this case, the undisputed facts show that Plaintiff was on

19 inquiry notice of his claims by no later than the Fall of 2005.

20 Defendants have presented evidence that by December of 2005: (1)

21 Michael Brown's Ponzi scheme had come to light, (2) HSBC had frozen

22 Plaintiff's account and sued Plaintiff for declaratory relief, (3)

23 Plaintiff had hired a team of lawyers, (4) Plaintiff had privileged

24 communications with his lawyers and had reviewed draft pleadings in

25 connection with the lawsuit, and (5) Plaintiff had been contacted

26 by an HSBC representative and told that if he cooperated he could

27 "get [his] $30 million investment back." These facts were

28 sufficient to put a reasonable person in Plaintiff's position on

1  inquiry notice "that [his] injury was caused by wrongdoing . . . ."

2  <u>Jolly</u>, 751 P.2d at 927.

3      The only evidence submitted by Plaintiff that purportedly

4  contradicts these facts is Plaintiff's declaration.  Plaintiff's

5  declaration states, in pertinent part: (1) "In or around November

6  of 2005, a representative from HSBC contacted me and asked me

7  questions regarding Michael Brown and his investment program," but

8  "[w]hen I inquired of Lu about HSBC's phone call, Lu told me she

9  spoke with Lopatin and confirmed that the call related to a problem

10 between HSBC and Brown and that the investment funds were safe at

11 HSBC," (So Decl. ¶ 11); (2) "In March or April 2006, I learned that

12 Lu, without notifying me or seeking my authority, had retained UK

13 counsel to act on my behalf in October or November of 2005," (<u>id.</u>);

14 and (3) "I did not learn that my funds were stolen until in or

15 around March or April of 2006."  (<u>Id.</u>)

16     The first statement about his conversation with an HSBC

17 representative is so vague that it does nothing to controvert

18 Plaintiff's sworn testimony that the representative told him he

19 could "cooperate" with HSBC in order to get his "$30 million

20 investment <u>back</u>."  (First Thibodo Decl., Ex. I, So Trial Testimony

21 65:3-66:23 (emphasis added).)  The second statement directly

22 contradicts Plaintiff's privilege log, which indicates that one

23 such lawyer hired on his behalf sent him draft pleadings in

24 connection with the HSBC litigation and had a privileged

25 conversation with him in December 2005.  The third statement is

26 conclusory, self-serving, and also at odds with Plaintiff's

27 privilege log and his sworn testimony concerning his discussion

28 with the HSBC representative.  The Ninth Circuit has "refused to

find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony." <u>Villiarimo v. Aloha Island Air, Inc.</u>, 281 F.3d 1054, 1061 (9th Cir. 2002) (citing <u>Kennedy v. Applause, Inc.</u>, 90 F.3d 1477, 1481 (9th Cir. 1996)); <u>see also</u> <u>FTC v. Publ'g Clearing House, Inc.</u>, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").

Therefore, the undisputed facts show that Plaintiff was on inquiry notice of his claims no later than December 2005, more than three years before he filed the FAC in this lawsuit.  Even assuming that Plaintiff was unaware of the identities of some of the defendants until later, "ignorance of the identity of the defendant" does not delay accrual of the statute of limitations pursuant to the discovery rule.  <u>Fox</u>, 110 P.3d at 923.

### 3. Fraudulent Concealment

Finally, Plaintiff argues that the statute of limitations should be tolled because the Moving Defendants fraudulently concealed their identities.  In particular, Meltzer acted as a legal assistant to Plaintiff's lawyer, Suchanek, without disclosing (1) her connection to the other Moving Defendants and (2) the fact that Suchanek simultaneously represented Lopatin.  Additionally, while Meltzer assisted Suchanek, Suchanek advised Plaintiff that he did not have a potential claim against Lopatin, KM&A, or Kondas.

The California Supreme Court has recognized "the equitable principle that a defendant who intentionally conceals his or her identity may be equitably estopped from asserting the statute of limitations to defeat an untimely claim . . . ."  <u>Bernson v.</u>

15

1  <u>Browning-Ferris Indus.</u>, 30 Cal. Rptr. 2d 440, 444-45 (1994).

2  "[W]here the bar [of the statute of limitations] becomes a sword

3  rather than a shield, wielded by a party that has intentionally

4  cloaked its identity, factors of fairness and unjust enrichment

5  come into play, which courts are bound to consider in equity and

6  good conscience."   <u>Id.</u> at 445.   Therefore, the statute of

7  limitations "may be equitably tolled" when "as a result of

8  intentional concealment, the plaintiff is unable to discover the

9  defendant's actual identity."   <u>Id.</u> at 446.

10      But, this "rule of equitable estoppel includes, of course, the

11  requirement that the plaintiff exercise reasonable diligence."   <u>Id.</u>

12  As a result, "the statute will toll <u>only</u> until such time that the

13  plaintiff knows, or through the exercise of reasonable diligence

14  should have discovered, the defendant's identity."   <u>Id.</u>   "One

15  factor which must be considered pertinent to the diligence inquiry

16  is whether the filing of a timely Doe complaint would, as a

17  practical matter, have facilitated the discovery of the defendant's

18  identity within the requisite three-year period for service of

19  process."   <u>Id.</u>   "Where the identity of at least one defendant is

20  known, for example, the plaintiff <u>must avail himself</u> of the

21  opportunity to file a timely complaint naming Doe defendants and

22  take discovery."   <u>Id.</u> (emphasis added).   California Code of Civil

23  Procedure section 474 permits a plaintiff to file suit against a

24  Doe party and "[f]rom the time such a complaint is filed, the

25  plaintiff has three years to identify and serve the defendant."

26  <u>Jolly</u>, 751 P.2d at 932 (discussing Cal. Code Civ. P. § 474).

27  Section 474 "effectively enlarg[es] the statute of limitations

28  period by three years."   <u>Id.</u>

16

1    Here, it is clear that Plaintiff could have filed a timely Doe

2  Complaint within the limitations period.  In fact, Plaintiff filed

3  the Complaint in this action on May 20, 2008, just over two years

4  into the limitations period, naming Land Base, Boris Lopatin, and

5  Charles Woodhead, and alleging that "Land Base and Lopatin, acting

6  in concert with various non-party co-conspirators" engaged in a

7  "conspiracy wherein these Defendants intended to and did steal

8  millions of dollars from unsuspecting investors like the

9  Plaintiff."  (Compl. ¶ 1.)  The Complaint, did not, however, name

10  any Doe defendants in the caption, nor did it assert any claims

11  against Doe defendants.  See Fireman's Fund Ins. Co. v. Sparks

12  Const., Inc., 8 Cal. Rptr. 3d 446, 452 (Ct. App. 2004) (noting that

13  section 474 requires that the complaint allege a claim against each

14  Doe defendant and allege that the plaintiff is ignorant of the Doe

15  defendant's names).  Furthermore, Plaintiff filed suit against his

16  former attorney, Suchanek, in December 2008 based on his failure to

17  disclose that he had a conflict of interest due to his

18  representation of Lopatin, but Plaintiff still did not seek to

19  amend his complaint in this case to name Doe defendants.

20    Because the undisputed facts show that Plaintiff failed to

21  exercise due diligence, he is not entitled to rely on fraudulent

22  concealment to toll the statute of limitations.  Bernson, 30 Cal.

23  Rptr. 2d at 446.

24  ///

25  ///

26  ///

27  ///

28  ///

17

**IV.  Conclusion**

For the reasons set forth above, the Court GRANTS the Motion for Summary Judgment.

IT IS SO ORDERED.


Dated: September 2, 2010

DEAN D. PREGERSON
United States District Judge

18